## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HENRY J. LANZALOTTI AND HEATHER A. LANZALOTTI, H/W,<br><br>           PLAINTIFFS[1],<br><br>        V.<br><br>AMERICAN HONDA MOTOR CO., INC. AND JOHN DOES 1-10,<br><br>           DEFENDANTS. | CIVIL ACTION NO. 1:20-CV-08947-RMB-KMW |

| **FOURTH AMENDED COMPLAINT** |
|---|

**PERLMAN DEPETRIS**

**CONSUMER LAW**

Lee M. Perlman
Attorney ID #:  019171994
Email:
lperlman@newjerseylemons.com
Paul DePetris
Attorney ID #:  005821996
Email:
info@newjerseylemons.com
1926 Greentree Road, Suite 100
Cherry Hill, New Jersey 08003
Tel.#: 856-751-4224
Fax#: 856-751-4226
Counsel for plaintiffs

**LEWIS G. ADLER**
**ATTORNEY AT LAW**
Attorney ID#:  023211985
26 Newton Ave.
Woodbury, NJ 08096
Tel. #:  (856) 845-1968
Fax #:  (856) 848-9504
Email:
lewisadler@verizon.net
Co-counsel for plaintiffs

---

[1] As used in this document, use of the plural includes the singular, where applicable.  The parties are referred to in the plural regardless of their actual number.

Plaintiffs HENRY J. LANZALOTTI AND HEATHER A. LANZALOTTI, H/W, plead as follows:

## ABBREVIATIONS USED IN THIS DOCUMENT

1. For brevity's sake, hereafter the following abbreviated terms are used in this document:

   A. This civil action - this case or the case.

   B. Henry J. Lanzalotti And Heather A. Lanzalotti collectively - Plaintiffs.

   C. Henry J. Lanzalotti individually - Henry.

   D. American Honda Motor Co., Inc. individually - the manufacturer or defendants.

   E. John Does 1-10 – the does.

   F. All parties named to the complaint collectively - the parties.

   G. The 2019 Honda Pilot Touring all wheel drive 4 door SUV that is the subject of this case - the vehicle.

   H. The sales or lease transaction that is the subject of this case - the sale or the transaction.

   I. Turnersville Auto Mall, d/b/a Honda of Turnersville (the automotive dealership that sold or leased the vehicle to plaintiffs) - the selling dealer or Honda of Turnersville.

   J. The contract for the sale or lease of the vehicle to plaintiffs - the contract.

K. The various new vehicle limited warranties that defendants issued plaintiffs with the vehicle collectively - the warranty.

L. The automotive repair attempts that defendants' authorized dealerships performed to the vehicle under the vehicle's warranty - the repairs or repair attempts.

M. The automotive dealerships that performed the repair attempts collectively - the servicing dealers or the dealers.

N. The problems/nonconformities that the consumers' experienced with the vehicle and/or when using the vehicle - the problems.

O. The New Jersey Truth-In-Consumer Contract, Warranty And Notice Act, N.J.S.A. 56:12-14 To -18 – TCCWNA.

P. New Jersey Uniform Commercial Code, N.J.S.A. 12A:1-101, et seq. – UCC.

Q. Magnuson-Moss Warranty- Federal Trade Improvement Act, 15 U.S.C. § 2301, et seq. – MMWA.

R. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, Et Seq. – CFA.

S. New Jersey Used Car Lemon Law, N.J.S.A. 56:8-67, et seq. – UCLL.

T. N.J.S.A. 56:8-2 – section 2.

U. New Jersey Division Of Consumer Affairs – DCA.

V. An act concerning new motor vehicle warranties and repealing P.L. 1983, c. 215 and making an appropriation, N.J.S.A. 56:12-29, et seq. a/k/a the New Jersey New Car Lemon Law – NCLL.

W. New Jersey Automotive Sales Practices Regulations, N.J.A.C. 13:45A-26B.1, et seq. – ASP.

X. New Jersey Automotive Advertising Practices Regulations a/k/a New Jersey Motor Vehicle Advertising Practices, N.J.A.C. 13:45A-26A.1, et seq. – MVAP.

Y. Motor Vehicle Cost Information Act, 49 U.S.C. § 32701, et seq. a/k/a federal odometer law – FOL.

Z. An Act Concerning Service Contracts And Supplementing And Amending P.L.1980, C.125; the Service Contracts Act, N.J.S.A. 56:12-87, et seq. – SCA.

AA. The proposed class as identified below – the class.

BB. The members of the class – the class members.

CC. The 2019 Honda Pilot vehicles manufactured, assembled or distributed by defendants and purchased or leased by the class members – the class vehicles.

DD. The case captioned Lesley Conti And Tom Conti On Behalf Of Themselves And All Others Similarly Situated, Plaintiffs, Vs. American Honda Motor Co., Inc, A California Corporation, Defendant, Case No. 2:19-cv-

02160-CJC-GJS United States District Court Central
District Of California – the Conti case.

**EXHIBITS TO COMPLAINT**

2. The allegations contained in the previous paragraphs are
   repeated as if fully set forth herein.

3. Attached hereto are the following exhibits:

   A. Letter from plaintiffs' counsel to the manufacturer
      dated 7-8-19.

   B. Results of Henry's online research about other 2019
      Honda Pilot owners' problems with their vehicles.

   C. Honda Service News Article titled "Popping or
      Crackling from the Speakers? Check the MOST Bus" dated
      March 2019.

   D. Second amended complaint in Lesley Conti And Tom Conti
      On Behalf Of Themselves And All Others Similarly
      Situated vs. American Honda Motor Co., Inc, A
      California Corporation, Defendant, Case No. 2:19-cv-
      02160-CJC-GJS United States District Court Central
      District Of California filed on 3-22-19.

   E. Order Granting In Part And Denying In Part Defendant's
      Motion To Dismiss Plaintiffs' First Amended Complaint
      in Lesley Conti And Tom Conti On Behalf Of Themselves
      And All Others Similarly Situated vs. American Honda
      Motor Co., Inc, A California Corporation, Defendant,

Case No. 2:19-cv-02160-CJC-GJS United States District Court Central District Of California filed on 10-17-19.

F.  The Warranty Process Flow Within The Automotive Industry:  An Investigation Of Automotive Warranty Processes And Issues (Center For Automotive Research, August 2005).

**PARTIES**

4. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

5. Plaintiffs are individuals with an address of 885 Weeks Landing Road, Cape May, New Jersey 08204.

6. Defendants American Honda Motor Co., Inc. is a business with address of 1919 Torrance Boulevard, Mail Stop 100-5E-BA, Torrance, California 90501-2746.

7. John Does 1-10 are fictitious defendants who are entities and/or individuals, including but not limited to those who have yet to be identified by plaintiff but whose identity may be revealed during the period of discovery that shall occur in future relative to this action and who may be liable for plaintiff's damages as referenced herein or who are known but not presently considered to be indispensable parties relative to this matter.  Such individuals/entities may include but are not necessarily limited to automotive

manufacturers, automotive distributors, automotive parts

manufacturers, automotive parts distributors, automotive

transporters, automotive dealerships, contractors,

subcontractors, independent contractors, companies,

corporations, businesses, partnerships, agents, officers,

directors, managing members, employees, salespeople,

technicians, staff, workmen or representatives of the other

defendants named herein.

### FACTUAL ALLEGATIONS

8. The allegations contained in the previous paragraphs are
   repeated as if fully set forth herein.

9. At all times relevant to this case, the selling dealer was
   a dealership authorized by defendants to sell the vehicle,
   issue manufacturer warranties associated therewith, service
   the vehicle and perform warranty repairs to the vehicle
   under the warranty.

10. At all times relevant to this case, the selling dealer was
    a "dealer", meaning a person who is actively engaged in the
    business of buying, selling or exchanging motor vehicles at
    retail and who has an established place of business.[2]

11. At all times relevant to this case, the vehicle was a
    "motor vehicle", meaning a passenger automobile, authorized
    emergency vehicle, or motorcycle as defined in R.S.39:1-1

which is purchased or leased in the State of New Jersey or which is registered by the New Jersey Motor Vehicle Commission, except the living facilities of motor homes. [3]

12. At all times relevant to this case, the vehicle was a "consumer product", which means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).[4]

13. Defendants manufactured and/or assembled and/or distributed and/or advertised the vehicle, prepared the warranty and via the selling dealer, issued plaintiffs the warranty.

14. At all times relevant to this case, the manufacturer was a "manufacturer", meaning a person engaged in the business of manufacturing, assembling or distributing motor vehicles, who will, under normal business conditions during the year, manufacture, assemble or distribute to dealers at least 10 new motor vehicles. [5]

15. At all times relevant to this case, the manufacturer was a

---

[2] N.J.S.A. 56:12-30; N.J.S.A. 56:12-31.
[3] N.J.S.A. 56:12-30.
[4] 15 U.S.C. § 2301(1).
[5] N.J.S.A. 56:12-30.

"supplier", which means any person engaged in the business of making a consumer product directly or indirectly available to consumers.[6]

16. At all times relevant to this case, the manufacturer was a "warrantor", which means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty. [7]

17. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer or lessee, other than for purposes of resale or sublease, of a motor vehicle; a person to whom a motor vehicle is transferred during the duration of a warranty applicable to the motor vehicle; or any other person entitled by the terms of the warranty to enforce the obligations of the warranty.[8]

18. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or

---

[6] 15 U.S.C. § 2301(4).
[7] 15 U.S.C. § 2301(5).

service contractor) the obligations of

the warranty (or service contract).[9]

19. On or about 11-8-18, plaintiffs purchased the vehicle in

new condition with an odometer reading of 5 miles from the

selling dealer in Turnersville, Gloucester County, New

Jersey.

20. At time of sale, plaintiffs paid for the vehicle in full.

21. At time of sale, the selling dealer issued plaintiffs the

warranty with various coverage periods for various

components, including but not limited to the following:

New Vehicle Limited Warranty...Every new Honda is covered,

including the 12-volt battery, for 3 years or 36,000 miles,

whichever comes first. The tires are warranted separately.

Powertrain Limited Warranty...The powertrain in your new

Honda is covered for 5 years or 60,000 miles, whichever

comes first. Following purchase, claimant experienced

problems with the vehicle's operation and pursuant to the

manufacturer's new vehicle limited warranty, took the

vehicle to various dealerships for multiple unsuccessful

repair attempts.

22. At all times relevant to this case, the warranty was a

"warranty", which means any warranty, whether express or

---

[8] N.J.S.A. 56:12-30.
[9] 15 U.S.C. § 2301(3).

implied of the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, of the manufacturer, co-manufacturer or post-manufacturing modifier, of the vehicle's condition and fitness for use, including any terms or conditions precedent to the enforcement of obligations under the warranty. [10]

23. At all times relevant to this case, the warranty was a "written warranty", which means — (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for

---

[10] N.J.S.A. 56:12-30.

purposes other than resale of such product.[11]

24. At all times relevant to this case, the warranty was a
    warranty which pertained to a consumer product actually
    costing plaintiffs more than $5 (i.e., the vehicle).[12]

25. As time of sale, one or more implied warranties covering
    the vehicle arose as a matter of law in plaintiffs' favor,
    with the term "implied warranty" meaning an implied
    warranty arising under State law (as modified by 15
    U.S.C. 2308 and 2304(a)) in connection with the sale by
    a supplier of a consumer product.[13]

26. At all times relevant to this case, plaintiffs were
    entitled to seek repair attempts to the vehicle under the
    warranty for problems that plaintiffs experienced with the
    operation of the vehicle.

27. During the vehicle's warranty period and/or during the
    first 24,000 miles of operation or during the period of two
    years following the date of original delivery of the
    vehicle to plaintiffs (whichever occurred first),
    plaintiffs experienced the problems, the details of which
    are set forth below and/or in complaint exhibit A.

28. The problems were "nonconformities", which means a defect
    or condition which substantially impairs the use, value or

---

[11] 15 U.S.C. § 2301(6).
[12] 15 U.S.C. § 2302(2)(e).

safety of a motor vehicle.[14]

29. During the vehicle's warranty period and/or during the first 24,000 miles of operation or during the period of two years following the date of original delivery of the vehicle to plaintiffs (whichever occurred first), plaintiffs presented the vehicle to the dealerships for the dealerships, reported the problems to the dealerships and those dealerships performed repair attempts to the vehicle relative to the problems.  Exhibit A.

30. As detailed below and in complaint exhibit A, during the vehicle's warranty period and/or during the first 24,000 miles of operation or during the period of two years following the date of original delivery of the vehicle to plaintiffs (whichever occurred first), defendants or the dealerships were unable to repair or correct the problems within a reasonable time.  Exhibit A.

31. Via the last repair attempt made before plaintiffs filed suit (exhibit A) and pursuant to the MMWA,[15] plaintiffs gave defendants a last chance to cure the vehicle's problems but that last chance to cure was unsuccessful.

32. Around late February - March 2019, the vehicle started making a popping, snap, crackle pop noise coming from front

---

[13] 15 U.S.C. § 2301(7).
[14] N.J.S.A. 56:12-30.

speakers/dashboard area. At first, the noise was intermittent but thereafter got worse.

33. Accordingly, on or about 3-19-19, plaintiffs took the vehicle to Avalon Honda for repair.

34. At that time, while the vehicle was not yet due for an oil change, Avalon Honda performed an oil change on the vehicle.

35. The vehicle was at Avalon Honda from between 3-19-19 to 3-29-19.

36. During that time, plaintiffs conducted multiple phone calls with Ross Seifert, Service and Parts Manager for Avalon Honda.

37. However, plaintiffs were given the run around, as Avalon Honda was unable to find the cause of the vehicle's problems, explaining that the manufacturer had no fix for the problem. Avalon Honda took the vehicle's dash apart. Avalon Honda told plaintiffs that Avalon Honda tried tightening connections. Avalon Honda also told plaintiffs that they opened a tech line and received a technical service bulletin which recommended replacing multiple components.

38. Finally, Avalon Honda explained that they were a small dealership and service department not well equipped to

---

[15] 15 U.S.C. §2310, et seq.

address the vehicle's problems and that they had just lost a mechanic and didn't have time to troubleshoot the issue. At that point, it became clear to plaintiffs that Avalon Honda didn't want to take the next steps to complete warranty repairs to the vehicle. Avalon Honda explained to plaintiffs that they may have tightened some things up and didn't hear the noises anymore.

39. At that time, Henry J. Lanzalotti took a short test drive with an Avalon Honda employee and didn't hear the noise. Accordingly, Henry J. Lanzalotti accepted return of the vehicle from Avalon Honda, hoping that the problems were repaired.

40. However, shortly after driving away from Avalon Honda and while on the drive home, the popping noise returned and was worse than prior to Avalon Honda's unsuccessful repair attempt.

41. On or about 3-30-19, Henry J. Lanzalotti called Honda of Turnersville to report the problems and to make an appointment for another repair attempt, explaining that plaintiffs needed to have the problems fixed.

42. Henry J. Lanzalotti requested to talk to Honda of Turnersville's general manager (Min Chin) and Honda of Turnersville's service manager (Mark Viggiano) but neither were available, so Henry J. Lanzalotti left messages with

each of them.

43. In the meantime, the popping noise was really bad and the tuner unit/LCD went out.  Henry J. Lanzalotti thereafter spoke with Mark Viggiano and made an appointment with Honda of Turnersville's service department for 4-3-19.  Henry J. Lanzalotti asked to meet with Mr. Viggiano and Mr. Chin and all of them met on 4-3-19 at Honda of Turnersville.

44. At that time, Henry J. Lanzalotti asked Honda of Turnersville to repurchase the vehicle due to its problems but the offer was refused.  Accordingly, Henry J. Lanzalotti simply left the vehicle at Honda of Turnersville's service department for another repair attempt.

45. Honda of Turnersville's service department explained that they replaced the vehicle's amplifier and a wiring harness per the manufacturer's directions and that the problems were resolved.  Following a test drive, Henry J. Lanzalotti accepted the vehicle back from Honda of Turnersville with the hope that the problems were resolved.

46. On or about 4-18-19, after Heather A. Lanzalotti has been driving the vehicle for about a week, while she was on her way to work with plaintiffs' 3 and 5 year olds in the car heading to day care to drop them off before work, the problems returned and they were even worse.  At that time,

the vehicle's tuner unit/LCD went out and turned black,
with the vehicle's instrument cluster where the speedometer
is located blacking out.  Because Heather A. Lanzalotti
feared for the safety of herself and plaintiffs' children,
she turned the vehicle around and returned home, deciding
to use plaintiffs' 9 year old pickup truck with close to
100,000 miles registered on its odometer, as she felt safer
in that truck than she did in the vehicle with its
problems.

47. At that time, Henry J. Lanzalotti called Honda of
    Turnersville to report the issue and have a conversation
    with Min Chin the next day too.  Henry J. Lanzalotti again
    demanded that Honda of Turnersville to repurchase the
    vehicle due to its problems and because plaintiffs didn't
    believe the vehicle was safe to drive but the offer was
    refused.

48. Because of the vehicle's safety issues, plaintiffs refused
    to drive the vehicle to Honda of Turnersville.
    Accordingly, on or about 4-20-19, Honda of Turnersville
    picked the vehicle up and dropped off a loaner vehicle to
    plaintiffs. At that time, the vehicle was making noise even
    when it was turned off.  Honda of Turnersville's service
    department had the vehicle for repair from approximately 4-
    20-19 to 5-10-19.  At that time Honda of Turnersville's

service department claimed that it replaced the vehicle's tuner unit/LCD, instrument cluster and a wiring harness. Mr. Viggiano explained to Henry J. Lanzalotti that these repairs cost over $4,800 in parts and labor.  On or about 5-15-19, plaintiffs accepted return of the vehicle from Honda of Turnersville.

49. On or about 6-25-19, Heather A. Lanzalotti drove the vehicle to Philadelphia, Pennsylvania to take plaintiffs' son to a doctor's appointment.  During that trip, the vehicle exhibited the noise problems more noticeably than before.  At that time, Heather A. Lanzalotti heard a huge spark type noise that sounded like a big rock hitting the windshield.

50. On or about 6-28-19, while Heather A. Lanzalotti drove the vehicle with the kids as passengers in the vehicle, the vehicle's DVD player was on for the kids when Heather A. Lanzalotti heard a noise, after which the volume from the DVD player stopped working.  This was a problem that had occurred before when Heather A. Lanzalotti had operated the vehicle.

51. The vehicle's noise problems continued to occur on an intermittent basis.  For example, the static, snap, crackle and pop noise frequently happens with phone calls, as well as at other times. The static, snap, crackle and pop noise

is very distracting and very loud at times.

52. The sound made by the vehicle makes plaintiffs think that the vehicle is experiencing electrical problems and they fear that the vehicle will catch fire or that the vehicle will experience yet another electrical system failure, such as when the vehicle's displays blacked out as mentioned above.

53. As to the intermittent snap, crackle and pop noise made by the vehicle's speakers, despite the repeated repair attempts discussed above, there doesn't seem to be a fix to this and the underlying problem appears to have the ability to cause the Tuner/LCD and instrument cluster including the speedometer and/or the vehicle's entertainment or infotainment system to fail without notice, thereby creating a serious safety hazard/issue and use and value issue.

54. The aforesaid snap, crackle and pop noise problem is known to defendants, as defendants issued Honda Service News Article titled "Popping or Crackling from the Speakers? Check the MOST Bus" dated March 2019.  Exhibit C.

55. The vehicle's rear wiper doesn't work – a potential use, value and safety issue.

56. While a statement was provided by the servicing dealers each time plaintiffs picked up the vehicle following a

repair attempt, the statements were not all accurate, as one or more invoices failed to state reported customer complaints or other information and/or stated misrepresentations about those customer complaints.

57. For example, shortly after receiving the vehicle back from Avalon Honda after a repair attempt, the problems returned and were worse.

58. Henry thereafter reported the snap, crackle and pop noise to Honda of Turnersville and informed them it was now also happening when the vehicle's doors were locked and unlocked even when the car engine was off.

59. More specifically, on or about 4-1-19 and during a phone conference with Mark Viggiano, service manager at Honda of Turnersville, Henry reported the snap, crackle and pop noise to Mark Viggiano.

60. On or about 4-3-19 and during an in person meeting occurring at Honda of Turnersville between Henry, Mark Viggiano, Honda of Turnersville's Service Manager and Min Chin, Honda of Turnersville's General Manager Henry reported the snap, crackle and pop noise – this time to both of those employees of Honda of Turnersville.

61. However, in the category of Honda of Turnersville invoice number HOCS458523 dated 4-8-19 prepared when the vehicle's odometer registered 7,034 miles titled "J#1", the invoice

describes the customer's complaint as follows: "CUSTOMER
WAS AT AVALON HONDA AND WAS TOLD THAT TECHNICAL SUPPORT
WANTED TO REPLACE THE TUNER, AMPLIFIER, BLUE-RAY AND 2
HARNESSES. THE CUSTOMER DECIDED TO TAKE THE VEHICLE HERE
FOR A SECOND OPINION.....AHM IS AWARE THE THE (sic) VEHICLE
IS COMING HERE."  Exhibit A.

62. Accordingly, by issuing plaintiffs the aforesaid invoice,
    defendants, via its agent Honda of Turnersville, violated
    N.J.S.A. 56:12-34, which states, in relevant part:  b. Each
    time a consumer's motor vehicle is returned from being
    examined or repaired during the period specified in section
    3 of P.L.1988, c.123 (C.56:12-31), the manufacturer, or, in
    the case of an authorized emergency vehicle, the
    manufacturer, co-manufacturer, or post-manufacturing
    modifier, through its dealer or distributor, shall provide
    to the consumer an itemized, legible statement of repair
    which indicates any diagnosis made and all work performed
    on the vehicle and provides information including, but not
    limited to, the following: a general description of the
    problem reported by the consumer or an identification of
    the problem reported by the consumer or an identification
    of the defect or condition and the source of the defect;
    the amount charged for parts and the amount charged for
    labor, if paid for by the consumer; the date and the

odometer reading when the vehicle was submitted for repair; and the date and odometer reading when the vehicle was made available to the consumer.  c. Failure to comply with the provisions of this section constitutes an unlawful practice pursuant to section 2 of P.L.1960, c.39 (C.56:8-2).[16]

63. Accordingly, while defendants knew that the vehicle was undergoing repair at Honda of Turnersville for a customer concern that defied a previous repair attempt by Avalon Honda, defendants, via their agent, failed to issue plaintiffs an invoice that would have documented yet another repair for the same customer concern.

64. This failure by defendants to document a repeat concern undermined plaintiffs' ability to secure evidence crucial to the documentation of the problems and thereby threatens to endanger plaintiffs' claims pled herein.[17]

65. Due to the distracting nature of the vehicle's problems, plaintiffs view the problems as a safety hazard.

66. As explained above, the problems may occur at any time, thereby startling plaintiffs while operating the vehicle and putting the passengers' safety at risk.

67. Therefore, the problems make the vehicle unfit for the use for which the vehicle was intended because the vehicle

---

[16] This is a reference to section 2 of the CFA.
[17] See *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997);

cannot be relied upon as a safe and reliable means of transport on roadways.

68. Due to the problems and defendants' failure to fix the problems in a reasonable time, plaintiffs' confidence in the vehicle is totally shaken.

69. Further details about the vehicle's repair history are specified in complaint exhibit A.  Exhibit A.

70. The vehicle's extensive repair history cannot be erased and if disclosed to potential purchasers, that history shall affect the vehicle's resale value, such as in the case of a private party sale.

71. Approximately one year ago and after purchasing the vehicle and experiencing the problems, Henry did research online about the problems.

72. It was then that plaintiffs learned that the problems affected other Honda Pilot vehicles and that defendants had knowledge of the problems.

73. That research revealed that other 2019 Honda Pilot owners and the owners of earlier model years of Honda Pilots had been reporting problems similar to plaintiffs before plaintiffs purchased the vehicle.

79.    Henry secured forum posts from an online Honda Pilot owners' form located on the World Wide Web at

N.J.S.A. 56:12-34(b).

www.piloteers.org where Henry found this information and Henry made some posts himself, using the screenname "FrustratedOwner".  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

80.    One such post by Henry dated on or about 4-2-19 stated: "Purchased a new 2019 Pilot Touring in November 2018 and the snap crackle popping sound started between 6,000 and 7,000 miles. And now started losing LCD intermittently. Sound has occurred a couple times with doors locking. I am being told this is probably a MOST Bus issue and a Service News Article (same thing as TSB?) was issued in March 2019 for 2019 Pilots, 2018-19 Odyssey's and 2019 Passports. Since it only applies to 2019 Pilots I wonder if this is a new issue unrelated to the problems with AC. We've only owned the vehicle for the winter months so we haven't even turned the AC on yet. After connections checked and were fine I am told the next step is to replace the Tuner unit, Stereo Amplifier, Blue Ray Player and Two Wiring Harnesses. I'll let you know how I make out after the parts are replaced."  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

81.    Another post by Henry dated on or about 4-5-19 states: "That may well be the proper resolution. But Honda will never do anything but replace existing parts to try and put a band aid on the problem. That way they can point their finger and blame the issue on defective parts. If they were to implement a fix such as adding a flyback diode that would be the smoking gun admitting there is a design defect. That would open Honda up to an enormous voluntary recall and/or a class action lawsuit. This has less to do with R&D and more to do with containing Honda's potential liability."  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

82.    A review of some of those posts clearly reveal that, long before and after plaintiffs purchased the vehicle (the purchase occurring on or about 11-8-18), Honda Pilot owners reported online that they were experiencing problems similar if not identical to those experienced by plaintiffs.  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

83.    A post by Brianmccarthy33 dated 3-5-18 states: "I have a 2017 Pilot Touring and I have the same popping issue through the speakers. Honda replaced the diode in the alc

relay. This seems to have worked although I still have a loud Pop when the door locks engage. The dealership told me that is normal and there is nothing they can do about it. Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

84.     A post by Hassan007 dated 8-17-18 states: "2019 elite just purchased and the popping is so bad it interrupts music. This seems worse than what I have read here so maybe another problem?"  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

85.     A post by Waylyn99 dated 11-13-18 states: "I just purchased a 2019 and my car has been in the shop for 8 days for the same exact problem. I have no resolution as of yet. I will post any updates."  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

86.     A post by gweb42982 dated 3-8-19 responding to the post by Waylyn99 dated 11-13-18 states: "Hi, just following up on your post to find out if Honda determined the issue. We have a 2019 Pilot with same issue, and the dealership does not know how to fix. I appreciate any information you may have. Thanks!" Exhibit C;

https://www.piloteers.org/threads/random-electrical-
snapping-cracking-sound-elite.107474/page-5#post-1627413.

87.     A post by Nick128 dated 3-10-19 responding to the post
by gweb42982 dated 3-8-19 states:  "Same issue. 19 touring
Radio, amp, tuner instrument cluster and complete body
harness replaced. lost instrument cluster functions several
times also. No fix from honda (sic) at this time. 5 times
to dealership. Working with lemon law now. Good luck."
Exhibit C; https://www.piloteers.org/threads/random-
electrical-snapping-cracking-sound-elite.107474/page-
5#post-1627413.

88.     A post by teacherpayne dated 3-10-19 stated:
"Crackling popping noise and LCD instrument panel turning
off. My elite has under 300 miles on it and the same thing
happened. lost (sic) both LCD and instrument panel with the
speedometer. Super loud crackling noises. No pattern to it
at all. I have taken it in twice already. They tried to
give it back to me last Wednesday and I told them I am not
driving it if the speedometer and instrument cluster goes
out. He said the rest of the car is safe. I looked up
California law and it says legally you have to have a
working speedometer. So they kept it and gave us a loaner.
They called for some master honda (sic) technician. He
won't be in until some time next week to look at it. They

have told me that they have never heard of this problem and that it is just a software update that needs to be sent out. Yet I read about all these other problems that sound exactly the same as mine. Super frustrated. Can you please let me know what process you are taking to get your car designated as a lemon law car? If they don't fix it I will do the same. Problem is what car do I get next?  Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

89.    A post by Nick128 dated 3-10-19 responding to the post by teacherpayne dated 3-10-19 stated:  "You have to check online and do some research on lemon law lawyers. Each state has different qualifications for lemon law. Several Repair attempts must be made and the vehicle still not be fixed. First thing you need to get the car back to the dealership and let them see the video. Curious to see what the dealer says .. (sic)  They are "working" on a fix now. We get stuck with a defective car because some engineers at Honda f#$*#% up and pushed out a defective product. They said it could be weeks or months they dont (sic) know. Funny how they had no problem taking my money when I bought this POS. Im (sic) about 3 weeks into the process now with lawyer. Playing waiting game. We have our pilot (sic) back now, radio cracking and error messages. We take my new F150

on road trips so we don't have to worry about the dashboard
turning off with my 2 year old son in the car. Let me know
how you make out. Good luck!  Exhibit C;
https://www.piloteers.org/threads/random-electrical-
snapping-cracking-sound-elite.107474/page-5#post-1627413.

90.    A post by A09 dated 3-30-19 states:  "All: don't
expect a fix from Honda on this issue. It has been
occurring since 2010 on other Honda products; see link
below. The current Pilot is in its fourth model year, and
the problem still persists. If Honda R&D hasn't fixed it in
*nine* years, don't expect a fix in this (or even the next)
generation. I had the *NC* compressor, clutch, coil, dutch
relay replaced in 2017 (refer to post 28 of this thread).
The popping resurfaced in August 2018. The popping noise
occurs under the same conditions: A/C running, independent
of radio operation, and above 50 degrees F. Since the parts
were changed the popping noise is very faint, but just as
frequent. Once a month, there will be a very loud pop as I
linked in post 22 of this thread. Earlier this week, I
wired in the diode as Pilotforlife details very well in
Post 46. Honda R&D is well aware of this issue but they
choose to do nothing. Again, it is *nine* years and
counting with no countermeasure in sight. My 2016 Elite
will be paid off this year. I will return to Toyota in

2022, when the next-gen Sienna is in its second model year." Exhibit C; https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

91.    A post by Moelsaman23 dated approximately 6 months ago stated: "Wondering if that took care of the issue or the snapping noise came back ? I have a 2019 touring and I am experiencing the same"[.] https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

92.    A post by Tourist2012 dated approximately 6 months ago stated: "Well, our '19 Elite is making the crackling sounds through the audio system. Only has 1200 miles on it. It's generally just occasional pops. At first, I thought it was bugs hitting the windshield because it was lovebug season here in FL. Well, the lovebugs are gone and we're still getting it. My wife hasn't said anything about it until tonight. She heard it before and assumed the same thing I did. I purposely didn't say anything about the issue because I wanted to see if she experienced/recognized it when she drove the car. But tonight, she said it was actually crackling. So, I am going to see about making an appointment for Saturday to take it in to the dealer."

https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

93.     A second post by Tourist2012 dated approximately 5 months ago stated:  "Well, I got the Pilot back... I went to the dealer the other day to switch loaners and they told me the Pilot was fixed. I was skeptical. Service writer told me Honda corporate got back to them and had them do something with the infotainment connections in the rear of the vehicle. Once they did what Honda instructed, the noise was gone. They sent tech out to drive the vehicle. On a 15 mile trip, no popping. Tech got back with the car right after I got to the dealer. They ran it through the car wash and gave it back to me.  So far, so good. It's only been two days, but previously we heard the popping every time we drove the car. However, the case is still open at least for the time being. If the noise returns - they are replacing the harness. Well, I got the Pilot back... I went to the dealer the other day to switch loaners and they told me the Pilot was fixed. I was skeptical. Service writer told me Honda corporate got back to them and had them do something with the infotainment connections in the rear of the vehicle. Once they did what Honda instructed, the noise was gone. They sent tech out to drive the vehicle. On a 15 mile trip, no popping. Tech got back with the car right after I

got to the dealer. They ran it through the car wash and gave it back to me. So far, so good. It's only been two days, but previously we heard the popping every time we drove the car. However, the case is still open at least for the time being. If the noise returns - they are replacing the harness." https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

94.     A third post by Tourist2012 dated approximately 5 months ago stated:  "Here's my latest update: I took the Pilot in yesterday, had a different service writer so I had to explain it all again. I gave him the USB drive with the dashcam recordings. He said they didn't have any loaners left to give me. I will address that issue separately at a later time. So I waited while they checked it out. I at least wanted them to acknowledge the problem and then we could go from there. Last time, I could tell they weren't taking me seriously. About 20 minutes later the service writer came and found me and asked me to take a ride with the mechanic. I did, and as soon as I sat down the mechanic asked me to describe the noise. I asked him if he watched the videos. What videos?  I showed him the thumb drive that was on the keyring and explained there were numerous instances of the problem recorded by my dashcam.  We took a

drive and it happened right away, before we even got off the property. He got to hear multiple instances of the popping on our 10 minute drive. We got back to the dealership and I could tell the service writer was hoping that the mechanic would say he didn't hear anything. Mechanic told him that it's just as I describe. At that point the service writer turned into Ralph Kramden (homina, homina, homina). So, now they are going to call Honda and see what they should do next. I've got an appointment to take it back in next week and they will have a loaner for me, and are going to keep it as long as necessary." https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

95.    A post by closetredneck dated approximately 11 months ago states:  "Seems like the issue originally detailed in this thread and those discussed from post #50 on could be different issues. I have a 2019 elite and have the same/similar problems as described by FrustratedOwner, teacherpayne, hasan007, gweb42982 and nick128. Here is my reply to another thread describing this issue: I am having this issue as well on my 2019 elite purchased just over two weeks ago - first occurrence at 119 miles . I was really hoping this was a software issue that could be fixed via update, or that a simple DIY would get the job done, but it

seems like it truly is a manufacturing defect. Tonight, I found this: https://static.nhtsa.gov/odi/tsbs/20...55369-0001.pdf. Looks like a MOST Bus issue, with connectors. Funny though, multiple instances on this forum state how replacement of harnesses has not fixed the issue. I REALLY do not want to have my $50K car's interior ripped out, especially multiple times (3 for lemon law), but if that's my only recourse to get the vehicle replaced or be refunded, I guess that's it. Shame...I really like this car." https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

96.    A post by compnerd01@aol dated 8-9-18 stated: "This problems (sic) also occurs in the 2016 touring model which I have. The dealer has looked at it multiple times and the sources have been identified as the AC compressor which changing the relay is only a temporary fix. Another sources (sic) is the door locks. I also suspect that occasionally the radiator cooling fan causes a soft popping sound. So anything that can cause a power surge. I suspect that the audio system was designed with poor noise suppression." https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

97.    A post by mazer75 dated 3-18-17 stated: "Glad I found this thread. This issue just started with my 2017 Elite.

Bought the car 12/28/2016, and the popping started maybe a week ago. Car only has 2200 miles, and was made in November 2016. Had Gardena Honda check it out today, and they said it was because my bass was up too high. Lol. Should have checked here first. Has anyone managed to get this permanently fixed? Or is the fix to replace that relay wherever the popping returns? This sucks..."
https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

98.    A post by larful dated 10-16-17 stated: "Update: I went in for the random popping issue to Honda. I told them about this information I found online on this forum and also else where (sic). finding noise connecting to the A/C system and the temporary fix being the relay and the more permanent fix replacing a/c parts. I wanted them armed with extra information prior to attempting to repair. They informed me they use a Honda Tech line to search issues they later found it to be the relay just as you have mentioned. I went ahead and let them just fix the relay and we had the discussion to allow the sound to come back and then have a open case for this and when the noise re occurs proceed with the replacement of parts not just quick relay replacement. I'm happy at the moment the random one snap noise is gone. I'll enjoy this next 8-10 weeks of quiet

road sounds. It does faintly comes through my upgraded tweeters when I lock and unlock the door still but I consider that maybe an incidental to upgrading my stock tweeters and amplifying them."

https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

99.    A post by vintrip dated approximately 4 months ago states: "We bough (sic) 2019 Honda Pilot Touring in June 2019, So far 4000 miles, and I have been hearing these random electrical chatter or static popping noise from my speakers. It seems like it is catching small sparks somewhere in the system. I also noticed that the same popping or crackle happens when I lock/unlock the door. If I repeatedly lock/unlock the door, the popping sound dies down by 5th or 6th time, and I do not hear popping for long time. Feels like the locking/unlocking the door switch clears the built up static (maybe just my imagination from my basic understanding of electric fields). This often happens when I start the car in the morning. I have noticed that this does not happen on humid or foggy days, which again from my imagination is humid air fills the connection gaps, and avoids any electric charge build up. This problem has nothing to do with AC clutch, because it is random and it happens when the engine is turned off, and cabin is in

accessory mode. The problem could be to do with bad quality connections or type of connections. I have not gone to dealership, but I will bring it up with them on my first service appointment. Someone posted a Technical document in a thread about Media BUS connection issue, which explains the resolution of this issue by harness replacement or tightening the joins. Please reply, if you have gotten fix this problem, and how."

https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

100.    These and other posts on www.piloteers.com make clear that:  (1) since at least 2016, defendants, via complaints made to dealerships pursuant to requests for warranty service pursuant to the warranty (and  some of which were reported to defendants via its Tech Line system), knew of the problems; (2) at least a year before plaintiffs purchased the vehicle, other consumers purchasing Honda Pilots of the same make and model as the vehicle (including those of the same year) were frustrated in their efforts to get defendants to fix the problems in a reasonable period of time; and (3) by the time plaintiffs purchased the vehicle, Honda customers were told by dealership employees that their problems were known to defendants. Exhibit C;

https://www.piloteers.org/threads/random-electrical-snapping-cracking-sound-elite.107474/page-5#post-1627413.

101.    Another online Honda owners' forum disclosed Honda customers' problems with their 2019 Honda Pilots, some which arose shortly after the consumers took delivery of their Pilots.  https://hondaforum.com/forum/pilot-forum-16/2019-honda-pilot-touring-popping-sounds-13832/page2/.

102.    On or about 11-18-19, one 2019 Honda Pilot consumer identifying themselves as "JuliaSugarbaker" placed a post stating that: "my 2019 pilot elite starting making the cracking sound about 30 days after purchase. i too described it to the technician as glass cracking or ice cracking. my husband and i believe it is something with the speakers and it may be more like a bad connection with wires. of course, when i took it in, no one heard anything. also when it auto locks, there is a "static" sound in the locking mechanism. is there anyone else experiencing this and, if so, have you been given an answer to what's causing this. i'm 9sic) pretty upset that my vehicle is less than a year old and already i'm having what appears to be an electrical issue." .  https://hondaforum.com/forum/pilot-forum-16/2019-honda-pilot-touring-popping-sounds-13832/page2/.

103.    On 2-6-20, another 2019 Honda Pilot consumer identifying themselves as "shsd" placed a post stating that: "My 2019 touring started making the cracking/popping sound over the weekend at around 1k miles. It happens to come from all three front speakers one after the other and repeats every 3 second or so. Took it to the dealer yesterday...they initially said they pinpointed the problem to a loose connection in the system bus. However, today they called and said they have opened an issue with the Honda engineering about this. Not sure what is going on...this makes me nervous. https://hondaforum.com/forum/pilot-forum-16/2019-honda-pilot-touring-popping-sounds-13832/page2/.

104.    A 2019 Honda Pilot consumer maintains a website on the World Wide Web at https://www.2019pilotproblems.com/ titled "Problems with my 2019 Honda Pilot Elite".

105.    That website explains that "In August of 2018 I purchased a brand new 3rd Generation Top of the line 2019 Honda Pilot Elite, and my first year of ownership has been nothing short of a Nightmare with more than 7 issues including major issues with Honda Sense's new Collision Mitigation Braking System malfunctioning at highway speeds and unnecessarily applying the brakes, nearly causing an accident not once, not twice but now three separate times.

This site is dedicated to sharing my story of not only the many problems I have videos and documentation of but more important the Nightmare it has been working with Honda trying to get a resolution which to this day, after spending nearly $50,000 on a vehicle 6 of the 7 issues remain unfixed, including my speakers constantly making a loud "Static Pop / Crack Noise."  My Local Honda Dealership's Service Manager has essentially said there is nothing else he can do at this time to resolve the issues until Honda's engineers give him "something else to try." I have been in the process of working with Honda's Mediation Department requesting a resolution via a buyback or an Exchange and shockingly Honda's reputation of a standing behind their products has been in line with the reliability of this vehicle and has also been nothing short of a Nightmare as well. I am now in the process of being forced to find an attorney specializing in vehicle Lemon Law which based on Ohio Lemon Law Code 1345.71 - 1345.78 this vehicle clearly qualifies, but Honda for whatever reason as of today remains unwilling to resolve…. #2 : 3-2019 AV Head Unit "Glitching" and emitting "Static Pops" from front Speakers typically in random sets of 3 Un-Resolved : 6 Months and 5 trips to my local Honda dealership, the Service Manager says they have nothing else

they can try. Currently Waiting for Honda Engineers to get back to them. This is one of the many videos I have regarding this specific issue. This problem arose while waiting for Honda to get parts in to replace the defective front engine mount from Issue #1. While my wife was driving the vehicle with our 4 children, out of the blue this loud "Static Pop" started nearly causing her to run off the road. She called me in a panic thinking the vehicle was going to shock her or start a fire or something. Being out of town I had no way of helping her as she was pulled over alongside the road. The noise as you can hear in the video was constant and no matter if you turned the radio off or even shut off the vehicle the popping remained. My Local Honda Dealership initially had my vehicle for over a week trying to fix this problem. During the week, I was told that they had my Radio Head Unit dismantled and were going back and forth with several Corporate Honda Engineers trying to fix the problem and they could not figure it out. I have saved voicemails from dealership giving updates and finally after a week was notified that the vehicle was fixed. When I inquired what the problem ended up being I was told "We reset the software for the Head Unit and the noise stopped" As someone who originally started a business at the age of 11 building computers and doing repairs and

as someone who currently runs a Digital Marketing company and still manages a team of IT people doing computer repairs, I responded.. "It took you a week to try that? You had my car completely torn apart and spent a week going back and forth with Honda Engineers and then decided to reset the software? Wouldn't that be one of the first steps?" They didn't have a response other than the service manager telling me it seemed to fix the issue and I was again told to take the vehicle and if it returned to let them know. As I drove the vehicle off the lot it appeared to be fixed but within a mile of leaving the dealership Issue #3 arose with the the (sic) HVAC emitting a high pitched hum noise. More importantly, the AV noise returned within about a week, but it returned and would only glitch and pop the speakers for about 10-15 seconds and then stop. I stopped by the dealership and they could not reproduce the issue. At this point this issue remained recurring at least once a day, but more important all the remaining issues began occurring. I again brought the vehicle in and spoke to the Service Manager and inquired about Lemon Law rights. As a service manager he said all he could do was take the vehicle in and try to diagnose and fix the problems. He suggested I reach out to Honda's Customer Care team if I wanted to initiate a Buy Back request. So I did.

More on that process later. since this issue remained
sporadic and random in nature, even with providing videos
to "prove" it still existed the service manager explained
to me that they can't fix an issue unless it is a "Known
and Documented" issue within the Honda Service Bulletin
Database or unless the issues remained consistent and could
easily be reproduced. I was told that none of the issues I
was experiencing including this one was a known issue and
again I was told my best option would be to deal with
Honda's Customer service team to try and get a resolution.
After going through Honda's Customer Care team, I was
assigned a point of contact from Honda's Mediation
Department. I spent most of June and July going back and
forth with Honda giving them ample opportunities to resolve
this issue along with the others below and none of them
were resolved. Honda sent a field rep out from corporate to
inspect the vehicle and even though I requested the
opportunity to show that rep from corporate the many videos
I had of the issues, the rep showed up drove the vehicle
and determined there was nothing wrong with it and left
without speaking to me or giving me the. (sic).  I was told
the vehicle passed all inspections and was operating fine
and since they were unable to re-produce any of the issues
they could not spend additional time attempting to diagnose

and fix the problems and were also unwilling to extend a Buy Back offer on the vehicle. "Even though I had videos of these issues still being present, Honda's field rep and Mediation team never asked to see them, and intentionally avoided giving me the opportunity to speak with the field rep they sent out to share these videos with." On Tuesday, September 9th this specific issue recurred like it normally would each day, randomly, but this time continued recurring every few seconds like it originally did. I immediately drove the vehicle to my Honda dealership where the service manager observed the problem, puzzled and stumped, He said that there was nothing else they could do to try and fix the problem outside of just randomly replacing parts. With no "Loaner vehicle available" I was told to keep driving it until they heard back from Honda's Engineers with a suggestion to try and fix it. As of right now it has been 3 days of me driving this vehicle unable to listen to music, use my AV system, use the Navigation, and being forced to listen to my speakers constantly pop while spending hours each day on sales calls in my vehicle.

https://www.2019pilotproblems.com/.

106.    Further support for plaintiffs' claims that defendants had foreknowledge of the vehicle's problems but failed to disclose same can be found in the second amended complaint

filed in a putative class action pending against defendants

captioned Lesley Conti And Tom Conti On Behalf Of

Themselves And All Others Similarly Situated, Plaintiffs,

vs. American Honda Motor Co., Inc, A California

Corporation, Defendant, Case No. 2:19-cv-02160-CJC-GJS

filed in the United States District Court for the Central

District Of California.  Exhibit D.

107.    On 3-22-19, the plaintiffs in the Conti case filed

their original complaint and presently the Conti

plaintiffs' second amended complaint is pending before the

District Court hearing the case.  Exhibits D-E.

108.    The Conti case involves issues similar if not

identical to the problems experienced by plaintiffs and by

the persons posting on the forum www.piloteers.org.

Exhibits C-E.

109.    More specifically, the Conti case involve persons and

entities nationwide who purchased or leased a 2018-2019

Honda Odyssey vehicle, 2019 Honda Pilot, or 2019 Honda

Passport ("Vehicles" or "Defective Vehicles").   Exhibit D,

§1.

110.    The Conti case already survived at least one motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6).

Exhibit E.

111.    The Conti complaint explains that the subject

vehicles' infotainment systems – integrated in-vehicle communication, navigation and entertainment systems – behave erratically, malfunctioning, freezing, and creating a safety hazard and distraction. Such systems are designed to attract buyers who want to manage available technology while on the road, while minimizing distractions and maximizing safety.  Exhibit D, §2.

112.    Per the Conti complaint, the subject vehicles' infotainment system consists of a minimum of two LCD screens: (1) a primary touch screen located in the center console; and (2) a screen located above the steering wheel that functions as a digital speedometer/odometer, and displays other information as well (e.g., remaining fuel, current song, turn-by-turn directions).  Exhibit D, §3.

113.    Per the Conti complaint, the subject vehicle's screens are the gateway between the user and the vehicle's safety, navigation, communications, entertainment, and climate control features. Among other operations, the subject vehicles' infotainment system allows the vehicle owner to operate the audio systems in the vehicle (including the radio); use the GPS navigation technology; control the vehicles' climate systems; operate the backup camera and CabinWatch rear seat monitor; and operate a Bluetooth-enabled mobile telephone or other device (including Apple

devices through the CarPlay application).  Apple CarPlay is
a software application compatible with many manufacturers'
infotainment systems, including the infotainment systems
found in the Defective Vehicles. It enables an infotainment
system to act as a controller for Apple devices, and
provides access to other Apple-specific applications
(including music, messaging, maps, and podcasts, among
others), as well as other third-party applications.  The
infotainment system's primary display is similar to a
tablet, and features a high definition, user-customizable
interface.  Exhibit D, §5.

114.   Per the Conti complaint, defendants manufactured,
tested, warranted, advertised, distributed, sold, and
leased the subject vehicles, which contain a defective
infotainment system that causes many of the subject
vehicles' features (e.g., the navigation system, rear-
entertainment system, audio system, backup camera,
CabinWatch system) to malfunction. As documented by
widespread consumer complaints, this defect has plagued the
infotainment system since its launch. Exhibit D, §6.

115.   Per the Conti complaint, the defect alleged can cause
safety-related systems – including backup camera functions
– to fail  and can cause the entire center console to go
black or blue while the vehicle is in motion. Exhibit D,

§7.

116.    Per the Conti complaint, navigation and other
dashboard features are also reportedly affected, shutting
down completely while in use. Exhibit D, §7.

117.    Per the Conti complaint, defendants failed to find a
solution to the infotainment system defect and instead,
simply replaces defective parts with equally defective
parts, thereby leaving consumers caught in a cycle of use,
malfunction, and replacement. Exhibit D, §10.

118.    Per the Conti complaint, defendants acknowledged in
communications to its dealer network that a defect in the
infotainment systems exists and that Honda does not yet
have a fix.  Exhibit D, §10.

119.    Per the Conti complaint, from standard industry pre-
launch testing, Honda knew of the defect before marketing
affected vehicles in 2018. Further, Honda knew of the
defect immediately after the release of affected vehicles,
based on the numerous customer complaints it received, and
yet continued to market affected vehicles. In spite of
these issues, Honda not only installed the same defective
in 2019 Odyssey vehicles but incorporated it into the 2019
Pilot and 2019 Passport as well. Honda's failure to
disclose the infotainment systems defects—either directly
to consumers or through its dealers, which are Honda's

agents—was material to each and every plaintiff and member

of the putative classes.  Exhibit D, §8.

120.    Per the Conti complaint, in April and July of 2019,

defendants released identical documents—the former

captioned a "Tech Line Summary Article" and the latter a

"ServiceNews Article"— titled "Radio Stays On with Ignition

OFF."  Both articles identify all trim levels of the 2018-

19 Odyssey, 2019 Pilot, and 2019 Passport as affected

vehicles. Exhibit D, §316.

121.    In March and May 2019, Honda released a "ServiceNews

Article" that identifies the 2018-19 Odyssey (all trims

except LX), 2019 Pilot (all trims except LX), and 2019

Passport (all trims except Sport) as affected vehicles. The

article is titled "Popping or Crackling from the Speakers?

Check the MOST Bus Network," and states:

Are you hearing a popping or crackling from the speakers?

This may be due to a connection issue in the MOST bus

network, which can be identified by the unique red and

green connectors at each component of the infotainment

system. During component inspection or replacement, you can

easily damage these connectors if the cable is used for

leverage when unplugging them. To save you time during

troubleshooting, check the repair history on the vehicle.

Most reported cases happened after a separate previous

repair was made to the system. Be sure to inspect the MOST connectors at all components and any connections between the harnesses. If a connector is found to be damaged, like you see here, the entire harness must be replaced  These connectors are **not** repairable. If you want more info on what the MOST bus network does, look up the Tech2Tech® video, "Lets Talk MOST Bus Network and ECL Diagnostics." And If you want to know how to check for damaged or loose connections, be sure to check out "A Look at MOST Bus Network Connectors."

122.    Per the Conti complaint, numerous Honda customers—including various named plaintiffs in this action—have been told by dealership employees since at least mid-2018 that their problems are known to Honda. However, with the exception of the Tech Line Summary Article noted above, Honda has yet to publicly acknowledge the scope and severity of these problems, or to release any kind of long-promised fix or update to its customers.  Exhibit D, §318.

123.    Per the Conti complaint, the database maintained by the National Highway Transportation Safety Administration contains numerous customer complaints about the vehicles' infotainment systems, including those pertaining to 2019 Honda Pilots.

124.    These serious defects have plagued the vehicles'

infotainment systems since the system's launch. For

example, the database maintained by the National Highway

Transportation Safety Administration contains numerous

customer complaints about the vehicles' infotainment

systems, some of which are set forth below include:

**Date Complaint Filed:** December 19, 2017
**Date of Incident:** October 14, 2017
**NHTSA ID Number:** 11055584
**Vehicle Identification Number:** 5FNRL6H8XJB****
**Vehicle Type:** 2018 Odyssey
FAILURE OF THE REAR ENTERTAINMENT SYSTEM: THE REAR
CAMERA AND ENTERTAINMENT SYSTEM WILL LOST "NETWORK
CONNECTIVITY" AND STOP FUNCTIONING…. FAILURE OF THE
INFOTAINMENT SYSTEM: THE INFOTAINMENT SYSTEM WILL
TURN OFF AND GO INTO A SERIES OF FAILURES, ULTIMATELY
TURNING OFF COMPLETELY AND NOT FUNCTIONING. THE
INFOTAINMENT SYSTEM WILL ALSO EXPERIENCE POWER
ERRORS RESULTING IN ERRORS WITH THE ANTI THEFT SYSTEM.
IN ADDITION, THE RADIO/SPEAKERS PERIODICALLY STOP
WORKING.
**Date Complaint Filed:** February 13, 2018
**Date of Incident:** August 23, 2017
**NHTSA ID Number:** 11072728
**Vehicle Identification Number:** 5FNRL6H78JB****
**Vehicle Type:** 2018 Odyssey
THE CENTER CONSOLE, WHICH IS THE MONITOR THAT UTILIZES
GPS NAVIGATION, REAR VIEW CAMERA DISPLAY, CONTROLS
HEAT/AC, VOLUME CONTROL, ETC. HAS CONTINUED TO FAIL
SINCE DATE OF PURCHASE (7/15/17). THE MONITOR SHUTS DOWN
AT RANDOM TIMES, FOR UNIDENTIFIED REASONS, LEAVING THE
DRIVER, DISTRACTED AND ATTEMPTING TO RESOLVE. THE
SHUT DOWN CAN OCCUR WHILE IN THE VAN IS MOVING OR
STATIONARY. NAVIGATION SHUTS DOWN WHILE THE DRIVER IS
IN ROUTE TO A LOCATION CAUSING SIGNIFICANT
DISTRACTION.… Honda WAS MADE AWARE OF THIS PROBLEM IN
AUGUST 2017. WE BROUGHT OUR VAN IN TO THE SHOP TWICE
AND NO RESOLUTION WAS FOUND. WE FILED A COMPLAINT
WITH Honda AMERICA (VOICE MAILS ARE RETAINED AS
RECORD). AFTER SEVERAL MONTHS OF NO RESOLUTION, Honda

AMERICAN TOLD US OUR CASE WAS BEING CLOSED BECAUSE
THE COMPANY CONTINUED TO HAVE NO RESOLUTION. 7
MONTHS AFTER PURCHASE THE CENTER CONSOLE/MONITOR
CONTINUES TO RANDOMLY FAIL. SOMETIMES THE MONITOR
GOES BLACK, SOME FEATURES WORK WHILE OTHERS STOP (FOR
EXAMPLE THE RADIO MAY WORK WHILE THE SCREEN IS
BLACK). SOMETIMES THE MONITOR GOES BLUE AND
EVERYTHING SHUTS DOWN. PHOTOS AND VIDEOS OF THESE
OCCURRENCES WERE SUBMITTED TO Honda VIA EMAIL. THE
PROMOTED FEATURES BY Honda AMERICA LEAD THE BUYER TO
BELIEVE THERE IS ADDED SAFETY IN THIS VAN. THE OPPOSITE
HAS TURNED OUT TO BE TRUE. THESE FAILURES CAUSE
SERIOUS SAFETY CONCERNS FOR THE DRIVER AND THE YOUNG
FAMILIES UTILIZING THE VAN.
**Date Complaint Filed:** September 5, 2018
**Date of Incident:** September 2, 2018
**NHTSA ID Number:** 11124525
**Vehicle Identification Number:** 5FNRL6H89JB****
**Vehicle Type:** 2018 Odyssey
TOURING-REAR ENTERTAINMENT SYSTEM SHUTS OFF TO
BLACK SCREEN AND CABINWATCH LOSES SIGNAL AND GIVES
AN ERROR CODE. WHILE DRIVING LONG DISTANCES, THE KIDS
CAN ONLY WATCH THE FIRST 30 MINUTES OF THEIR DVD
BEFORE THE SYSTEM SEEMS TO OVERHEAT AND COMPLETELY
SHUTDOWN. WE HAVE RESORTED TO TURNING IT OFF TO LET IT
COOL DOWN (DVD THAT IS REMOVED FROM THE PLAYER
COMES OUT SCALDING HOT) BEFORE RETRYING TO LET THEM
WATCH AND HAVE IT FAIL A FEW MINUTES LATER.
CABINWATCH SEEMS TO ACT UP AT THE SAME TIME THE REAR
ENTERTAINMENT SYSTEM FAILS.
**Date Complaint Filed:** October 29, 2018
**Date of Incident:** October 23, 2018
**NHTSA ID Number:** 11143895
**Vehicle Identification Number:** n/a
**Vehicle Type:** 2018 Odyssey
ENTIRE DASH TURNED OFF WHILE DRIVING INCLUDING
SPEEDOMETER AND INFORMATION SCREEN-REPLACED
RADIOHEAD…. IT'S A BAD REAR ENTERTAINMENT SYSTEM. I
BOUGHT MY CAR 1 YEAR AGO AND IT'S OBVIOUSLY FLAWED.
**Date Complaint Filed:** December 25, 2018
**Date of Incident:** October 22, 2018
**NHTSA ID Number:** 11163391
**Vehicle Identification Number:** 5FNRL6H76JB****
**Vehicle Type:** 2018 Odyssey
CRAKLING SOUND ON DASH FROM SIDE TO SIDE, NOISY AND
STRONGER BY THE WEEKS. TOOK CA TO THE DEALER WITH 12K
MILES; THREE ATTEMPTS WERE MADE. Honda SERVICE

REPLACED THE AUDIO SYSTEM, NEXT ATTEMPTS THEY SAID IT
WAS MY IPHONE CABLE. NOW, WITH 14K MILES, CAN'T USE
RADIO, BLUETOOTH, CARPLAY AND THE ENT SYSTEM FREEZES.
ANY CALL I MAKE OR RECEIVE, THE CRACKLIN STARTS AND
CALL FREEZES UNTIL GETS DISCONNECTED. DOES NOT MATTER
IF THE CAR IS PARKED OR ON THE ROAD. HAVE MORE THAN 10
VIDEOS SHOWING THE PROBLEM. WILL GO NOW TO THE 4TH
ATTEMPT TO SEE IF IT CAN BE FIXED.
**Date Complaint Filed:** January 5, 2019
**Date of Incident:** November 15, 2018
**NHTSA ID Number:** 11165340
**Vehicle Identification Number:** n/a
**Vehicle Type:** 2019 Pilot
WHILE DRIVING, BOTH HIGHWAY AND AROUND TOWN, LOUD
CRACKLING WOULD OCCUR THROUGH THE SPEAKERS. THEN
BOTH THE NAVIGATION SCREEN AND/OR THE SPEEDOMETER
SCREEN WOULD GO COMPLETELY BLACK. THE MESSAGE
"NETWORK CONNECTION LOST" WOULD SOMETIMES APPEAR.
ALL BLUETOOTH CONNECTIVITY AND SPEAKER USAGE WAS
LOST. THIS OCCURS ALMOST EVERY DAY WHILE COMMUTING.
CAR HAS BEEN BROUGHT TO Honda SERVICE TWICE FOR
REPAIRS.
**Date Complaint Filed:** March 20, 2019
**Date of Incident:** March 16, 2019
**NHTSA ID Number:** 11190215
**Vehicle Identification Number:** 5FNYF6H09KB****
**Vehicle Type:** 2019 Pilot
RECURRENT PROBLEM. STARTED WHEN VEHICLE WAS 2
MONTHS OLD. TAKEN CAR TO DEALER SERVICE DEPARTMENT.
NO SOLUTION.
WHEN IN MOTION (HIGHWAYS, CITY ROADS) SPEAKERS MAKE A
SPARKLING SOUND FOLLOWED BY THE ENTERTAINMENT
SCREEN (NAVIGATION, HANDHELD PHONE, REAR VISION...) AND
THE ODOMETER SCREEN (SPEED DISPLAY, ALL THE SIGNALS)
BECAME DEAD. IT COULD LAST FEW SECONDS AND REBOOT
BACK OR UP TO 30 MINUTES. IN A 15 MILE JOURNEY, COULD
HAPPEN AROUND 15 TIMES. SO THE DANGEROUS SITUATION IS
THAT I AM DRIVING WITH NO IDEA HOW MUCH SPEED I AM
GOING, I AM NOT ABLE TO USE MY HANDHELD PHONE (ALSO
VERY IMPORTANT TO ME AS A BUSY DOCTOR TRYING TO
ANSWER EMERGENCY CALLS), NO NAVIGATION SYSTEM
AVAILABLE, THE REAR VISION CAMERA BECOMES USELESS
WITH A BLANK SCREEN...
I LEARNT FROM THE INTERNET THAT THIS IS AN ONGOING
PROBLEM AND NO SOLUTION HAVE BEEN FOUND.
PROBLEM HAPPENS IN MOTION AND ALSO OR WHEN CAR IS
PARKED.

**Date Complaint Filed:** April 7, 2019
**Date of Incident:** March 31, 2019
**NHTSA ID Number:** 11194482
**Vehicle Identification Number:** 5FNYF5H60KB****
**Vehicle Type:** 2019 Pilot
WHEN DRIVING THE CAR, THE INSTRUMENT PANEL (INCLUDING
THE SPEEDOMETER) WILL SHUT OFF FOR APPROXIMATELY 2
MINUTES, AND THE REBOOT. THIS RESULT IN THE INABILITY TO
TELL EXACTLY HOW FAST THE VEHICLE IS MOVING. THIS WILL
OCCUR UNDER MULTIPLE CONDITIONS WHILE THE CAR IS IN
DRIVE, AND IS NOT DEPENDENT ON THE TYPE OF ROAD BEING
DRIVEN ON. ADDITIONALLY, THE CENTER CONSOLE
INFOTAINMENT SCREEN, WHICH ALSO SERVES AS THE SCREEN
FOR THE BACK UP CAMERA WILL SHUT OFF, FOR VARYING
AMOUNTS OF TIME, RENDERING THE ABILITY TO SEE/USE THE
BACK UP CAMERA USELESS. I HAVE ENCOUNTERED, ON
NUMEROUS OCCASIONS, BOTH SYSTEMS SHUTTING OFF AT THE
SAME TIME, WHILE THE CAR IS IN DRIVE OR REVERSE, LEAVING
ME WITH THE UNABLE TO SAFELY GAUGE HOW I AM
OPERATING THE VEHICLE.
**Date Complaint Filed:** April 3, 2019
**Date of Incident:** April 3, 2019
**NHTSA ID Number:** 11193522
**Vehicle Identification Number:** 5FNRL6H73JB****
**Vehicle Type:** 2018 Odyssey
I SHOULD HAVE NEVER GONE BACK TO Honda! MY 2018 Honda
ODYSSEY HAS BEEN ANOTHER LEMON! BOUGHT THE CAR AS A
CPO ON DECEMBER 21, 2018 WITH JUST OVER 3,000 MILES. SINCE
THEN THE CAR HAS BEEN IN THE SHOP 4 TIMES TO FIX THIS
INFOTAINMENT SYSTEM. I HAD THE ENTIRE DASHBOARD
BLACK OUT ON ME AND COULDN'T SEE MY SPEED, YET THE
Honda DEALERSHIP NEAR ME TOLD ME JUST DRIVE IT TO WORK,
IT'LL BE OKAY. THEN THE INFOTAINMENT WENT OUT AND
NOTHING WORKED FOR WEEKS UNTIL ANOTHER DEALERSHIP
WAS NICE ENOUGH TO REPLACE IT. JUST YESTERDAY MY
INFOTAINMENT SYSTEM MAKES A VERY LOUD 'BEEP' AND
SHUTS DOWN WHILE I'M DRIVING ON A BUSY HIGHWAY! THEN
THE DASHBOARD BLACKS OUT AND THE CAR SAFETY
FEATURES CAUSE IT TO BREAK! WHEN I SPOKE TO THE
DEALERSHIP I AM TOLD WE WILL HAVE TO RECREATE THAT
PROBLEM BEFORE ANYTHING IT DONE ARE YOU SERIOUS?! I
TAKE MY KIDS AROUND IN THIS MINI VAN. I PUSHED TO GO
BACK TO Honda BECAUSE THEY HAVE GOTTEN SO MUCH
BETTER, BUT IT TURNS OUT THEY HAVEN'T.
**Date Complaint Filed:** April 30, 2019
**Date of Incident:** April 16, 2019
**NHTSA ID Number:** 11204651

**Vehicle Identification Number:** 5FNYF6H67KB****
**Vehicle Type:** 2019 Pilot
8 DAYS AFTER PURCHASE AND LESS THAN 200 MILES, THE REAR
ENTERTAINMENT SCREEN STOPPED WORKING. THE DEALER
KEPT THE VEHICLE FOR 7 DAYS AND REPLACED THE RES
SCREEN. WHEN THE VEHICLE WAS RETURNED TO US, THE RES
SCREEN IMMEDIATELY FAILED TO TURN ON. THIS IS A KNOWN
ISSUE RELATED TO THE INFOTAINMENT SYSTEM AND THERE IS
AN OPEN CLASS ACTION LAWSUIT. Honda IS AWARE OF THE
ISSUE AND HAS NO FIX, YET THEY ARE STILL SELLING CLASS
VEHICLES.
**Date Complaint Filed:** April 19, 2019
**Date of Incident:** April 19, 2019
**NHTSA ID Number:** 11202559
**Vehicle Identification Number:** 5FNRL6H9XKB****
**Vehicle Type:** 2019 Odyssey
THERE IS AN ISSUE WITH THE INFOTAINMENT SYSTEM. REAR
BACK UP CAMERA DOES NOT WORK. RADIO DOES NOT WORK
AND CARPLAY DOES NOT WORK.
**Date Complaint Filed:** May 1, 2019
**Date of Incident:** February 11, 2019
**NHTSA ID Number:** 11205095
**Vehicle Identification Number:** 5FNYF5H41KB****
**Vehicle Type:** 2019 Pilot
AT ABOUT 300 MILES ENTIRE DISPLAY DOES NOT WORK ON
COLD START AND THROUGHOUT THE DAY. SCREEN FLASHES
BLUE AND THEN ACTIVATES, HOWEVER DOES NOT REMAIN ON.
NO REAR VIEW CAMERA, NAVIGATION, OR OTHER APPS
AVAILABLE TO THE DRIVER. SCREEN FLASHES WHILE DRIVING
WHICH IS A SAFETY ISSUE AND DISTRACTION. REAR VIEW
CAMERA NON-OPERATION IS ALSO A SAFETY ISSUE SINCE
UNABLE TO VIEW CHILDREN AS THEY CROSS BEHIND THE
VEHICLE."
**Date Complaint Filed:** May 11, 2019
**Date of Incident:** March 29, 2019
**NHTSA ID Number:** 11206993
**Vehicle Identification Number:** 5FNYF6H04KB****
**Vehicle Type:** 2019 Pilot
TAKATA RECALL CRACKING NOISE THROUGHOUT VEHICLE
STARTED A MONTH INTO OWNING THE CAR. SLOWLY THE
SYSTEM STARTED TO FAIL PHONE WOULD WORK RADIO
WOULDN'T WORK SCREENS WOULD GO OFF AND ON AND
FINALLY THE SCREEN WENT BLACK AND NEVER RECOVERED.
THEY PUT NEW DRIVER INTERFACE INSTRUMENTAL PANEL AND
IT STILL DIDN'T WORK SO Honda CHANGED THE WIRING
HARNESSES INFLOWTAINMENT SYSTEM. IT NOW BACK IN THE
SERVICE BC STILL NOT WORKING. VEHICLE IN MOTION.

DOESN'T MATTER IF IT MOVING GOING FAST OR SLOW.
**Date Complaint Filed:** July 10, 2019
**Date of Incident:** July 9, 2019
**NHTSA ID Number:** 11230644
**Vehicle Identification Number:** 5FNYF8H09KB****
**Vehicle Type:** 2019 Passport
NOTE. ALL HAS TAKEN PLACE WHILE IN MOTION EXCEPT FOR
THE RESTART. STARTED WITH INTERMITTENT SPEAKER
CRACKLES. YESTERDAY CRACKLES WITH RADIO ON
REOCCURRING CRACKLES FOLLED BY INFOTAINMENT SCREAN
NOTING RADIO SIGNAL LOSS FOLLED BY DATA
COMMUNICATIONS LOSS. (PARAPHRASING) FOLLWED BY
BLANK SCREEN. FOLLOWED BY BLANK INSTRUMENT SCREEN.
FOR SOME SECONDS. THEN ALL SCREANS BECAME
FUNCTIONAL. TODAY AS RADIO PLAYED THERE WAS A LOSS OF
SOUND WITH VISUAL INDICATION RADIO OPERATION WAS
CONTINUING AS A BUMP IN THE ROAD WAS NOTED. RADIO
REMAINED SILENT TILL LATER AS ENGINE WAS RESTARTED.
RADIO THEN SOUNDED THROUGH SPEAKERS.
**Date Complaint Filed:** July 19, 2019
**Date of Incident:** July 13, 2019
**NHTSA ID Number:** 11233479
**Vehicle Identification Number:** 5FNYF7H9XKB****
**Vehicle Type:** 2019 Passport
MULTIPLE ISSUES WITH THE INFOTAINMENT SYSTEM. THE
FIRST ISSUE HAPPENED AROUND 300 MILES, THE APPLE
CARPLAY WOULD NOT CONNECT. HAD TO REPEATEDLY
DISCONNECT AND RECONNECT APPLE XS MAX. AT TIMES THE
SOUND WOULD JUST STOP WORKING. SWITCHING FROM
CARPLAY, XM RADIO, AND FM WOULD FIX THE ISSUE.
THE INFOTAINMENT COMPLETELY SHUT DOWN ON JULY 13TH. I
TRIED TO "FIX" BY TURNING THE PASSPORT OFF AND ON,
GETTING OUT OF THE PASSPORT AND LOCKING THE DOORS,
GETTING BACK IN AND STARTING IT. I TRIED THIS ABOUT 10
TIMES AND NOTHING WORKED. I DROVEE STRAIGHT TO THE
DEALERSHIP. THEY QUICKLY DISCONNECTED THE BATTER
FROM THE PASSPORT AND THIS RESOLVED THE ISSUE.
THE ISSUES HAPPENED BOTH WHILE THE PASSPORT WAS IN
DRIVE AND WHILE IN MOTION.
I HAVE ALSO HAD ISSUES WITH THE DRIVER SIDE MIRROR NOT
HOLDING MEMORY. THE MIRROR SOMETIMES DOES A FACTORY
RESET, SO I AM FINDING MYSELF HAVING TO RESET THE
MIRROR EVERY TIME I GO TO DRIVE.
**Date Complaint Filed:** July 30, 2019
**Date of Incident:** June 18, 2019
**NHTSA ID Number:** 11240582
**Vehicle Identification Number:** 5FNYF6H38KB****

**Vehicle Type:** 2019 Pilot
CENTER DISPLAY AND DASHBOARD DISPLAY GO BLANK WHILE
DRIVING. IT RESTARTS AFTER SOME TIME. THE CENTER
DISPLAY SOMETIMES FLICKERS, SOMETIMES IT MAKES A
POPPING NOISE. YOU GET A MESSAGE NETWORK CONNECTION
LOST BEFORE THE WHOLE SEQUENCE OF EVENTS START. IT IS A
BRAND NEW VEHICLE AND NO ONE IS TAKING OWNERSHIP. THE
SCARY THING IS YOU ARE DRIVING ON THE ROAD AND THIS
HAPPENS ALL OF A SUDDEN. YOU ARE FORCED TO MOVE OVER
TO THE RIGHT LANE AND I HAVE TAKEN IT TO THE DEALER
MULTIPLE TIMES. AM HOPING HONDA CAN TAKE OWNERSHIP
AND FIX THE ISSUE. IN ALL INSTANCES, I WAS DRIVING ON THE
HIGHWAY AT AROUND 60MPH.
**Date Complaint Filed:** August 7, 2019
**Date of Incident:** August 7, 2019
**NHTSA ID Number:** 11242203
**Vehicle Identification Number:** 5FNYF6H92KB****
**Vehicle Type:** 2019 Pilot
DRIVERS SIDE MIRROR SHAKES WHILE DRIVING. CENTER
CONTROL STOPPED WORKING COMPLETELY. LOUD SOUND
WILL COME OVER ON THE RADIO AND THEN ALL SYSTEMS STOP
WORKING. BACK UP CAMERA DOES NOT WORK, RADIO DOES
NOT WORK. VEHICLE IS TURNED OFF BUT THE CENTER
CONTROL SCREEN IS FROZEN ON AND WILL NOT TURN OFF.
WHEN ON THE BLUETOOTH, RECIPIENT CALLER CANNOT HEAR
PERSON INITIATING THE CALL.
**Date Complaint Filed:** August 8, 2019
**Date of Incident:** May 1, 2019
**NHTSA ID Number:** 11242489
**Vehicle Identification Number:** 5FNYF5H30KB****
**Vehicle Type:** 2019 Pilot
THE RADIO IN THIS VEHICLE FREEZES, PRODUCES STATIC
FEEDBACK AND ELECTRICAL FEEDBACK WHILE OPERATING
THE TOUCHSCREEN. SOUND FROM THE SPEAKERS BECOMES
DISTORTED AND LACKING POWER. ELECTRICAL SURGING CAN
BE HEARD. THIS OCCURRED WITHIN THE FIRST 1000 MILES
SINCE PURCHASED NEW.
REAR HATCH ALIGNMENT WAS ALSO NOT INSTALLED
PROPERLY FROM THE FACTORY AND REQUIRED A BODY SHOP
TO ATTACH IT CORRECTLY. SEAT FABRIC MATERIAL WAS ALSO
DEFECTIVE AND COMING APART.
**Date Complaint Filed:** August 9, 2019
**Date of Incident:** July 31, 2019
**NHTSA ID Number:** 11242740
**Vehicle Identification Number:** 5FNYF8H09KB****
**Vehicle Type:** 2019 Passport
THE INFOTAINMENT INFORMATION DISPLAY BECOMES BLANK

INTERMITTENTLY. DATA CONNECTION LOSS RADIO SIGNAL
LOSS INTERMITTENTLY WHEN SCREEN IS ACTIVE. SPEED
INDICATOR PANEL GOES BLANK INTERMITTENTLY. IT IS
CURRENTLY UNKNOWN IF SAFETY FEATURES ARE
COMPROMISED AT THIS TIME. HONDA HAS REPLACED SYSTEMS
AND THE PROBLEM HAS REOCCURRED. GIVEN THESE
PROBLEMS THE VEHICLE IS NOT BEING DRIVEN. THESE EVENTS
ARE WHILE VEHICLE IS IN MOTION ON VERY FAT, TO SLIGHTLY
BUMPY SURFACES. HARDER JARRING HAS NOT CREATED
SIMILAR EVENTS. THIS ISSUE HAS BEEN REPORTED
PREVIOUSLY. AND CONTINUES AFTER HONDA RECOMMENDED
REPAIR.
**Date Complaint Filed:** August 11, 2019
**Date of Incident:** July 26, 2019
**NHTSA ID Number:** 11243163
**Vehicle Identification Number:** 5FNYF5H93KB****
**Vehicle Type:** 2019 Pilot
HONDA INFOTAINMENT ISSUE: PURCHASED A NEW 2019 PILOT
(TOURING) WITH 22 MILES ON IT ON 22 JULY 2019. ON 26 JULY
2019 WHILE DRIVING ON I-10 FROM PHOENIX THE AUDIO QUIT
AND THE SCREEN WENT BLANK. ONCE WE STOPPED AND USED
REVERSE DISCOVERED THERE WAS NO BACK UP CAMERA AND
THE SCREEN WOULD NOT TURN OFF WHEN THE CAR WAS
TURNED OFF.TOOK TO DEALER, THEY "FIXED" IT. ON 5 AUG 2019
SAME PROBLEM REOCCURRED. TOOK TO THE DEALER AND
THEY FIXED IT AGAIN. FROM 5 AUG TO TODAY (11 AUG) THE
SYSTEM HAS OPERATED LIKE IT SHOULD. I DID HAVE THE
ABILITY TO SEE WHAT SPEED I WAS GOING AND OTHER GAUGES
WORKED. I HAVE READ NUMEROUS REPORTS THAT EVEN THOSE
FEATURES WENT BLANK FOR OTHERS.DRIVING FROM TUCSON
AZ TO SAN DIEGO, CA TOMORROW AND I AM VERY CONCERNED
ABOUT THIS DEFECT HAPPENING WHILE IN THE MIDDLE OF
NOWHERE ON I-8! THERE IS NO EXCUSE FOR AN AUTO
MANUFACTURER TO NOT LET PEOPLE KNOW WHAT THE STATUS
OF A FIX IS AND WHEN TO EXPECT A RESOLUTION TO THE
PROBLEM. I HAVE READ NUMEROUS ARTICLES AND
EXPERIENCED IT MYSELF, THE DEALERS ACT LIKE THEY HAVE
NOT HEARD OF THIS ISSUE. HOW COULD PEOPLE INVOLVED ON
THE CAR BUSINESS NOT KNOW OF MAJOR PROBLEM THAT 1000S
OF PEOPLE ARE HAVING, IT IS LIKE THE HONDA CORP PASSED
THE WORD TO PLAY DUMB. I TRULY LIKE THE HONDA PILOT,
TRADED IN A 2016 EXL FOR THIS NEW CAR. WOULD REALLY LIKE
FOR THE CAR TO PREFORM AS ADVERTISED FOR MY (FAMILY)
COMFORT AND SAFETY. SAFETY BEING THE MAIN CONCERN
HERE.
**Date Complaint Filed:** September 3, 2019
**Date of Incident:** August 30, 2019

**NHTSA ID Number:** 11253049
**Vehicle Identification Number:** 5FNYF6H49KB****
**Vehicle Type:** 2019 Pilot
WHILE DRIVING THE CAR IN MOTION, THE INFOTAINMENT
SYSTEM PERIODICALLY AND RANDOMLY WILL 'LOSE
CONNECTION' AND BLACKOUT. WHEN THIS HAPPENS THE
ENTIRE DASHBOARD BLACKS OUT AND THERE IS NO
INFORMATION REGARDING EMERGENCY WARNINGS OR
SPEEDOMETER FOR AT LEAST 10 SECONDS, SOMETIMES MORE. I
HAVE NO IDEA OF HOW FAST I AM GOING OR IF THERE ARE ANY
EMERGENCY WARNINGS. I HAVE TAKEN TO HENNESSY HONDA
IN WOODSTOCK, GA FOUR TIMES AND THEY HAVE NOT FIXED
THE PROBLEM. THERE IS ALSO RANDOM STATIC ON THE ENTIRE
SYSTEM.
**Date Complaint Filed:** September 16, 2019
**Date of Incident:** September 14, 2019
**NHTSA ID Number:** 11255531
**Vehicle Identification Number:** 5FNYF6H92KB****
**Vehicle Type:** 2019 Pilot
THE TRANSMISSION HAS SLIPPED NOW TWICE WHILE DRIVING.
ONCE ON THE HIGHWAY AND AGAIN YESTERDAY AFTER
TURNING RIGHT ONTO A BUSY NARROW ROAD. THE
NAVIGATION SYSTEM AND SCREEN DISPLAY HAS BLACKED
OUT AND BECOME NON-FUNCTIONAL WHILE DRIVING AT LEAST
6-7 TIMES (NO RADIO, NAVIGATION, OR ANYTHING FUNCTIONS
WHEN THIS OCCURS). THE CAR HAS HAD TO BE TURNED OFF IN
ORDER RESET THE SCREEN AND FUNCTION AGAIN. IT IS NOT
POSSIBLE TO TURN OFF THE CAR WHEN DRIVING ON A
HIGHWAY OR NARROW COUNTRY ROAD. LASTLY, THE CAR HAS
BREAKED UNNECESSARILY ON SEVERAL OCCASIONS DESPITE
ADJUSTING THE SETTINGS TO NOT BE OVERLY SENSITIVE. ONCE
IT CAME TO A COMPLETE STOP UNNECESSARILY, THANKFULLY
NO ONE WAS BEHIND ME. IT HAS STARTED BREAKING
UNNECESSARILY WHILE DRIVING ON A HIGHWAY AND ON A
COUNTRY ROAD WHEN NO VEHICLES OR ANYTHING WERE
AROUND. THESE SITUATIONS HAVE BEEN SCARY AND
UNSETTLING.
**Date Complaint Filed:** September 17, 2019
**Date of Incident:** April 16, 2019
**NHTSA ID Number:** 11256170
**Vehicle Identification Number:** 5FNYF5H96KB****
**Vehicle Type:** 2019 Pilot
I PURCHASED MY VEHICLE IN MARCH OF 2019, BY MAY MY
DASH/RADIO WENT OUT. FIRST IT STARTED WHEN BLUETOOTH
WAS CONNECTED, IT WOULD SOUND LIKE A CRACKING NOISE,
LIKE STATIC. THIS IS ALL WHILE VEHICLE IS ON AND IN DRIVING
MODE. IT WAS A SCARY SOUND LIKE THAT OF AN ELECTRICAL

FIRE WAS GOING TO HAPPEN AT ANY SECOND. ULTIMATELY,
BOTH DASH AND RADIO COMPLETELY SHUT OFF AND DIDN'T
COME BACK ON. I TOOK IT IN TO THE DEALERSHIP, THEY KEPT
MY CAR FOR ALMOST A MONTH AND FINALLY GAVE IT BACK
AND STATED THAT THE WIRE HARNESS WAS LOOSE, OR NOT
PROPERLY INSTALLED AND THEY HAD RE DONE IT PROPERLY.
ALMOST 2 MONTHS LATER THE CRACKING NOISES STARTED
AGAIN, AND WOULD SPONTANIOUSLY CUT OFF THE
BLUETOOTH. THEN A FEW WEEKS LATER THE DASH WOULD RE
START ( SHUT OFF AND THEN BACK ON) BLUETOOTH WOULD
NOT CONNECT AND SAME NOISES ALL OVER AGAIN. NOW MY
DASH TURNS ON SOMETIMES AND THE RADIO DOES NOT
CONNECT AND IS A BLACK SCREEN. IT DOES TURN ON
SOMETIMES, BUT THIS IS A NEW CAR AND IT'S VERY ANNOYING.
HONDA WAS NOT ABLE TO FIX THE PROBLEM, AND I HAVE
HEARD SIMILAR ISSUES FROM OTHER OWNERS OF MY SAME
VEHICLE.
**Date Complaint Filed:** September 17, 2019
**Date of Incident:** June 27, 2019
**NHTSA ID Number:** 11256266
**Vehicle Identification Number:** 5FNYF6H08KB****
**Vehicle Type:** 2019 Pilot
THERE ARE SEVERAL ISSUES AND THEY HAVE HAPPENED MANY
TIMES - ALL RELATED TO ELECTRICAL SYSTEM, SPEEDOMETER
AND INFOTAINMENT DEFECTS. THE INFOTAINMENT AND DASH
DISPLAY INCLUDING THE SPEEDOMETER SHUT OFF WHILE
DRIVING. THIS INCLUDES THE SPEEDOMETER, ALL SAFETY
FEATURES, CRUISE CONTROL SHUTTING OFF WHILE DRIVING.
ALSO THE AUDIO WILL COMPLETELY SHUT OFF WHILE DRIVING
AND I WILL HAVE NO AUDIO FOR HOURS AT A TIME. ALSO
THERE ARE POPS AND CRACKLES OUT OF THE SPEAKERS EVERY
TIME I DRIVE THE VEHICLE.
I HAVE DETAILED DOCUMENTATION FOR THESE ISSUES
INCLUDING VIDEOS OF THE ISSUES HAPPENING WHILE DRIVING.
DEALERSHIP HAS ATTEMPTED TO REPAIR SEVERAL TIMES AND
THE ISSUES GET WORSE, NOT BETTER.
**Date Complaint Filed:** September 18, 2019
**Date of Incident:** July 2, 2019
**NHTSA ID Number:** 11256408
**Vehicle Identification Number:** 5FNYF8H08KB****
**Vehicle Type:** 2019 Passport
WHILE DRIVING IN MOTION AND RUNNING OVER SLIGHTLY
BUMPY SURFACE I WILL HEAR STATIC IN THE SPEAKERS AFTER
HITTING A FEW MORE BUMPS THE AUDIO WILL SHUT OFF. THEN
THE INFOTAINMENT SCREEN WITH EITHER SAY "FM RADIO
UNAVAILABLE" OR "NETWORK COMMUNICATIONS LOST"
FOLLOWING THIS THE INFOTAINMENT SCREEN WILL EITHER

REBOOT OR STAY OFF UNTIL THE CAR IS RESTARTED. IN SOME CASES WHEN THE INFOTAINMENT SCREEN WENT OFF THE DRIVER SCREEN THAT DISPLAYS SPEED, RPM AND OTHER SAFETY WARNING MESSAGE SHUTS OFF AND REBOOTS WHILE DRIVING IN MOTION WHICH IS VERY DISTRACTING AND UNSAFE. I HAVE HAD MY 2019 PASSPORT AT THE DEALER FOUR TIMES WHERE THEY HAVE CHECKED CONNECTIONS, REPLACED WIRING HARNESS AND EVEN REPLACED THE DRIVER SCREEN MODULE. WEEKS AFTER THIS LAST FIX THE SAME ISSUES HAPPENED AGAIN AND NOW BOTH SCREENS ARE BLANK AND WILL NOT COME BACK ON AFTER RESTARTING THE CAR. IT IS HEADING TO THE DEALER FOR YET ANOTHER DIAGNOSTIC. NOTE DURING MOST OF THESE ISSUES I WAS USING CAR PLAY BUT HAVE ALSO EXPERIENCED IT JUST USING FM RADIO. THE PROBLEMS USUALLY DON'T SURFACE TILL AFTER DRIVING ON A BUMPY ROAD.

**Date Complaint Filed:** September 30, 2019
**Date of Incident:** September 28, 2019
**NHTSA ID Number:** 11258912
**Vehicle Identification Number:** 5FNYF6H95KB****
**Vehicle Type:** 2019 Pilot

I PURCHASED THE VEHICLE ON AUGUST 10, 2019. WITHIN 2 WEEKS THE RADIO BEGAN MAKING A POPPING AND CRACKING SOUND THAT SOUNDED LIKE ROCKS HITTING THE WINDSHIELD. THIS SOUND HAPPENS DAILY WHEN I DRIVE THE VEHICLE. ABOUT ONE WEEK AFTER THIS HAPPENED, THE DVD PLAYER WOULD STOP WORKING AND THE SOUND FROM THE RADIO WOULD BEGIN TO COMPLETELY GO OUT. IT WOULD COME BACK ON EVENTUALLY, SOMETIMES AS MUCH AS 30 - 45 MINUTES LATER. AFTER ABOUT TWO WEEKS, THESE PROBLEMS CONTINUED AND THE SCREEN FOR NAVIGATION, ALONG WITH THE SPEEDOMETER SCREEN WOULD COMPLETELY GO BLACK WHILE THE VEHICLE WAS IN MOTION. IT RESTARTS AFTER ABOUT 10 - 20 SECONDS. IN TWO INSTANCES THE REAR BACKUP CAMERA HAS SHUT OFF WHILE I WAS BACKING UP AS WELL. I HAVE REPORTED THE ISSUE TO TWO DEALERSHIPS INCLUDING THE ONE WHERE I MADE THE PURCHASE. I AM SCHEDULED TO TAKE IT IN TO HAVE REPAIRS DONE TOMORROW.

**Date Complaint Filed:** October 2, 2019
**Date of Incident:** June 12, 2019
**NHTSA ID Number:** 11265747
**Vehicle Identification Number:** 5FNYF8H57KB****
**Vehicle Type:** 2019 Passport

TL THE CONTACT OWNS A 2019 HONDA PASSPORT. WHILE DRIVING AT ANY SPEED, THE BLUETOOTH SEIZED AFTER A FEW MINUTES OF DRIVING. ALSO, THE CLOCK AND RADIO DID NOT AUTOMATICALLY SET TO THE CONTACT'S CURRENT LOCATION.

THERE WAS NO WARNING INDICATOR ILLUMINATED. THE
SYSTEM RESTARTED AFTER THE VEHICLE WAS TURNED OFF
AND RESTARTED. THE VEHICLE WAS TAKEN TO DCH KAY
HONDA (732-982-2732, LOCATED AT 200 NJ-36, EATONTOWN, NJ
07724), BUT THE FAILURE COULD NOT BE DUPLICATED. THE
FAILURES RECURRED. THE MANUFACTURER WAS MADE AWARE
OF THE FAILURES AND STATED THAT THERE WAS A COMPUTER
UPDATE THAT SHOULD HAVE BEEN PERFORMED. THE CONTACT
WAS PROVIDED CASE NUMBER: 09932490 AND WAS REFERRED
BACK TO THE SAME DEALER; HOWEVER, THE DEALER STATED
THAT THERE WAS NO UPDATE. THE VEHICLE WAS NOT
REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 2,000.
**Date Complaint Filed:** October 6, 2019
**Date of Incident:** October 2, 2019
**NHTSA ID Number:** 11266621
**Vehicle Identification Number:** 5FNYF6H08KB****
**Vehicle Type:** 2019 Pilot
1ST PROBLEM...VIDEO DISPLAY WORKED ONLY
INTERMITTENTLY. 1ST VISIT, WOLFCHASE HONDA UPDATED
SOFTWARE, PROBLEM CONTINUED. 2ND VISIT THEY REPLACED
VIDEO UNIT.
2ND PROBLEM...SPEAKERS STARTED MAKING CRACKLING
NOISE. WENT ON THEIR SITE TO MAKE APPT AND RECEIVED A
NOTICE THAT OT A RECALL NOTICE ABOUT ELECTRICAL ISSUE
(OR A FLEET CAMPAIGN NOT SURE WHICH). THEY UPDATED
SOFTWARE ON THAT 3RD VISIT. SPEAKER PROBLEM WORSENED
AFTER THAT VISIT AND SPEEDOMETER DISPLAY AND VIDEO
(STEREO SYSTEM, NAVIGATION ETC) WOULD BLANK OUT
WHILE DRIVING. SYSTEM WOULD GENERALLY RESET BUT ONLY
AFTER 30 SECONDS OF NON VISIBILITY TO MY SPEED, CRUISE
CONTROL STATUS ETC.. TOOK IT BACK FOR 4TH VISIT. THEY
STATED THEY FOUND AN ISSUE WITH TAILGATE SENSOR.
PICKED IT UP ON FRIDAY OCT 4TH AND IT STARTED MAKING
THE CRACKLING NOISE IN THE SPEAKERS AGAIN YESTERDAY,
OCT 5TH. LAST TIME, IT EVENTUALLY GOT WORSE UNTIL
SPEEDOMETER STOPPED WORKING. PLAN TO MAKE ANOTHER APPT (MY 5TH)
THIS WEEK. CRACLKING NOISE OCCURS WHEN STOPPED, WHEN DRIVING,
WHEN VEHICLE IS TURNED OFF (AFTER BEING ON).
VIDEO AND SPEEDOMETER DISPLAY STOP WORKING WHEN
DRIVING.
**Date Complaint Filed:** October 8, 2019
**Date of Incident:** September 9, 2019
**NHTSA ID Number:** 11267053
**Vehicle Identification Number:** 5FNYF6H53KB****
**Vehicle Type:** 2019 Pilot
THE ISSUE IS RELATED TO THE HONDA INFOTAINMENT SYSTEM.
AFTER ONLY 2000 MILES THE SYSTEM BEGAN HAVING ISSUES.

WHILE THE DRIVER IS DRIVING, THE CENTER DISPLAY AND THE
DISPLAY ON THE CONTROL PANEL WILL FREQUENTLY GO
BLANK. WHEN THIS HAPPENS THE DRIVER IS UNABLE TO
ACTIVATE OR DEACTIVATE SPECIFIC SAFETY CONTROLS
INCLUDING LANE KEEP ASSIST, ADAPTIVE CRUISE CONTROL
AND AUTOMATIC BRAKING. THE AUTOMATIC BRAKING
WARNING IS ALSO LOST WHEN THE DISPLAY GOES OUT. THE
DRIVER ALSO LOSES THE SPEEDOMETER. FROM THE CENTER
DISPLAY, THE DRIVER IS UNABLE TO USE THE BACKUP CAMERA,
THE RADIO, NAVIGATION AND THE ABILITY TO MAKE HANDS
FREE PHONE CALLS.
**Date Complaint Filed:** October 16, 2019
**Date of Incident:** October 1, 2019
**NHTSA ID Number:** 11268786
**Vehicle Identification Number:** 5FNYF6H04KB****
**Vehicle Type:** 2019 Pilot
PURCHASED 2019 HONDA PILOT ELITE IN FEBRUARY 2019.
NOTICED A POPPING SOUND WHILE DRIVING IT HOME THAT
SOUNDED LIKE SAND OR ROCKS SLIGHTLY AMPLIFIED HITTING
THE WINDSHIELD INTERMITTENTLY. THIS HAS CONTINUED AND
OVER THE NEXT FEW MONTHS IT BECAME APPARENT THE
SOUND WAS NOT ACTUALLY FROM THE WINDSHIELD BUT
ASSOCIATED WITH THE SPEAKERS/ELECTRICAL SYSTEM. IN
AUGUST A LOUD CRACKLING SOUND INTERRUPTING THE
SATELLITE RADIO STARTED HAPPENING INTERMITTENTLY
FOLLOWING PERIODS OF THE ORIGINAL POPPING SOUNDS. BY
OCTOBER, THAT LOUD POP HAS BEEN FOLLOWED BY A
COMPLETE BLACKOUT OF THE SYSTEM SCREEN (BOTH)
INCLUDING THE SPEED, ETC. FOLLOWED AFTER 30 SECONDS - A
MINUTE BY THE SYSTEM RESTARTED. PRIOR TO THAT THERE
WERE SEVERAL CASES OF APPLE CAR PLAY SHUTTING DOWN
DURING PHONE CALLS THAT MAY HAVE BEEN ALSO
ASSOCIATED WITH THIS PROBLEM WITHOUT A COMPLETE
SHUTDOWN. I HAVE 27,000+ MILES AS OF 10/15/19, DRIVE A LOT
AND NO DEALER CLOSE BY AND ALSO DEPEND DAILY ON
HAVING THE VEHICLE. CONTACTED THE DEALER CAR WAS
PURCHASED FROM THIS WEEK AND THEY ADMITTED HAVING A
PILOT IN THE SHOP NOW WITH SIMILAR SYMPTOMS THAT THEY
HAD NOT BEEN ABLE TO DIAGNOSE OR FIX YET. SUGGESTED I
MAKE AN APPOINTMENT AND LEAVE IT WITHOUT THEM KNOW
HOW LONG IT MIGHT BE. AGREED I WOULD CALL BACK AND SEE
WHAT THEY WERE ABLE TO DO ON THE PILOT THEY ALREADY
HAD IN THEIR SHOP. HAVE SINCE THEM FOUND NUMEROUS
SIMILAR REPORTS WITH 2019 PILOTS ON THIS SITE AND OTHERS
WITH ALL REPORTING HONDA NOT ADMITTING TO A SYSTEMIC
PROBLEM AND ALSO NO PERMANENT REPAIRS. PROBLEMS
HAVE ALWAYS OCCURRED WHILE DRIVING ON INTERSTATE

HIGHWAYS AT FULL SPEED. OTHERS HAVE REPORTED BACKUP
CAMERAS GOING OUT BUT I HAVE NOT HAD THE PROBLEM
EXCEPT WHEN DRIVING AT FULL SPEED BUT EXPECT THAT
BACKUP CAMERA WOULD HAVE ALSO BEEN OUT HAD I BEEN
STOPPED AT THE TIME OF THE PROBLEM. I THINK HONDA
SENSING SAFETY FEATURES NOT AFFECTED.
**Date Complaint Filed:** October 24, 2019
**Date of Incident:** October 23, 2019
**NHTSA ID Number:** 11270566
**Vehicle Identification Number:** 5FNYF8H90KB****
**Vehicle Type:** 2019 Passport
INFOTAINMENT SYSTEM AND INSTRUMENT PANEL BOTH WENT
BLACK TODAY AND STOPPED WORKING FOR NO REASON. CAR
HAS ONLY 3000 MILES ON IT. VEHICLE WAS DRIVEN TO WORK
THIS MORNING WITH EVERYTHING WORKING. WHEN I STARTED
IT TO GO HOME AT END OF DAY NEITHER THE INSTRUMENT
PANEL OR INFOTAINMENT SYSTEM WOULD WORK; BOTH WERE
JUST BLACK SCREENS. HAVE SINCE DISCOVERED THERE IS A
CLASS ACTION LAWSUIT FILED AGAINST HONDA FOR
INFOTAINMENT SYSTEM PROBLEMS AND WANT TO REPORT MY
ISSUE. EXTREMELY CONCERNING SITUATION AS CAR UNSAFE
TO DRIVE WITHOUT INSTRUMENT PANEL.

125.    In Conti, denying in part a motion filed pursuant to

Fed. R. Civ. P. 12(b) to dismiss the first amended

complaint, the United States District Court for the Central

District Of California explained:  The FAC also quotes a

"Tech Line Summary Article" allegedly released by Honda

acknowledging that the infotainment system in at least one

vehicle model freezes under certain conditions. (*Id.* ¶

222.) Plaintiffs also allege that employees at Honda

dealerships made statements suggesting Honda was aware of

these defects as early as March 2018. (*See id.* ¶¶ 32-34,

62-65, 100, 119, 181, 196, 223). Finally, Plaintiffs allege

that soon after the 2018 vehicles were released, customers

submitted numerous consumer complaints through the National Highway Transportation Safety Administration and third-party websites. (*See id.* ¶¶ 217-221.).  Exhibit E.

126.    All of the above posts and the aforesaid website make clear that defendants have knowledge of the problems both before and after plaintiffs purchased the vehicle.

127.    Before plaintiffs purchased the vehicle, neither the selling dealer nor defendants ever advised plaintiffs of the problems, despite defendants' knowledge via warranty repair requests made to its franchise dealers that the problems affected many of its vehicles, including the vehicle and multiple years of earlier Honda Pilots.

128.    Under the warranty, defendants are responsible for the cost of warranty repairs during the warranty period and reimburse franchise dealerships for warranty repairs.

129.    When a vehicle purchaser has a problem with a vehicle under a new car warranty such as the warranty, the vehicle purchaser reports or makes a complaint to the franchise dealership of defendants or to defendants directly or to both.[18]

130.    The franchise dealership in turn notifies defendants. Exhibit F, p, i-ii.

131.    Once defendants receive that information, defendants'

employees enter that information into defendants' database. Exhibit F, p, ii.

132.    Warranty repairs are but one source of information about vehicle defects that are a source for defendants' database about a given vehicle – others being insurance records, police reports and technical or consumer call center inquiries.  Exhibit F, p. 5.

133.    By having such a database in place, defendants have the ability to tie a particular vehicle defect to the manufacturing date, date in service or some other timetable or reference point and this database is crucial to the tracking of system failures.  Exhibit F, p, iii.

134.    Under the NCLL, for each repair attempt made by defendants' franchise dealerships to vehicles during the lemon period, a record is prepared of such repair attempt.[19]

135.    In this regard, the NCLL states: "[e]ach time a consumer's motor vehicle is returned from being examined or repaired during the period specified in section 3 of P.L.1988, c.123 (C.56:12-31), the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, through its dealer or distributor, shall provide to the consumer an

---

[18] N.J.S.A. 56:12-31.
[19] N.J.S.A. 56:12-34(b).

itemized, legible statement of repair which indicates any
diagnosis made and all work performed on the vehicle and
provides information including, but not limited to, the
following: a general description of the problem reported by
the consumer or an identification of the problem reported
by the consumer or an identification of the defect or
condition and the source of the defect; the amount charged
for parts and the amount charged for labor, if paid for by
the consumer; the date and the odometer reading when the
vehicle was submitted for repair; and the date and odometer
reading when the vehicle was made available to the
consumer." [20]

136.    This documentation of the repair attempt process can
be crucial to the warranty tracking process and to notify
defendants of recurring issues with vehicles that
defendants sells, distributes and warrants.  Exhibit F, p.
3.

137.    Further, as mentioned above, defendants maintain a
computerized database of all of the warranty repairs and
resources for defendants' franchise dealerships to use to
attempt to repair vehicle issues or nonconformities
complained of by vehicle purchasers to said dealerships
(e.g., "Tech Line" and index of service campaigns and

---

[20] N.J.S.A. 56:12-34(b).

technical service bulletins).  Exhibit F.

138.    Therefore, defendants provide technical support to franchise dealerships performing repair attempts under the warranty.  Exhibit F, p. 3.

139.    Defendants require defendants' franchise dealerships to submit forms for reimbursement for warranty repairs, which include a description of the problem and the repairs being completed and those dealerships notify defendants of warranty issues.  Exhibit F, p. 4-5.

140.    As explained above, every time a vehicle is brought to defendants' franchise dealerships for repairs under the warranty, said dealerships notify defendants of the issues that are the subject of the repair attempts and are frequently asked by said dealerships to authorize the performance of repair attempts (i.e., performance of labor and replacement of parts on the vehicle).

141.    For example, as referenced above, a post by Brianmccarthy33 dated 3-5-18 states: "I have a 2017 Pilot Touring and I have the same popping issue through the speakers. Honda replaced the diode in the alc relay. This seems to have worked although I still have a loud Pop when the door locks engage. The dealership told me that is normal and there is nothing they can do about it.  Exhibit C; https://www.piloteers.org/threads/random-electrical-

snapping-cracking-sound-elite.107474/page-5#post-1627413.

142.     A post by Waylyn99 dated 11-13-18 states: "I just
purchased a 2019 and my car has been in the shop for 8 days
for the same exact problem. I have no resolution as of yet.
I will post any updates."  Exhibit C;
https://www.piloteers.org/threads/random-electrical-
snapping-cracking-sound-elite.107474/page-5#post-1627413.

143.     A post by mazer75 dated 3-18-17 stated: "Glad I found
this thread. This issue just started with my 2017 Elite.
Bought the car 12/28/2016, and the popping started maybe a
week ago. Car only has 2200 miles, and was made in November
2016. Had Gardena Honda check it out today, and they said
it was because my bass was up too high. Lol. Should have
checked here first. Has anyone managed to get this
permanently fixed? Or is the fix to replace that relay
wherever the popping returns? This sucks..."
https://www.piloteers.org/threads/random-electrical-
snapping-cracking-sound-elite.107474/page-5#post-1627413.

144.     A post by larful dated 10-16-17 stated: "Update: I
went in for the random popping issue to Honda. I told them
about this information I found online on this forum and
also else where (sic). finding noise connecting to the A/C
system and the temporary fix being the relay and the more
permanent fix replacing a/c parts. I wanted them armed with

extra information prior to attempting to repair. They
informed me they use a Honda Tech line to search issues
they later found it to be the relay just as you have
mentioned. I went ahead and let them just fix the relay and
we had the discussion to allow the sound to come back and
then have a open case for this and when the noise re occurs
proceed with the replacement of parts not just quick relay
replacement. I'm happy at the moment the random one snap
noise is gone. I'll enjoy this next 8-10 weeks of quiet
road sounds. It does faintly comes through my upgraded
tweeters when I lock and unlock the door still but I
consider that maybe an incidental to upgrading my stock
tweeters and amplifying them."

https://www.piloteers.org/threads/random-electrical-
snapping-cracking-sound-elite.107474/page-5#post-1627413.

145.    Therefore, it is beyond question that defendants, via
complaints made to defendants' franchise dealerships by
other purchasers of Honda Pilots purchasing their vehicles
before plaintiffs purchased the vehicle:  (1) had knowledge
of the problems long before plaintiffs purchased the
vehicle; and (2), were asked by other consumers purchasing
Honda Pilots equipped with the same or substantially
similar Infotainment System to perform repair attempts to
address the problems.

146. The NCLL imposes various reporting requirements on manufacturers relative to vehicles with inherent design defects and on the manufacturer and DCA relative to vehicles repurchased by manufacturers as lemons.

147.  Those reporting requirements shall make it easier for plaintiffs, during the course of discovery in this case, to determine the class members' identities.

148.  The NCLL requires manufacturers to "shall certify to the division, within one year of discovery, the existence of any inherent design defect common to all motor vehicles of a particular model or make."[21]

149.  Under the NCLL, a manufacturer commits a per se CFA violation if they fail to perform that certification.

150.  Upon information and belief, in violation of the CFA, defendants failed to perform that certification process notwithstanding defendants having knowledge that the problems were an inherent design defect of the vehicle.

151.  Pursuant to the NCLL regulations adopted by the DCA, the Division of Consumer Affairs shall maintain an index of all motor vehicle disputes by make and model and shall compile and maintain statistics indicating the record of manufacturer compliance with any settlement procedure decisions and the index and statistical record of

compliance shall be made available to the public.[22]

152.    Pursuant to the NCLL, "a. If a motor vehicle is returned to the manufacturer, or, in the case of an authorized emergency vehicle, to the manufacturer, co-manufacturer, or post-manufacturing modifier, under the provisions of this act or a similar statute of another state or as the result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New Jersey unless: (1) The manufacturer, co-manufacturer, or post-manufacturing modifier provides to the dealer, distributor, or lessor, and the dealer, distributor or lessor provides to the consumer, the following written statement on a separate piece of paper, in 10-point bold-face type: "IMPORTANT: THIS VEHICLE WAS RETURNED TO THE MANUFACTURER OR OTHER RESPONSIBLE PARTY BECAUSE IT DID NOT CONFORM TO THE MANUFACTURER'S OR OTHER PARTY'S WARRANTY FOR THE VEHICLE AND THE NONCONFORMITY WAS NOT CORRECTED WITHIN A REASONABLE TIME AS PROVIDED BY LAW;" (2) The dealer, distributor, or lessor obtains from the consumer a signed receipt certifying, in a conspicuous and understandable manner, that the written statement required under this subsection has been provided. The director shall

---

[21]. N.J.S.A. 56:12-44.
[22] N.J.A.C. 13:45A-26.15.

prescribe the form of the receipt. The dealer, distributor, or lessor may fulfill his obligation to obtain a signed receipt under this paragraph by making such a notation, in a conspicuous and understandable manner, on the vehicle buyer order form accompanying the sale or lease of that vehicle; and (3) The dealer, distributor, or lessor, in accordance with the provisions of section 1 of P.L.1993, c.21 (C.39:10-9.3), notifies the Chief Administrator of the Motor Vehicle Commission of the sale or transfer of ownership of the motor vehicle."[23]

153.    The DCA's website includes a list of "Vehicles Branded Under The New Jersey Lemon Law As of April 1, 2020" and that list includes the following 2019 Honda Pilots identified by their vehicle identification numbers that are listed as being so branded: 2019 HONDA PILOT 5FNYF6H91KB006207; 2019 HONDA PILOT 5FNYF6H98KB034392; 2019 HONDA PILOT 5FNYF6H56KB013926; 2019 HONDA PILOT 5FNYF6H98KB037440; 2019 HONDA PILOT 5FNYF5H65KB015573; 2019 HONDA PILOT 5FNYF5H97KB026911; 2019 HONDA PILOT 5FNYF6H61KB020226; and 2019 HONDA PILOT 5FNYF6H65KB018026. https://www.njconsumeraffairs.gov/llu/Documents/Vehicles-Branded-Under-The-New-Jersey-Lemon-Law.pdf.

---

[23] N.J.S.A. 56:12-35.

154.    Disclosure during discovery of the reasons for 2016-19 Honda Pilot vehicles being branded lemons could reveal that one or more of the reasons were issues similar to the problems.

155.    Returning to the vehicle that is the subject of this case, given the above allegations, defendants clearly knew of the problems that are the subject of this case long before plaintiffs purchased the vehicle on or about November, 2018 yet omitted that information from plaintiffs.

156.    Upon information and belief, before plaintiffs filed this pleading, defendants were provided notice of the problems by numerous complaints against it as reflected by the aforesaid index, which, in addition to listing 2019 Honda Pilots with branded lemon titles, also reflects multiple branded lemon titles involving 2018 and 2019 model year Honda Pilots and Honda Odysseys – vehicles which are the subject of the Conti complaint.  Exhibit D, §1.

157.    Upon information and belief, defendants had additional notice about the problems via the Conti complaint and by customer complaints, letters, emails and other communications from class members and from dealers and other repair facilities.  This is especially the case since 2016 Honda Pilots and older year Honda Pilots have been

subject to repair attempts for the problems as reflected by the aforesaid webposts by Honda Pilot owners.

158.    As indicated by multiple unsuccessful repair attempts, defendants' never found a solution to the problems in a reasonable period of time and may indeed never find a solution or if found, that discovery may not occur during the period of coverage provided via the vehicle's warranty, resulting in the need for costly repairs out of pocket for problems that were covered by the warranty and should have been fixed in a reasonable time during the warranty's duration at no cost to consumer but that defendants never fixed in a reasonable time and during that duration and plaintiffs failed to receive the benefit of plaintiffs' bargain – e.g., a safe, reliable, valuable vehicle warranted against yet discovered problems or problems that could be addressed under the warranty in a reasonable period of time.

159.    Instead, before plaintiffs purchased the vehicle, defendants had advanced knowledge, through the complaints of other consumers purchasing 2019 Honda Pilots, that those vehicles had problems which defendants were unable to successfully repair in a reasonable time.

160.    The vehicle's warranty and the protections afforded to

consumer via the NCLL are crucial to the purchasers of vehicles manufactured, assembled and distributed by defendants to which the warranty an the NCLL applies, as the warranty and the NCLL influences consumers' decisions to purchase vehicles covered by the warranty and NCLL.

161.   As the Appellate Division explained: [24]   "[w]arranties developed in the law ... to protect the ordinary consumer who cannot be expected to have the knowledge or capacity ... to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose." *Henningsen, supra,* 32 *N.J.* at 375, 161 *A.*2d 69. An express warranty for a new automobile is not provided gratuitously by the manufacturer or seller. The cost of the warranty is included in the cost of the product. The consumer has purchased the warranty along with the car. It is "part of the benefit of the bargain." *Thiedemann v. Mercedes-Benz USA, LLC,* 183 *N.J.* 234, 251, 872 *A.*2d 783 (2005).

162.   Express warranties are used by manufacturers to increase the attractiveness of their products to consumers. The inclusion of warranties is not a result of corporate

---

[24] *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012).

benevolence. Conversely, purchasers rely on warranties; they reasonably expect them to have meaning beyond a mere promise of replacement.[25]

163.    A warranty is intended to give consumers peace of mind that any problems with the vehicle arising during the applicable coverage periods of the warranty can and shall be addressed in a reasonable period of time and if not, that consumers shall have recourse to the law to seek damages such as the remedy of revocation of acceptance and the NCLL statutory refund.

164.    Therefore, while a warranty is not a guarantee against all issues that may arise in the operation of a vehicle, the warranty forms an important marketing tool, providing a consumer peace of mind that problems with a warranted vehicle's operation, brought to the manufacturer's attention during that period, can and shall be fixed by the vehicle's manufacturer in a reasonable time.

165.    However, in this case, before plaintiffs purchased the vehicle, defendants:  (1) knew that the problems existed; (2) were unable to fix those problems in a reasonable time – as shown from warranty repair

---

[25] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980)(Pashman, J., concurring).

experience with other 2019 Honda Pilot owners; and (3) proceeded to manufacture, assemble and distribute the vehicle into the stream of commerce with its warranty to its ultimate end user, plaintiffs.

166.    Therefore, since 2019 Honda Pilots suffer from known issues that defy repair and since defendants had knowledge of those issues before distributing 2019 Honda Pilots to dealerships for sale and lease to the public, the efficacy of the warranties issued with those 2019 Honda Pilots was in doubt before those Pilots were sold and leased.

167.    Accordingly, acting in bad faith, defendants lured plaintiffs to consider purchasing the vehicle, marketed and sold as it was with its warranty but without disclosure of the problems that were unable to be fixed in a reasonable time under the warranty.

**THE NCLL, BREACH OF WARRANTY AND MMWA CLAIMS**

168.    The allegations contained in the previous paragraphs are repeated as if fully set forth.

169.    Under the UCC "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the

affirmation or promise."[26]

170.   Further, every contract with a merchant for the sale of goods contains an implied warranty that the goods are fit for ordinary purposes for which the goods are used. This warranty is known as the implied warranty of merchantability.[27]

171.   In addition to other remedies available to consumers under the UCC for a breach of warranty, a UCC remedy available to consumers when a manufacturer fails to fix a vehicle in a reasonable period of time is revocation of acceptance.[28]

172.   By failing to fix the problems in a reasonable time, defendants violated the NCLL and breached the warranty and the implied warranty of merchantability that arose as a matter of law relative to the vehicle.

173.   The vehicle's use, value and safety are substantially impaired by defendants' failure to fix the problems in a reasonable time.

174.   The vehicle's value has suffered from diminution.

---

[26] *N.J.S.A.* 12A:2-313(1)(a).
[27] New Jersey Model Civil Jury Charge 4:22B.
[28] N.J.S.A. 12A:2-608; *General Motors Acceptance Corp. v. Jankowitz*, 216 N.J. Super. 313 (App. Div. 1987); *Realmuto v. Straub Motors*, 65 N.J. 336 (1974); *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226, 242 (App. Div. 2012); See also *Ventura v. Ford Motor Corp.,* 180 N.J. Super. 45, 53-54, 433 *A.2d* 801 (App. Div.1981).

175.    Diminution in value is a standard measure of damages in breach of warranty cases, such as here, where a revocation of acceptance remedy is sought.[29]

176.    Further, breach of warranty damages need not be established with exact certainty: "[M]ere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief. Although it complicates the precise calculation of damages, our courts have long held that "[p]roof of damages need not be done with exactitude. ... It is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate."[30]

177.    As explained in the Restatement (Second) of Contracts:

---

[29] See, e.g., In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 816-17 (3d Cir. 1995) (emphasizing, in a class action suit, that section 2-714(1) of the UCC allows for damages "as determined in any manner which is reasonable"); *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.*, 226 N.J. Super. 200, 219, 543 A.2d 1020 (App. Div. 1988); *McDonald v. Mianecki*, 79 N.J. 275, 282 n.1 (1979); accord *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 13, 860 A.2d 435 (2004) (applying UCC principles to a consumer fraud case and concluding that the cost of replacing a damaged carpet was the appropriate measure of damages, as that method put the buyer in the position he would have been in if he had received a non-defective carpet).
[30] *Totaro, Duffy, Cannova and Co., LLC v. Lane, Middleton & Co., LLC*, 191 N.J. 1, 14, 921 A.2d 1100 (2007) (quoting *Lane v. Oil Delivery Inc.*, 216 N.J. Super. 413, 420, 524 A.2d 405 (App. Div. 1987) ).

Alternative to Loss in Value of Performance § 348 (Am. Law Inst. 1981), a small windfall to the injured party based on an inability to prove exact damages should not defeat recovery.

178.    Also, the injured party need not prove that he or she actually spent the money to repair the defect in order to recover for the breach.[31]

179.    The United States Supreme Court rejected the notion that a jury may not estimate damages.[32]

180.    As to the implied warranty of merchantability, that warranty was breached because the vehicle was unfit for the ordinary purpose for which such goods are used.

181.    As reflected by the vehicle's repair history, before filing suit, plaintiffs gave defendants multiple efforts to cure the problems but defendants failed to fix the problems in a reasonable time.  Exhibit A.

182.    Moreover, as explained above, since defendants knew about the problems at the time of purchase, defendants had

---

[31] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 22, 647 A.2d 454 (1994).

[32] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)("[a]lthough the factfinder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly").  See also *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ----, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016).

ample opportunity before the sale to cure the breach of warranty.

183.    Accordingly, plaintiffs retained counsel relative to this dispute and, via a letter addressed to the manufacturer, plaintiffs revoked acceptance of the vehicle pursuant to N.J.S.A. 12A:2-608 and requested defendants to make arrangements with plaintiffs' counsel to:  (1) accept the return of the vehicle; (2) provide plaintiffs a full refund of all payments made to date on the vehicle's lease/purchase agreement; and (3) pursuant to the MMWA,[33] pay plaintiffs' attorney's fees accrued as of that date. Exhibit A.

184.    However, the manufacturer failed to provide the aforesaid relief.

185.    Nor has the manufacturer repurchased the vehicle from plaintiffs pursuant to the NCLL.

186.    The NCLL states, in relevant part:  "[t]he Legislature finds that the purchase of a new motor vehicle is a major, high cost consumer transaction and the inability to correct defects in these vehicles creates a major hardship and an unacceptable economic burden on the consumer. It is the intent of this act to require the manufacturer of a new

---

[33]See 15 U.S.C. § 2310.

motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, to correct defects originally covered under warranty which are identified and reported within a specified period. It is the further intent of this act to provide procedures to expeditiously resolve disputes between a consumer and a manufacturer, co-manufacturer, or post-manufacturing modifier when defects in a new motor vehicle are not corrected within a reasonable time, and to provide to award specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle.

187.    Because of defendants' failure to fix the vehicle in a reasonable time and defendants' failure to provide plaintiffs with a revocation of acceptance remedy or a statutory repurchase under the NCLL, plaintiffs must now seek damages against defendants.

188.    As stated on page 13 of the vehicle's warranty booklet, defendants attempt to disclaim liability for consequential damages and thereby limit the warranty to one simply providing a repair remedy.

189.    However, that limitation language fails to negate plaintiffs' damages claims because where a limited repair

remedy fails of its essential purpose (i.e., failing to fix a vehicle in a reasonable time), the repair remedy limitation is no impediment to the consumer's recovering consequential damages.  This is because, to be effective, a repair remedy must be provided within a reasonable period of time.  Otherwise, the buyer loses the substantial benefit of the buyer's purchase and is thus entitled to seek damages against the offending party.[34]

190.    "It is to be emphasized that we are here dealing with words of exclusion or limitation contained in a contract document that is not the product of mutual negotiation or cooperative draftsmanship. The purchaser of a mass-produced consumer article with a standard warranty form or booklet, as in this case, has no opportunity to bargain over its terms. Warranties are prepared unilaterally by the company and distributed automatically with the product on a mass basis. *Henningsen v. Bloomfield Motors, Inc.*, supra, 32 N.J. at 390.  The consumer must ordinarily place considerable reliance upon the fairness and good faith of the manufacturer and its dealers. It has therefore been recognized that the reliance which a consumer necessarily

---

[34] *G.M.A.C. v. Jankowitz*, 216 N.J. Super. 329, 330-331 (App. Div. 1987); *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085-1086 (3rd Cir. 1980); N.J.S.A. 12A:2-719(2); *Smith v. Chrysler*, 1990 WL 65700 (E.D.Pa. 1990); *Beal v. General Motors*

reposes in a seller engenders a corresponding responsibility on the seller. See id. at 399." [35]

191.    As to the NCLL and warranty claims, this isn't a case a defect but rather, the relief to which consumers are entitled when a manufacturer fails to provide a limited warranty repair remedy in a reasonable time.

192.    Under NCLL, the UCC and/or the MMWA, proof of the existence of a problem in the vehicle or of negligence on any defendants' part is not a prerequisite to a finding that the problems substantially impair the vehicle's use and/or value and/or safety. [36]

193.    To establish the existence of a defect or nonconformity impairing the product's vehicle's use or

---

*Corporation*, 354 F. Supp. 423, 426, 427 (1973).

[35] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980).

[36] As stated by the court in *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012): "the plaintiff in a warranty action need not establish the existence of a defect; the failure of the goods to perform as warranted is sufficient." *Spring Motors, supra,* 98 *N.J.* at 586, 489 *A.*2d 660; *accord Gen. Motors Acceptance Corp. v. Jankowitz*, 216 *N.J. Super.* 313, 336, 523 *A.*2d 695 (App. Div.1987). Proof of causation must still be shown in a case based on breach of an express warranty, but "mere failure of promised performance is enough without proof of any defect." *Realmuto v. Straub Motors, Inc.,* 65 *N.J.* 336, 343, 322 *A.*2d 440 (1974) (citing *Collins v. Uniroyal, Inc.,* 64 *N.J.* 260, 262, 315 *A.*2d 16 (1974)). In *Jankowitz, supra,* 216 *N.J. Super.* at 320-22, 336-37, 523 *A.*2d 695, on facts that resemble those of this case, we held that the buyer of a new car was not required to produce expert evidence to prove that the manufacturer's and the seller's failure to repair the car was a breach of the express warranty they had provided. See also *Ventura v. Ford*

value, plaintiffs need only identify the effect of a defect rather than pinpointing its cause.[37]

194.    As further explained by the Appellate Division, the "intent" of the Lemon Law is to "provide procedures to expeditiously resolve disputes between a consumer and a manufacturer when defects in a new motor vehicle are not corrected within a reasonable time," and to provide "specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle." Ibid.

Toyota's construction of the statute would turn this expeditious administrative proceeding into a full blown litigation entangling the consumer in the intricacies of design defects and other complexities of product liability law. The Legislature clearly intended to spare the unfortunate buyer of a "lemon" those hazards and costs.[38]

195.    Moreover, to establish a breach of warranty, plaintiffs need not show that defendants acted negligently or in bad faith.[39]

---

*Motor Corp.,* 180 *N.J. Super.* 45, 53-54, 433 *A.*2d 801 (App. Div.1981).

[37] *Christelles v. Nissan Motor Corp.,* 305 N.J. Super. 222, 228-229 (App. Div. 1997).

[38] *Berrie v. Toyota Motor Sales, USA, Inc.*, 630 A.2d 1180, 267 N.J. Super. 152 (App. Div. 1993).

[39] *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085 (3rd Cir. 1980).

196.    The MMWA includes a private cause of action for consumers damaged by a breach of warranty as follows:  "(d) Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims (1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief— (A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection. (2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

197.    The MMWA envisions class action treatment of claims

brought pursuant to the MMWA.[40]

198.    In this case, since this pleading doesn't name over 100 putative class action representatives, this court and not any district court, has jurisdiction over the dispute – an issue that cannot be circumvented by the Class Action Fairness Act (CAFA).[41]

199.    Pursuant to 15 U.S.C. § 2310(e), plaintiffs are entitled to bring this class action and are not required to give defendants notice and an opportunity to cure until such time as the court determines the representative capacity of plaintiffs.

**THE CFA'S APPLICATION TO THIS DISPUTE GENERALLY**

200.    The allegations contained in the previous paragraphs are repeated as if fully set forth.

201.    The CFA is a statute that is to be applied broadly given the statute's remedial purpose.[42]

---

[40] 15 U.S.C. § 2310.

[41] 15 U.S.C. § 2310. As to class actions, MMWA's requirement to name one hundred plaintiffs must be met independently of CAFA's jurisdictional standard." *Floyd v. Am. Honda Motor Co.*, 2018 WL 6118582, at *3 (C.D. Cal. June 13, 2018) (Wilson, J.); *MacDougall v. Am. Honda Motor Co.*, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) (Guilford, J.); *Cadena v. Am. Honda Motor Co.*, 2019 WL 3059931, at *11 (C.D. Cal. May 29, 2019) (Fitzgerald, J.). "CAFA—a basis for federal courts to exercise jurisdiction over state law disputes between diverse parties— doesn't fill in the gaps for missing substantive requirements of a federal law." *MacDougall*, 2017 WL 8236359, at *4.

[42] *Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 264 (1997); *Blatterfein v. Larken Associates*, 323 N.J. Super.

202.   Under the CFA, "(d) The term "person" as used in this act shall include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof;" N.J.S.A. 56:8-1(d).

203.   The parties meet the definition of "person" as set forth in N.J.S.A. 56:8-1(d).

204.   Under the CFA, "[t]he term "advertisement" shall include the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan;…." N.J.S.A. 56:8-1(a).

205.   Under the CFA, "[t]he term "merchandise" shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale;…." N.J.S.A. 56:8-1(c).

206.   The vehicle is merchandise subject to the CFA.

207.   Under the CFA, the term "sale" shall include any sale,

167, 178 (App. Div. 1999).

rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute. N.J.S.A. 56:8-1(e).

208.  The sale of the vehicle constitutes a "sale" under the CFA.

209.  Further, N.J.S.A. 56:8-2 states, in pertinent part: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice…." N.J.S.A. 56:8-2.

210.  The CFA is designed to protect the public even when a merchant acts in good faith.[43]

211.  As to any individual defendants facing CFA violations pled in this pleading, under the CFA, there is no need to pierce any corporate or company veil; the Court instead focuses on individual defendants' misconduct supporting CFA

violations.

212.    Therefore, assuming for argument's sake that the individual defendants named to this case operated via one or more valid corporations or companies, the corporate veil does not insulate corporate officers or employees or company managing members or employees from CFA liability.[44]

**SECTION 2 CFA VIOLATIONS**

213.    The allegations contained in the previous paragraphs are repeated as if fully set forth.

214.    Defendants' course of conduct in this dispute provides evidence of a section 2 knowing omission violation of N.J.S.A. 56:8-2 (section 2) via unlawful practices, both in the initial transaction and in subsequent performance.

215.    Relative to the vehicle's problems, which were known to defendants before plaintiffs purchased the vehicle and which defendants failed to disclose to plaintiffs, defendants committed a knowing omission involving the following:  (1) nondisclosure—"a fact existing at the time of the transaction was not disclosed"; (2) materiality of fact undisclosed—"the fact, if disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge—

---

[43] *Cox v. Sears*, 138 N.J. 2, 16 (1994).
[44] *Allen v. V & A Bros.*, 208 N.J. 114 (2011).

defendants "knew the fact and its importance at the time of the transaction"; and (4) intentional concealment—defendants withheld the information intending for the buyer to make a decision without knowing the fact.

216.    Defendants engaged in an "omission" – the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a duty to act under the circumstances.[45]

217.    Vehicle purchasers such as plaintiffs have viable knowing omission claims where, as here, a manufacturer designs and distributes a vehicle with a problem not readily discoverable by customers but of which the manufacturer was aware yet failed to disclose to those customers.[46]

---

[45.] New Jersey Model Civil Jury Charge 4:43.

[46.] *Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 U.S. Dist. LEXIS 121755 (D.N.J. Sept. 11, 2015). The court explained:  In addition to the allegations of knowledge described above, Plaintiffs further assert that Kia was aware of the defect based on (1) online customer complaints about the alleged problem, and (2) a technical service bulletin ("TSB") issued by Defendants . . . . Specifically, Plaintiffs direct the Court to specific websites that they allege contain complaints about the crankshaft pulley bolt problem. (*Id*.). They include detailed information regarding the names of the websites and the number and nature of the complaints. (*Id*.). In addition, Plaintiffs allege that a TSB issued in June 2007 that "identified the problem discussed in this complaint stating: '[t]he Crankshaft Pulley bolt may become loose, especially if improperly torqued during routine service . . . .'" At least one New Jersey Plaintiff, Robinson, purchased her vehicle after the June 2007 TSB was issued . . . . Its "publication adds further

218.    Unlike the usual vehicle put into the steam of commerce with a warranty, the manufacturer was not in good faith insuring against a risk but actually knew *with certainty* that the product at issue or one of its components was going to fail.[47]

219.    Plaintiffs need not prove their case on the pleadings but rather, must merely allege details showing that it is *plausible* that defendants knew of the problems before the sale and yet failed to disclose same to plaintiffs.[48]

220.    There is evidence of defendants' foreknowledge of failure because defendants knew the problems plagued successive model years of Pilots (as evidenced by comments on the aforesaid vehicle owner forum indicating the repeated reporting of failures for identical or near identical or related reasons) and yet failed to correct the problems for subsequent model year lines.[49]

---

plausibility to [plaintiffs'] allegations that [d]efendants had knowledge of . . . the alleged defect."
[47]. *Coba v. Ford Motor Co.*, No. 12-1622 (KM) (MAH), 2017 U.S. Dist. LEXIS 123546 (D.N.J. Aug. 4, 2017).
[48] *Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 472 (App. Div. 2001).  See also *Printing Mart v. Sharp Elecs.Corp.*, 116 N.J. 739, 746 (1989)("…in determining whether dismissal under Rule 4:6-2(e) is warranted, the court should not concern itself with the plaintiffs' ability to prove its allegations.").
[49]. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-04209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. Mar. 11, 2015). The court explained: Plaintiff buttresses this allegation with a research report from CK Commercial Vehicles, published before Plaintiff purchased any of its tractors, which indicates that 37%

221.    In addition to the aforesaid misconduct referenced

above, during the course of the transaction or during

subsequent performance of obligations, defendants may have

committed other types of CFA violations, such as failure to

make other mandatory disclosures or the like – misconduct

which may be uncovered during the course of discovery.

222.    To the extent that substantial aggravating

circumstances are necessary for any of the aforesaid CFA

violations, all of the aforesaid misconduct amounted to

substantial aggravating circumstances over and above a mere

breach of contract and/or breach of warranty and therefore,

said misconduct was sufficient to trigger one or more CFA

violations.

223.    Substantial aggravating circumstances may include,

'existence of bad faith or lack of fair dealing.'"[50]

---

of a group of users of tractors with Cummins engines experienced
"a high rate of cracked DPF filters . . . ." [T]he amended
complaint also alleges that Defendants learned about these
defects through "[t]he on-board diagnostics systems . . . that
store trouble or fault codes and provide data to Defendants'
and/or their authorized service providers' diagnostic computers."
On a motion for class certification of the CFA claims, the
district court held that the plaintiffs' CFA claims sufficed. As
to ascertainable loss, one plaintiff incurred over $80,000 in
post-warranty repair costs. *T.J. McDermott Transp. Co. v.
Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S. Dist. LEXIS
29678 (D.N.J. June 7, 2016).

[50] *JWQ Cabinetry Inc. v. Granada Wood & Cabinets Inc.*, No. 13-
4110 (FLW), 2015 U.S. Dist. LEXIS 31730 (D.N.J. Mar. 16, 2015)
(citing *Petri Paint Co., Inc. v. OMG Ams., Inc.*, 595 F. Supp. 2d

224.    Substantial aggravating circumstances are present in this case because defendants, possessing knowledge of the vehicle's predelivery problems, acted in bad faith and failed to deal fairly with plaintiffs because defendants: (1) put into the stream of commerce and continued to offer the vehicle for sale to consumers such as plaintiffs while failing to disclose the vehicle's problems; (2) was aware that the problems would manifest themselves within the warranty period and that the vehicle would fail yet failed to disclose that information to plaintiffs; and (3) provided repeated repairs that defendants knew would not fix the vehicle or fix the vehicle in a reasonable period of time while failing to disclose such fact to plaintiffs and while failing to simply provide plaintiffs with a UCC revocation of acceptance remedy or NCLL statutory repurchase remedy.[51]

---

416, 420 (D.N.J. 2008)) (citing, in turn, *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994)).

[51] See, e.g., *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 443 (D.N.J. 2012) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111-12 (App. Div. 2006); *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501 (D.N.J. 2009); *Kuzian v. Electrolux Home Prods., Inc.*, No. 12-3341 (NLH/AMD), 2013 U.S. Dist. LEXIS 44050, at *29-30 (D.N.J. Mar. 27, 2013)(A putative class of plaintiffs alleged that defective ice makers failed to produce ice, leaked water into the refrigerators causing the electrical components to short out and malfunction, thereby caused the refrigerators to warm to unsafe temperatures and that the defective ice makers and resulting leaks caused food to spoil and caused damage to flooring, walls and other personal

225.    When purchasing the vehicle, plagued as it is by the problems of which the manufacturer was aware of presale, plaintiffs failed to receive the benefit of plaintiffs' bargain.  The vehicle's value is substantially impaired by the predelivery problems of which plaintiffs only became aware after taking delivery of the vehicle.

226.    That diminution in the vehicle's value due to its repair history establishes the basis for an ascertainable loss of money or property proximately caused by the CFA violations detailed above that is able to be ascertained within a reasonable degree of certainty.[52]

227.    The potential for future repair costs to attempt to fix the problems once the warranty is over is evidence of an out of pocket ascertainable loss of money that is able to be ascertained within a reasonable degree of certainty.[53]

---

property beyond the refrigerator itself.).

[52]. *Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist. LEXIS 166329 (D.N.J. Dec. 1, 2016). The court explained: Here, Plaintiffs have alleged injuries that have already occurred, as well as imminent future injury. Specifically, all Named Plaintiffs have alleged economic injury in the form of diminished resale value of their vehicles. In addition, Plaintiffs spent time taking their vehicles to BMW repair centers. Several Plaintiffs have also incurred out-of-pocket costs to purchase extra oil and replacement batteries. Accordingly, they have satisfied Article III's injury in fact requirement.
*Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist. LEXIS 166329 (D.N.J. Dec. 1, 2016).

[53] *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. June 7, 2016).(one

Where, as here, someone faces or expects to incur an out of pocket loss, such a loss equates with an ascertainable loss sufficient to support liability under the CFA.[54]

228.    Had plaintiffs received disclosure of the problems before purchasing the vehicle, plaintiffs would have never paid out of pocket for the vehicle and that purchase price – paid for a vehicle with problems that can't be fixed in a reasonable time or perhaps ever under the warranty - establishes an out of pocket ascertainable loss of money that is able to be ascertained within a reasonable degree of certainty.[55]

229.    Because plaintiffs suffered an ascertainable loss as aforesaid, treble damages are available for the CFA aforesaid CFA violations.[56]

---

plaintiff incurred over $80,000 in post-warranty repair costs.).
[54] See *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994); *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).  Under the CFA one does not need to actually incur the loss to sufficiently allege same in a pleading.  See *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).
[55] *BK Trucking Co. v. PACCAR, Inc.*, No. 15-2282 (JBS/AMD), 2016 U.S. Dist. LEXIS 85149 (D.N.J June 30, 2016)(Vehicle buyers claimed vehicles equipped with emission treatment system are defective and render plaintiffs' vehicles inoperable due to the engines' constant failure despite repeated warranty repair and the precise details of those systems are in the exclusive control of defendants. Plaintiffs have further alleged that, if defendants had disclosed to them the nature of the ATS and its impact on the engine, they would not have bought vehicles equipped with the engine or would not have paid over $100,000 for them).
[56] N.J.S.A. 56:8-19.

230.    Equitable relief is available in the form of a full refund and a judgment or order declaring the aforesaid misconduct as illegal.[57]

231.    In addition, a statutory refund is sought – that is, relief pursuant to the CFA's refund provision, which states: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful.[58]  The refund of moneys herein provided for may be recovered in a private action or by such persons authorized to initiate actions pursuant to P.L.1975, c. 376 (C. 40:23-6.47 et seq.).[59]"  The New Jersey Supreme Court explained the separate cause of action available for refunds as follows: "The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18, & -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise,

---

[57] N.J.S.A. 56:8-19.
[58] N.J.S.A. 56:8-2.11.
[59] N.J.S.A. 56:8-2.12.  The last reference in this provision to "P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by the offices of the Department of Consumer Affairs.

N.J.S.A. 56:8-19."[60]

232.   Pursuant to the CFA, an award of counsel fees and litigation costs is also sought.[61]

233.   One or more statutes pled herein provide for fee shifting for parties hiring counsel and prevailing under said statutes.

234.   Accordingly, the counsel bringing this case serves as a private attorney general.[62]

235.   Otherwise, consumers pursuing claims under fee shifting states might incur potentially considerable expense for a potentially small recovery.[63]

CLASS ACTION ALLEGATIONS

236.   The allegations contained in the previous paragraphs are repeated as if fully set forth.

237.   Plaintiffs bring this putative class action for damages, repurchases, refunds, equitable and injunctive relief on behalf of themselves and applicable New Jersey

---

[60] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).

[61]. *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).

[62] See *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 268 (1997).

[63] See, e.g., *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 470 (App. Div. 1982)(discussing fee shifting under the CFA); *Chattin v. Cape May Greene, Inc.*, 243 N.J. Super. 590, 610 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1992) (citing *Coleman v. Fiore*

citizens.

238.    More specifically and subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, plaintiffs propose the following class of New Jersey citizens who purchased or leased a 2019 Honda Pilot vehicle (class vehicle) manufactured or assembled or distributed by defendants, with the vehicle being purchased or registered in New Jersey..

239.    Excluded from the class are: (a) New Jersey citizens that demanded a NCLL or revocation remedy from the manufacturer or filed a claim about the problems and the class vehicle by filing suit or an Administrative Law claim with the Office of Administrative Law or file a binding alternate dispute resolution claim against the manufacturer and/or that the manufacturer, in response to such a demand or claim or in satisfaction thereof, provided or paid a settlement, refund or revocation remedy.  (b) defendants, any entity in which defendant has a controlling interest and its legal representatives, officers, directors, employees, assigns and successors; (c) the Judges to whom this case is assigned and any member of the Judges' staff or immediate family; (d) class counsel.

_Bros._, Inc., 113 N.J. 594, 598 (1989))(same); _Furst v. Einstein Moomjy_, 182 N.J. , 21 (2004)(same).

240.    Plaintiffs seek only damages and injunctive relief on behalf of themselves and the class members. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by plaintiffs and/or the class members.

241.    Defendants are in exclusive possession, custody and control of the list of persons who were class members in the prior case and any other cases.

242.    While there may be other cases pending against defendants, upon information and belief, the proposed class members' claims in this matter don't overlap with those other pending cases.

243.    It isn't the intent to have overlapping classes and any overlap will be ameliorated through amendment if facts show that they do overlap.

244.    Defendants' actions are not isolated.

245.    Defendants' actions have affected similarly situated individuals throughout the State of New Jersey.

246.    Defendants acted on grounds generally applicable to the class members, thereby justifying relief against defendants for the class members as whole.

247.    Plaintiffs are members of the class that they seek to represent.

248.    The class is believed to number at least hundreds, if

not thousands, of persons and their joinder is impracticable, except by via a class action.

249.   The disposition of the claims of the class in a class action will benefit both the parties and the Court.

250.   There are questions of law and/or fact common to the class predominating over any question affecting only individual class members as to whether defendants are liable to plaintiffs for violation of applicable law. For instance, are defendants liable for the class action claims pled in the complaint?

251.   Class certification is also appropriate because defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to plaintiffs and the class members.

252.   Specifically, plaintiffs seek injunctive relief via a court judgment or order requiring an end to the unlawful practices and/or the issuance of a corrective or explanatory notice to the class members.

253.   Plaintiffs' claims are typical of the claims of the class insofar as named class representatives and the members of the class were similarly exposed to the statutory harms alleged herein and were similarly injured and/or face similar risks therefrom.

254.   The proposed class representatives state a claim upon

which relief can be granted that is typical of the claims

of absent class members.  If brought and prosecuted

individually, the claims of each class member would

necessarily require proof of the same material and

substantive facts, rely upon the same remedial theories,

and seek the same relief.

255.   Plaintiffs will fairly and adequately represent the

interests of the class insofar that the plaintiffs' claims

are typical of those of the class members.

256.   Plaintiffs are committed to the vigorous

representation of the class members.

257.   Plaintiffs retained counsel experienced and skilled in

consumer law and class action litigation.

258.   Plaintiffs have no conflict of interest in the

maintenance of this class action.

259.   If the matter is maintained as a class action, it

shall provide for a fair and efficient adjudication of this

dispute.

260.   The claims and remedial theories pursued by the named

class representative are sufficiently aligned with the

interests of absent class members to ensure that the

individual claims of the class will be prosecuted with

diligence and care by the individual plaintiffs as class

representatives.

261.   Contrawise, especially in view of the small dollar
amounts in controversy relative to the individual
plaintiffs' claims, it would be impracticable and
undesirable for each member of the class who suffered harm
to bring a separate action.

262.   Further, the maintenance of separate actions in lieu
of the instant proposed class action would place a
substantial and unnecessary burden on the courts and could
result in inconsistent adjudications.

263.   Contrawise, a single class action such as the instant
proposed class action can determine the rights of all class
members while economizing judicial resources.

264.   Moreover, as plaintiffs invoked consumer protection
statutes and have pled a prima facie case for the violation
of same, the policy goals behind those consumer protection
statutes provide further reason for permitting class action
certification of the instant action.

265.   The benefits of adjudicating this case via a class
action far outweigh any difficulties in management of the
case as a class action.

266.   Class action treatment of this case is a superior
method for the fair and efficient adjudication of this
dispute because:

- individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake;

- as a result, there has been no other litigation over the controversies herein;

- individual members of the class have no interest in prosecuting and controlling separate actions; and

- the proposed class action is manageable.

- the proposed class is readily ascertainable.

267.  Certification of the class under R. 4:32 or Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate because defendants acted on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

268.  Certification of the class under R. 4:32 or Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate in that: (a) the questions of law or fact common to the members of the class predominate over any questions affecting an individual member; and (b) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

269.  Class treatment will permit a large number of similarly situated persons to prosecute their common claims

in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual lawsuits would entail.

270.   Absent a class action, many members of the class will likely not even obtain relief, whether because they are unaware of their right to relief from the harm caused by defendants' illegal practices, due to the prohibitive time and monetary cost inherent in individual litigation, or otherwise.

271.   While the exact number of class members is unknown to plaintiffs at this time and can only be determined by appropriate discovery, membership in the class is ascertainable based upon the records maintained by defendants and governmental officials.

272.   Upon information and belief, during the relevant time periods, over one hundred of the class vehicles, if not thousands of class vehicles, were sold to New Jersey citizens or are registered to New Jersey citizens in New Jersey.

273.   Therefore, the class members are so numerous that individual joinder of all class members is impracticable under R. 4:32 or Fed. R. Civ. P. 23(a)(1).

274.   Plaintiffs' claims are typical of the claims of the class members whom they seek to represent under R. 4:32 or

Fed. R. Civ. P. 23(a)(3) because plaintiffs and each class

member have a vehicle with the same problems.

275.    Plaintiffs will fairly and adequately represent and

protect the interests of the class members as required by

R. 4:32 or Fed. R. Civ. P. 23(a)(4).

276.    Plaintiffs are adequate representatives because their

interests do not conflict with the interests of the class

members and intend to vigorously prosecute this case.

277.    Further, plaintiffs retained counsel (i.e., Lewis

Adler and Paul Depetris) competent and experienced in

complex class action litigation, including putative

automotive warranty class action litigation and New Jersey

CFA litigation and who together certified at least eight

(8) class actions and intend to vigorous prosecute this

case vigorously.

278.    Therefore, the interests of the class members will be

fairly and adequately protected.

279.    A class action is appropriate under R. 4:32 or Fed. R.

Civ. P. 23(b)(3) because questions of law or fact common to

class members predominate over any questions affecting only

individual members and a class action is superior to any

other available means for fairly and efficiently

adjudicating the controversy.

280.    The class members' interests in individually

controlling the prosecution of separate actions is low

given the magnitude, burden, and expense of individual

prosecutions against large merchants such as defendants.

281.    Plaintiffs nor their counsel are aware of any pending

litigation concerning this controversy already begun by any

of the class members.

282.    By way of example, a review of the Conti complaint

indicates that it doesn't involve any claims brought by New

Jersey citizens under the New Jersey Lemon Law, New Jersey

UCC or CFA.

283.    It is desirable to concentrate this litigation in this

forum to avoid burdening the courts with individual

lawsuits.

284.    As interpreted by New Jersey courts, New Jersey

consumer statutes lend themselves to class action

treatment, lest viable individualized consumer claims go

unprosecuted due to the dubious utility of prosecuting them

on individual bases.

285.    Further, individualized litigation presents a

potential for inconsistent or contradictory results and

increases delay and expense to all parties and the court

system presented by the legal and factual issues of this

case.

286.    The proposed class action has no management

difficulties.

287.    Defendant's records and the records available publicly will easily identify the class members.

288.    As the problems are common to all the class vehicles, the same documents and testimony shall prove plaintiffs' and the class members' claims.

289.    If the case proceeds as a class action, the parties and the court system shall benefit via a single adjudication, economies of scale and comprehensive supervision by a single court.

290.    A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(2) because, as detailed above, defendants acted or refused to act on grounds applicable  generally to the class members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all class members.

**COUNT 1**

**VIOLATION OF THE NEW JERSEY NEW CAR LEMON LAW**

**PLAINTIFF AND THE CLASS AGAINST DEFENDANTS**

291.    The allegations contained in the previous paragraphs are repeated as if fully set forth.

292.    This count is pled by plaintiffs and the class against defendants.

293.    Pursuant to N.J.S.A. 56:12-31, et seq., plaintiffs

reported the problems and/or nonconformities with the vehicle to the manufacturer via the dealer and/or the repairing dealers (the dealers repairing the vehicle) directly to the manufacturer and thereby gave the manufacturer a reasonable number of opportunities to repair the vehicle.

294.   After said notification and/or a reasonable number of repair attempts to the vehicle as performed by the manufacturer (either itself or via the dealer and/or repairing dealers), the manufacturer was unable to repair the problems and/or nonconformities in a reasonable period of time.

295.   In violation of N.J.S.A. 56:12-29, et seq., the problems and/or nonconformities substantially impair or impaired the vehicle's use, value and/or safety.

296.   The NCLL states, in relevant part:[64]  "[i]f, during the period specified in section 3 of this act, the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, of that part of the motor vehicle containing the nonconformity, or its dealer or distributor, is unable to repair or correct the nonconformity within a reasonable time, the manufacturer, comanufacturer, or post-

manufacturing modifier shall accept return of the motor
vehicle from the consumer. (1) In the case of a motor
vehicle, other than an authorized emergency vehicle as set
forth in paragraph (2) of this subsection, the manufacturer
shall provide the consumer with a full refund of the
purchase price of the original motor vehicle including any
stated credit or allowance for the consumer's used motor
vehicle, the cost of any options or other modifications
arranged, installed, or made by the manufacturer or its
dealer within 30 days after the date of original delivery,
and any other charges or fees including, but not limited
to, sales tax, license and registration fees, finance
charges, reimbursement for towing and reimbursement for
actual expenses incurred by the consumer for the rental of
a motor vehicle equivalent to the consumer's motor vehicle
and limited to the period during which the consumer's motor
vehicle was out of service due to the nonconformity, less a
reasonable allowance for vehicle use. (2) In the case of an
authorized emergency vehicle, the manufacturer, co-
manufacturer, or post-manufacturing modifier shall provide
the consumer with a full refund of the purchase price of
the original emergency vehicle, depending on the source of
the nonconformity, including any stated credit or allowance

---

[64] N.J.S.A. 56:12-32.

for the consumer's used emergency vehicle, as well as any
other charges or fees, including, but not limited to, sales
tax, license and registration fees, reimbursement for
towing and reimbursement for actual expenses incurred by
the consumer for the rental of a substitute emergency
vehicle, if applicable, for the period during which the
consumer's emergency vehicle was out of service due to the
nonconformity. (3) Nothing in this subsection shall be
construed to preclude a manufacturer, co-manufacturer, or
post-manufacturing modifier from making an offer to replace
the vehicle in lieu of a refund; except that the consumer
may, in any case, reject an offer of replacement and demand
a refund. Refunds shall be made to the consumer and
lienholder, if any, as their interests appear on the
records of ownership maintained by the Chief Administrator
of the New Jersey Motor Vehicle Commission. In the event
that the consumer accepts an offer to replace the motor
vehicle in lieu of a refund, it shall be the
manufacturer's, co-manufacturer's, or postmanufacturing
modifier's responsibility to insure that any lien on the
returned motor vehicle is transferred to the replacement
vehicle. b. A consumer who leases a new motor vehicle shall
have the same remedies against a manufacturer, co-
manufacturer, or post-manufacturing modifier under this

section as a consumer who purchases a new motor vehicle. If it is determined that the lessee is entitled to a refund pursuant to subsection a. of this section, the consumer shall return the leased vehicle to the lessor or manufacturer, co-manufacturer, or post-manufacturing modifier, and the consumer's lease agreement with the motor vehicle lessor shall be terminated and no penalty for early termination shall be assessed. The manufacturer, co-manufacturer, or post-manufacturing modifier shall provide the consumer with a full refund of the amount actually paid by the consumer under the lease agreement, including any additional charges as set forth in subsection a. of this section if actually paid by the consumer, less a reasonable allowance for vehicle use. The manufacturer, comanufacturer, or post-manufacturing modifier shall provide the motor vehicle lessor with a full refund of the vehicle's original purchase price plus any unrecovered interest expense, less the amount actually paid by the consumer under the agreement. Refunds shall be made to the lessor and lienholder, if any, as their interests appear on the records of ownership maintained by the Chief Administrator of the Motor Vehicle Commission.

297.    While plaintiffs, via plaintiffs' counsel, offered to return the vehicle to the manufacturer, to date and in

violation of N.J.S.A. 56:12-32, the manufacturer never accepted return of the vehicle from plaintiffs and never provided plaintiffs with a full refund of the purchase price of the vehicle as required by N.J.S.A. 56:12-32.

298.    Pursuant to N.J.S.A. 56:12-32 and N.J.S.A. 56:12-42, plaintiffs seek a refund and other actual expenses incurred (including any expert witness fees incurred) as well as attorney's fees and court costs.

299.    Plaintiffs complied with the provisions of N.J.S.A. 56:12-41.

## COUNT 2

## BREACH OF EXPRESS WARRANTY AND VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT

### PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

300.    The allegations contained in the previous paragraphs are repeated as if fully set forth.

301.    This count is pled by plaintiffs and the class against defendants.

302.    Since the contract in this case was predominantly for the sale of goods and the warranty pertained to goods, the UCC applies to this dispute.[65]

---

[65] As explained by the Appellate Division: Article 2 of the UCC applies to transactions in goods. N.J.S.A. 12A:2-102. "`Goods' mean all things (including specially manufactured goods) which are movable at the time of identification to the contract for

303.    At the time of sale and/or thereafter, defendants or their agents issued plaintiffs the warranty, which was an express warranty in accordance with the UCC and/or the MMWA.

304.    Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

305.    Defendants expressly warranted the labor that defendants performed or caused to be performed to the vehicle and/or parts that defendants replaced or caused to be replaced on the vehicle.

306.    Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

307.    Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle wasn't as warranted.

308.    For, the vehicle, as originally delivered and/or subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

309.    Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to

---

sale other than the money in which the price is to be paid, investment securities and things in action." N.J.S.A. 12A:2-105(1). *DiIorio v. Structural Stone & Brick*, 845 A.2d 658, 368 N.J. Super. 134 (N.J. Super., 2004).

plaintiffs' obligation to notify defendants of problems that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

310.   By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

311.   The limited repair remedies that defendants provided to plaintiffs failed of their essential purpose, as defendants were unable and/or unwilling to correct and/or repair and/or remedy the vehicle's problems within a reasonable time.  Therefore, any disclaimers/limitations of liability contained in the warranty are null and void under the doctrine of failure of essential purpose.

312.   Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable period of time or to provide the remedy of revocation of acceptance constitute a breach of express warranty.

313.   Pursuant to the MMWA, via one or more repair attempts referenced in this pleading (exhibit A) and before filing suit, plaintiffs afforded defendants a reasonable

opportunity to cure defendants' failure to comply with the warranty but defendants failed to render such compliance.

314.    Thereafter, pursuant to the UCC (N.J.S.A. 12A:2-608), plaintiffs provided defendants with a letter notifying defendants that plaintiffs revoked acceptance of the vehicle and demanded a refund from defendants pursuant to the UCC and/or MMWA.  Exhibit A.  However, to date, defendants refused to comply with said demand.

315.    Defendants committed a breach of express warranty under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

316.    Plaintiffs are entitled to relief pursuant to N.J.S.A. 12A:2-608 and therefore, seek the remedy of revocation of acceptance in accordance therewith.

317.    Plaintiffs are consumers as defined by 15 U.S.C. § 2301, defendants are warrantors as defined by 15 U.S.C. § 2301 and the vehicle is a consumer product as defined by 15 U.S.C. § 2301.

318.    The provisions of 15 U.S.C. § 2301, et seq. apply to this case, because, pursuant to 15 U.S.C. § 2301-2303, defendants are manufacturers and/or sellers and/or warrantors of a consumer product sold to plaintiffs with written and implied warranties and plaintiffs are entitled to enforce the provisions of same.

319.   Pursuant to 15 U.S.C. § 2308, defendants provided a written warranty to plaintiffs in conjunction with the vehicle.

320.   Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle.  Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the U.C.C. and/or MMWA and/or under the aforesaid warranty and thus bring this action against defendants for damages and pursuant to 15 U.S.C. § 2310, et seq., plaintiffs are entitled to recover attorney's fees and court costs.

321.   More specifically, 15 U.S.C. § 2310 states in part: "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—(A) in any court of competent jurisdiction in any State or the District of Columbia…(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably

incurred by the plaintiffs for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

322.   Accordingly, pursuant to the UCC and the MMWA, plaintiffs seek the remedies of revocation of acceptance, damages applicable under those statues and an award of fees and costs pursuant to the MMWA.

### COUNT 3

**BREACH OF IMPLIED WARRANTY AND VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT**

**PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS**

323.   The allegations contained in the previous paragraphs are repeated as if fully set forth.

324.   This count is pled by plaintiffs and the class against defendants.

325.   At the time of sale and/or thereafter, defendants failed to properly disclaim implied warranties in accordance with the UCC and/or the MMWA and/or defendants impliedly warranted that the vehicle was of merchantable quality and/or was reasonably fit and/or suitable for the purpose for which it was purchased.

326.   Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

327.   Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

328.   Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle was not as warranted.

329.   For, the vehicle, as originally delivered and/or subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

330.   Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to plaintiffs' obligation to notify defendants of problems that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

331.   By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

332.   Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable period of time constitute a breach of defendants' warranty

obligations, including but not limited to a breach of the implied warranty of merchantability.

333.   Pursuant to the MMWA, via one or more repair attempts referenced in this pleading (exhibit A) and before filing suit, plaintiffs afforded defendants a reasonable opportunity to cure defendants' failure to comply with the warranty but defendants failed to render such compliance.

334.   Thereafter, pursuant to the UCC (N.J.S.A. 12A:2-608), plaintiffs provided defendants with a letter notifying defendants that plaintiffs revoked acceptance of the vehicle and demanded a refund from defendants pursuant to the UCC and/or MMWA.  Exhibit A.  However, to date, defendants refused to comply with said demand.

335.   Defendants committed a breach of the implied warranty of merchantability under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

336.   Plaintiffs are entitled to relief pursuant to N.J.S.A. 12A:2-608 and therefore, seek the remedy of revocation of acceptance in accordance therewith.

337.   Plaintiffs are consumers as defined by 15 U.S.C. § 2301, defendants are warrantors as defined by 15 U.S.C. § 2301 and the vehicle is a consumer product as defined by 15 U.S.C. § 2301.

338.   The provisions of 15 U.S.C. § 2301, et seq. apply to this case, because, pursuant to 15 U.S.C. § 2301-2303, defendants are manufacturers and/or sellers and/or warrantors of a consumer product sold to plaintiffs with written and implied warranties and/or service contracts and plaintiffs are entitled to enforce the provisions of same.

339.   Pursuant to 15 U.S.C. § 2308, as defendants have extended written warranties and/or service contracts to plaintiffs, except for the modifications permitted in said statute, defendants are unable to disclaim or modify the implied warranties issued in conjunction with the vehicle.

340.   Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle.  Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the U.C.C. and/or MMWA and/or under the aforesaid warranty and thus bring this action against defendants for damages and pursuant to 15 U.S.C. § 2310, et seq., plaintiffs are entitled to recover attorney's fees and court costs.

341.   More specifically, 15 U.S.C. § 2310 states in part: "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring

suit for damages and other legal and equitable relief—(A) in any court of competent jurisdiction in any State or the District of Columbia…(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiffs for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

342. Accordingly, pursuant to the UCC and the MMWA, plaintiffs seek the remedies of revocation of acceptance, damages applicable under those statues and an award of fees and costs pursuant to the MMWA.

### COUNT 4

### SECTION 2 KNOWING OMISSION CFA VIOLATIONS

### TREBLE DAMAGES

### PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

343. All paragraphs stated above are repeated as if set forth herein in full.

344. This count is pled on behalf of plaintiffs and the class against defendants.

345.   As discussed above, the CFA applies to the facts of this case.

346.   As discussed above, defendants committed SECTION 2 KNOWING OMISSION CFA VIOLATIONS against plaintiffs.

347.   As discussed above, plaintiffs' suffered an ascertainable loss of money or property proximately caused by the misconduct.

348.   Pursuant to the CFA, plaintiffs seek statutory treble damages, attorney's fees and litigation costs.

349.   As reflected in the certification submitted with the complaint filed in this case, plaintiffs are complying with the requirements of N.J.S.A. 56:8-20, et seq.

### COUNT 5

### SECTION 2 KNOWING OMISSION CFA VIOLATIONS

### EQUITABLE RELIEF

### PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

350.   All paragraphs stated above are repeated as if set forth herein in full.

351.   This count is pled on behalf of plaintiffs and the class against defendants.

352.   As discussed above, defendants committed SECTION 2 KNOWING OMISSION CFA VIOLATIONS against plaintiffs.

353.   As discussed above, plaintiffs' suffered an ascertainable loss of money or property proximately caused

by the misconduct and therefore, plaintiffs have standing to seek equitable relief.

354.    Plaintiffs seek an injunction to halt the unlawful practices being committed by defendants as described above and to require disclosure to the class regarding the problems.[66]

355.    Plaintiffs also seek equitable relief in the form of a refund of the purchase price of class vehicles pursuant to N.J.S.A. 56:8-19, which provides for the remedy of equitable relief.

356.    Pursuant to the CFA, plaintiffs also seek attorney's fees, litigation costs and other legal and equitable relief.

357.    As reflected in the certification submitted with the complaint filed in this case, plaintiffs are complying with the requirements of N.J.S.A. 56:8-20, et seq.

## COUNT 6

### SECTION 2 KNOWING OMISSION CFA VIOLATIONS

### STATUTORY REFUND REMEDY

### PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

358.    All paragraphs stated above are repeated as if set

---

[66.] See, e.g., *Kugler v. Haitian Tours, Inc.*, 120 N.J. Super. 260, 267 (Ch. Div. 1972); *Kugler v. Romain*, 58 N.J. 522, 545 (1971); *Kugler v. Koscot Interplanetary, Inc.*, 120 N.J. Super. 216, 226 (Ch. Div. 1972).

forth herein in full.

359.    This count is pled on behalf of plaintiffs and the
class against defendants.

360.    As discussed above, defendants committed SECTION 2
KNOWING OMISSION CFA VIOLATIONS against plaintiffs.

361.    As discussed above, plaintiffs' suffered an
ascertainable loss of money or property proximately caused
by the misconduct and therefore, plaintiffs have standing
to seek relief (assuming for argument's sake that such is
necessary to pursue the statutory refund remedy provided
for in the CFA).

362.    plaintiffs seek a statutory refund of the goods'
purchase price – that is, relief pursuant to the CFA's
refund provision, which states: "Any person violating the
provisions of the within act shall be liable for a refund
of all moneys acquired by means of any practice declared
herein to be unlawful.[67]  The refund of moneys herein
provided for may be recovered in a private action or by
such persons authorized to initiate actions pursuant to
P.L.1975, c. 376 (C. 40:23-6.47 et seq.).[68]"

363.    The New Jersey Supreme Court explained the separate

---

[67] N.J.S.A. 56:8-2.11.
[68] N.J.S.A. 56:8-2.12.  The last reference in this provision to
"P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by
the offices of the Department of Consumer Affairs.

cause of action available for refunds as follows: "The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18, & -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19."[69]

364.    Those seeking a statutory refund under the CFA aren't required to prove an ascertainable loss because under the CFA's refund provisions, any party violating the CFA is liable for a refund of all money they acquired by means of the violation.

365.    For, since the refund provisions do not refer to the ascertainable loss requirement of N.J.S.A. 56:8-19, the refund provision is independent of that requirement: "[t]he refund provision is a statutory remedy, not based on the proving of any damages."[70]

366.    Accordingly, the refund provisions allow CFA claimants to recover a refund where they prove unlawful acts but are unable to prove an ascertainable loss.

---

[69] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).
[70] *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005).

367.    This view is consistent with caselaw holding that the CFA's application is not limited only to situations where the attempt to deceive succeeded or actually resulted in injury.[71]

368.    For example, the CFA's amendment in 1971 allows a private cause of action for treble damages if the private claimant can prove an ascertainable loss and the CFA's amendment in 1979 allows a separate private cause of action to recover refunds. The Legislature is presumed to be aware of existing legislation at the time a statute is enacted[72] and "[i]f the plain language leads to a clear and unambiguous result, then our interpretative process is over."[73]

369.    The Legislature clearly envisioned a separate cause of action for penalties; otherwise the Legislature would not have included the reference to the private cause of action in the CFA's penalty subsections.

370.    Therefore, a CFA claimant is "entitled to the refund regardless of whether he suffered any ascertainable loss. There is no causal relationship needed to be eligible for a

---

[71]. *Hyland v. Zuback*, 146 N.J. Super. 407, 415 (App. Div. 1976).
[72]. *Township of Mahwah v. Bergen Cnty. Bd. of Taxation*, 98 N.J. 268, 279, *cert. denied sub nom. Borough of Demarest v. Twp. of Mahwah*, 471 U.S. 1136 (1985).

refund."[74]

371.    To recover a refund from a merchant, the CFA claimant need only prove that the merchant acquired the money sought by means of any practice violating the CFA.[75]

372.    The party receiving a CFA refund is also entitled to a mandatory award of counsel fees, filing fees and costs.[76]

373.    Pursuant to the CFA's aforesaid statutory refund remedy, a refund of the purchase price of class vehicles is sought.

374.    Pursuant to the CFA, plaintiffs also seek attorney's fees, litigation costs and other legal and equitable relief.

375.    As reflected in the certification submitted with the complaint filed in this case, plaintiffs are complying with the requirements of N.J.S.A. 56:8-20, et seq.

## PRAYER FOR RELIEF COMMON TO ALL COUNTS

**WHEREFORE,** judgment is demanded for: (1) all applicable damages - including any specific types of damages specifically pled in

---

[73] *Johnson v. Roselle EZ Quick LLC*, 226 N.J. 370, 386 (2016) (quoting *Richardson v. Bd. of Trs., PFRS*, 192 N.J. 189, 195 (2007)).
[74] . *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005); accord *Block v. Plosia*, 390 N.J. Super. 543, 551 (App. Div. 2007).
[75] . N.J.S.A. 56:8-2.11.
[76] . *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).

any of the above listed counts; (2) the remedies provided for under the common law and/or any state and/or federal statutes pled herein or applicable to this case including revocation of acceptance pursuant to the UCC, any mandated counsel fees and/or costs/expenses and any applicable refunds, equitable relief and injunctive relief; and (3) such other and further relief as the court shall deem equitable and just.

## CERTIFICATION OF VERACITY OF PLEADING

LEWIS G. ADLER hereby certifies to the Court as follows:

### PRELIMINARY STATEMENT

1. I am an attorney at law licensed to practice law in the State of New Jersey.

2. I am counsel for plaintiff.

3. I make the statements contained in this certification from personal knowledge.

4. The basis of my personal knowledge is my personal work on this file.

### VERACITY OF PLEADING

5. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument

for extending, modifying, or reversing existing law; (3) the factual contentions have  evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

CERTIFICATION MADE PURSUANT TO 28 U.S.C. §1746

6. I certify, under penalty of perjury that the foregoing is true and correct.

```
EXECUTED ON:  October 23, 2020  /s/ LEWIS G. ADLER
                                LEWIS G. ADLER
                                26 Newton Ave.
                                Woodbury, NJ 08096
                                Tel. #: (856) 845-1968
                                Fax #: (856) 848-9504
                                Co-counsel for plaintiffs
                                Email:  lewisadler@verizon.net
```

**JURY DEMAND**

Relative to all issues pled in the instant action that so triable, a trial by six (6) jurors is demanded.

**DESIGNATION OF TRIAL ATTORNEY**

LEWIS G. ADLER is hereby designated as trial attorney.

**CERTIFICATION OF SERVICE PURSUANT TO**

**N.J.S.A. 56:8-20 AND/OR N.J.A.C. 13:45A-26F.2**

**AND/OR N.J.S.A. 56:12-41**

LEWIS G. ADLER hereby certifies to the Court as follows:

1. I am an attorney at law of the State of New Jersey.

2. I am counsel for the party/parties offering this document for filing in this case and am personally familiar with the facts recited in this certification by my involvement in those facts.

3. As required by N.J.S.A. 56:8-20 and/or N.J.S.A. 56:12-41 and/or N.J.A.C. 13:45A-26F.2 and within the time frame required under said laws or regulations, I hereby certify that I am causing a copy of this pleading to be served upon the following offices via first class United States Mail, postage prepaid:

| | |
|---|---|
| **XX** | Office of the Attorney General, Richard J. Hughes Justice Complex, P.O. Box 80, Trenton, NJ, 08625-0080. |
| | Division of Consumer Affairs, Used Car Lemon Law Unit, P.O. Box 45026, 124 Halsey St., Newark, NJ 07101-5026. |

CERTIFICATION MADE PURSUANT TO 28 U.S.C. $1746

I certify, under penalty of perjury that the foregoing is true
and correct.

EXECUTED ON:  October 23, 2020  /s/ LEWIS G. ADLER
                                LEWIS G. ADLER
                                26 Newton Ave.
                                Woodbury, NJ 08096
                                Tel. #: (856) 845-1968
                                Fax #: (856) 848-9504
                                Co-counsel for plaintiffs
                                Email:  lewisadler@verizon.net

**LOCAL RULE 11.2 CERTIFICATION**

LEWIS G. ADLER hereby certifies to the Court as follows:

PRELIMINARY STATEMENT

1. I am an attorney at law licensed to practice law in the
   State of New Jersey.

2. I am counsel for plaintiff.

3. I make the statements contained in this certification from
   personal knowledge.

4. The basis of my personal knowledge is my personal work on
   this file.

NO OTHER ACTIONS OR ARBITRATIONS OR

ADMINISTRATIVE PROCEEDINGS PENDING

5. The matter in controversy is not the subject of any other
   action pending in any court, or of any pending arbitration
   or administrative proceeding.

CERTIFICATION MADE PURSUANT TO 28 U.S.C. $1746

I certify, under penalty of perjury that the foregoing is true and correct.

```
EXECUTED ON:  October 23, 2020 /s/ LEWIS G. ADLER
                                LEWIS G. ADLER
                                26 Newton Ave.
                                Woodbury, NJ 08096
                                Tel. #: (856) 845-1968
                                Fax #: (856) 848-9504
                                Co-counsel for plaintiffs
                                Email:  lewisadler@verizon.net
```

# EXHIBIT A

# Perlman-DePetris Consumer Law

**1926 GREENTREE ROAD, SUITE 100, CHERRY HILL, NEW JERSEY 08003**
**Telephone (856) 446-9797, Facsimile (888) 635-5933**
**www.newjerseylemons.com**

LEE M. PERLMAN
Member, NJ bar
Member, NJ & PA bars
lperlman@newjerseylemons.com
info@newjerseylemons.com

PAUL DEPETRIS

VIA FIRST CLASS & CERTIFIED MAIL, RRR

July 8, 2019

American Honda Motor Co., Inc.
Honda Automobile
Customer Service
1919 Torrance Boulevard
Mail Stop 100-5E-BA
Torrance, CA 90501-2746

Re:

| Case caption: | Lanzalotti ads. American Honda Motor Co. |
|---|---|
| Case docket no.: | None yet assigned |
| Consumers: | Henry J. Lanzalotti and Heather A. Lanzalotti |
| Vehicle: | 2019 Honda Pilot 4 door SUV, VIN # 5FNYF6H61KB018766 |
| Selling dealer: | Turnersville Auto Mall, d/b/a Honda of Turnersville – Turnersville, NJ |
| Purchase date: | On or about 11/8/18 |

Dear Sir/Miss/Counsel:

In the above matter, my office represents the above referenced consumers relative to the purchase of the above referenced vehicle. Kindly direct all future correspondence or calls about this matter to my office.

The purpose of this letter is to make a formal demand for revocation of acceptance. The demand herein must be accepted within the time frame and in the manner set forth below and is presented without prejudice to my clients.   As the contents of this letter are for settlement purposes only, nothing herein should be construed as an admission of any kind and the consumers shall object to any effort to introduce the contents of this letter at any court proceeding in this matter.  The demand referenced herein is a compromise that reflects the potential resolution of this matter before additional time and expense may be expended in this matter.

Please do not misconstrue any of the contents of this letter or any documents enclosed herewith or identified or referenced herein as adoptive admissions on the consumers' part.   See N.J.R.E. 803(b)(2); *Skibinski v. Smith*, 206 N.J. Super. 349 (App. Div. 1985); *Cocoran v. Sears*, 312 N.J. Super. 117 (App. Div. 1998).

Page 1 of 7

Excepting those facts which were gleaned from the documents provided by the consumers, all facts set forth below were provided by the consumers and are related below as I understand those facts.

This letter provides the manufacturer formal presuit notice of the consumer's intent to revoke acceptance of the subject product pursuant to the New Jersey Uniform Commercial Code (UCC), specifically N.J.S.A. 12A:2-608 and the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301, et seq. (MMWA).  Please do not misconstrue this letter as an optional final repair attempt letter pursuant to N.J.S.A. 56:12-29, et seq.

## FACTUAL ALLEGATIONS

On or about the above referenced date, the consumers purchased the above referenced vehicle in new condition with an odometer reading of 5 miles.  At time of sale, the consumers paid for the vehicle in full.  At time of sale, the selling dealer issued the consumers a new vehicle limited warranty with various coverage periods for various components, including but not limited to the following:

> New Vehicle Limited Warranty...Every new Honda is covered, including the 12-volt battery, for 3 years or 36,000 miles, whichever comes first. The tires are warranted separately.

> Powertrain Limited Warranty...The powertrain in your new Honda is covered for 5 years or 60,000 miles, whichever comes first.

Following purchase, claimant experienced problems with the vehicle's operation and pursuant to the manufacturer's new vehicle limited warranty, took the vehicle to various dealerships for multiple unsuccessful repair attempts.

Around late February - March 2019, the vehicle started making a popping, snap, crackle pop noise coming from front speakers/dashboard area. At first, the noise was intermittent but thereafter got worse.

Accordingly, on or about 3-19-19, the consumers took the vehicle to Avalon Honda for repair.  At that time, while the vehicle was not yet due for an oil change, Avalon Honda performed an oil change on the vehicle.  The vehicle was at Avalon Honda from between 3-19-19 to 3-29-19.  During that time, the consumers conducted multiple phone calls with Ross Seifert, Service and Parts Manager for Avalon Honda.  However, the consumers were given the run around, as Avalon Honda was unable to find the cause of the vehicle's problems, explaining that the manufacturer had no fix for the problem. Avalon Honda took the vehicle's dash apart.  Avalon Honda told the consumers that Avalon Honda tried tightening connections.  Avalon Honda also told the consumers that they opened a tech line and received a technical service bulletin which recommended replacing multiple components.  Finally, Avalon Honda explained that they were a small dealership and service department not well equipped to address the vehicle's problems and that they had just lost a mechanic and didn't have time to

troubleshoot the issue.  At that point, it became clear to the consumers that Avalon Honda didn't want to take the next steps to complete warranty repairs to the vehicle. Avalon Honda explained to the consumers that they may have tightened some things up and didn't here the noises anymore.  Henry J. Lanzalotti took a short test drive with an Avalon Honda employee and didn't hear the noise. Accordingly, So Henry J. Lanzalotti accepted return of the vehicle from Avalon Honda hoping that the problems were repaired.  However, shortly after driving away from Avalon Honda and while on the drive home, the popping noise returned and was worse than prior to Avalon Honda's unsuccessful repair attempt.

On or about 3-30-19, Henry J. Lanzalotti called Honda of Turnersville to report the problems and to make an appointment for another repair attempt, explaining that the consumers needed to have the problems fixed.  Henry J. Lanzalotti requested to talk to Honda of Turnersville's general manager (Min Chin) and Honda of Turnersville's service manager (Mark Viggiano) but neither were available so Henry J. Lanzalotti left messages with each of them.  In the meantime, the popping noise was really bad and the tuner unit/LCD went out.  Henry J. Lanzalotti thereafter spoke with Mark Viggiano and made an appointment with Honda of Turnersville's service department for 4-3-19. Henry J. Lanzalotti asked to meet with Mr. Viggiano and Mr. Chin and all of them met on 4-3-19 at Honda of Turnersville.  At that time, Henry J. Lanzalotti asked Honda of Turnersville to repurchase the vehicle due to its problems but the offer was refused. Accordingly, Henry J. Lanzalotti simply left the vehicle at Honda of Turnersville's service department for another repair attempt.  Honda of Turnersville's service department explained that they replaced the vehicle's amplifier and a wiring harness per the manufacturer's directions and that the problems were resolved.  Following a test drive, Henry J. Lanzalotti accepted the vehicle back from Honda of Turnersville with the hope that the problems were resolved.

On or about 4-18-19, after Heather A. Lanzalotti has been driving the vehicle for about a week, while she was on her way to work with the consumers' 3 and 5 year in the car heading to day care to drop them off before work, the problems return and they are even worse.  At that time, the vehicle's tuner unit/LCD goes out and turns black, the vehicle's instrument cluster where the speedometer is located blacks out.  Because Heather A. Lanzalotti feared for the safety of herself and the consumers' children, she turned the vehicle around and returned home, deciding to use the consumers' 9 year old pickup truck with close to 100,000 miles registered on its odometer, as she felt safer in that truck than she did in the vehicle with its problems.  At that time, Henry J. Lanzalotti called Honda of Turnersville to report the issue and have a conversation with Min Chin the next day too.  Henry J. Lanzalotti again demanded that Honda of Turnersville to repurchase the vehicle due to its problems and because the consumers didn't believe the vehicle was safe to drive but the offer was refused.  Because of the vehicle's safety issues, the consumers refused to drive the vehicle to Honda of Turnersville.  Accordingly, on or about 4-20-19, Honda of Turnersville picked the vehicle up and dropped off a loaner vehicle to the consumers. At that time, the vehicle was making noise even when it was turned off.  Honda of Turnersville's service department has the vehicle for repair from approximately 4-20-19 to 5-10-19.  At that time Honda of Turnersville's service department claimed that it replaced the vehicle's tuner unit/LCD, instrument cluster and a wiring harness.  Mr. Viggiano explained to Henry J. Lanzalotti

that these repairs cost over $4,800 in parts and labor.  On or about 5-15-19, the consumers accepted return of the vehicle from Honda of Turnersville.

On or about 6-25-19, Heather A. Lanzalotti drove the vehicle to Philadelphia, Pennsylvania to take the consumer's son to a doctor's appointment.  During that trip, the vehicle exhibited the noise problems more noticeably than before.  At that time, Heather A. Lanzalotti heard a huge spark type noise that sounded like a big rock hitting the windshield.

Presently, the vehicle's noise problems continue to occur on an intermittent basis.  For example, the static, snap, crackle and pop noise happens with just about every phone call, as well as at other times. The static, snap, crackle and pop noise is very distracting and very loud at times.

The sound makes plaintiffs think that the vehicle is experiencing electrical problems and they fear that the vehicle will catch fire or that the vehicle will experience yet another electrical system failure, such as when the vehicle's displays blacked out as mentioned above.  Due to the distracting nature of the vehicle's problems, the consumers view the problems as a safety hazard.   The consumers' confidence in the vehicle is totally shaken.

The following is a recitation of that repair history as taken from repair orders for the vehicle:

| Date In & Out Of Dealer & # Of Days Vehicle At Dealer | Miles In & Out Of Dealer | Invoice # | Customer Complaint | Repair Attempt and/or Diagnosis Reported by Dealer |
|---|---|---|---|---|
| 3/19/19 To 3/29/19  10 days | 7001 to 7034 | 600621 7/1 | MISC: ENTER COMMENTS HERE CUSTOMER STATES THERE IS A POPPING NOISE COMING FROM THE RADIO SPEAKERS, PLEASE CHECK AND ADVISE | Caused by THERE IS AN INTERFERENCE FROM AN ITEM CONNECTED TO THE MOST BUS – Tech: ANTHONY PINELLI (474) HONDA TECH LINE REFERENCE # 4221437 SUGGESTS REPLACING THE TUNER UNIT, STEREO AMPLIFIER, BLUE-RAY PLAYER AND TWO WIRING HARNESSES. CUSTOMER IS GO TAKING TO TURNERSVILLE WHERE HE PURCHASED CAR |
| 4/3/19 To 4/8/18 | 7,034 TO 7,034 | HOCS45 8523 | CUSTOMER WAS AT AVALON HONDA AND WAS TOLD THAT TECHNICAL | INSPECTED ALL MOST BUS CONNECTIONS AT THE INFORMATION RES, BLUE-RAY PLAYER, TUNER |

| 6 days | | | SUPPORT WANTED TO REPLACE THE TUNER, AMPLIFIER, BLUE-RAY AND 2 HARNESSES. THE CUSTOMER DECIDED TO TAKE THE VEHICLE HERE FOR A SECOND OPINION ..... AHM IS AWARE THE THE (sic) VEHICLE IS COMING HERE. | UNIT, AND GAUGE CONTROL TO AMPLIFIER. FOUND THE GREEN BUS CONNECTOR WAS STUCK ONTO THE AMPLIFIER CAUSING A POOR CONNECTION ..... (THE MALE PART ON THE AMPLIFIER WAS STUCK IN THE CONNECTION) CALL HONDA TECH SUPPORT LET THEM KNOW WHAT WE FOUND (REF 4221437) THEY REQUESTED TO REPLACE THE AMPLIFIER. REPLACED AMPLIFIER AND ROAD TESTED. |
|---|---|---|---|---|
| 4/20/19 To 5/10/19 21 days | 7,034 To 7,893 | HOCS46 0162 | CUSTOMER STATES THAT THE POPPING NOISE CAME BACK WORSE THEN BEFORE, AND ALSO DISPLAY SCREEN WENT BLANK AND INSTRUMENT CLUSTER WENT OUT | PICKED UP THIS VEHICLE ON 4/ 20 AT THE CUSTOMERS RESIDENCE ON 4-20-19 AND WAS UNABLE TO DUPLICATE ISSUE ON THE WAY BACK TO THE DEALERSHIP , ON 4-22-19 TECHNICIAN ROAD TESTED FOR 35 MILES AND WAS UNABLE TO DUPLICATE ISSUE, CALLED TECHLINE SUPPORT SPOKE WITH TOM LET HIM KNOW THAT WE DIDNT DUPLICATE ISSUE BUT WE HAVE A VIDEO THAT THE CUSTOMER SENT TO THE SERVICE MANAGER OS THE ISSUE, TOM RECOMMEND REPLACING THE NAVIGATION CONTROL UNIT, COMBINATION METER ANO THE INSTRUMENT HARNESS BEHIND THE DASH BOARD, TECHLINE REFERENCE NUMBER 4221437 REPLACED ALL 3 RECOMMENDED COMPONENTS RESET TELEMATICS. SYSTEM IS WORKING AS DESIGNED AT THIS TIME. |

> ➤ Total number of days that the vehicle was at dealerships for repair attempts performed starting from the vehicle's delivery = 37 days.

➢ Total number of repair attempts performed upon vehicle since delivery = 3.

## NOTICE OF PROSPECTIVE LITIGATION HOLD

Since this matter may in future result in litigation, there is a legal duty to preserve all evidence, whether printed or electronic that might become relevant to this matter. The purpose of this letter is to explain to you what that obligation means. Take the following steps immediately to protect and preserve any of that information until further notice. Specifically, the following must be done immediately:

1. Suspend deletion, overwriting, or any other destruction of electronic information relevant to this dispute that is under the attorneys' control. This includes electronic information wherever it is stored – at work stations, on a phone or tablet, on a laptop, or at home. It includes all forms of electronic communication – e.g., e-mail, word processing, calendars, voice messages, videos, photographs, information in the personal data assistants/cell phones/tablets and the like. This electronic information must be preserved so that it can be retrieved at a later time. The information must be preserved in its original electronic form, so that all information contained within it, whether visible or not, is also available for inspection – i.e., it is not sufficient to make a hard copy of electronic communication.
2. Preserve any new electronic information that is relevant to this dispute and that is generated after receipt of this letter.
3. Preserve any hard copy of information that is relevant to this dispute.

This is an important legal duty and if this dispute results in litigation, failure to follow these instructions may result in imposition of sanctions by a court or arbitrator.

## DEMAND FOR REVOCATION OF ACCEPTANCE FOR BREACH OF WARRANTY

You failed to address the vehicle's problems in a reasonable period of time and the vehicle suffers from problems that substantially impair the vehicle's value to the consumers. Accordingly, via this letter, the consumers demand the remedy of revocation of acceptance of the vehicle and remedies under N.J.S.A. 12A:2-608 and attorney's fees pursuant to the MMWA.

**The consumers hereby revoke acceptance of the vehicle. Within seven (7) days from the date of this letter, you are requested to:**

1. Make arrangements to accept the return of the vehicle in its present condition by arranging for its return to you from the consumers at the selling dealership.

2. Forward the consumers a check for all sums that the consumers paid for the vehicle to date (inclusive of all payments, deposits, etc.) plus $3,000 – the attorney's fees and costs I charged them to date in this case. The vehicle's purchase price totaled $45,800, inclusive of taxes and registration/title fees. Therefore, the consumers require you to pay $48,300.

Page 6 of 7

If you refuse to act as requested in the aforesaid time frame, the consumers shall consider filing suit against you for all applicable relief. If the consumers must file suit, the consumers intend to seek all applicable relief, including attorney's fees and costs per the MMWA. While the attorney's fees in this matter are currently small, if this dispute continues unresolved and if litigation commences, the attorney's fees and costs shall increase substantially and continue to accrue as the case proceeds through discovery. When seeking any fee award, we shall point to this letter as indicative that you had an opportunity to resolve this matter without incurring greater fees and costs.

Thank you for your attention to this matter.

Best Regards,

LEE M. PERLMAN

LMP/pd

cc:    client(s) (via email)
       Paul DePetris (via email)

# EXHIBIT B

 **HONDA**  *ServiceNews Article*

**March 2019**                                                                 11536 Version 1

# Popping or Crackling from the Speakers? Check the MOST Bus Network

AFFECTED VEHICLES

| Year | Model | Trim |
|------|-------|------|
| 2018-19 | Odyssey | ALL except LX |
| 2019 | Pilot | ALL except LX |
| 2019 | Passport | ALL except Sport |

Are you hearing a popping or crackling from the speakers? This may be due to a connection issue in the MOST bus network, which can be identified by the unique red and green connectors at each component of the infotainment system.

During component inspection or replacement, you can easily damage these connectors if the cable is used for leverage when unplugging them.

To save you time during troubleshooting, check the repair history on the vehicle. Most reported cases happened after a separate previous repair was made to the system. Be sure to inspect the MOST connectors at all components and any connections between the harnesses. If a connector is found to be damaged, like you see here, the entire harness must be replaced. These connectors **are not** repairable.



If you want more info on what the MOST bus network does, look up the *Tech2Tech*® video, "Lets Talk MOST Bus Network and ECL Diagnostics".

© 2019 American Honda Motor Co., Inc. — All Rights Reserved

Audio and Visual System Most Bus Diagnostics Mode

## MOST Bus Diagnosis

Audio and visual system in this vehicle has MOST communication network that use for communicating audio, video, and control signals. This network consist of the gateway unit (gauge control module) and node units (tuner unit, stereo amplifier, tuner-amplifier unit, RES control unit, BD player unit, CD player unit, and infotainment control unit), and the MOST circuit of each unit consist of MOST ECL lines, MOST TX/RX lines, and power (+B) and ground lines. The MOST TX/RX line forms a ring topology between each MOST connected unit. If the MOST network stuck or was broken, the audio and visual system may malfunction.

If abnormal symptom appears in the audio and visual system, it may be intermittent failure of MOST network. If the center display unit displays any screen, do the System Diagnostic Mode to check the audio and visual system condition.

If audio and visual system does not work, or does not work properly, check these items:

- Do the gauge control module Self-Diagnostic Function to check communication lines (B-CAN and F-CAN) condition.
- Do the ECL test (refer to How to Check MOST Bus Connection).
- Check power and ground circuits for each MOST node unit.
- Check MOST circuits (MOST TX+/ - , MOST RX+/ - , and MOST ECL lines) for the gauge control module and each MOST node unit.

If the circuits are OK, substitute a known-good MOST connected units one by one, and recheck:

- Gauge control module
- Tuner unit (with 11 speakers)
- Stereo amplifier (with 11 speakers)
- Tuner-amplifier unit (with 7 speakers)
- RES control unit (with rear entertainment)
- BD player unit (with rear entertainment)
- CD player unit (without rear entertainment, with CD player)
- Infotainment control unit

If the symptom goes away when any one of unit was substituted, replace the original failure unit.

## How to Check MOST Bus Condition

If the MOST bus network is broken, it is not possible to diagnose on the System Diagnostic Mode. To check the MOST bus connection, do the ECL test using the gauge control module. This test is performed using the diagnostic function of the MOST ECL line. If somewhere of MOST ECL circuit is broken, the ECL test does not function properly.

NOTE: Check the vehicle 12 volt battery condition first.

1. Turn the vehicle to the ON mode.

2. Select the Settings menu on the multi-information display (MID).

3. While displaying the Settings screen, press and hold the HANG-UP/BACK button and then the ENTER button until the MOST bus diagnosis screen is displayed.

4. This diagnosis checks PWR (power) and SIG (signal) status about each unit on the MOST bus network.

NOTE: The multi-information display (MID) may update to latest information after 35 seconds as maximum delay.

- Meter (Gauge control module)
- Infotainment (Infotainment control unit)
- Amplifier (Stereo amplifier[*1])
- Remote Tuner (Tuner unit[*1])
- Optical Disc Player (BD player unit[*2] or CD player unit[*3])
- Rear Infotainment (RES control unit[*2])
- Tuner Amplifier (Tuner-amplifier unit[*4])

*1: With 11 speakers
*2: With rear entertainment
*3: Without rear entertainment, with CD player
*4: With 7 speakers

| Symbol | | Status |
|---|---|---|
| ✓ | OK (GREEN) | The power or MOST signal status is OK at this time. |
| ✗ | NG (RED) | • The unit lost the power or cannot receive MOST signal. If the unit lost the power, both the PWR and SIG symbol indicates it.<br>• If the unit not equipped to the vehicle, or is not connected to the module using the bus, both the PWR and SIG symbol indicates it. |

**Indication Pattern**

| Pwr | Sig | Solution |
|---|---|---|
| ✓ | ✓ | If all control units indicate this pattern, the power and MOST signal status are OK at this time. |
| ✓ | ✗ | • Check for MOST TX+/MOST RX+ and MOST TX-/MOST RX- lines between the first RED symbol control unit and the last GREEN symbol control unit.<br>• If the wire is OK, substitute these items to a known-good one, and recheck:<br>  – Last GREEN symbol control unit<br>  – First RED symbol control unit |
| ✗ | ✗ | • Check for the RED symbol control unit(s) power and ground circuit.<br>• If the wire is OK, substitute the RED symbol control unit(s) to a known-good one, and recheck. |



5. To exit the MOST bus diagnosis, press the HOME button or the BACK button, or turn the vehicle to the OFF (LOCK) mode.

*C'RACKING FROM THE SPEAKERS*

Audio Unit Removal and Installation

**Removal/Installation**

NOTE:
- Do not work in a dusty or dirty place.
- Do not work with dirty hands.
- If you are replacing the audio unit, write down the audio presets (if possible), and enter them into the new audio unit.

1. Dashboard Center Middle Trim - Remove

2. Audio Unit Assembly - Remove



A
4.4 N·m
(0.45 kgf·m, 3.2 lbf·ft)

1. Loosen the bolts (A).



2. Pull out the audio unit assembly with the appropriate trim tool (A).

3. Disconnect the connectors, then remove the audio unit
assembly.



3. Audio Unit - Remove



NOTE:

- Do not touch the circuit board(s) with your bare hands.
- Discharge static electricity from your body before and
during the work.
- Do not touch the terminal connector of the flat plate cable
with your bare hands (If you have touched it, wipe it off
thoroughly).

1. Remove the dashboard center vents.

2. Remove the brackets (A).



3.7 N·m
(0.38 kgf·m, 2.7 lbf·ft)

3. Disconnect the flexible printed circuit (A).

4. Remove the audio unit (B) from the audio panel (C).

4. All Removed Parts - Install

1. Install the parts in the reverse order of removal.

NOTE: After Installation, do the In Line Diag in the System Diagnostic Mode to confirm that there are no problems in the system.

**Dashboard Center Middle Trim Removal and Installation**

**Removal/Installation**

1. Both Dashboard Side Lid - Remove

2. Driver's Dashboard Lower Cover - Remove

3. Passenger's Dashboard Trim Panel - Remove

4. Dashboard Center Panel - Remove

5. Dashboard Center Middle Trim - Remove

Fastener Locations
▶ : 3     ▷ : 14



1. Remove the screws.

2. Remove the dashboard center middle trim (A).

3. Disconnect the connectors (B). (for some models)

4. Remove the harness clip (C).

6. All Removed Parts - Install

1. Install the parts in the reverse order of removal.

Infotainment Control Unit Removal and Installation

Removal/Installation

NOTE:

-  Where icon is shown, click for further information.
- When working on electronic components, make sure the work area is clean and dust free.
- Make sure your hands are clean and free of oils and grease.
- If you are replacing the infotainment control unit, write down the audio presets (if possible), and enter them into the new infotainment control unit.
- Unless otherwise indicated, illustrations used in the procedure are for the vehicle with telematics.

1



| 📖 | Detailed information, notes, and precautions |
| --- | --- |
| | Torque: N·m (kgf·m, lbf·ft) |

1. Center Display Unit Assembly - Remove

Infotainment Control Unit Removal and Installation 7556

2. Infotainment Control Unit - Remove

**Note for installation**

- Make sure all the connectors are secure.
- After Installation, do the System Links in the System Diagnostic Mode to confirm that there are no problems in the system.

3. All Removed Parts - Install

1. Install the parts in the reverse order of removal.

Tuner Unit Removal and Installation

## Removal/Installation

NOTE: With XM, if you are replacing the tuner unit, write down the XM radio presets (if possible), and enter them into the center display unit.

1



2.

2
9.4
{0.96, 6.9}

| | Torque: N·m (kgf·m, lbf·ft) |
|---|---|

1. Right Rear Side Trim Panel - Remove

2. Tuner Unit - Remove

3. All Removed Parts - Install

   1. Install the parts in the reverse order of removal.

Tuner-Amplifier Unit Removal and Installation

**Removal/Installation**

NOTE:
-  Where icon is shown, click for further information.
- With XM, if you are replacing the tuner-amplifier unit, write down the XM radio presets (if possible), and enter them into the center display unit.

1



2
9.4
(0.96, 6.9)

2
9.4
(0.96, 6.9)

| | Detailed information, notes, and precautions |
|---|---|
| | Torque: N·m (kgf·m, lbf·ft) |

1. Right Rear Side Trim Panel - Remove

2. Tuner-Amplifier Unit - Remove

NOTE: There is a lever lock on tuner-amplifier unit connector A.

Stereo Amplifier Removal and Installation

Removal/Installation

1



| | Torque: N·m (kgf·m, lbf·ft) |
|---|---|

1. Right Rear Side Trim Panel - Remove

2. Stereo Amplifier - Remove

3. All Removed Parts - Install

    1. Install the parts in the reverse order of removal.



3. All Removed Parts - Install

1. Install the parts in the reverse order of removal.

Rear Entertainment System (RES) Control Unit Removal and Installation

Removal/Installation

1



| | Torque: N·m (kgf·m, lbf·ft) |
|---|---|

1. Glove Box - Remove

2. RES Control Unit - Remove

3. All Removed Parts - Install

   1. Install the parts in the reverse order of removal.

BD Player Unit Removal and Installation

Removal/Installation

1



2



1. Dashboard Center Middle Trim - Remove

2. BD Player Unit Assembly - Remove

NOTE: When removing the TORX bolts, using a TORX E8 bit.

**Note for installation**

If the bolt threads of the steering hanger beam are stripped, replace the bolts with one-size larger bolts (available as a service part), which are specifically designed to tighten the instrument panel to the specified torque setting.

3. Seat Heater Switch (With Seat Heater) - Remove

4. Ventilated Seat Switch (With Ventilated Seat) - Remove

5. Front Accessory Power Socket - Remove

6. Accessory Socket Panel - Remove

7. BD Player Unit - Remove

8. All Removed Parts - Install

1. Install the parts in the reverse order of removal.

# EXHIBIT C



Home › Forums › Pilot Discussions › 2016- Third generation Pilot ›

# Random Electrical Snapping/Cracking Sound - Elite

→ Jump to Latest          Follow

41 - 60 of 168 Posts          ◄Prev   1   2   3   4   5   ...   9   Next ►

**B**

**Brianmccarthy33**
Registered
Joined Mar 2, 2018
3 Posts

#41 · Mar 5, 2018

I have a 2017 Pilot Touring and I have the same popping issue through the speakers. Honda replaced the diode in the a/c relay. This seems to have worked although I still have a loud Pop when the door locks engage. The dealership told me that is normal and there is nothing they can do about it.

Reply                                    Save     Share

**M**

**Marky_Mark**
Registered
Joined Jul 4, 2018
3 Posts

#42 · Jul 4, 2018

When my Elite started making these noises, I began researching, and came across this thread. I found it interesting that the only vehicles experiencing this problem are Touring and Elite models, which also happen to be the only models with external amplifiers.
In my younger days, I was really into car audio, and would occasionally get AC noise through the speakers. The cause of this was always an insufficient ground for the amplifier.
So I figured I'd start there. I disconnected the negative battery cable from the frame, and sanded the paint away from the grounding point. I also did this where the relay box ground point is. Put everything back together, and the noise is gone. If that didn't work, my next step was to run 8 awg from the negative battery terminal to the amp ground point. So far, no noise running the AC in the Georgia heat.

Reply                                    Save     Share

**Y**

**YF6H9GKNW**
Registered
Joined Jul 9, 2016
171 Posts

#43 · Jul 6, 2018

Mark,
Please provide updates when you can. The popping noise came back on our Touring a few weeks after the dealership replaced the AC relays. I'm getting ready to take it in for the 30,000 mile service and I will bring this up to them again. As my warranty is almost up I am looking for a more permanent solution. I hope your remedy of improving the grounds is it. That would be great. Thanks!

2016 Touring AWD in CA
► Show Full Signature

Reply                                    Save     Share

#44 · Aug 3, 2018

## About this Discussion

**167** Replies    **70** Participants

Last post:
PNW_Sucks 18 d ago


See How Much You Could Save
GEICO
GET A QUOTE

### Honda Pilot - Honda Pilot Forums

Piloteers.org forum community offers tech info, troubleshooting, modification DIY's and discussion for the Honda Pilot SUV.

Full Forum Listing →

### Explore Our Forums

General Discussions
2016- Third generation Pilot
2003-2008 Pilot
Problems
2009-2011 Pilot


ROCKAUTO.COM
ALL THE PARTS YOUR CAR WILL EVER NEED

### Popular Communities

 Mountain Bike Reviews
450,000+ members          Join

**C**

**compnerd01@aol.**
Registered

Joined Aug 3, 2018
4 Posts

**2016 pilot touring**

I have been to the dealer multiple times with this problem and have discovered that there are multiple sources for this noise. Number one is the AC clutch relay. They replace this relay and after about 1500 miles the problem comes back. number 2 cause is the door locks. either when they lock or unlock they power surge makes a popping sound in the audio. the third cause I have not been able to pinpoint but I believe the cooling fan can also cause a soft popping noise in the audio system. It is important to note that even if yo turn the radio off the audio circuit remains on as that is how the nav talks to you. I am now out of warranty and frustrated. I think it is very clear that this audio system has a crappy noise suppression circuit. The dealer has replace the Ac relay multiple times and it has only served as a temporary fix. I am quite frustrated by the popping noise.

Reply                                                    Save    Share

 PROGRESSIVE    **Chat. Click. Call.**    ⚫ Connect with Flo on Messenger
**Your quote, your way**    Get a Quote

Professional
Contractors                    Join
450,000+ members

Working From Home
Forum - New!                   Join
25+ members

 *Family Favorites*
LARGE SIZE    FROSTED FLAKES    little bites    FAMILY SIZE    FROOT LOOPS

 amazon fresh  Shop now ▸

 BBB ACCREDITED BUSINESS     GDPR COMPLIANT



**A09**
Registered

Joined Jul 24, 2015
113 Posts

#45 · Aug 6, 2018

> compnerd01@aol. said: ⊕
> I have been to the dealer multiple times with this problem and have discovered that there are multiple sources for this noise. Number one is the AC clutch relay. They replace this relay and after about 1500 miles the problem comes back. number 2 cause is the door locks. either when they lock or unlock they power surge makes a popping sound in the audio. the third cause I have not been able to pinpoint but I believe the cooling fan can also cause a soft popping noise in the audio system. It is important to note that even if yo turn the radio off the audio circuit remains on as that is how the nav talks to you. I am now out of warranty and frustrated. I think it is very clear that this audio system has a crappy noise suppress **Click to expand** dealer has replace the Ac relay multiple

compnerd01: I had the compressor, clutch, coil set, along with A/C Clutch relay #4 replaced in August 2017. The popping noise from the A/C was eliminated. Popping still occurs randomly (maybe twice a month) when I lock/unlock the doors while the engine is running.

Although I have HondaCare through 100k miles, I have given up on resolving the pops from the locks. I spent 18 months working with my local dealer to resolve the A/C-related pops. It could be another 18-24 months before Honda has a permanent fix to the popping issue. By that time my HondaCare will be expired, and I will have moved on to the next-gen Toyota Sienna.

Seeing the posts here from the 2009-2015 Generation Pilots, it is safe (for me) to conclude that Honda will not be addressing the popping noise on the current gen Pilot.

2016 Pilot Elite, Obsidian Blue Pearl
▶ Show Full Signature

👍 compnerd01@aol.

Reply                                                    Save    Share

**P**

**Pilotforlife**
Registered

Joined Apr 27, 2018
18 Posts

#46 · Aug 8, 2018

http://www.piloteers.org/forums/114-2016-third-generation-pilot/155577-diy-get-rid-ac-clutch-popping-sound.html

👍 compnerd01@aol.

Reply                                                    Save    Share

#47 · Aug 9, 2018

> Pilotforlife said: ⊕

U

http://www.piloteers.org/forums/114-2016-third-generation-pilot/155577-diy-get-rid-ac-clutch-popping-sound.html

Nice fix, thanks!!!

**USN9111**
Registered

Joined Sep 26, 2017
230 Posts

Reply                                                                    Save    Share

C

#48 · Aug 9, 2018

This problems also occurs in the 2016 touring model which I have. The dealer has looked at it multiple times and the sources have been identified as the AC compressor which changing the relay is only a temporary fix. Another sources is the door locks. I also suspect that occasionally the radiator cooling fan causes a soft popping sound. So anything that can cause a power surge. I suspect that the audio system was designed with poor noise suppression.

**compnerd01@aol.**
Registered

Joined Aug 3, 2018
4 Posts

Reply                                                                    Save    Share



C

#49 · Aug 9, 2018

Thanks. I dont have the Honda care but I was all over the dealer and Honda corporate with my problem before my warranty was up. During one of the times the dealer had the vehicle they gave me an EX loaner which has a different radio system than the Elite and Touring and it did not have any problems (popping sound) so that is how I have come to suspect the audio system in the Elite and Touring as having a bad noise suppression circuit.

**compnerd01@aol.**
Registered

Joined Aug 3, 2018
4 Posts

Reply                                                                    Save    Share

H

#50 · Aug 17, 2018

2019 elite just purchased and the popping is so bad it interrupts music. This seems worse than what I have read here so maybe another problem?

**Hasan007**
Registered

Joined Aug 17, 2018
1 Posts

Reply                                                                    Save    Share

W

#51 · Nov 13, 2018

I just purchased a 2019 and my car has been in the shop for 8 days for the same exact problem. I have no resolution as of yet. I will post any updates.

**waylyn99**
Registered

Joined Nov 13, 2018
3 Posts

Reply                                                                    Save    Share

B

#52 · Feb 15, 2019 (Edited)

Update: the Ac relay has been replaced twice and the amplifier was replaced. Popping stopped briefly after the amp was replaced but started again. Honda is dragging their feet.

**Brianmccarthy33**
Registered          Reply          Save    Share
Joined Mar 2, 2018
3 Posts



Y

**YF6H9GKNW**
Registered

Joined Jul 9, 2016
171 Posts

#53 · Feb 15, 2019

I had the A/C Compressor Clutch Relay replaced twice. The first time, it cured the popping for a few weeks. The second time was about six months ago and the popping hasn't returned yet. We just passed 36,000 miles so when it starts popping again I guess I'll be buying a new relay and replacing it myself

2016 Touring AWD in CA
▶ Show Full Signature

Reply          Save    Share

G

**gweb42982**
Registered

Joined Mar 8, 2019
2 Posts

#54 · Mar 8, 2019

> waylyn99 said: 
>
> I just purchased a 2019 and my car has been in the shop for 8 days for the same exact problem. I have no resolution as of yet. I will post any updates.

Hi, just following up on your post to find out if Honda determined the issue. We have a 2019 Pilot with same issue, and the dealership does not know how to fix. I appreciate any information you may have. Thanks!

Reply          Save    Share

N

**Nick128**
Registered

Joined Jan 9, 2019
14 Posts

#55 · Mar 10, 2019

Same issue. 19 touring Radio,amp, tuner instrument cluster and complete body harness replaced. Lost instrument cluster functions several times also. No fix from honda at this time. 5 times to dealership. Working with lemon law now. Good luck

Reply          Save    Share

T

**teacherpayne**
Registered

Joined Mar 10, 2019
2 Posts

#56 · Mar 10, 2019 (Edited)

**Crackling popping noise and LCD instrument panel turning off.**

My elite has under 300 miles on it and the same thing happened. Lost both LCD and instrument panel with the speedometer. Super loud crackling noises. No pattern to it at all. I have taken it in twice already. They tried to give it back to me last Wednesday and I told them I am not driving it if the speedometer and instrument cluster goes out. He said the rest of the car is safe. I looked up California law and it says legally you have to have a working speedometer. So they kept it and gave us a loaner. They called for some master honda technician. He won't be in until some time next week to look at it.

They have told me that they have never heard of this problem and that it is just a software update that needs to be sent out. Yet I read about all these other problems that sound exactly the same as mine. Super frustrated.

Can you please let me know what process you are taking to get your car designated as a lemon law car? If they don't fix it I will do the same. Problem is what car do I get next?

Here is the video we took of it. I pulled over and took the video. I posted it on youtube and sent it to the dealer so they could see what we are experiencing.

YouTube

Reply                                                                                      Save    Share


Get make the ok to the ok
took to yo yone want.

advantage
RENTAL & SALES
ADVANTAGE RENTAL CENTER
100 ROUTE US 9 S
MARMORA, NJ 8223
631-499-6302

#57  •  Mar 11, 2019 (Edited)

**Nick128**
Registered

Joined Jan 9, 2019
14 Posts

You have to check online and do some research on lemon law lawyers. Each state has different qualifications for lemon law. Several Repair attempts must be made and the vehicle still not be fixed. First thing you need to get the car back to the dealership and let them see the video. Curious to see what the dealer says. . They are "working" on a fix now. We get stuck with a defective car because some engineers at Honda f#$*#% up and pushed out a defective product. They said it could be weeks or months they dont know. Funny how they had no problem taking my money when I bought this POS. Im about 3 weeks into the process now with lawyer. Playing waiting game. We have our pilot back now, radio cracking and error messages. We take my new F150 on road trips so we dont have to worry about the dashboard turning off with my 2 year old son in the car. Let me know how you make out. Good luck!

Reply                                                                                      Save    Share

#58  •  Mar 23, 2019 (Edited)

**teacherpayne**
Registered

Joined Mar 10, 2019
2 Posts

So here is the newest and latest update. Honda (dealership) called me and asked to get their loaner back. We called our case carrier from Honda Corp. She agreed to return it since the Pilot was half fixed. They claimed to have fixed the instrument panel and LCD so they do not go out anymore. They said the electrical popping sound is still there but insisted that the car was safe to drive. The popping is consistent and does not stop. When it is popping you cannot listen to the radio, bluetooth phone, navigation, etc. It is extremely loud with the audio on or off. It also occurs when the engine is off but you have not opened the door.

So we had to return the car last night and were promised by Corp. and by the dealership that the car was 100% safe. The new harness for the car would be in next week and then they would fix the popping by replacing it. So today was my wife's birthday and so we drove in our Pilot for the day to the wine country. Twenty minutes into the ride, boom the noise starts up and does not stop for over forty consecutive minutes. On top of that we were on the freeway when all the electrical went out again. The error code showed the windows, radio, LCD, instrument panel, and everything else electrical went out. Safe right?

We called and found a local dealership where the Service manager was outstanding. He was shocked they put me back in this car. He stated that the noises alone were very distracting. Not to mention not being able to see the instrument panel.

I decided to test out the brake mitigation system. I got close to the car in front of me when the system shut down for the 5th time... and guess what... it didn't work.

I paid for a 50K car that doesn't work. It is beyond frustrating and now I am stuck in a Nissan Rogue with cloth seats. Honda does not seem to think this is an issue. They feel the car is safe and just needs a little work done on it. We bought it over three weeks ago and it has spent three nights in our garage. This is the third time we have had to turn in this car. First for one day. The second for 15 days, and now the third time I will let you know.

Good news is we have a great lemon law lawyer and are going to start the ball rolling. I am also attaching the videos taken from today's safe car ride.

YouTube
YouTube

YouTube
YouTube

I will post again soon

Reply                                                          Save        Share



**A09**
Registered

Joined Jul 24, 2015
113 Posts

#59 · Mar 30, 2019 (Edited)

All: don't expect a fix from Honda on this issue. It has been occuring since 2010 on other Honda products; see link below. The current Pilot is in its fourth model year, and the problem still persists. If Honda R&D hasn't fixed it in *nine* years, don't expect a fix in this (or even the next) generation.

I had the A/C compressor, clutch, coil, clutch relay replaced in 2017 (refer to post 28 of this thread). The popping resurfaced in August 2018. The popping noise occurs under the same conditions: A/C running, independent of radio operation, and above 50 degrees F. Since the parts were changed the popping noise is very faint, but just as frequent. Once a month, there will be a very loud pop as I linked in post 22 of this thread.

Earlier this week, I wired in the diode as Pilotforlife details very well in Post 46.

Honda R&D is well aware of this issue but they choose to do nothing. Again, it is *nine* years and counting with no countermeasure in sight. My 2016 Elite will be paid off this year. I will return to Toyota in 2022, when the next-gen Sienna is in its second model year.

https://www.piloteers.org/forums/70-2009-2011-pilot/28421-popping-cracking-noise-audio-system.html#/forumsite/20573/topics/28421

2016 Pilot Elite, Obsidian Blue Pearl
▶ Show Full Signature

Reply                                                          Save        Share

**F**

**FrustratedOwner**
Registered

Joined Apr 2, 2019
3 Posts

#60 · Apr 2, 2019 (Edited)

Purchased a new 2019 Pilot Touring in November 2018 and the snap crackle popping sound started between 6,000 and 7,000 miles. And now started losing LCD intermittently. Sound has occurred a couple times with doors locking. I am being told this is probably a MOST Bus issue and a Service News Article (same thing as TSB?) was issued in March 2019 for 2019 Pilots, 2018-19 Odyssey's and 2019 Passports. Since it only applies to 2019 Pilots I wonder if this is a new issue unrelated to the problems with AC. We've only owned the vehicle for the winter months so we haven't even turned the AC on yet.

After connections checked and were fine I am told the next step is to replace the Tuner unit, Stereo Amplifier, Blue Ray Player and Two Wiring Harnesses.

I'll let you know how I make out after the parts are replaced.

Reply                                                          Save        Share

41 - 60 of 168 Posts                    ◀Prev   1   2   3   4   5   …   9   Next▶

## Join the discussion

or sign up with email



Continue with Facebook          G Continue with Google

Home ›    Forums ›    Pilot Discussions ›    **2016- Third generation Pilot** ›

Home    About Us    Terms of Use    Privacy Policy    Help    Contact us

Forum software by XenForo 🔊

VerticalScope Inc., 111 Peter, Suite 901, Toronto, Ontario, M5V 2H1, Canada

## Recommended Reading                                    Read More ➜

### 2020 Pilot Price paid reports
2016- Third generation Pilot
💬 240    👁 40K        Rocky · updated 4 h ago

### Wet Floor Passenger Side
2016- Third generation Pilot
💬 82    👁 9K        F  fixit · updated 9 h ago

### Would anyone be afraid to use an after market ATF filter?
2016- Third generation Pilot
💬 72    👁 1K        Nail Grease · updated 17 h ago

### Millsboro Auto Salon - Contact Us for Details
Millsboro Auto Salon
We Provide Professional Automotive Detail Services.
🌀                                                        Ad

### Full size spare with a trailer hitch?
2016- Third generation Pilot
💬 6    👁 222        FASTFJR · updated 18 h ago

### Upgraded 2019 Touring Fogs - Diode Dynamics
2016- Third generation Pilot
💬 3    👁 307        C  carguy83 · updated 18 h ago



Home > Forums > Pilot Discussions > **2016- Third generation Pilot** >

# Random Electrical Snapping/Cracking Sound - Elite

→ Jump to Latest          Follow

61 - 80 of 168 Posts          ◀Prev  1  2  3  4  5  6  ...  9  Next ▶

**A09**
Registered
Joined Jul 24, 2015
113 Posts

**#61** · Apr 2, 2019

FrustratedOwner said: ⊕

Purchased a new 2019 Pilot Touring in November 2018 and the snap crackle popping sound started between 6,000 and 7,000 miles. And now started losing LCD intermittently. Sound has occurred a couple times with doors locking. I am being told this is probably a MOST Bus issue and a Service News Article (same thing as TSB?) was issued in March 2019 for 2019 Pilots, 2018-19 Odyssey's and 2019 Passports. Since it only applies to 2019 Pilots I wonder if this is a new issue unrelated to the problems with AC. We've only owned the vehicle for the winter months so we haven't even turned the AC on yet.

Click to expand...

This is just crazy. Unless the part numbers have revisions, replacing parts with existing designs will not solve the problem. The root cause is back-EMF. The resolution is a flyback diode as discussed in previous posts of this thread. Unless Honda R&D put in a diode into the schematic, wiring diagram, and ultimately the harness, this problem will persist.

I was replacing relays -- on my dime -- at $16/pop twice per year until I wired in the solution myself.

2016 Pilot Elite, Obsidian Blue Pearl
▶ Show Full Signature

Reply                    Save    Share

**#62** · Apr 2, 2019 (Edited)

**F**

**FrustratedOwner**
Registered
Joined Apr 2, 2019
3 Posts

That may well be the proper resolution. But Honda will never do anything but replace existing parts to try and put a band aid on the problem. That way they can point their finger and blame the issue on defective parts. If they were to implement a fix such as adding a flyback diode that would be the smoking gun admitting there is a design defect. That would open Honda up to an enormous voluntary recall and/or a class action lawsuit. This has less to do with R&D and more to do with containing Honda's potential liability.

Reply                    Save    Share

**A09**
Registered
Joined Jul 24, 2015
113 Posts

**#63** · Apr 5, 2019

FrustratedOwner said: ⊕

That may well be the proper resolution. But Honda will never do anything but replace existing parts to try and put a band aid on the problem. That way they can point their finger and blame the issue on defective parts. If they were to implement a fix such as adding a flyback diode that would be the smoking gun admitting there is a design defect. That would open Honda up to an enormous voluntary recall and/or a class action lawsuit. This has less to do with R&D and more to do with containing Honda's potential liability.

## About this Discussion

**167** Replies    **70** Participants

Last post:
PNW_Sucks 18 d ago

**Keep projects moving — even from home.**

Create, edit, sign, and share PDFs in Google Drive and Microsoft apps, and on any device.

Get started

### Honda Pilot - Honda Pilot Forums

Piloteers.org forum community offers tech info, troubleshooting, modification DIY's and discussion for the Honda Pilot SUV.

Full Forum Listing →

### Explore Our Forums

General Discussions

2016- Third generation Pilot

2003-2008 Pilot

Problems

2009-2011 Pilot


NO NONSENSE. JUST TIRES.
Tire Reviews And More

### Popular Communities


Mountain Bike Reviews
450,000+ members          Join

It has everything to do with Honda R&D; this is the group in Marysville, OH who design and develop all Honda vehicles for the North American market. In a prior life I was at two automakers: a test technician in at an automaker in Dearborn, MI; then a chassis engineer at a Japanese automaker in MI. We had Honda's in the lab all the time for benchmarking, which is why the Pilot is my second Honda (and likely last). I am now a design engineer at another vehicle manufacturer.

As I discussed previously, the A/C compressor, coil, clutch, and relay on my Pilot was replaced in 2017 in an attempt to resolve the popping noise. The retail cost of those components is over $1k. The popping noise resumed after one year. Your vehicle will have its harness replaced, in addition to several other components. Honda's cost (not yours) will be greater than mine.

My flyback diode installation (credit due to PFL in this forum) was less than $3 USD.

Honda can afford $3/vehicle through a TSB campaign, where Honda's exposure is limited to owners that complain...only they will receive the fix. Anyone else that doesn't notice or doesn't have the issue won't get anything.

To your point on liability: $3/vehicle extended to 200,000 vehicles per year is expensive, hence the reason Honda is quiet, and not dealing with the problem. Honda does not want to expose themselves to repairing every vehicle. I haven't looked at the unique incidents through this thread, but I speculate less than 100 owners who hear (or claim to hear) pops on their 2009-2019 Pilots. Statistically speaking (using this forum as the population) less than 0.0002% of all owners experience pops. On this basis, I can understand why Honda R&D in Ohio chooses to keep this as a very low (or no) priority issue. Regardless, I may not buy another Honda again if I have to wire in my own diodes to fix their design shortcomings.

Separately, I replaced both blower motors on my own dime because they were making helicopter sounds after 18 months of ownership. The motor commutators worn out...I looked up the PN's; like the A/C Compressor, the blower motors have revised part numbers. I replaced the blower motors on my own dime in less than 30 minutes because I did not want to waste time going back and forth with my dealer so they can say "everything sounds normal". Both motors were less than $160. I value my time at $50/hour, so I saved ~4 hours of non-productive dealer visits.

2016 Pilot Elite, Obsidian Blue Pearl
▶ Show Full Signature

Reply                                        Save      Share


Professional Contractors — 450,000+ members    [Join]
Working From Home Forum - New! — 25+ members    [Join]


Order Chick-fil-A delivery on Uber Eats
ORDER NOW →
Uber Eats | Chick-fil-A

 BBB ACCREDITED BUSINESS     GDPR

**F**

**FrustratedOwner**
Registered

Joined Apr 2, 2019
3 Posts

#64 · 12 mo ago

Got the car back last week and sure enough the sound came back about a week later. Then the instrument panel and speedometer went out similar to what teacherpayne described. At this point the hunk of junk is not even safe to drive. It's going back in tomorrow and I'm getting a loaner. Retained a lemon law attorney and will be filing suit soon.

Reply                                        Save      Share


Gerber — Protein for tiny tummies    ...ood Start Gentle (HMO) Non-GM...  46    [Add to Cart]



#65 · 11 mo ago

Seems like the issue originally detailed in this thread and those discussed from post #50 on could be different issues. I have a 2019 elite and have the same/similar problems as described by FrustratedOwner, teacherpayne, hasan007, gweb42982. and nick128. Here is my reply to another thread describing this issue:

**closetredneck**

Registered

Joined 11 mo ago
22 Posts

I am having this issue as well on my 2019 elite purchased just over two weeks ago - first occurrence at 119 miles . I was really hoping this was a software issue that could be fixed via update, or that a simple DIY would get the job done, but it seems like it truly is a manufacturing defect. Tonight, I found this: https://static.nhtsa.gov/odi/tsbs/20...55369-0001.pdf. Looks like a MOST Bus issue, with connectors. Funny though, multiple instances on this forum state how replacement of harnesses has not fixed the issue. I REALLY do not want to have my $50K car's interior ripped out, especially multiple times (3 for lemon law), but if that's my only recourse to get the vehicle replaced or refunded, I guess that's it. Shame...I really like this car.

Reply                                      Save      Share



#66 • 8 mo ago

**gobears81**

Registered

Joined 8 mo ago
1 Posts

I have a 2018 Elite I bought in Sep 2017. The popping noise started happening about a year into owning it (we don't put many miles on it). Then it started happening for a span of about 10 minutes during a drive. We took it in twice. The first time they said they couldn't reproduce it. The second time they pulled everything out to redo the connections(?) and the problem got so much worse. We are taking it back later this week to get looked at again.

Reply                                      Save      Share



#67 • 8 mo ago

**toolbagtom**

Registered

Joined 8 mo ago
2 Posts

I have 2019 touring 9,700 and its constantly popping. I have a appointment scheduled for tomorrow. Any suggestions on how I should approach this with best chances of getting the most help from the dealer? Can someone confirm if grounding the diode is a permanent fix?

I can't post my YouTube link bc its my first post. Ill post as soon as i figure out how to link it.

Reply                                      Save      Share

Y

**YF6H9GKNW**

Registered

Joined Jul 9, 2016
171 Posts

#68 • 8 mo ago

When I took our Touring in to the dealer for this I did not have a video to show them. When I would return to pick it up I was told they could not reproduce the problem so I would have to sit with one of their techs quietly listing for the pop so I could point it out to them. Each time they ended up replacing the A/C Compressor Clutch Relay. When my warranty ran out I bought a couple of these relays to have on hand for when the popping returns. So far so good though. Good luck!

2016 Touring AWD in CA
▶ Show Full Signature

Reply                                      Save      Share

**Work virtually —
anywhere.**                    Try free

#69 • 7 mo ago

Hello! I just purchased a 2019 Touring a couple weeks ago and it immediately started making a popping sound. At first I thought it was the windshield. It sounds like pebbles are hitting the windshield. After reading these posts, I think it may be coming from the



**T_Puma**
Registered

Joined 7 mo ago
3 Posts

speakers. I have had it at the dealer twice now with no resolution. It is back for the third time. I'm very frustrated. HELP! 😫

 Tourist2012

Reply                                    Save    Share

---



**toolbagtom**
Registered

Joined 8 mo ago
2 Posts

#70 • 6 mo ago

Heres my Pilot.

> 2019 Honda Pilot touring audio popping sound
>
> ▶

Popping would happen on/off and infotainment system would black out. Its been at the dealer for about a month now and waiting for a reply tomorrow. I suggest you stay organized and clearly state in your reports if it effects the safety of your driving. Good luck and keep us posted.

Reply                                    Save    Share

---

**P**

**poleary2000**
Registered

Joined Aug 12, 2011
4 Posts

#71 • 6 mo ago

> toolbagtom said: ⊕
> I have 2019 touring 9,700 and its constantly popping. I have a appointment scheduled for tomorrow. Any suggestions on how I should approach this with best chances of getting the most help from the dealer? Can someone confirm if grounding the diode is a permanent fix?
>
> I can't post my YouTube link bc its my first post. Ill post as soon as I figure out how to link it.

Same deal here. My dealer had my Pilot for 3 weeks. They replaced a harness behind the dash. To others points, it may come back. If it does, I hope it does soon because it will be my 3rd time in the shop for it and I have about 10k miles. 3x and <=12k miles in PA is lemon law.

Reply                                    Save    Share

---



**jjdoreo**
Registered

Joined 6 mo ago
1 Posts

#72 • 6 mo ago

I have owned 3 Honda Pilots in the past and never had this problem with the earlier models (my last one was a 2012) I Leased a 2019 Honda Pilot Touring in June 2019. Drove it off the lot to find the next day the horn did not work-someone almost backed into me and I had no horn. Took it back to the dealer-they said a fuse blew. They fixed the horn but then the crackling and popping noise started. It seemed to get worse on long trips. Then the car stalled out on me twice. I have taken it back to my Honda dealer three times already. They have no idea what I am talking about with the crackling noise. They state there is no record of this happening with any of their vehicles- are they kidding! The technician drove the car with me in it to hear the noise. I also told him that there is a static noise when you lock and unlock the doors. The last time I took it in and got the car back they said it has been fixed, Well, that lasted about a day before it started again. I

have had no luck resolving this issue. Honda has to be aware of this problem-obviously it has been occurring for years form reading all of these posts. Not sure what to do at this point. They seem bothered by me every time I call my service agent. Wonder what the lemon law is in my state....will need to read up on it. It really is a shame that this is happening, the Pilot is a really great car.

Reply                                                                                   Save          Share


greatcall    Easy-to-use Jitterbug phones    jitterbug ✕

#73 · 6 mo ago

F

**Flowergal**
Registered

Joined 6 mo ago
2 Posts

We are having the same issues with our infotainment system on 2019 Honda Pilot Touring edition as have been described here. It is currently at the dealership for repairs for the 3rd time in 6 months, Honda technical told them it needs a replacement body harness which they can't get until December! We are thinking about trading this in for another vehicle from our dealership (who carries multiple manufacturers), but except for this serious issue, we really love the Pilot and the others don't interest us as much. Has anyone who has already purchased a 2020 Honda Pilot experienced this same issue? From what we have read, it doesn't appear Honda has changed anything on the 2020's.

Reply                                                                                   Save          Share



**Tourist2012**
Premium Member

Joined Oct 27, 2012
328 Posts

#74 · 6 mo ago

Well, our '19 Elite is making the crackling sounds through the audio system. Only has 1200 miles on it. It's generally just occasional pops. At first, I thought it was bugs hitting the windshield because it was lovebug season here in FL. Well, the lovebugs are gone and we're still getting it. My wife hasn't said anything about it until tonight. She heard it before and assumed the same thing I did. I purposely didn't say anything about the issue because I wanted to see if she experienced/recognized it when she drove the car. But tonight, she said it was actually crackling.

So, I am going to see about making an appointment for Saturday to take it in to the dealer.

2019 Honda Pilot Elite Lunar Silver Metallic / Grey Interior
2018 Nissan Titan XD SV 4x4 Crew Cab Brilliant Silver / Black Interior
▶ Show Full Signature

Reply                                                                                   Save          Share



**Tourist2012**
Premium Member

Joined Oct 27, 2012
328 Posts

#75 · 6 mo ago (Edited)

Just got back from the dealer. I had an 8:45 appointment, got there at 8:30. I explained everything again, which I did on the online form when I made the appointment. At 9:15, when I was wandering around the showroom the service writer came and waved me over. The tech drove the car, heard the sound, did a factory reset on the head unit, and drove the car again - sound is gone. I rolled my eyes, and the service writer told me to drive it and if it makes the noise to come back. I made it all the way home, which is a 40 minute drive without hearing a snap, crackle, or pop. I can't quite believe it, and am not optimistic it will last. But, at least for now, the issue is no longer presenting itself.

I'm off this weekend and am going to run the car around as much as possible to see if the noise returns.

2019 Honda Pilot Elite Lunar Silver Metallic / Grey Interior
2018 Nissan Titan XD SV 4x4 Crew Cab Brilliant Silver / Black Interior
▶ Show Full Signature



Reply                                    Save    Share

C

**#76** · 6 mo ago

**Captain_Pilot**
Registered

Joined 6 mo ago
56 Posts

If this is a design issue instead of production defect, all 2016+ Pilots, soon or later, will have this problem. Am I correct? Sounds like a class action time.

Reply                                    Save    Share

**#77** · 6 mo ago

**Tourist2012**
Premium Member

Joined Oct 27, 2012
328 Posts

> Captain_Pilot said: ⊕
> If this is a design issue instead of production defect, all 2016+ Pilots, soon or later, will have this problem. Am I correct? Sounds like a class action time.

Its hard to say. Correct me if I am wrong, but I thought it was only Elite and Touring trims affected.

Oh, and my popping noise is back. So it'll be going to the dealer again…

2019 Honda Pilot Elite Lunar Silver Metallic / Grey Interior
2018 Nissan Titan XD SV 4x4 Crew Cab Brilliant Silver / Black Interior
► Show Full Signature

Reply                                    Save    Share

C

**#78** · 6 mo ago

**Captain_Pilot**
Registered

Joined 6 mo ago
56 Posts

saw this from Odyssey chat site… not sure if this is the right fix. maybe someone already posted.

http://www.urvi.net/forumfiles/SN/A19030B.PDF

Reply                                    Save    Share

M

**#79** · 6 mo ago

**mohsha**
Registered

Joined 9 mo ago
4 Posts

> Captain_Pilot said: ⊕
> saw this from Odyssey chat site… not sure if this is the right fix. maybe someone already posted.
>
> http://www.urvi.net/forumfiles/SN/A19030B.PDF

Not in my case since no repairs were done to cause this issue. I am waiting for a new wiring harness which is on backorder (2 weeks since dealer informed about backorder).

Reply                                    Save    Share

F

**#80** · 6 mo ago

> mohsha said: ⊕
> Not in my case since no repairs were done to cause this issue. I am waiting for a new wiring harness which is on backorder (2 weeks since dealer informed about backorder).

**Flowergal**

Registered

Joined 6 mo ago

2 Posts

mohsha, we also were told we needed the new wiring harness, and Honda corporate told our dealership that the harness would not be in until December. We contacted Honda corporate - check out https://www.elliott.org/company-contacts/honda/ for the primary contact person and sent an email to that individual explaining our issues and that we needed the part prior to leaving on a cross country trip with the vehicle in less than a month. They overnighted the part to our dealership within a few days after our contact. Picking up our Pilot tomorrow, fingers crossed that this will correct the issues for good.

👍 Tourist2012

Reply                                                          Save       Share

61 - 80 of 168 Posts

◄Prev    1   2   3   4   5   6   …   9   Next►

## Join the discussion

Continue with Facebook           G Continue with Google        or sign up with email

## Recommended Reading                               Read More →

**2020 Pilot Price paid reports**
2016- Third generation Pilot
💬 240     👁 40K     Rocky · updated 4 h ago

**Wet Floor Passenger Side**
2016- Third generation Pilot
💬 82     👁 9K     F  fixit · updated 9 h ago

**Would anyone be afraid to use an after market ATF filter?**
2016- Third generation Pilot
💬 72     👁 1K     Nail Grease · updated 17 h ago

**Ask a Mechanic Online Now - A Mechanic Answers in Minutes**
justanswer.com/car-help
Questions Answered Every 9 Seconds. Get Professional Answers Online & Save Time!
                                                                                    Ad

**Full size spare with a trailer hitch?**
2016- Third generation Pilot
💬 6     👁 226     FASTFJR · updated 18 h ago

**Upgraded 2019 Touring Fogs - Diode Dynamics**
2016- Third generation Pilot
💬 3     👁 310     C carguy83 · updated 18 h ago

Home › Forums › Pilot Discussions › 2016- Third generation Pilot ›

Home  About Us  Terms of Use  Privacy Policy  Help  Contact us

VerticalScope Inc., 111 Peter Street, Suite 600, Toronto, Ontario, Canada

Forum software by XenForo

# EXHIBIT D

STEVE W. BERMAN (*pro hac vice*)
SEAN R. MATT (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steve@hbsslaw.com*
*sean@hbsslaw.com*

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
*christopherp@hbsslaw.com*

*Counsel for Plaintiffs and Class*

[Additional Counsel listed on Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LESLEY CONTI, TOM CONTI, BRANDI BISHOP, BRIGID HIRTH, MICHAEL HIRTH, MARK ANKROM, HEIDI PHAN, PETER PHAN, ANTHONY ROSSOMANDO, LAURA MOHR, LARRY SIMKIN, HARMEET GILL, YAZEED ISSA, ASHLEY PFEIFER, WILLIAM D. LAMPTON, JACOB SZAJOWITZ, MICHAELA HETZLER, MICHELLE BECKWITH, ROSS CONLEY, STEPHANIE CONLEY, EMILY DARR, PAMELA TURBERVILLE, SMRUTI PATEL, ANN MORGAN, and JULIE PEREIRA on behalf of themselves and all others similarly situated, | Case No.: 2:19-cv-2160 <br><br> **CLASS ACTION** <br><br> **SECOND AMENDED COMPLAINT** <br><br> Complaint Filed: March 22, 2019 |

Case 2:20-cv-08947-RMB-KMW Document 17 Filed 10/23/20 Page 182 of 453 PageID
Case 2:19-cv-02160-CJC-GJS Document 50 Filed 11/04/19 Page 2 of 223 Page ID #509
791

Plaintiffs,

v.

AMERICAN HONDA MOTOR CO.,
INC, a California corporation,

Defendant.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case 2:20-cv-09467-RMB-KMW Document 17 Filed 10/23/20 Page 183 of 453 PageID:
Case 2:19-cv-02160-CVC-CJS Document 50 Filed 11/04/19 Page 3 of 233 PageID #:510
792

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THIS ACTION ................................................................ 1

II.  JURISDICTION AND VENUE ........................................................... 4

III. PARTIES ............................................................................................. 4

    A.   Plaintiffs ..................................................................................... 4

        1.   Alabama—Brandi Bishop ................................................. 4

        2.   Arizona ............................................................................. 7

            a.   Brigid and Michael Hirth ...................................... 7

            b.   Mark Ankrom ....................................................... 10

        3.   Colorado—Heidi and Peter Phan ................................... 12

        4.   Connecticut—Anthony Rossomando ............................. 15

        5.   Florida ............................................................................ 18

            a.   Laura Mohr .......................................................... 18

            b.   Larry Simkin ....................................................... 20

        6.   Georgia—Harmeet Gill ................................................... 24

        7.   Illinois—Yazeed Issa ...................................................... 27

        8.   Kansas—Ashley Pfeifer ................................................. 30

        9.   Kentucky—William D. Lampton ................................... 33

        10.  Maryland—Jacob Szajowitz ........................................... 38

        11.  Massachusetts—Michaela Hetzler .................................. 42

        12.  Missouri—Michelle Beckwith ........................................ 47

        13.  Ohio—Lesley and Tom Conti ......................................... 51

        14.  Oklahoma—Ross and Stephanie Conley.......................... 56

        15.  South Carolina—Emily Darr ........................................... 59

        16.  Tennessee—Pamela Turberville ...................................... 62

        17.  Texas—Smruti Patel ....................................................... 64

        18.  Virginia—Ann Morgan .................................................... 68

19. Washington—Julie Pereira .......................................................... 71

B. Defendant ....................................................................................... 77

IV. FACTUAL ALLEGATIONS.................................................................... 83

A. The Honda Infotainment System ............................................... 83

B. Defendant's Failure to Fix or Disclose the Defect ................. 86

C. Defendant's Warranties and Response to the Defect........... 113

V. CLASS ACTION ALLEGATIONS.................................................... 114

VIOLATIONS ALLEGED ................................................................................ 119

A. Claims Brought on Behalf of the Nationwide Class............... 119

COUNT I BREACH OF EXPRESS WARRANTY— MAGNUSON-MOSS
WARRANTY ACT (15 U.S.C. §§ 2301, *ET SEQ.*) ...................... 119

COUNT II BREACH OF IMPLIED WARRANTY— MAGNUSON-MOSS
WARRANTY ACT (15 U.S.C. §§ 2301, *ET SEQ.*) ...................... 123

B. Claims Brought on Behalf of the Alabama Class .................... 124

COUNT I VIOLATION OF THE ALABAMA DECEPTIVE TRADE
PRACTICES ACT (ALA. CODE § 8-19-1 ET SEQ.) ..................... 124

COUNT II BREACH OF EXPRESS WARRANTY (ALA. CODE § 7-2-313) ..... 125

COUNT III BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (ALA. CODE § 7-2-314)............................. 127

C. Claims Brought on Behalf of the Arizona Class...................... 128

COUNT I VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
(ARIZ. REV. STAT. § 44-1521 ET SEQ.) ...................................... 128

COUNT II BREACH OF EXPRESS WARRANTY (ARIZ. REV. STAT. § 47-
2313)..................................................................................................... 129

COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (ARIZ. REV. STAT. § 47-2314).................. 131

D. Claims Brought on Behalf of the Connecticut Class .............. 132

COUNT I VIOLATION OF THE CONNECTICUT
UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110A
ET SEQ.) ............................................................................................. 132

COUNT II BREACH OF EXPRESS WARRANTY (CONN. GEN. STAT.
ANN. § 42A-2-313)............................................................................. 133

COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (CONN. GEN. STAT. ANN. § 42A-2-314) ........... 135

    E.    Claims Brought on Behalf of the Colorado Class ............................... 136

COUNT I VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
ACT (COLO. REV. STAT. §§ 6-1-101, *ET SEQ.*) ........................................ 136

COUNT II BREACH OF EXPRESS WARRANTY  (BASED ON
COLORADO LAW) ...................................................................... 137

COUNT III BREACH OF IMPLIED WARRANTY  (BASED ON
COLORADO LAW) ...................................................................... 139

    F.    Claims Brought on Behalf of the Florida Class ................................... 140

COUNT I VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT  (FLA. STAT. § 501.201, ET SEQ.) .............................. 140

COUNT II FRAUDULENT CONCEALMENT  (BASED ON FLORIDA
LAW) ......................................................................................... 142

COUNT III BREACH OF EXPRESS WARRANTY (FLA. STAT. § 672.313) .... 145

COUNT IV BREACH OF IMPLIED WARRANTY (FLA. STAT. § 672.314) ..... 147

COUNT V UNJUST ENRICHMENT (BASED ON FLORIDA LAW) ................ 149

    G.    Claims Brought on Behalf of the Georgia Class .................................. 149

COUNT I VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES
ACT ........................................................................................... 149

COUNT II BREACH OF EXPRESS WARRANTY ....................................... 151

COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (GA. CODE. ANN. §§ 11-2-314 AND 11-2A-
212) ........................................................................................... 153

    H.    Claims Brought on Behalf of the Illinois Class ................................... 154

COUNT I VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.*
AND 720 ILCS 295/1A) ................................................................ 154

COUNT II BREACH OF EXPRESS WARRANTY ....................................... 155

COUNT III BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (810 ILL. COMP. STAT. §§ 5/2-314 AND
5/2A-212) ................................................................................... 156

    I.    Claims Brought on Behalf of the Kansas Class ................................... 157

COUNT I VIOLATION OF THE KANSAS CONSUMER PROTECTION
ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*) ........................................ 157

Case 2:20-cv-08947-RMB-KMW Document 17 Filed 10/23/20 Page 186 of 453 PageID:
Case 2:19-cv-02160-CVG-CJS Document 50 Filed 11/04/19 Page 6 of 23 Page ID #813
795

COUNT II BREACH OF EXPRESS WARRANTY ............................................... 159

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (KAN. STAT. §§ 84-2-314 AND 84-2A-212) ....... 161

    J.    Claims Brought on Behalf of the Kentucky Class ............................... 162

COUNT I VIOLATION OF THE KENTUCKY CONSUMER PROTECTION
    ACT (KY. REV. STAT. § 367.110, *ET SEQ.*) ................................................. 162

COUNT II BREACH OF EXPRESS WARRANTY ............................................... 165

    K.    Claims Brought on Behalf of the Maryland Class ............................... 167

COUNT I VIOLATIONS OF THE MARYLAND CONSUMER
    PROTECTION ACT (MD. CODE COM. LAW § 13-101, ET SEQ.) .......... 167

COUNT II BREACH OF EXPRESS WARRANTY ............................................... 169

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (**MD. CODE COM. LAW § 2-314**) .................... 171

    L.    Claims Brought on Behalf of the Massachusetts Class ....................... 172

COUNT I VIOLATIONS OF THE MASSACHUSETTS CONSUMER
    PROTECT ACT .......................................................................................... 172

COUNT II BREACH OF EXPRESS WARRANTY (MASS. GEN. LAWS CH.
    106, § 2-313) ............................................................................................ 173

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (MASS. GEN. LAWS CH. 106, § 2-314) .............. 175

    M.    Claims Brought on Behalf of the Missouri Class ............................... 176

COUNT I VIOLATION OF THE MISSOURI MERCHANDISING
    PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*) ........................ 176

COUNT II BREACH OF EXPRESS WARRANTY ............................................... 177

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (MO. REV. STAT. § 400.2-314) ............................ 179

    N.    Claims Brought on Behalf of the Ohio Class ..................................... 180

COUNT I VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
    (OHIO REV. CODE §§ 1345.01, *ET SEQ.*) ................................................. 180

COUNT II BREACH OF EXPRESS WARRANTY (OHIO REV. CODE
    § 1302.26) ................................................................................................. 182

COUNT III BREACH OF IMPLIED WARRANTY IN TORT (BASED ON
    OHIO LAW) .............................................................................................. 184

    O.    Claims Brought on Behalf of the Oklahoma Class ............................ 185

COUNT I VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15 § 751, *ET SEQ.*)......................................................185

COUNT II BREACH OF EXPRESS WARRANTY ...............................................188

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (12A OKLA. STAT. ANN. § 2-314).....................190

P.     Claims Brought on Behalf of the South Carolina Class .....................191

COUNT I VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10 *ET SEQ.*) ........................191

COUNT II BREACH OF EXPRESS WARRANTY ...............................................192

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.C. CODE §§ 36-2-314 AND 36-2A-212)..........194

Q.     Claims Brought on Behalf of the Tennessee Class.............................195

COUNT I VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT OF 1977 (TENN. CODE ANN. § 47-18-101, *ET SEQ.*) ...............................195

COUNT II BREACH OF EXPRESS WARRANTY (BASED ON TENNESSEE LAW)...........................................................................................................196

R.     Claims Brought on Behalf of the Texas Class ....................................198

COUNT I VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*) .........................................198

COUNT II BREACH OF EXPRESS WARRANTY  (TEX. BUS. & COM. CODE § 2.313)...............................................................................................201

COUNT III BREACH OF IMPLIED WARRANTY  (BASED ON TEXAS LAW)...........................................................................................................204

S.     Claims Brought on Behalf of the Virginia Class ................................205

COUNT I VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*) ............................................205

COUNT II BREACH OF EXPRESS WARRANTY (VA. CODE ANN. § 8.2-313)........................................................................................................206

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (VA. CODE ANN. § 8.2-314)................................208

T.     Claims Brought on Behalf of the Washington Class ...........................209

COUNT I VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)...........................................................................................................209

Case 2:20-cv-08947-RMB-KMW Document 17 Filed 10/23/20 Page 188 of 453 PageID:
Case 2:19-cv-02160-CJC-GJS Document 50 Filed 11/04/19 Page 8 of 228 Page ID #:815
797

COUNT II BREACH OF EXPRESS WARRANTY (REV. CODE WASH.
§ 62A.2-313)..................................................................................210

COUNT III BREACH OF IMPLIED WARRANTY..............................................212

PRAYER FOR RELIEF ....................................................................................214

JURY DEMAND..............................................................................................214

Case 2:20-cv-08947-RMB-KMW Document 17 Filed 10/23/20 Page 189 of 453 PageID:
Case 2:19-cv-02160-CVC-CJS Document 50 Filed 10/04/19 Page 9 of 228 Page ID #916
798

All allegations made in this Amended Complaint are based upon information and belief except those allegations that pertain to Plaintiffs, which are based on personal knowledge. Each allegation in this Amended Complaint either has evidentiary support or, alternatively, pursuant to Rule 11(b)(3) of the *Federal Rules of Civil Procedure*, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## I.   NATURE OF THIS ACTION

1. Plaintiffs bring this proposed class action for damages and injunctive relief on behalf of themselves and all other persons and entities nationwide[1] who purchased or leased a 2018-2019 Honda Odyssey vehicle, 2019 Honda Pilot, or 2019 Honda Passport ("Vehicles" or "Defective Vehicles") manufactured by defendant American Honda Motor Co., Inc. ("Honda" or "Defendant").

2. The defect at issue in this case relates to what is known in the automobile industry as an "infotainment system." Such systems are designed to attract buyers who want to manage available technology while on the road, while minimizing distractions and maximizing safety. The infotainment system found in the Defective Vehicles is no different.

3. All Vehicles' infotainment system consists of a minimum of two LCD screens: (1) a primary touch screen located in the center console; and (2) a screen located above the steering wheel that functions as a digital speedometer/odometer, and displays other information as well (e.g., remaining fuel, current song, turn-by-turn directions). Certain upgraded Odyssey and Pilot models have a third screen, marketed as the "Rear Entertainment System" (or "RES"), that folds down from the top of the vehicle's cabin and can be used by back seat passengers via a Honda-provided remote control to watch

---

[1] For purposes of this Complaint, "nationwide" refers to the following states: Alabama, Arizona, Colorado, Connecticut, Florida, Georgia, Illinois, Kansas, Kentucky, Maryland, Massachusetts, Missouri, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and Washington.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 190 of 453   PageID: 7
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 109 of 129   PageID #837
799

DVDs and interact with various applications.  The RES adds approximately $1,000 to the cost of the Vehicle.

4.      Honda first introduced this iteration of its infotainment system—which replaced the so-called "HondaLink system"—in 2018 Odyssey vehicles, and later to 2019 Pilot and 2019 Passport vehicles.  Notwithstanding superficial variation between models, these infotainment systems are the same.

5.      The screens are the gateway between the user and the vehicle's safety, navigation, communications, entertainment, and climate control features.  Among other operations, the Vehicles' infotainment system allows the vehicle owner to operate the audio systems in the vehicle (including the radio); use the GPS navigation technology; control the Vehicles' climate systems; operate the backup camera and CabinWatch rear seat monitor;[2] and operate a Bluetooth-enabled mobile telephone or other device (including Apple devices through the CarPlay application[3]).  The infotainment system's primary display is similar to a tablet, and features a high definition, user-customizable interface.

6.      Honda manufactured, tested, warranted, advertised, distributed, sold, and leased the Defective Vehicles, which contain a defective infotainment system that causes many of the Vehicles' features (e.g., the navigation system, rear-entertainment system, audio system, backup camera, CabinWatch system) to malfunction.   As documented by widespread consumer complaints, this defect has plagued the infotainment system since its launch.

---

[2] The CabinWatch rear seat monitor is a feature available in certain Odyssey models (or "trims") that allows front seat occupants to monitor the 2nd and 3rd row passengers on the primary LCD screen via a ceiling-mounted camera.

[3] Apple CarPlay is a software application compatible with many manufacturers' infotainment systems, including the infotainment systems found in the Defective Vehicles.  It enables an infotainment system to act as a controller for Apple devices, and provides access to other Apple-specific applications (including music, messaging, maps, and podcasts, among others), as well as other third-party applications.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 191 of 453 PageID:
800
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 119 of 121   Page ID #:528

7.      As a result of the defect, the Vehicles' infotainment systems frequently freeze or crash, in which case no features connected to system are operational, including the navigation technology, the radio, and the rearview camera.  These problems pose a safety risk because when the system malfunctions, unexpected audio or video – or a blank or blue infotainment screen – can cause the driver to become distracted.  Indeed, even under the best of conditions when infotainment-type systems are working properly, using them can create dangerous distractions.  *See*, *e.g.*, Strayer, D. L., Cooper, J. M., Turrill, J., Coleman, J. R., & Hopman, R. J.. *Measuring Cognitive Distraction in the Automobile III: A Comparison of Ten 2015 In-Vehicle Information Systems*. Washington, DC: AAA Foundation for Traffic Safety (2015) (found at https://pdfs.semanticscholar.org/7bc7/04c103b3eb5b84aa90d1509472bf222b862c.pdf) .  The chance of distraction is magnified when the systems do not work properly.  The defect can also render safety-related systems (including backup camera functions) to fail.

8.      From standard industry pre-launch testing, Honda knew of the defect before marketing the Vehicles in 2018.  Further, Honda knew of the defect immediately after the release of the Vehicles, based on the numerous customer complaints it received, and yet continued to market the Vehicles.  In spite of these issues, Honda not only installed the same defective in 2019 Odyssey vehicles, but incorporated it into the 2019 Pilot and 2019 Passport as well.  Honda's failure to disclose the infotainment systems defects—either directly to consumers or through its dealers, which are Honda's agents—was material to each and every Plaintiff and member of the putative classes.

9.      Under the Vehicles' New Vehicle Limited Warranty, Honda is required to "repair or replace any part that is defective in material or workmanship under normal use."[4]   The infotainment systems in the Defective Vehicles, which share identical

---

[4] A true and correct copy of the New Vehicle Limited Warranty is available at https://owners.honda.com/Documentum/Warranty/Handbooks/2018_Honda_Warranty _Basebook_AWL05251_FINAL.pdf;

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 192 of 453 PageID:
801
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 12 of 123   Page ID #:529

infotainment system technology, are defective in material or workmanship under normal use.

10.   Honda has not found a solution to the infotainment system defect. Instead, Honda simply replaces defective parts with equally defective parts, thereby leaving consumers caught in a cycle of use, malfunction, and replacement. Honda has acknowledged in communications to its dealer network that a defect in the infotainment systems exists and that Honda does not yet have a fix.

11.   Accordingly, Plaintiffs bring this action for violation of relevant state consumer protection acts and for breach of express and implied warranties on behalf of state classes of Vehicle lessees and owners. Plaintiffs seek damages and equitable relief on behalf of themselves and all others similarly situated.

## II.   JURISDICTION AND VENUE

12.   This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and because this is a class action in which the members of the classes and Defendant are citizens of different states.

13.   Venue is proper in this judicial district under 28 U.S.C. §1391 because Defendant is a resident of Torrance, California, which is located in this district.

## III.   PARTIES

### A.   Plaintiffs

#### 1.   Alabama—Brandi Bishop

14.   Plaintiff Brandi Bishop resides in and is a citizen of Lineville, Alabama.

15.   Plaintiff Bishop purchased a new 2018 Honda Odyssey Elite on October 10, 2017, from Serra Honda, an authorized Honda dealership located in Sylacauga,

---

https://owners.honda.com/Documentum/Warranty/Handbooks/2019_Honda_Warranty_Basebook_AWL07531_Petrol_Hybrid_PHEV__SIS.pdf.

SECOND AMENDED COMPLAINT          - 4 -
010811-11/1205802 V1

Alabama. Prior to purchasing the Odyssey, Plaintiff Bishop researched the features and benefits of the Odyssey on Honda's website. Plaintiff Bishop also test drove the Odyssey and interacted with the dealership's salesperson prior to purchasing the vehicle.

16. Plaintiff Bishop purchased and continues to own the 2018 Honda Odyssey Elite. Unknown to Plaintiff Bishop at the time she purchased the vehicle, the Odyssey suffered from (and continues to suffer from) a defective infotainment system, which has caused attempted repairs, overpayment, and diminished value of the Odyssey. Plaintiff was also deprived of the benefit of her bargain. Honda knew about this defect at the time Plaintiff Bishop purchased the vehicle but did not disclose it to her. Thus, Plaintiff Bishop purchased the Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

17. Plaintiff Bishop selected and ultimately purchased her Odyssey Elite, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda—indeed, Plaintiff Bishop chose to purchase the Elite trim solely because of the CabinWatch feature. Before her purchase, Plaintiff Bishop researched the vehicle online, reviewing the features, specifications, and benefits of the Odyssey Elite as described by Honda, including the benefits of the infotainment system, on Honda's website. The features of the vehicle's infotainment system were further reviewed and described by the salesperson at the dealership and during the test drive prior to purchase. While at the dealership, Plaintiff Bishop and her husband also received, and reviewed, a Honda-branded brochure describing the 2018 Odyssey.

18. None of Honda's advertisements or marketing information reviewed by Plaintiff Bishop, nor any of the representations received by Plaintiff Bishop from the Honda dealership prior to the purchase, contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in her vehicle suffered from numerous defects which would prevent the full use of the vehicle

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 194 of 453   PageID:
803
Case 2:19-cv-02160-CMC-CJS   Document 60   Filed 04/03/20   Page 149 of 223   PageID: 321

1      as advertised and pose safety risks, Plaintiff Bishop would not have purchased the

2      Odyssey with the infotainment system, or would have paid less for the vehicle.

3      19.    Plaintiff Bishop began experiencing problems with her Odyssey's

4      infotainment system within a week of purchase, when the system as a whole crashed

5      and froze during a drive to a nearby pumpkin patch.  Although Plaintiff Bishop

6      subsequently left a voicemail with Serra Honda complaining about the problem, no

7      dealership employee responded.  Approximately one month later, during a service visit

8      related to her vehicle's doors, Plaintiff Bishop again mentioned her problem with the

9      vehicle's infotainment system and asked that it be addressed.  A Serra Honda

10     representative later called Plaintiff Bishop to explain that it was a "known problem" and

11     that Honda was unable to fix it.

12     20.    Since that time, the problems Plaintiff Bishop has had with the

13     infotainment system are so frequent and pervasive that she is not able to determine the

14     precise dates she has experienced such problems.  Indeed, on some days, the system will

15     crash five or six separate times.  On these occasions, when the CabinWatch feature is in

16     use, the central display screen will display the message "Camera system problem image

17     cannot be displayed," and freeze.  The DVD player will freeze at the same time, and the

18     Bluetooth system will make crackling and/or popping sounds.  Generally, to reboot the

19     system after one of these crashes, Plaintiff Bishop (or her husband) must turn the vehicle

20     off, wait for approximately fifteen minutes, then turn the vehicle back on.  Sometimes,

21     the problem will re-occur within minutes.  In addition to these frequent crashes, Plaintiff

22     Bishop has had other problems. The Apple CarPlay application in the vehicle has never

23     worked; when opened, it displays a loading screen indefinitely.  Furthermore, the

24     Bluetooth system frequently fails to recognize voice commands.

25     21.    The defects described above constantly create substantial distractions that

26     can result in dangerous driving conditions, creating safety hazards.

27

28

22.     Plaintiff Bishop has repeatedly sought to have the problems with her infotainment system fixed, to no avail.  In addition to the communications with Serra Honda described above, Plaintiff Bishop has also brought her vehicle Sunny King Honda in Anniston, Alabama, for service.  When Plaintiff Bishop has asked Sunny King personnel about the issues with her infotainment system, she has been told that the problem is known to Honda and that there is nothing the dealership is able to do to help her.  Plaintiff Bishop also opened a case with Honda directly approximately four months after purchase, in early 2018.  When Plaintiff Bishop has described her problems to Honda personnel, she has been told that Honda is "working on" these issues.  Eventually, Plaintiff Bishop became so frustrated with Honda's failure to respond that she stopped inquiring as to the status of a fix.

23.     As of this date, Plaintiff Bishop continues to experience the problems described above with the infotainment system in her Odyssey.

24.     Plaintiff Bishop has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of her vehicle.

25.     Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Bishop of the existence of the infotainment system's defects prior to purchasing the vehicle.

**2.     Arizona**

**a.     Brigid and Michael Hirth**

26.     Plaintiffs Brigid and Michael Hirth (the "Hirths") reside in and are citizens of Mesa, Arizona.

27.     The Hirths purchased a new 2018 Honda Odyssey Elite on July 11, 2018 from AutoNation Honda, an authorized Honda dealership located in Chandler, Arizona.  Prior to purchasing the Odyssey, the Hirths researched the features and benefits of the Odyssey on Honda's website, and were exposed to Honda's omissions through

SECOND AMENDED COMPLAINT               - 7 -

010811-11/1205802 V1

AutoNation, Honda's agent. The Hirths also test drove the Odyssey and interacted with the dealership's salesperson prior to purchasing the vehicle.

28.    The Hirths purchased and continue to own the 2018 Honda Odyssey Elite. Unknown to the Hirths at the time they purchased the vehicle, the Odyssey suffers from a defective infotainment system, which has caused attempted repairs, overpayment, and diminished value of the Odyssey. Plaintiffs were also deprived of the benefit of the bargain. Honda knew about this defect at the time the Hirths purchased the vehicle but did not disclose it to them. Thus, the Hirths purchased the Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

29.    The Hirths selected and ultimately purchased their Odyssey Elite because, in part, of the features of the infotainment system, as represented through advertisements and representations made by Honda. Specifically, prior to their purchase, the Hirths researched the Odyssey extensively, comparing it with similar vehicles like the Toyota Sienna, and the infotainment system (including the CabinWatch feature) was ultimately the single most important variable affecting their purchase—because of features like the entertainment system, Apple CarPlay/phone integration, CabinWatch, CabinTalk, and the backup camera, many of which were appealing for safety reasons. The Hirths researched the van and its amenities on various websites, including TrueCar.com, Edmunds, and Honda's website, and reviewed Honda promotional materials—including a brochure for the Odyssey—at the dealership prior to purchase. The features of the vehicle's infotainment system were further reviewed and described by the salesperson at the dealership and during the test drive prior to purchase. At the time of purchase, a salesperson also spent a significant amount of time setting up the infotainment system for the Hirths.

30.    None of Honda's advertisements or marketing information reviewed by the Hirths, nor any of the representations received by them from the Honda dealership prior

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 197 of 453 PageID:
806
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 1 of 123 Page ID #324

to the purchase, contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in their vehicle suffered from numerous defects which would prevent the full use of the vehicle as advertised and pose safety risks, the Hirths would not have purchased the Odyssey with the infotainment system, or would have paid less for the vehicle.

31. The Hirths' problems with their infotainment system began in the spring of 2019, when the system began freezing and crashing unexpectedly—thus disabling all associated features (e.g., audio, CabinWatch). Sometimes, by turning their car off and on again, the Hirths were able to restart the infotainment system; other times, however, the system would remain non-functional. When the frequency of these failures increased in August 2019, the Hearths began documenting them.

32. On August 21, the Hirths brought their vehicle to AutoNation for service related to their infotainment problems. During that visit, AutoNation personnel told the Hearths that their infotainment problems were an issue known to Honda, and that there was nothing they could do until Honda released a software update in "a couple of months."

33. Following this visit, Mrs. Hirth called AutoNation to complain, explaining that, based on her online research, it appeared that her problems were known to Honda but never disclosed at the time of sale. A customer service representative responded that the dealership was not aware of the problem until a few months earlier, and was being directed by Honda to have affected people call Honda's customer complaint line.

34. Following this conversation, Mrs. Hirth left a voicemail for AutoNation's general manager, requesting a conversation during which the Hirths could explain their concerns with the infotainment system, and discuss why the dealership failed to inform them of these issues prior to purchase. The Hirths have yet to receive a response.

35. As of this date, the Hirths continue to experience problems with the infotainment system in their Odyssey. Most recently, on October 24, 2019, the

SECOND AMENDED COMPLAINT          - 9 -
010811-11/1205802 V1

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 198 of 453 PageID:
807
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 198 of 453   Page ID #325

infotainment system's screen turned black when Mrs. Hirth turned the vehicle on, and would not respond when she pressed the on/off button.

36.     The Hirths have suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of her vehicle.

37.     Neither Honda nor any of its agents, dealers, or other representatives informed the Hirths of the existence of the infotainment system's defects prior to purchasing the vehicle.

### b.     Mark Ankrom

38.     Plaintiff Mark Ankrom resides in and is a citizen of Chandler, Arizona.

39.     Plaintiff Ankrom purchased a new 2019 Honda Passport Elite on May 1, 2019, from Earnhardt Honda, an authorized Honda dealership located in Avondale, Arizona.  Before buying his vehicle, Plaintiff Ankrom researched the features and benefits of the Passport on Honda's website.  Plaintiff Ankrom also test drove the Passport and interacted with the dealership's salesperson prior to purchasing the vehicle.

40.     Plaintiff Ankrom continues to own his 2019 Passport.  Unknown to Plaintiff Ankrom at the time he purchased the vehicle, the Passport suffered from (and continues to suffer from) a defective infotainment system, which has caused attempted repairs, overpayment, and diminished value of the Passport.  Plaintiff was also deprived of the benefit of his bargain.  Honda knew about this defect at the time Plaintiff Ankrom purchased the vehicle but did not disclose it to him.  Thus, Plaintiff Ankrom purchased the Passport on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.  Indeed, at the time he bought his Passport, Plaintiff Ankrom had owned a Honda Ridgeline for approximately twelve years, and considered himself a loyal Honda customer.

41.     Plaintiff Ankrom selected and ultimately purchased his Passport, in part, because of the features of the infotainment system, as represented through

advertisements and representations made by Honda.  Specifically, prior to his purchase, Plaintiff Ankrom researched the vehicle online where, among other things, he used the Honda website's "build-a-vehicle" many times to compare options, prices, and models. While shopping for his vehicle, Plaintiff Ankrom also visited a separate Honda dealership near his home, where he received advertising and promotional materials for the 2019 Passport.  The features of the vehicle's infotainment system were further reviewed and described by the salesperson at Earnhardt Honda and during the test drive prior to purchase.

42.  None of Honda's advertisements or marketing information reviewed by Plaintiff Ankrom, nor any of the representations received by Plaintiff Ankrom from the Honda dealership prior to the purchase, contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent the full use of the vehicle as advertised and pose safety risks, Plaintiff Ankrom would not have purchased the Passport with the infotainment system, or would have paid less for the vehicle.

43.  Plaintiff Ankrom began having problems with his Passport's infotainment system not long after he purchased it in May of 2019, when the infotainment screen began displaying various error messages (e.g., "No audio connect," "Cabin control has stopped," "Check tuner").  On these occasions, the vehicle's audio system also stops working—thus disabling all related functions, like AM/FM/Sirius radio, voice commands, Bluetooth, and music—and will not begin functioning again unless Plaintiff Ankrom turns off his vehicle, waits for approximately 7-8 minutes, then turns it on again.  At first, Plaintiff Ankrom attributed this recurrent problem to something he was doing, rather than to a defect with his vehicle.  But soon, it began happening every day.

44.  On two occasions, the infotainment system in Plaintiff Ankrom's vehicle has frozen completely, thus disabling the system as a whole (and all associated features). During one of these incidents, Plaintiff Ankrom was only able to restore the system's

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 200 of 453 PageID7
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/13 Page 200 of 229 Page ID #327
809

functionality by turning off his vehicle twice—once for approximately 7-8 minutes, which failed to resolve the problem, and then again for approximately ten minutes, at which point the infotainment system rebooted. Even then, however, it took approximately twenty minutes for the system to load and regain functionality.

45. Plaintiff Ankrom brought his vehicle to Earnhardt Honda on August 19, 2019, for service related to his infotainment system. The dealership worked on Plaintiff Ankrom's vehicle for six weeks. When Plaintiff Ankrom returned to pick up his vehicle on October 4, 2019, dealership employees told him that they had traced his problem to a defective amplifier, and that this part had been replaced.

46. But within a week, Plaintiff Ankrom began having the same problems described above. To date, the audio system in Plaintiff Ankrom's Passport has frozen four additional times.

47. Plaintiff Ankrom has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of his vehicle.

48. Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Ankrom of the existence of the infotainment system's defects prior to purchasing the vehicle.

**3.    Colorado—Heidi and Peter Phan**

49. Plaintiffs Heidi and Peter Phan reside in and are citizens of Highlands Ranch, Colorado.

50. Heidi and Peter Phan purchased a new 2019 Honda Odyssey Elite on September 20, 2018 from Kuni Honda, an authorized Honda dealership located in Highlands Ranch, Colorado. Prior to purchasing the Odyssey, the Phans researched the features and benefits of the Odyssey on Honda's website. The Phans also viewed videos on Youtube that demonstrated how many of the infotainment system's features

SECOND AMENDED COMPLAINT                                    - 12 -
010811-11/1205802 V1

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 201 of 453 PageID:
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 214 of 221   Page ID #328
810

functioned, and the Phans test drove the Odyssey and interacted with the dealership's salesperson prior to purchasing the vehicle.

51.     The Phans also considered the Toyota Sienna prior to purchasing the Odyssey.  However, the Toyota Sienna did not offer a feature similar to "CabinWatch," which Honda offered.  The Sienna also did not appear to have an infotainment system that touted the latest technology, as Honda did.  The CabinWatch rear seat monitor is a feature available in certain Odyssey models (or "trims") that allows front seat occupants to monitor the second and third row passengers on the primary LCD screen via a ceiling-mounted camera.  The CabinWatch feature of the infotainment system was extremely important to the Phans and was a major factor in their decision to purchase the Odyssey because the Phans have two young children (ages 3.5 years old and 10 months old) who are often transported in the Odyssey.  Heidi also transports her sister's young children and her sister-in-law's young children in the Odyssey.  The CabinWatch feature, if functioning properly, permits the Phans to monitor the status of the children and their activities in the second and third rows.  Accordingly, based upon the above described interactions and communications, the Phans were exposed to Honda's omissions in the state of Colorado and made their purchase decision in Colorado.

52.     The Phans purchased and continue to own the 2019 Honda Odyssey Elite.  Unknown to the Phans at the time they purchased the vehicle, the Odyssey suffered from (and continues to suffer from) a defective infotainment system, which has caused attempted repairs, overpayment, and diminished value of the Odyssey.  Plaintiffs were also deprived of the benefit of their bargain.  Honda knew about this defect at the time the Phans purchased the vehicle but did not disclose it to them.  Thus, the Phans purchased the Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

53.     The Phans selected and ultimately purchased their Odyssey Elite, in part, because of the features of the infotainment system, as represented through

SECOND AMENDED COMPLAINT                              - 13 -

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 202 of 453   PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 22 of 223   Page ID #:29
811

advertisements and representations made by Honda. Specifically, prior to their purchase, the Phans researched the vehicle online, reviewing the features, specifications, and benefits of the Odyssey Elite as described by Honda, including the benefits of the infotainment system.  The features of the vehicle's infotainment system were further reviewed and described by the salesperson at the dealership and during the test drive prior to purchase.  The fact that the 2019 Odyssey Elite contained the supposedly advanced infotainment system with the latest technology and fully functional CabinWatch feature was one of the main reasons the Phans chose to purchase the Odyssey.  None of Honda's advertisements or marketing information reviewed by the Phans nor any of the representations received by the Phans from the Honda dealership prior to the purchase contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in their vehicle suffered from numerous defects which would prevent the full use of the vehicle as advertised and pose safety risks, the Phans would not have purchased the Odyssey with the infotainment system, or would have paid less for the vehicle.

54.    The Phans began experiencing problems with their Odyssey's infotainment system soon after the purchase.  For example, the CabinWatch system initially functions for two or three minutes (actually projecting real time video of the children in the second and third rows on the main infotainment screen) but then malfunctions and freezes – projecting an outdated video of the status in the second and third rows.  This defect occurs routinely – nearly every time CabinWatch is used.  The CabinWatch system will operate for two or three minutes then it malfunctions and freezes.  Thus, this safety feature (represented by Honda as an easy and safe way to monitor the activities of young children without having to turn around) is dysfunctional, requiring the Phans to turn around to check on the status of the children being transported.  The Phans also experience regular and reoccurring malfunctions with the infotainment system's backup camera function.  Approximately 30% of the time, the system will freeze and is

SECOND AMENDED COMPLAINT          - 14 -
010811-11/1205802 V1

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 203 of 453   PageID
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 239 of 223   Page ID #:590
812

essentially useless.  Since the date of purchase of their Odyssey, the problems the Phans have (and continue to experience) with the infotainment system are so frequent and pervasive that they are not able to determine the precise dates they have experienced such problems.  The defects described above constantly create substantial distractions which can result in dangerous driving conditions creating safety hazards.

55.     To date, no Kuni Honda dealership employee has notified the Phans of an update to or fix for their vehicle's infotainment system, nor have the Phans received any other notification from Honda about any potential permanent repair or aftermarket modification that would cure the defects they have experienced.  The Phans took their Odyssey back to the Kuni Honda dealership in November 2018, complaining of the defects described above.  The dealership technician explained that they could not replicate any of the problems so the dealership could not, and did not, attempt any repair.  The defects persisted after this November 2018 repair attempt.  When the Phans contacted the Kuni Honda dealership a second time to address the defects, no one from the dealership called back to schedule a service or to inform the Phans as to how to remedy the defects.

56.     As of this date, the Phans continue to experience the problems described above with the infotainment system in their Odyssey.

57.     The Phans have suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of their vehicle.

58.     Neither Honda nor any of its agents, dealers, or other representatives informed the Phans of the existence of the infotainment system's defects prior to purchasing the vehicle.

**4.     Connecticut—Anthony Rossomando**

59.     Plaintiff Anthony Rossomando resides in and is a citizen of Quaker Hill, Connecticut.

SECOND AMENDED COMPLAINT                          - 15 -
010811-11/1205802 V1

60.     Plaintiff Rossomando leased a new 2019 Honda Pilot on June 11, 2019, from Cardinal Honda, an authorized Honda dealership located in Groton, Connecticut. Prior to leasing the Pilot, Plaintiff Rossomando researched the features and benefits of the Pilot on Honda's website, as well as on websites like Autotrader.  Plaintiff Rossomando also test drove the Pilot and interacted with the dealership's salesperson prior to leasing the vehicle.

61.     Plaintiff Rossomando continues to lease his 2019 Pilot.  Unknown to Plaintiff Rossomando at the time he leased the vehicle, the Pilot suffered from (and continues to suffer from) a defective infotainment system, which has caused attempted repairs, overpayment, and diminished value of the Pilot.  Plaintiff was also deprived of the benefit of his bargain.  Honda knew about this defect at the time Plaintiff Rossomando leased the vehicle but did not disclose it to him.  Thus, Plaintiff Rossomando leased the Pilot on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

62.     Plaintiff Rossomando selected and ultimately leased his Pilot, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.  The infotainment system was a selling point of the vehicle, which distinguished it from competing models and makes (like the Toyota Highlander) that Plaintiff Rossomando was considering.  Plaintiff Rossomando also chose to upgrade his Pilot's trim specifically for the Rear Entertainment System, which is only available on higher-end models.  When Plaintiff Rossomando leased the vehicle, a Cardinal Honda employee walked him through the use of the infotainment system, including use of the Bluetooth and Carplay systems.

63.     Prior to his lease, Plaintiff Rossomando researched the vehicle online (including on Honda's website), reviewing the features, specifications, and benefits of the Pilot as described by Honda, including the benefits of the infotainment system.  The features of the vehicle's infotainment system were further reviewed and described by

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 205 of 453 PageID:
814
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 25 of 225   Page ID #:302

the salesperson at the dealership and during the test drive prior to lease. None of Honda's advertisements or marketing information reviewed by Plaintiff Rossomando nor any of the representations received by Plaintiff Rossomando from the Honda dealership prior to the lease contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent the full use of the vehicle as advertised and pose safety risks, Plaintiff Rossomando would not have leased the Pilot with the infotainment system, or would have paid less to lease the vehicle.

64.    Plaintiff Rossomando began having problems with his Pilot's infotainment system in October 2019. On several occasions, the infotainment system in the vehicle has made a static noise, then frozen, thus disabling all related features (e.g., music, Bluetooth, radio, Apple Carplay). On these occasions, Plaintiff Rossomando has not been able to reboot the system by turning the vehicle off—instead, the infotainment screen stays on (thus threatening to drain the car's battery) until Plaintiff Rossomando pulls the fuse.

65.    On October 21, 2019, Plaintiff Rossomando brought his vehicle to Cardinal Honda for service related to his problems with the infotainment system. When Plaintiff Rossomando returned to pick up his vehicle later that day, he was told by dealership personnel that they were unable to recreate the problem, but performed a factory reset. They also told Plaintiff Rossomando to return if his problems continue.

66.    Plaintiff Rossomando has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of his vehicle.

67.    Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Rossomando of the existence of the infotainment system's defects prior to leasing the vehicle.

Case 2:20-cv-02047-RMB-KMW Document 17 Filed 10/23/20 Page 206 of 453 PageID 3
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 206 of 453 Page ID #363
815

5.      **Florida**

    a.      **Laura Mohr**

68.    Plaintiff Laura Mohr resides in and is a citizen of Clermont, Florida.

69.    Plaintiff Mohr purchased a used 2019 Honda Pilot on June 9, 2019, from Fountain Acura, an authorized Honda dealership located in Orlando, Florida.  Prior to purchasing the Pilot, Plaintiff Mohr researched the features and benefits of the Pilot on Honda's website.  Plaintiff Mohr also test drove the Pilot and interacted with the dealership's salesperson prior to purchasing the vehicle.  At the time Plaintiff Mohr purchased her vehicle, it had approximately 6,538 miles.

70.    Plaintiff Mohr purchased and continues to own the 2019 Honda Pilot. Unknown to Plaintiff Mohr at the time she purchased the vehicle, the Pilot suffered from (and continues to suffer from) a defective infotainment system, which has caused attempted repairs, overpayment, and diminished value of the Pilot.  Plaintiff was also deprived of the benefit of her bargain.  Honda knew about this defect at the time Plaintiff Mohr purchased the vehicle but did not disclose it to her.  Thus, Plaintiff Mohr purchased the Pilot on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

71.    Plaintiff Mohr selected and ultimately purchased her Pilot, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.  Before buying the car, Plaintiff Mohr and her husband spent several months researching and comparing family-sized SUVs, and the infotainment system was an important selling point of the 2019 Pilot.

72.    Specifically, prior to her purchase, Plaintiff Mohr researched the 2019 Pilot extensively online, reviewing the features, specifications, and benefits of the Pilot as described by Honda, including the benefits of the infotainment system, both on Honda's website and others.  Plaintiff Mohr also visited a nearby Honda dealership multiple times, where she inspected the 2019 Pilot and test drove it.  During these test drives, a

SECOND AMENDED COMPLAINT       - 18 -
010811-11/1205802 V1

Honda dealership employee "sold" Plaintiff Mohr on the infotainment system's features, including the rear DVD player and various safety features. Indeed, the infotainment system was one of the most significant differences between the Pilot and the other cars Plaintiff Mohr was interested in. In addition, the salesperson at Fountain Acura who later sold Plaintiff Mohr hervehicle also told her how well-suited the system was for children, but did not mention any problems with the vehicle.

73. None of Honda's advertisements or marketing information reviewed by Plaintiff Mohr, nor any of the representations received by Plaintiff Mohr from the dealership prior to the purchase, contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in her vehicle suffered from numerous defects which would prevent the full use of the vehicle as advertised and pose safety risks, Plaintiff Mohr would not have purchased the Pilot with the infotainment system, or would have paid less for the vehicle.

74. Plaintiff Mohr began experiencing problems with her Pilot's infotainment system six days after she purchased the vehicle in June 2019, when the infotainment system froze (thus disabling all associated features, including the backup camera, Bluetooth, and Carplay) three times over the course of a week—and would not restart or reboot, even when the vehicle was turned on and off.

75. The failures took place during a trip Plaintiff Mohr and her husband took to Ohio approximately one week after purchasing the vehicle. The system first failed on the drive from Florida to Ohio. As noted above, Plaintiff Mohr was unable to get the system to reset even after shutting the car. Plaintiff Mohr's husband researched the problem on the internet and discovered that other people had experienced it as well. A YouTube video ultimately showed him how to reset the system by pulling the fuses out of the car.

76. Not long after these incidents, Plaintiff Mohr returned her vehicle to Fountain Acura for service. After Plaintiff Mohr dropped the vehicle off, dealership

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 208 of 452 PageID:
Case 2:19-cv-02160-CNC-CJS Document 90 Filed 11/04/19 Page 229 of 228 Page ID #385
817

employees contacted her to explain that they could not reproduce the problem. Two days later, the dealership called Plaintiff Mohr again and asked her for a description of what had happened. Not long afterwards, the dealership called Plaintiff Mohr a third time to explain that hers was a "known problem," and that they could not address it. When Plaintiff Mohr complained, dealership personnel called her once more to explain that her problems are attributable to Honda, and that they were incapable of fixing them.

77.     Since that time, the defect with Plaintiff Mohr's vehicle has manifested in new, increasingly frequent, and still more dangerous ways. Almost every day that Plaintiff Mohr drives the vehicle, the audio system makes a constant, distracting noise (a "ticking," "snapping," and/or "popping" sound). In addition, approximately one or two times a week, both the infotainment system and the digital dashboard shut off—thus disabling not only important safety features like the backup camera, but also preventing Plaintiff Mohr from knowing how fast she is driving. These dashboard shut-downs usually last for between thirty seconds and one minute. Sometimes, they happen multiple times in a row.

78.     As of this date, Plaintiff Mohr continues to experience the problems described above with the infotainment system in her Pilot.

79.     Plaintiff Mohr has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of her vehicle.

80.     Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Mohr of the existence of the infotainment system's defects prior to purchasing the vehicle.

### b.     Larry Simkin

81.     Plaintiff Larry Simkin resides in Tampa, Florida.

82.     Plaintiff Simkin purchased a new 2018 Honda Odyssey Elite in October 2017 from AutoNation Honda, an authorized Honda dealership in Clearwater, Florida.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 209 of 453 PageID:
Case 2:19-cv-02265-CNC-CJS   Document 50   Filed 11/04/19   Page 29 of 223   Page ID #:836
818

Plaintiff Simkin was interested in purchasing an Odyssey with the infotainment system and conducted most of his research from his home in Tampa.  Plaintiff Simkin was exposed to Honda's misrepresentations and/or omissions in that state and made his purchase decision there.

83.    Plaintiff Simkin purchased and still owns this Odyssey.  Unknown to Plaintiff Simkin at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused him out-of-pocket loss, attempted repairs, and diminished value of the Odyssey.  Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Simkin's purchase but did not disclose it to him.  Thus, Plaintiff Simkin purchased his Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

84.    Plaintiff Simkin selected and ultimately purchased his vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.  Specifically, prior to his purchase of the vehicle, Plaintiff Simkin researched the Honda Odyssey online—including on Honda's website, where he compared the 2018 Odyssey with previous models, used the model builder tool, and read about forthcoming features (like the entertainment system and Blu-ray compatibility).

85.    Plaintiff Simkin's problems with his vehicle's infotainment system started on or about January/February 2018, when he began having intermittent issues with the infotainment system's entertainment unit.  On some occasions, the DVD/Blu-ray player would stop playing and both front and rear screens would display the message "Connecting."  This occurred while playing both DVDs and Blu-ray discs. On other occasions, the XM radio would stop working and display the message "Network Connection Lost" on the front screen.  This occurred in places where an XM signal was known to exist—like the driveway or common routes.  On still other occasions, when the disc type in the vehicle was switched—e.g., from DVD to Blu-ray (or vice versa)—

only the sound would play, and no video was displayed on the rear screen. These issues would correct only after the vehicle was off for a prolonged period (like stopping for a meal or when the vehicle was parked overnight).

86. After these problems persisted and became more frequent—and to avert having issues on an upcoming family trip—Plaintiff Simkin made a service appointment on March 11, 2018, at AutoNation Honda. During that visit, AutoNation performed a multipoint inspection of the vehicle and updated its entertainment software, but the technician could not recreate any of the issues and could find no technical bulletins from Honda on the issues.

87. After this visit, Plaintiff Simkin's issues not only persisted, but became more frequent as well. And, as before, the system would correct itself only after pulling off the highway, stopping the car, turning off the engine, opening and closing the driver door, and restarting the car (or after sitting overnight).

88. On March 20, 2018, Plaintiff Simkin again left his vehicle for service at AutoNation Honda. The technician was able to recreate several of the problems described above and, after speaking with a Honda engineer via the Honda tech line, determined that the Rear Entertainment Control Unit (ECU) was faulty and should be replaced. The ECU was replaced, and the vehicle was returned to Plaintiff Simkin with the indication that all issues were fixed.

89. Between March of 2018 and July of 2019, Plaintiff Simkin had few issues with the infotainment system in his vehicle. But beginning again in July, the XM radio in Plaintiff Simkin's vehicle began losing its signal, seemingly at random, and was unable to connect (or reconnect). This occurred in locations where Plaintiff Simkin never previously had signal issues, such as in his driveway, home, on main streets, and in the parking lots of frequented retail locations. This issue occurred, and continues to occur, at random times, and under a variety of driving conditions.

Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 211 of 453 PageID:
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 31 of 211   Page ID #308
820

90.     On September 9, 2019, Plaintiff Simkin returned to AutoNation Honda for service related to these problems.  The technician determined that the tuner in Plaintiff Simkin's vehicle was defective, replaced the part, and returned the vehicle with the indication that all issues were fixed.

91.     However, within days of this tuner replacement, the Rear Entertainment System in Plaintiff Simkin's vehicle began, once again, to intermittently stop working once more.  As before (i.e., prior to March 2018), to reboot the system after one of these failures, Plaintiff Simkin must pull off the highway, stop his vehicle, turn off the engine, open and close the driver door, and restart the car (or, alternatively, let the system "sit" overnight).

92.     Between September 23 and 25, 2019, Plaintiff Simkin left his vehicle for service at AutoNation Honda.  The technicians were unable reproduce these issues, and returned Plaintiff Simkin's vehicle with the instruction to continue monitoring them.

93.     On or around October 2019, Plaintiff Simkin's vehicle began to have another issue: when starting the vehicle, a notice on the entertainment system sometimes appears that says "Anti-Theft System.  This system has lost power.  Push and hold the power button for more than two seconds to enable the system."  This message had appeared previously on two occasions, and Plaintiff Simkin did not give it much thought.  However, since the September 23-25 service, it has appeared several times.

94.     Plaintiff Simkin left his vehicle for service at AutoNation once more between October 25 and 26, 2019.  Once again, technicians could not reproduce the issue, and returned the vehicle.  After this service, a service manager called Plaintiff Simkin and requested that he open a case with Honda to ensure continued coverage of his issues, explaining that (1) Plaintiff Simkin's warranty coverage was close to expiring; and (2) if Plaintiff Simkin opened a case with Honda, it would allow AutoNation to make more aggressive repairs to the infotainment system in Plaintiff Simkin's vehicle.  Recently, Plaintiff Simkin called Honda, and was assigned a case

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 213 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/13   Page 32 of 223   Page ID #:309
821

number (100008422). 94. To date, Plaintiff Simkin continues to experience problems with the infotainment system in his vehicle.

95.     Plaintiff Simkin has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of her vehicle.

96.     Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Simkin of the existence of the infotainment system's defect prior to purchase.

**6.     Georgia—Harmeet Gill**

97.     Plaintiff Harmeet Gill resides in Hoschton, Georgia.

98.     Plaintiff Gill purchased a new 2018 Honda Odyssey on May 29, 2018, from Milton Martin Honda, an authorized Honda dealership in Gainesville, Georgia.  Plaintiff Gill was interested in purchasing an Odyssey with the infotainment system and conducted most of his research from his home in Georgia.  Plaintiff Gill was exposed to Honda's  omissions in that state and made his decision to purchase the vehicle there.

99.     Prior to purchasing the Odyssey, Plaintiff Gill researched the features and benefits of the Odyssey on Honda's website, where he was exposed to various advertisements describing the features of the infotainment system.

100.    Plaintiff Gill purchased and still owns this Odyssey.  Unknown to Plaintiff Gill at the time he purchased this vehicle, the Odyssey suffered from a defective infotainment system, which has caused him out-of-pocket loss, attempted repairs, the diminished value of the Odyssey.  Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Gill's purchase but did not disclose it to him.  Thus, Plaintiff Gill purchased his Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

101.   Plaintiff Gill selected and ultimately purchased his vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.  Specifically, Plaintiff Gill paid a significant premium to purchase a 2018 Honda Odyssey Elite that included the CabinWatch feature and rear entertainment system, which were particularly appealing to Plaintiff Gill because he has a young daughter.

102.   None of the advertisements reviewed or representations received by Plaintiff Gill contained any disclosure relating to any defects in the infotainment system.  Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent the full use of his vehicle and pose safety risks, Plaintiff Gill would not have purchased his vehicle with the infotainment system, or would have paid less to do so.

103.   Plaintiff Gill first began having problems with his vehicle's infotainment system within approximately one or two weeks of purchase in May 2019.  Almost every time Plaintiff Gill used the CabinWatch feature, the application crashed—and would not reboot even if the vehicle was restarted.  The other problems he has experienced include, but are not limited to, failure of the rear entertainment system, and failure of the navigation system.  When these issues arise, they are distracting.

104.   On or about October 30, 2018, Plaintiff Gill brought his vehicle to Milton Martin Honda for a regularly-scheduled service.  Prior to that service, Plaintiff Gill described the problems he was experiencing with his CabinWatch system, and requested that they be addressed; indeed, when Plaintiff Gill dropped his vehicle off at the dealership, he showed the service advisor pictures he had taken of the CabinWatch and RES systems during times when these features had failed.  Although dealership employees attempted to resolve the defect in Plaintiff Gill's vehicle as part of the service, they were unsuccessful in doing so.

Case 2:20-cv-02047-RMB-KMW Document 17 Filed 10/23/20 Page 214 of 452 PageID:
823
Case 2:19-cv-02160-CMC-CJS Document 50 Filed 11/04/19 Page 349 of 213 Page ID #321

105.   After his problems continued unabated, Plaintiff Gill brought his vehicle to Milton Martin Honda a second time on or about January 10, 2019, to have the infotainment system inspected.  As part of this inspection, dealership employees kept Plaintiff Gill's vehicle for approximately a week, during which time they performed tests on the vehicle and communicated with personnel at Honda's manufacturing plant and with Honda engineers.  When Plaintiff Gill returned to pick up the vehicle, he was told that the defects with his system had been resolved.  But as soon as Plaintiff Gill left the dealership and attempted to use the CabinWatch feature, it crashed once again. Plaintiff Gill immediately returned to Milton Martin Honda, where a service manager spent several additional hours examining the vehicle.  However, the service manager was unable to correct the defect.

106.   Shortly after this incident, Plaintiff Gill called Honda customer service and complained.   Between January 2019 and March 2019, Plaintiff Gill communicated extensively by phone with both Milton Martin personnel and American Honda representatives concerning the problems with his vehicle.  Ultimately, Plaintiff was advised by dealership personnel that there is no known fix for the defects with his infotainment system, and that Honda has instructed its dealerships not to change or otherwise inspect vehicles with defective infotainment systems for the time being.

107.   To date, no Milton Martin Honda employee has notified Plaintiff Gill of an update to or fix for his vehicle's infotainment system, nor has Plaintiff Gill received any other notification from Honda about any potential repair or aftermarket modification that would cure the defects he has experienced.

108.   Most recently, when Plaintiff Gill contacted the dealership by phone on June 6, 2019, to inquire about the status of Honda's response, he was told once again by a service advisor that there is no known resolution for the defect.  Although the service advisor suggested that an over the air ("OTA") update released in April 2019 may

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 215 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 359 of 453   Page ID #:512
824

address Plaintiff Gill's problems, Plaintiff Gill has already downloaded that update—to no avail.

109.    As of this date, Plaintiff Gill continues to experience problems with the infotainment system in his vehicle.

110.    Plaintiff Gill has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of his vehicle.

111.    Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Gill of the existence of the infotainment system's defect prior to purchase.

### 7.    Illinois—Yazeed Issa

112.    Plaintiff Yazeed Issa resides in and is a citizen of Chicago, Illinois.

113.    Plaintiff Issa purchased a new 2019 Honda Pilot EX on April 11, 2019 from McGrath City Honda, an authorized Honda dealership located in Illinois.  Because the vehicle was intended to be used primarily by his son, Abdalhfeth, and because Plaintiff Issa does not speak English and relies on his son to translate for him, Plaintiff Issa asked his son to research the vehicle online at his home and at the dealership.

114.    Abdalhfeth's online research included reviewing (1) another authorized Honda dealership website for pricing information as well as (2) Honda's website, where he reviewed the Pilot's pricing and features.  Abdalhfeth also visited a Costco[5], where he reviewed Honda promotional materials discussing the Pilot.  Plaintiff Issa and Abdalhfeth's research at the McGrath City Honda dealership included interacting with the salesperson and observing and reviewing various Pilot models at the dealership.  Accordingly, Plaintiff Issa and Abdalhfeth communicated with various dealers and was

---

[5] Through its "Auto Program," Costco allows members to purchase cars through participating dealerships.

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 27 -

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 216 of 453 PageID:
Case 2:19-cv-02160-CMC-CJS Document 50 Filed 11/04/19 Page 509 of 219 Page ID#343
825

1   exposed to Honda's omissions in the state of Illinois and made the purchase decision in

2   Illinois.

3       115.   Plaintiff Issa purchased and still owns the 2019 Honda Pilot EX.  Unknown

4   to Plaintiff Issa at the time of purchase, the Pilot suffered from a defective infotainment

5   system, which has caused him out-of-pocket loss, attempted repairs, over payment, and

6   diminished value of the Pilot.  Plaintiff was also deprived of the benefit of the bargain.

7   Honda knew about this defect at the time of Plaintiff Issa's purchase but did not disclose

8   it to Plaintiff Issa.  Thus, Plaintiff Issa purchased the Pilot on the reasonable but

9   mistaken belief that it would be safe and reliable on public roadways and was not subject

10  to any known defects.

11      116.   Plaintiff Issa selected and ultimately purchased his Pilot EX, in part,

12  because of the features of the infotainment system, as represented through

13  advertisements and representations made by Honda.  Specifically, prior to his purchase

14  of the vehicle, Plaintiff Issa's son researched the Pilot and its various features (including

15  the features of the infotainment system) by reviewing and comparing several different

16  trim lines of the Pilot at the dealership with the salesperson, who also reviewed the

17  vehicle's features (including the infotainment system). Abdalhfeth also viewed the

18  Pilot's Monroney label before purchasing his vehicle. The fact that the 2019 Pilot EX

19  contained the supposedly advanced infotainment system with a relatively large screen

20  that was compatible with android phones was one of the main reasons Plaintiff Issa

21  chose to purchase the Pilot.  The infotainment systems in other vehicles seemed out-of-

22  date in comparison.  None of the advertisements reviewed or representations received

23  by Plaintiff Issa or Abdalhfeth contained any disclosure relating to any defects in the

24  infotainment system.  Had Honda disclosed that the infotainment system in his vehicle

25  suffered from numerous defects which would prevent his full use of his vehicle and pose

26  safety risks, Plaintiff Issa would not have purchased his vehicle with the infotainment

27  system or would have paid less for the vehicle.

28

SECOND AMENDED COMPLAINT          - 28 -
010811-11/1205802 V1

Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 217 of 453 PageID:
826
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 37 of 223   Page ID #304

117.   Abdalhfeth began having problems with the Pilot's infotainment system within days following the purchase.   At that time, he observed that the system would sometimes fail to load upon starting, that the Bluetooth function would disconnect repeatedly, that the infotainment system screen would freeze when certain apps such as Google Maps and Waze were operating, and that the entire system would crash when the Cabin Control function was used.   In order to temporarily resolve many of these problems and reset the infotainment system, Abdalhfeth would be forced to stop the vehicle and re-set the infotainment system to its factory settings.   Most recently, the infotainment system froze, and the screen only displays the Honda logo.   Since the date of purchase, the problems Abdalhfeth has experienced with the infotainment system are so frequent and pervasive that he is not able to determine the precise dates he has experienced such problems.   The defects described above have resulted in and created dangerous driving conditions.   For example, Abdalhfeth recalls one instance in which he narrowly avoided colliding with another vehicle because he was trying to restart Google Maps or Waze immediately after he realized the infotainment system had become frozen and was no longer providing accurate navigation and directions.

118.   In or about May 2019, Abdalhfeth brought the vehicle to McGrath City Honda to inquire about a fix for the issues he was experiencing.   During this visit, dealership personnel told Abdalhfeth that there was nothing they could do to resolve his problems.

119.   To date, no McGrath City Honda employee has notified Plaintiff Issa of an update to or fix for his vehicle's infotainment system, nor has Plaintiff Issa received any other notification from Honda about any potential permanent repair or aftermarket modification that would cure the defects in his Pilot.

120.   In or around June 2019, Abdalhfeth, on behalf of Plaintiff Issa, contacted Honda to complain about a problem with a software update to the Pilot's infotainment system, and to ask whether Honda was going to release an update that would address

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 218 of 452 PageID:
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 339 of 228 Page ID #:345
827

the issues he was experiencing with the infotainment system. In response to his complaint, a Honda representative told Abdalhfeth that there was nothing Honda could do at this time to address his concern, that someone from Honda would contact him soon thereafter, and that an update would be available at some point in the future. No one from Honda has followed up with Plaintiff Issa or Abdalhfeth. Furthermore, while Plaintiff Issa's vehicle has since received two such updates, neither has fixed, or improved, the problems.120. As of this date, Plaintiff Issa continues to experience problems with the infotainment system in his Pilot EX despite repeated attempts by Honda to update the software.

121. Plaintiff Issa has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein, overpayment, attempted repairs, and diminished value of his vehicle.

122. Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Issa of the existence of the infotainment system's defects prior to purchasing the vehicle.

### 8. Kansas—Ashley Pfeifer

123. Plaintiff Ashley Pfeifer resides in and is a citizen of Olathe, Kansas.

124. Plaintiff Pfeifer purchased a 2018 Honda Odyssey EX-L in September 2018 from Honda of Olathe, an authorized Honda dealership located in Olathe, Kansas. Prior to purchasing the Odyssey, Plaintiff Pfeifer looked online to research the vehicle. Her research included looking at the Honda dealership website which contained marketing and advertising information specific to the Odyssey's infotainment system. Plaintiff Pfeifer also visited Honda's website where she utilized the option to build her Odyssey online to get ideas on what features she could add and at what cost. Plaintiff Pfeifer also reviewed a brochure for the Odyssey that she picked up while dropping another vehicle off at the Honda dealership for service. Plaintiff Pfeifer also viewed

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 219 of 453   PageID:
828
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 59 of 223   Page ID #:946

Youtube videos specific to the 2018 Odyssey that demonstrated the various attributes and functions of the infotainment system, including the DVD movie system.  Plaintiff Pfeifer also test drove the Odyssey at the Honda of Olathe dealership prior to the purchase, and reviewed the Monroney label prior to purchase.  During the test drive, the salesperson went through a full tutorial demonstrating all the functions and benefits of the Odyssey's new infotainment system.  After conducting this research and comparing the Odyssey to the comparable Chrysler option, Plaintiff Pfeifer decided to purchase the Odyssey.  One of the reasons Plaintiff Pfeifer selected the Odyssey was because of Honda's new, state-of-the-art infotainment system. Accordingly, Plaintiff Pfeifer was exposed to Honda's  omissions in the state of Kansas and made her purchase decision in Kansas.

125.   Plaintiff Pfeifer purchased and still owns the 2018 Honda Odyssey EX-L. Unknown to Plaintiff Pfeifer at the time of purchase, the Odyssey suffered from a defective infotainment system, which has resulted in attempted repairs, overpayment, and diminished the value of the Odyssey.  Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Pfeifer's purchase but did not disclose it to Plaintiff Pfeifer.  Thus, Plaintiff Pfeifer purchased the Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

126.   Plaintiff Pfeifer selected and ultimately purchased the Odyssey EX-L, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda and the Honda dealership as described above.  The fact that the 2018 Odyssey EX-L contained the supposedly advanced infotainment system with the latest technology, including a functioning DVD player to provide entertainment for the occupants in the second and third rows was one of the main reasons Plaintiff Pfeifer chose to purchase the Odyssey.  None of the advertisements reviewed or representations received by Plaintiff Pfeifer contained any

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 220 of 453 PageID:
829
Case 2:19-cv-02260-CNC-CJS   Document 90   Filed 11/04/13   Page 40 of 229   Page ID #:307

disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent the full use of his vehicle's features and pose safety risks, Plaintiff Pfeifer would not have purchased the Odyssey vehicle with the infotainment system, or would have paid less for the vehicle.

127. Plaintiff Pfeifer began having problems with her Odyssey's infotainment system within two months following the purchase. For example, the use of the infotainment system's DVD player causes the control screen for the infotainment system to freeze. The infotainment system's screen nearly always freezes when the DVD player is in operation. When the screen freezes, no other infotainment system functions (e.g., fast forward, volume control, handsfree phone, etc.) will work. Plaintiff Pfeifer can sometimes temporarily reset the frozen infotainment screen by turning the Odyssey off and restarting it. Another problem relates to the backup camera which displays through or on the infotainment system screen. Occasionally, rather than displaying the view from behind the vehicle once the Odyssey is put in reverse, the backup camera malfunctions and a warning displays on the screen indicating that there is a "poor connection." When this occurs, Plaintiff Pfeifer is forced to operate the Odyssey without the assistance of the rear camera, which creates safety issues. Plaintiff Pfeifer also has experienced constant problems with the infotainment system's handsfree phone function such that incoming calls are not connected to the system. Since she purchased the Odyssey, the problems Plaintiff Pfeifer has experienced with the infotainment system are so frequent and pervasive that she is not able to determine the precise dates she has experienced such problems. The defects described above constantly create substantial distractions which can result in dangerous driving conditions creating safety hazards.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 221 of 453   PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 21 of 221   Page ID #:828
830

128.   Plaintiff Pfeifer presented her vehicle to Honda of Olathe in June 2019 to have these issues repaired.  The dealership kept the vehicle for an entire afternoon, but was unable to replicate the issues and therefore unable to repair them.

129.   To date, no Honda of Olathe employee has notified Plaintiff Pfeifer of an update to or fix for his vehicle's infotainment system, nor has Plaintiff Pfeifer received any other notification from Honda about any potential permanent repair or aftermarket modification that would cure the defects she has experienced.

130.   As of this date, Plaintiff Pfeifer continues to experience problems with the infotainment system in her Odyssey.  Most recently, the defect in Plaintiff Pfeifer's vehicle manifested in a new, dangerous way: while driving, both the infotainment screen and the digital dashboard (which displays, among other things, the speedometer) went black and reset itself, thus preventing Plaintiff Pfeifer from knowing how fast she was going.

131.   Plaintiff Pfeifer has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to overpayment, attempted repairs, and diminished value of her vehicle.

132.   Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Pfeifer of the existence of the infotainment system's defects prior to purchasing the vehicle

### 9.   Kentucky—William D. Lampton

133.   Plaintiff William D. Lampton III resides in Newburgh, IN.

134.   Plaintiff Lampton purchased a new 2018 Honda Odyssey on April 23, 2018, from Don Moore Honda, an authorized Honda dealership in Owensboro, Kentucky.  Plaintiff Lampton was interested in purchasing an Odyssey with the infotainment system and conducted most of his Odyssey research from his home in Indiana.  Plaintiff Lampton also communicated with various dealers and was exposed to Honda's  omissions in that state and made his purchase decision there.

SECOND AMENDED COMPLAINT                    - 33 -

135.   Plaintiff Lampton purchased and still owns this Odyssey.  Unknown to Plaintiff Lampton at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused him out-of-pocket loss, attempted repairs, and diminished value of the Odyssey.  Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Lampton's purchase but did not disclose it to Plaintiff Lampton.  Thus, Plaintiff Lampton purchased his Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

136.   Plaintiff Lampton selected and ultimately purchased his vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda. Specifically, prior to his purchase of the vehicle, Plaintiff Lampton researched the Honda Odyssey extensively, both online and off.  He visited Honda's website numerous times, where he watched videos of the "CabinWatch" feature in use[6], and estimates that, on more than twenty occasions before buying his Odyssey, he used the "build-a-vehicle" feature to compared various models on Honda's website.

137.   Approximately two or three weeks before his purchase, Plaintiff Lampton also visited D-Patrick Honda, an authorized Honda dealership in Evansville, Indiana, as part of his research.  During that visit, D-Patrick employees gave Plaintiff Lampton a Honda-branded promotional booklet for the Odyssey.  This booklet contained information describing the infotainment system's various features, including the display, wifi, CabinWatch, CabinTalk, the rear entertainment system, the "How Much Farther?" application, and the streaming application.

---

[6] Plaintiff Lampton specifically recalls watching a video titled "How to Use Cabinwatch," which Honda still makes available to the public on its YouTube channel at the following URL: https://www.youtube.com/watch?v=7RzBtXThMfM (last viewed Oct. 28, 2019).  Among other things, the video states that "CabinWatch makes it convenient to monitor children in the rear seats, especially young children, and Odyssey is the first to have it."

138.   Plaintiff Lampton recalls that the existence of the infotainment system—and the CabinWatch system in particular—was one of main reasons that he chose a Honda Odyssey over other vehicles with similar systems, which struck him as out of date by comparison.  Plaintiff Lampton is a tech-minded person, and the advanced technology Honda marketed with the 2018 Odyssey were particularly exciting to him. Indeed, Plaintiff Lampton chose the Elite trim because he did not want to miss out on the new features he wanted.  And when he finally selected his vehicle, he reviewed its Monroney label prior to purchase to confirm that it included a multi-view rear camera, rear entertainment system, CabinTalk, CabinWatch, and a mobile hotspot.

139.   None of the advertisements reviewed or representations received by Plaintiff Lampton contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with the infotainment system, or would have paid less for the vehicle.

140.   Plaintiff Lampton began having problems with his vehicle's infotainment system approximately one week after purchase.  At that time, he first observed that the system would sometimes fail to load upon starting, thus disabling the CabinWatch feature as well.  In order to temporarily resolve this problem and reset the infotainment system, Plaintiff Lampton would be forced to stop his vehicle, open and close the doors, turn it off, and turn it on again.  The other problems he has experienced include, but are not limited to, frequent freezing and lockup of the infotainment system during use (including the CabinWatch feature and DVD player), failure of the internet hotspot, glitches with the audio system while the DVD player is in use, and loud "cracking"/"knocking" noises during driving.  Since the date of purchase, the problems Plaintiff Lampton has experienced with his infotainment system are so frequent and

Case 2:20-cv-02047-RMB-KMW Document 17 Filed 10/23/20 Page 224 of 453 PageID 1
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 449 of 223 Page ID#351
833

pervasive that he is not able to determine the precise dates he has experienced such problems, which create distractions.

141.   Plaintiff Lampton was particularly dismayed by an episode that occurred during a family trip on June 29, 2018.  As Plaintiff Lampton's children were watching a movie on the infotainment system's rear screen, the speaker system made a loud cracking noise.  At the same time, the movie screen froze and the CabinWatch feature shut off; meanwhile, audio from the movie continued to play.  Although Plaintiff Lampton pulled off the road and attempted to reboot the system, he was unsuccessful. The system remained inoperable for the remainder of the approximately 3-hour drive from southern Indiana to Nashville, and would not reboot or restart until several hours after Plaintiff Lampton's family arrived.

142.   On or about July 5, 2018, Plaintiff Lampton took his vehicle to Don Moore Honda to have the infotainment system serviced.  After describing his problems with the infotainment system, Plaintiff Lampton was told that the dealership was familiar with the issues he had experienced, and that Honda was working on an update.  Rather than check the vehicle in for service, the dealership performed a system reset on the infotainment system, and instructed Plaintiff Lampton to call back if the problem happened again.

143.  Plaintiff Lampton's infotainment system continued to regularly malfunction after his July 5, 2018, visit in the various ways described above.

144.   On or about October 1, 2018, Plaintiff Lampton brought his vehicle to D-Patrick Honda for an oil change.  During that visit, Plaintiff Lampton again described his problems with the infotainment system in the hopes of obtaining a fix.  In response, a D-Patrick employee asked that Plaintiff Lampton provide him with proof that he could share with Honda.

145.  Plaintiff Lampton sent the employee video documentation of the infotainment system in his vehicle malfunctioning.  On or about October 16, 2018, the

Case 2:20-cv-02947-RMB-KMW  Document 17  Filed 10/13/20  Page 225 of 453 PageID:
834
Case 2:19-cv-02160-CMC-CJS  Document 50  Filed 11/04/19  Page 45 of 223  Page ID #:352

employee informed Plaintiff Lampton that there was an update "in the works" for the infotainment system in his vehicle.

146.  As of this date, Plaintiff Lampton continues to experience problems with the infotainment system in his vehicle.  For example, during an eleven-day vacation in June 2019, the rear entertainment system in Plaintiff Lampton's vehicle repeatedly froze, turned black, failed to play audio, and/or simply failed to turn on, thus requiring Plaintiff to restart his vehicle—and even then, the system would sometimes continue to malfunction.  The CabinWatch system also froze for several hours during Plaintiff Lampton's trip.  Finally, on one occasion, a loud "cracking" sound played over the speakers before both the front display and the rear entertainment system crashed and displayed the message "No Audio Connection for FM."  This last incident was particularly distressing to Plaintiff Lampton because it created a distraction that placed him, and his family, in danger.

147.  Since Plaintiffs filed their First Amended Complaint on June 10, 2019, Plaintiff Lampton has returned his vehicle for repair two more times: first on June 13, 2019, and again on September 25, 2019.  During the June 13 visit, Plaintiff Lampton was once more told that Honda was "working on a repair," and that nothing could be done in the interim.  By contrast, during the September 25 visit, a dealership employee installed an update in Plaintiff Lampton's vehicle that he claimed would fix the issues described above.  But since that visit, the rear entertainment system has frozen again (and, on the same occasion, refused to function even after Plaintiff Lampton restarted his vehicle).

148.  Plaintiff Lampton has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of his vehicle.

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 226 of 453 PageID:
Case 2:19-cv-02160-CMC-CJS Document 50 Filed 11/04/19 Page 46 of 229 Page ID#563
835

149.  Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Lampton of the existence of the infotainment system's defect prior to purchase.

**10.  Maryland—Jacob Szajowitz**

150.  Plaintiff Jacob Szajowitz resides in and is a citizen of Baltimore, Maryland.

151.  Plaintiff Szajowitz leased a new 2019 Honda Odyssey EX-L in August 2018 from Honda of Owings Mills, an authorized Honda dealership located in Garrison, Maryland.  Plaintiff Szajowitz was interested in purchasing an Odyssey with the infotainment system and conducted online research on the vehicle at his home, including research and reviewing marketing materials related to the infotainment system.  As part of his online research, Plaintiff Szajowitz compared the Odyssey to other similar vehicles manufactured by Chrysler and Chevrolet.  Plaintiff Szajowitz also read vehicle reviews in Consumer Reports, talked to friends about their vehicles, and test drove various vehicles including the 2019 Honda Odyssey EX-L.  Plaintiff Szajowitz also went to Honda's website and utilized the "build-a-vehicle" feature to build a potential Odyssey for pricing information and to review the features and trim levels.  During this process, Plaintiff Szajowitz reviewed information about the Odyssey's infotainment system and the functions offered.  The Android Auto function marketed by Honda for the Odyssey was very important to Plaintiff Szajowitz because he and his wife use Samsung phones.  It was also important to Plaintiff Szajowitz, and an attractive feature touted by Honda, that the Odyssey's infotainment system contains the latest technology.  Plaintiff Szajowitz's research at the Honda of Owings Mills dealership included interacting with the salesperson who described the various features contained in the 2019 Odyssey, including the state-of-art infotainment system.  Accordingly, based upon the above described interactions and communications, Plaintiff Szajowitz was exposed to Honda's  omissions in the state of Maryland and made his purchase decision in Maryland.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 227 of 453 PageID:
836
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 1 of 223   Page ID #:554

152.   Plaintiff Szajowitz leased and continues to lease the 2019 Honda Odyssey EX-L.  Unknown to Plaintiff Szajowitz at the time he leased the vehicle, the Odyssey suffered from (and continues to suffer from) a defective infotainment system, which has caused him out-of-pocket loss, attempted repairs, and diminished value of the Odyssey. Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Szajowitz's lease transaction but did not disclose it to him.  Thus, Plaintiff Szajowitz leased the Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

153.   One of the main reasons Plaintiff Szajowitz selected and ultimately purchased his Odyssey EX-L was because of the features of the infotainment system, as represented through advertisements and representations made by Honda. Specifically, prior to his lease of the vehicle, Plaintiff Szajowitz researched the Odyssey and its various features (including the features of the infotainment system) by reviewing the marketing materials and interacting with the dealership salesperson as described above. The fact that the 2019 Odyssey EX-L contained the supposedly advanced infotainment system with the latest technology and was compatible with Android phones was one of the main reasons Plaintiff Szajowitz chose to purchase the Odyssey.  None of the advertisements reviewed or representations received by Plaintiff Szajowitz contained any disclosure relating to any defects in the infotainment system.  Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with the infotainment system or would have paid less for the vehicle.

154.  Plaintiff Szajowitz began having problems with his Odyssey's infotainment system soon after the lease began.  For example, the Sirius/XM satellite music function locks, the music ceases, and the infotainment system screen freezes.  The infotainment system remains dysfunctional until Plaintiff Szajowitz turns the vehicle off and restarts it, apparently resetting the system.  Another example relates to the

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 228 of 452 PageID:
837
Case 2:19-cv-02180-CNC-CJS Document 90 Filed 11/04/19 Page 49 of 228 Page ID #385

infotainment system's Android Auto feature. Whenever Plaintiff Szajowitz attempts to skip more than one song while playing through Android Auto, the infotainment system freezes and music stops playing. Sometimes, though not always, Plaintiff Szajowitz can restore the infotainment system by unplugging the USB connection. In those instances when unplugging the USB connection does not restore the infotainment system, the system can be restored by turning off and restarting the vehicle. The most common infotainment system defect experienced by Plaintiff Szajowitz relates to the handsfree phone function. Nearly every call using this system results in terrible audio reception experienced by the person to whom Plaintiff Szajowitz is speaking. The reception is so poor that Plaintiff Szajowitz is often forced to manually disconnect the phone from the handsfree function. Also, the infotainment system often freezes when Plaintiff Szajowitz attempts to use either the Waze app or Google Maps. Since the date his lease began, the problems Plaintiff Szajowitz has experienced with his infotainment system are so frequent and pervasive that he is not able to determine the precise dates he has experienced such problems. The defects described above constantly create substantial distractions which can result in dangerous driving conditions creating safety hazards. For example, Plaintiff Szajowitz often has been forced to disconnect his phone from the infotainment system in order to complete an important work-related phone call.

155. In several instances, Plaintiff Szajowitz has documented the failure of his infotainment system by photograph. One such picture is shown below:

Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 229 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 49 of 223   Page ID #356
838



156.   To date, no Honda of Owings Mills employee has notified Plaintiff Szajowitz of an update to or fix for his vehicle's infotainment system, nor has Plaintiff Szajowitz received any other notification from Honda about any potential permanent repair or aftermarket modification that would cure the defects he has experienced. When Plaintiff Szajowitz returned his vehicle in October 2018 to the Honda of Owings Mills dealership because of the infotainment defects described above, the technician explained that they could not replicate any of the problems.  Nonetheless, the technician explained that he downloaded the most recent software update for the vehicle, proclaimed that there was nothing wrong with the vehicle, and went on to explain that any issues or problems with Sirius/XM radio should be raised with Sirius/XM—not Honda.  Plaintiff Szajowitz did call Sirius/XM in an attempt to fix the issues described

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 230 of 453 PageID 7
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 50 of 229   Page ID#: 57
839

above but those efforts, just like the October 2018 visit to the Owings Mills Honda dealership, did not resolve the defects.

157.  As of this date, Plaintiff Szajowitz continues to experience problems with the infotainment system in his Odyssey despite Honda's attempt to update the software.

158.  Plaintiff Szajowitz has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein, overpayment, attempted repairs, and diminished value of his vehicle.

159.  Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Szajowitz of the existence of the infotainment system's defects prior to leasing the vehicle.

**11.    Massachusetts—Michaela Hetzler**

160.  Plaintiff Michaela Hetzler resides in and is a citizen of Fall River, Massachusetts.

161.  Ms. Hetzler purchased a new 2019 Honda Odyssey EX-L in September 2018 from Honda of Seekonk, an authorized Honda dealership located in Seekonk, Massachusetts.  Prior to purchasing the 2019 Odyssey, Ms. Hetzler owned another Honda Odyssey and was very satisfied with the overall performance of the vehicle from a quality and reliability perspective.  So, when it was time to look for a new vehicle, she was very interested in looking at the new 2019 Odyssey.  Ms. Hetzler researched the 2019 Odyssey prior to her purchase by reviewing the marketing materials and information present on Honda's website, including information about the features and benefits offered by the infotainment system.  Ms. Hetzler also read Consumer Reports reviews about the 2019 Odyssey.  Ms. Hetzler went to the Honda of Seekonk dealership to look at the 2019 Odyssey and to test drive the vehicle.  The salesperson at the dealership discussed the various features and benefits of the 2019 Odyssey as well as those offered by the infotainment system, including Android Auto connectivity which

was a very important feature to Ms. Hetzler because she and her husband have Android phones. After the salesperson discussed the benefits and features of the vehicle, a dealership technician performed a demonstration of the capabilities and functions offered by the infotainment system in the 2019 Odyssey.

162. Accordingly, based upon the above described interactions and communications, Ms. Hetzler was exposed to Honda's omissions in the state of Massachusetts and made her purchase decision in Massachusetts.

163. Ms. Hetzler purchased and continues to own the 2019 Odyssey EX-L. Unknown to Ms. Hetzler at the time she purchased the vehicle, the Odyssey suffered from (and continues to suffer from) a defective infotainment system, which resulted in overpayment and has diminished the value of the Odyssey. Plaintiff was also deprived of the benefit of the bargain. Honda knew about this defect with the infotainment system at the time Ms. Hetzler purchased the vehicle but did not disclose it to her. Thus, Ms. Hetzler purchased the Odyssey on the reasonable but mistaken belief that it would be a reliable vehicle and was not subject to any known defects.

164. Ms. Hetzler selected and ultimately purchased the Odyssey, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda and its agents at the dealership. Specifically, prior to her purchase, Ms. Hetzler reviewed the representations on Honda's website about the infotainment system and spoke to the dealership salesperson and technician who reviewed the features and benefits of the new Odyssey, including the updated infotainment system. The fact that the 2019 Odyssey contained the supposedly advanced infotainment system with the latest technology was one of the main reasons Ms. Hetzler chose to purchase the Odyssey. None of Honda's advertisements or marketing information at the dealership contained any disclosure relating to any defects in the infotainment system. Nor did the salesperson or the technician at the dealership disclose any such defects with the infotainment system when they discussed the new

system or when they gave Ms. Hetzler a tutorial of the infotainment system. Had Honda disclosed that the infotainment system in the Odyssey was defective which prevents the full use of the vehicle as advertised, Ms. Hetzler would not have purchased the Odyssey with the infotainment system, or would have paid less for the vehicle.

165.    Ms. Hetzler began experiencing problems with her Odyssey's infotainment system soon after the purchase. For example, the infotainment screen would make a static sound then go completely black, rendering the entire infotainment system frozen and inoperable. Here are two screen shots of frozen screens encountered by Ms. Hetlzer:



Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 233 of 453 PageID:
842
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 53 of 223   Page ID #360

166.   Nothing related to the infotainment system functions when this occurs as there is no audio, no video, no handsfree phone functions, and no backup camera.  And, even when the infotainment system is functioning, the handsfree Bluetooth phone functionality is dysfunctional and does not consistently work.  Often, the person to whom Ms. Hetzler is speaking cannot clearly hear her.  This makes it nearly impossible to have an effective conversation.  Also, the vocal commands and controls associated with the infotainment system do not work.  Ms. Hetzler returned her Odyssey to the Honda of Seekonk dealership in the winter of 2018 to rectify the above described problems with the infotainment system.  When she returned to pick up the vehicle, the dealer stated that the issues had been resolved.  Yet, within a few weeks the same problems reappeared.  So, Ms. Hetzler returned the vehicle to the Honda of Seekonk dealership in early 2019 for a second repair.  Ms. Hetzler returned to get the Odyssey after she was informed that the most recent repair was successful.  However, as she was driving her Odyssey out of the dealership's parking lot following the second repair, the infotainment screen went black and froze.  So, Ms. Hetzler turned around and retuned the Odyssey to the dealer for a third attempt to repair the defective infotainment system.  This time, a representative from Honda's national corporate office assisted with the

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 234 of 452   PageID:
843
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 54 of 223   Page ID #501

repair attempt.  Two weeks after this third repair attempt, the Odyssey's infotainment system failed again.  Ms. Hetzler returned the Odyssey to the dealer in April 2019 for the fourth repair attempt.  Following the fourth repair, the infotainment system still does not function as advertised, as Ms. Hetzler continues to experience terrible handsfree connectivity, the voice commands do not work, and persons to whom she is trying to have a phone conversation cannot hear her.  The fact that Ms. Hetzler's Odyssey essentially has no handsfree Bluetooth phone functionality is a major concern for Ms. Heltzler because Massachusetts recently enacted a new "handsfree law" which will soon make it illegal to drive with a cell phone in your hand.  Since the date of purchase of her Odyssey, the problems she has (and continues to experience) with the infotainment system are so frequent and pervasive that Ms. Hetzler is not able to determine the precise dates she has experienced such problems.  The defects described above constantly create substantial distractions which can result in dangerous driving conditions creating safety hazards.

167.  To date, no Honda of Seekonk dealership employee has notified Ms. Hetzler of an update to or fix for her vehicle's infotainment system, nor has she received any other notification from Honda about any potential permanent repair or aftermarket modification that would cure the defects she has experienced.

168.  As of this date, Ms. Hetzler continues to experience the problems described above with the infotainment system in her Odyssey.

169.  Ms. Hetzler has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of her vehicle.

170.  Neither Honda nor any of its agents, dealers, or other representatives informed Ms. Hetzler of the existence of the infotainment system's defects prior to purchasing the vehicle.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 235 of 453   PageID
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 59 of 225   Page ID #302
844

### 12.   Missouri—Michelle Beckwith

171.   Plaintiff Michelle Beckwith resides in Columbia, Missouri.

172.   Plaintiff Beckwith purchased a new 2019 Honda Odyssey on April 17, 2019, from Jefferson City Honda, an authorized Honda dealership in Jefferson City, Missouri.   Plaintiff Beckwith was interested in purchasing an Odyssey with the infotainment system and conducted most of her research from her home in Missouri. Plaintiff Beckwith was exposed to Honda's  omissions in that state and made her purchase decision there.

173.   Plaintiff Beckwith purchased and still owns this Odyssey.  Unknown to Plaintiff Beckwith at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused her out-of-pocket loss, attempted repairs, and diminished value of the Odyssey.   Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Beckwith's purchase but did not disclose it to Plaintiff Beckwith.   Thus, Plaintiff Beckwith purchased her Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

174.   Plaintiff Beckwith selected and ultimately purchased her vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.   Among other things, Plaintiff Beckwith chose to purchase a 2019 Honda Odyssey Elite because the vehicle featured a premium stereo system that could be used (by way of the infotainment system's Bluetooth feature) with her cell phone.

175.   Prior to purchase, Plaintiff Beckwith researched the vehicle extensively online, including on Honda's website, where she compared various models and accessories packages.   In addition, while at the dealership, Plaintiff Beckwith was provided with a variety of printed, Honda-branded promotional materials, and reviewed Honda's website with a sales representative.   Plaintiff Beckwith asked the sales

SECOND AMENDED COMPLAINT                     - 47 -

representative a number of questions about the infotainment system, test drove two separate vehicles, and made several test phone calls in order to confirm that her cell phone would pair properly with the vehicle. The proper functioning of this feature was so important to Plaintiff Beckwith that she made an additional pre-sale trip to Jefferson City Honda just to inquire about it.

176. Plaintiff Beckwith began having problems with her vehicle's infotainment system less than two weeks after buying the vehicle. While travelling on vacation, Plaintiff Beckwith observed that the vehicle's stereo would malfunction—causing the screen to go black—and/or fail to load, thus requiring that she restart the vehicle. Plaintiff Beckwith also received various error messages on the infotainment system's center screen, including "Audio cannot be used right now," "Loading…[,]" and "Check Tuner." The CabinWatch feature in Plaintiff Beckwith's vehicle has also failed to work on several occasions.

177. Plaintiff Beckwith has documented some of these failures in the following photographs:



Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 237 of 452 PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/13   Page 57 of 223   Page ID #:304
846

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27



28

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 238 of 453   PageID:
Case 2:19-cv-02167-CMC-CJS   Document 50   Filed 11/04/19   Page 59 of 228   Page ID #:305
847

178.   As a result of these problems, Plaintiff Beckwith brought her vehicle to Jefferson City Honda for service on April 29, 2019.  During that visit, the dealership replaced the tuner in Plaintiff Beckwith's vehicle.  The service notes from Plaintiff Beckwith's visit state: "Vehicle at random will get check tuner or audio not available message.  Called tech line after finding no codes in system and was advised to replaced [sic] tuner unit in rear and vehicles are awaiting an OTA [over the air] software update that is not yet released.  Replace tuner unit in vehicle and audio is working ok at this time."  When Plaintiff Beckwith returned to pick up the vehicle on May 3, 2019, she was informed that if the tuner replacement did not fix her issues, there was nothing else the dealership could do to resolve the defect with her vehicle's infotainment system.

179.   On May 5, 2019, two days later, the stereo in Plaintiff Beckwith's vehicle again rebooted several times while driving.  In addition, another problem developed: approximately half of the time that Plaintiff Beckwith's cellphone is paired with the vehicle's infotainment system, her voice is inaudible to car recipients—e.g., those receiving Plaintiff Beckwith's calls tell her that her voice is garbled.  This problem is particularly concerning to Plaintiff Beckwith because, each time it occurs, Plaintiff Beckwith is forced to divert her attention to her phone—thus creating a dangerous distraction.

180.   On May 6, 2019, Plaintiff Beckwith called Jefferson City Honda to describe this problem and inquire about a fix.  During a return phone call, a dealership employee told Plaintiff Beckwith that there was nothing that could be done to resolve the issue she described, and that her only option was to wait for a software update expected in June or July of 2019.  On May 20, after requesting several times to speak with Jefferson City Honda's general manager about the problem, Plaintiff Beckwith was told once again (by the general manager) that there was nothing the dealership could do other than advocate with Honda on her behalf.

Case 2:20-cv-02947-RMB-KMW    Document 17    Filed 10/23/20    Page 239 of 453    PageID:
848
Case 2:19-cv-02160-CMC-CJS    Document 90-17    Filed 11/04/19    Page 59 of 229    Page ID #306

181.    On June 6, 2019, after numerous additional inquiries by Plaintiff Beckwith, a dealership employee informed Plaintiff Beckwith via text message that the dealership has been in contact with a Honda representative who is "working to see what he needs to do" to send a beta version of the above-referenced update to Jefferson City Honda so that it can be installed on Plaintiff Beckwith's vehicle.

182.    To date, no Jefferson City Honda employee has contacted Plaintiff Beckwith or otherwise tried to follow through on this promise.    To the contrary, although Plaintiff Beckwith has since left several messages with the dealership inquiring about the status of a fix and/or whether there are any new updates that might resolve her problems, dealership personnel have not returned her calls.    Indeed, when Plaintiff Beckwith's old service representative left the dealership, a new one called her to introduce himself, and promised to call her back to discuss the defect the next day—but never did so.

183.    Plaintiff Beckwith has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of her vehicle.

184.    Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Beckwith of the existence of the infotainment system's defect prior to purchase.

**13.    Ohio—Lesley and Tom Conti**

185.    Plaintiffs Lesley and Tom Conti (the "Contis") are Ohio citizen residing in Munroe Falls, Ohio.

186.    The Contis purchased a new 2018 Honda Odyssey EX-L from Great Lakes Honda in Akron, Ohio on or around June 12, 2017.

187.    The Contis were exposed to Honda's omissions in that state and made their purchase decision there.

188.   The Contis purchased and still own this Odyssey.  Unknown to the Contis at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused them out-of-pocket loss, attempted repairs, and diminished value of the Odyssey.  Plaintiffs were also deprived of the benefit of the bargain.  Honda knew about this defect at the time of the Contis purchase but did not disclose it to them.  Thus, the Contis purchased their Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

189.   The Contis selected and ultimately purchased their vehicle, in part, because of the features of the infotainment system.  In June 2017, the Contis saw online that Great Lakes Honda had a 2015 used Odyssey for sale. They then went to the dealership and met with a salesperson, who showed them the 2015 used Odyssey as well as the 2018 Odysseys, which had recently come in. The salesman sat in the 2018 with the Contis and went over all the features in the van, including the infotainment system.  The Contis ultimately decided that the newer Odyssey model would be best for their family—especially the navigation, hands-free phone, and back-up camera features, which were all appealing safety features.  In addition, the Contis reviewed the Monroney label on their Odyssey before purchasing.

190.   None of the representations received by the Contis contained any disclosure relating to any defects in the infotainment system.  Had Honda disclosed that the infotainment system in their vehicle suffered from numerous defects which would prevent the full use of their vehicle and pose safety risks, the Contis would not have purchased their vehicle with the infotainment system, or would have paid less for the vehicle.

191.   The Contis experienced continuing and repeated problems with the vehicle's infotainment system from within two months of purchase.

192.   The Contis first noticed problems with the audio system in approximately August 2017.  The infotainment system displayed the message "Radio unavailable," and

there was no sound from the radio, satellite radio, CD player, hands free calling, and navigation system.

193.    When the Contis took the Vehicle to their dealership for an oil change on January 11, 2018, they notified the technician of the problems they had been experiencing with the infotainment system.  The service invoice states: "Cust states is still[] having issues with Audio Unit.  States is seeing radio unavailable when using AM/FM.  Please advise remarks found bulletin for audio unit replacement.  Ordered audio tuner per bulletin."

194.    Less than a month later, on February 1, 2018, the Contis returned to the dealership to have the audio tuner replaced per the Honda service bulletin (Service Bulletin 17-088).

195.    Two days after the replacement, the infotainment system failed again. Later, on February 3, 2018, Mrs. Conti sent a text message to a technician at the dealership stating that "the radio just went out completely, nothing is working." Shortly thereafter, the Contis returned the Vehicle to the dealer to have the dealer again attempt to fix the infotainment system.

196.    On February 8, 2018, the dealership notified the Contis as follows: "[W]e are currently waiting on a call back from Honda Tech line.  We have followed all diagnosis charts so leaning towards audio unit or even an issue with the tuner.  Just waiting for there (sic) techs to advise next steps."

197.    The next day, the Contis received a text message from the technician stating: "Honda contacted us last night and requested a snap shot of the audio unit software which means they wanna see what we see in the programming.  They should contact us today but they are based on the west coast so won't be till later." When the Contis picked up the Vehicle from the dealership, they were told that the whole dashboard had been removed in an effort to repair the unit.

198.    Despite these repair efforts, the infotainment system problems persisted.

Case 2:20-cv-02047-RMB-KMW Document 17 Filed 10/23/20 Page 242 of 453 PageID
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 62 of 243 Page ID #369
851

199.   The Contis took the van back in to the dealership on approximately February 12, 2018, and then again on February 22, 2018. The dealership's service invoice states: "Cust states is still having issues with the audio unit.  States still getting message radio unavailable, states are fading in and out very quickly and then just shuts off.  States has not worked for a full day since install."  The invoice further states: "Vehicle has a new tuner, new audio unit from brand new donor and OTA software update.  According to customer, vehicle is still malfunctioning.  Per DPMS and field service engineer, customer needs to keep for a few weeks and log malfunctions and report back to us to further diagnose.  Closing paperwork for now."

200.   The Contis asked to speak with the dealership's service manager, who instructed the Contis to start keeping a journal of the problems with the vehicle. According to the Contis' journal, the vehicle experienced infotainment system problems (usually related to audio) every single day between February 28, 2018 and March 12, 2018.

201.   On March 12, 2018, the Contis received a text message from the technician stating: "We have spoken to Honda on the situation not just with your vehicle but with others as well and are getting the same response which is don't replace any more parts and wait for an update.  Very frustrating I understand."

202.   The next day, the Contis received a follow up text message asking them to bring the Vehicle into the dealership, which they did.  The dealer kept the Vehicle for 10 days.   The service invoice states, "Per Service Manager and DPSM Veh to be dropped off for further diag." It further states: "Replaced instrument panel wire harness, floor wire harness, and rear entertainment system control unit per previous diagnosis performed by Honda field engineer.  Radio is working consistently after testing multiple times over the court of two day[s].  No other problems found at this time."  The Contis were told that an engineer from Honda flew in specifically to observe the Vehicle and personally drove the Vehicle back and forth to his hotel.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 243 of 453   PageID:
852
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 63 of 243   Page ID #:870

203.   The Contis picked up the van on March 22, 2018.  But the infotainment system problems continued.

204.   On May 1, 2018, the Contis contacted dealership about problems experienced with the infotainment system, which included crackling sounds and a non-functioning backup camera.

205.   On May 18, 2018, the Vehicle's audio functions failed, and the infotainment system would not produce any sound.

206.   Around this time, the Contis were informed by the dealership's service manager that a number of other people had experienced issues similar to their own.

207.   On at least two occasions since the dealership attempted to repair the defect, Mrs. Conti has been driving when the entire "infotainment" console display turned black and became wholly inoperable.  The Contis have recorded video of these failures in order to document them.

208.   On December 18, 2018, the Contis returned the Vehicle to the dealership and showed them the videos of the infotainment system failures.  Later that day, the Contis were told that the Honda engineer had looked at the videos and determined that the Blu-ray player and the speedometer needed to be replaced.

209.   However, the infotainment problems continue to plague the Vehicle after the dealership's many repair attempts.  On March 1, 2019, the Vehicle's audio cut out and the infotainment system showed the following message: "Audio cannot be used right now."  On March 25, 2019, the infotainment system's screen went black while the radio continued to play.

210.   To date, the Contis' problems have continued.   Most recently, on September 5, 2019, the Contis informed Great Lakes Honda of their continued problems during a scheduled oil change.  The dealership told the Contis that there was nothing that could be done to address their problem, and that many other Odyssey owners are having similar problems.

Case 2:20-cv-02047-RMB-KMW  Document 17  Filed 10/23/20  Page 244 of 452 PageID 1
Case 2:19-cv-02160-CNC-CJS  Document 50  Filed 11/04/19  Page 64 of 243  Page ID #371
853

211.  Despite providing the dealership and Honda engineers at least eight attempts to repair the infotainment system, the Vehicle's infotainment system continues to malfunction.

**14.    Oklahoma—Ross and Stephanie Conley**

212.  Plaintiffs Ross and Stephanie Conley (the "Conleys") reside in Enid, Oklahoma.

213.  The Conleys purchased a new 2019 Honda Odyssey on February 16th, 2019, from Battison Honda, an authorized Honda dealership in Oklahoma City, Oklahoma.   The Conleys were interested in purchasing an Odyssey with the infotainment system and conducted most of their research from their home in Oklahoma.  The Conleys were exposed to Honda's  omissions in that state and made their purchase decision there.

214.  The Conleys purchased and still own this Odyssey.  Unknown to the Conleys at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused them out-of-pocket loss, attempted repairs, and diminished value of the Odyssey.  Plaintiffs were also deprived of the benefit of the bargain.  Honda knew about this defect at the time of the Conleys' purchase but did not disclose it to them.  Thus, the Conleys purchased their Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

215.  The Conleys selected and ultimately purchased their vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.  The Conleys upgraded to the EX-L trim in order to obtain an Odyssey with the infotainment system, and were particularly attracted to the integrated Apple CarPlay application.

216.   Before purchase, the Conleys reviewed information about the Odyssey on Honda's website and other car comparison pages (like Kelley Blue Book), where they compared the specifications and model variants of the Odyssey.   The Conleys also

Case 2:20-cv-02947-RMB-KMW  Document 17  Filed 10/23/20  Page 245 of 453  PageID:
854
Case 2:19-cv-02160-CMC-CJS  Document 50  Filed 11/04/19  Page 59 of 245  Page ID #:872

looked at the Odyssey on Honda's website, and reviewed the website for any discounts or other offers Honda was running at the time. In addition, Mrs. Conley flipped looked through an Odyssey brochure at the dealership the day of purchase, and both Conleys reviewed the Monroney label on their vehicle. 216.      None of the advertisements reviewed or representations received by the Conleys contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in their vehicle suffered from numerous defects which would prevent the full use of their vehicle and pose safety risks, the Conleys would not have purchased their vehicle with the infotainment system, or would have paid less for the vehicle.

217.   The Conleys first began having problems with their vehicle's infotainment system on or about March 14, 2019, when the vehicle's radio made a static noise and shut off, which in turn caused the infotainment system as a whole to crash and reset itself—thus disabling all of the system's features and associated controls. Between March 14 and March 28, this problem was intermittent; on some days, the infotainment system would work without issue, while on others, it would crash and reset itself repeatedly.

218.   On or about March 28, 2019, Mrs. Conley brought the vehicle to Curttright Honda, an authorized Honda dealership in Enid, Oklahoma, for service related to the infotainment system defect. At the time the vehicle was presented for repair, the infotainment system was functioning properly, and Curttright employees were unable to replicate the Conleys' problems. Employees performed a system update on the vehicle.

219.   Following this system update, the infotainment system in the Conleys' worked without issue for approximately three weeks. But starting on or about April 20, 2019, the same problems described above returned.

220.   The Conleys returned to Curtright Honda on April 22, 2019. Once again, dealership employees attempted a system update.

SECOND AMENDED COMPLAINT                    - 57 -
010811-11/1205802 V1

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 246 of 453 PageID:
Case 2:19-cv-02160-CMC-CJS Document 50 Filed 11/04/19 Page 69 of 249 Page ID #:873
855

221.   The update did not work.  To the contrary, after this April 22, 2019, visit, the problems with the Conleys' infotainment system became worse, and the system began to intermittently shut down—after crashing—for extended periods of time, rather than rebooting.  Furthermore, following some of these crashes, the infotainment system would not shut down or reboot even after the vehicle was turned off.

222.   The Conleys returned to Curtright Honda for a third time on May 11, 2019. During this visit, dealership employees told the Conleys that there were no system updates available for their vehicle, and that they neither knew of a fix for the problem nor knew what to do next.

223.   Since that time, the Conleys' problems with their infotainment system have continued, thus rendering the system almost completely unusable.  For a period of time during the summer of 2019, the system would crash within minutes of turning on, and afterward stay blank and inoperable for extended periods of time.  Most recently, the infotainment system has continued to fail regularly and/or make an audible "static" sound, and the backup camera periodically fails to turn on as well.  During a drive to and from upstate New York in July 2019, for example, the system was so unreliable that, rather than use it to play music, the Conleys instead relied on a wireless Bluetooth speaker.  When, during the same trip, Mrs. Conley visited a Honda dealership in Canandaigua, NY, for routine servicing, she asked dealership employees if Honda has made a fix available yet—and was told "no."

224.   The Conleys have suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of their vehicle.

225.   Neither Honda nor any of its agents, dealers, or other representatives informed the Conleys of the existence of the infotainment system's defect prior to purchase.

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 247 of 453 PageID:4
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 67 of 223 Page ID #:874
856

### 15. South Carolina—Emily Darr

226. Plaintiff Emily Darr resides in Charleston, South Carolina.

227. Plaintiff Darr purchased a new 2018 Honda Odyssey on November 1, 2017, from Hendrick Honda of Charleston, an authorized Honda dealership in Charleston, South Carolina. Plaintiff Darr was interested in purchasing an Odyssey with the infotainment system and conducted most of her research from her home in South Carolina. Plaintiff Darr was exposed to Honda's omissions in that state and made her purchase decision there.

228. Plaintiff Darr purchased and still owns this Odyssey. Unknown to Plaintiff Darr at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused her out-of-pocket loss, attempted repairs, and diminished value of the Odyssey. Plaintiff was also deprived of the benefit of the bargain. Honda knew about this defect at the time of Plaintiff Darr's purchase but did not disclose it to her. Thus, Plaintiff Darr purchased her Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

229. Plaintiff Darr selected and ultimately purchased her vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda. Plaintiff Darr tested a number of vans before settling on the Odyssey, and waited specifically for the release of the 2018 Odyssey. Plaintiff Darr also paid a premium for the Touring Elite trim because she wanted a van equipped with Honda's CabinWatch feature, which allows a front seat occupant to monitor second and third row passengers through the infotainment system's main touch screen via a ceiling mounted camera. This feature was particularly appealing to Plaintiff Darr because she has young children.

230. Specifically, prior to purchase, Plaintiff Darr was told by a Honda dealership employee that the Odyssey was being redesigned, but would be worth the wait. As a result, in the period leading up to the 2018 Odyssey's release, Plaintiff Darr

visited Hendrick Honda several times to inquire about the vehicle's specific release date, and did a significant amount of on- and offline research. Among other things, Plaintiff Darr researched the 2018 Odyssey's features on Honda's website, watched Honda's official "unveiling" video for the vehicle, and also reviewed Honda's printed marketing material (which was provided to her by Hendrick Honda) promoting the new Odyssey—which confirmed the addition of the new CabinWatch system. Furthermore, Plaintiff Darr finally learned that the 2018 Odyssey was in stock when she received a flyer in the mail promoting the vehicle. 230. None of the advertisements reviewed or representations received by Plaintiff Darr contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in her vehicle suffered from numerous defects which would prevent the full use of her vehicle and pose safety risks, Plaintiff Darr would not have purchased her vehicle with the infotainment system, or would have paid less for the vehicle.

231. Plaintiff Darr first began having problems with her vehicle's infotainment system in July 2018, when she observed that the DVD player would sometimes malfunction when the CabinWatch feature was also in use, and in turn disable the infotainment system as a whole. During these incidents, which continue to occur regularly, the DVD picture freezes while audio continues to play, and the CabinWatch interface displays an error message. When a user attempts to exit the CabinWatch application, the "home" button is unresponsive, and the display screen on the front console freezes and will not restart unless the vehicle is stopped and turned off for at least several minutes.

232. On or about July 20, 2019, Plaintiff Darr brought her vehicle to Hendrick Honda to have the infotainment system in her vehicle serviced. However, dealership employees were unable to reproduce the problem, and made no other attempt to fix it.

233. In the months following this visit, the infotainment system in Plaintiff Darr's vehicle began to malfunction more often. In October 2017, in advance of a long

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 249 of 453   PageID:
858
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 69 of 249   Page ID #376

road trip during which she anticipated using her vehicle's DVD player, Plaintiff Darr called Hendrick Honda to inquire whether an update was available from Honda that would fix the defect with her vehicle's infotainment system. The dealership employees with whom Plaintiff Darr spoke were unfamiliar with the defect, and suggested that she call American Honda to resolve her problem.

234.    Plaintiff Darr lodged a complaint Honda on October 17, 2018, and was given a case number and case manager. Plaintiff Darr described her defect to the case manager, who in turn contacted Hendrick Honda. Eventually, a service manager at Hendrick Honda contacted Plaintiff Darr to explain that, in late October 2018, Honda had released an internal memo admitting the existence of a defect with the infotainment system in Odyssey vehicles, and conceding that a fix had yet to be developed. When Plaintiff Darr asked what her options were in light of this memo, the manager told Plaintiff Darr to consult the consumer rights booklet in her glove box.

235.    Plaintiff Darr returned to Hendrick Honda on February 13, 2019, for service related to a door lock issue on her driver-side door, and she again asked if Honda had developed a fix for her defective infotainment system. The service advisor did not know.

236.    As of this date, Plaintiff Darr continues to experience problems with the infotainment system in her Odyssey. Most recently, when Plaintiff Darr took her children apple picking—a four-hour drive—the DVD player once again failed to work.

237.    Plaintiff Darr has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of her vehicle.

238.    Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Darr of the existence of the infotainment system's defect prior to purchase.

Case 2:20-cv-02907-RMB-KMW Document 17 Filed 10/23/20 Page 250 of 453 PageID 7
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 70 of 229 Page ID #:37
859

<table>
<tr><td>1</td></tr>
</table>

**16. Tennessee—Pamela Turberville**

239. Plaintiff Pamela Turberville resides in and is a citizen of Afton, Tennessee.

240. Ms. Turberville purchased a new 2019 Honda Pilot EX-L in December 2018 from Honda of Kingsport, an authorized Honda dealership located in Kingsport, Tennessee. Prior to purchasing the 2019 Pilot, Ms. Turberville owned a 2013 Honda Pilot and was very satisfied with the overall performance of the vehicle from a quality and reliability perspective. So, when it was time to look for a new vehicle, she was very interested in looking at the new 2019 Pilot. Ms. Turberville went to the Honda of Kingsport dealership and spoke to the dealeship's salesperson about the various features offered in the new 2019 Pilot, including the new infotainment system. The 2019 Pilot's infotainment system was a very important feature to Ms. Turberville and was a major factor in her decision to purchase the vehicle because she likes Sirius/XM radio and her young children like to listen to the Disney and Kids Bop channels.

241. Accordingly, based upon the above described interactions and communications, Ms. Turberville was exposed to Honda's omissions in the state of Tennessee and made her purchase decision in Tennessee.

242. Ms. Turberville purchased and continue to own the 2019 Honda Pilot EX-L. Unknown to Ms. Turberville at the time she purchased the vehicle, the Pilot suffered from (and continues to suffer from) a defective infotainment system, which has caused overpayment and the diminished value of the Pilot. Plaintiff was also deprived of the benefit of the bargain. Honda knew about this defect with the infotainment system at the time Ms. Turberville purchased the vehicle but did not disclose it to her. Thus, Ms. Turberville purchased the Pilot on the reasonable but mistaken belief that it would be a reliable vehicle and was not subject to any known defects.

243. Ms. Turberville selected and ultimately purchased their Pilot, in part, because of the features of the infotainment system, as represented through a Honda Pilot brochure and representations made by Honda and its agents at the dealership.

SECOND AMENDED COMPLAINT                - 62 -
010811-11/1205802 V1

Case 2:20-cv-02047-RMB-KMW Document 17 Filed 10/23/20 Page 251 of 453 PageID 7
Case 2:19-cv-02160-CMC-CJS Document 50 Filed 11/04/19 Page 7 of 223 Page ID #:378
860

Specifically, prior to her purchase, Ms. Turberville spoke to the dealership salesperson who reviewed the features and benefits of the new Pilot, including the new infotainment system, and she also reviewed several Honda brochures discussing the features of the 2019 Pilot. The fact that the 2019 Pilot EX-L contained the supposedly advanced infotainment system with the latest technology was one of the main reasons Ms. Turberville chose to purchase the Pilot. None of Honda's advertisements or marketing information at the dealership contained any disclosure relating to any defects in the infotainment system. Nor did the salesperson disclose any such defects with the infotainment system when he discussed the new system or when he gave Ms. Turberville a tutorial of the infotainment system. Had Honda disclosed that the infotainment system in her vehicle was defective which prevents the full use of the vehicle as advertised, Ms. Turberville would not have purchased the Pilot with the infotainment system, or would have paid less for the vehicle.

244. Ms. Turberville began experiencing problems with her Pilot's infotainment system soon after the purchase. For example, the Sirius/XM radio function routinely pauses when in use so there is no audio, then returns, only to pause again with no audio. This occurs nearly every time Ms. Turberville listens to Sirius/XM. Also, while listening to Sirius/XM, it is not uncommon for the infotainment screen to completely freeze, rendering the entire infotainment system nonoperational. The only way Ms. Turberville has been able to reset the infotainment system is to turn the vehicle off and restart it. Since the date of purchase of her Pilot, the problems she has (and continues to experience) with the infotainment system are so frequent and pervasive that Ms. Turberville is not able to determine the precise dates she has experienced such problems. The defects described above constantly create substantial distractions which can result in dangerous driving conditions creating safety hazards.

245. Plaintiff Turberville first took her Pilot to Johnson City Honda in or around March 2019 to seek a repair for the problems she was experiencing. She was told that

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 252 of 453 PageID:
Case 2:19-cv-02160-CCC-CJS Document 50 Filed 11/04/19 Page 72 of 223 Page ID#:379
861

because the issues were caused by a software problem, there was nothing the dealership could do. She next contacted Honda of Kingsport about her issues when she took her vehicle in for an oil change, in or around June 2019. Plaintiff Turberville asked the dealership personnel if there was a fix yet for the problems she was experiencing, and was told there was still no known fix for this issue and that, according to Honda, even replacing the infotainment system would not correct the issue. Plaintiff Turberville was told that she was not the only customer complaining about this but that a software update may be coming from Honda, and that she should just wait for that.

246. To date, no Honda of Kingsport dealership employee has notified Ms. Turberville of an update to or fix for their vehicle's infotainment system, nor has she received any other notification from Honda about any potential permanent repair or aftermarket modification that would cure the defects they have experienced.

247. As of this date, Ms. Turberville continues to experience the problems described above with the infotainment system in her Pilot.

248. Ms. Turberville has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket losses,[7] overpayment, attempted repairs, and diminished value of their vehicle.

249. Neither Honda nor any of its agents, dealers, or other representatives informed Ms. Turberville of the existence of the infotainment system's defects prior to purchasing the vehicle.

**17. Texas—Smruti Patel**

250. Plaintiff Smruti Patel resides in and is a citizen of McKinney, Texas.

251. Plaintiff Patel purchased a new 2018 Honda Odyssey EX in October 2017 from Honda of McKinney, an authorized Honda dealership located in McKinney, Texas.

---

[7] Ms. Turberville pays a month subscription fee for Sirius/XM radio. The defective infotainment system prevents Ms. Turberville from receiving the full benefit from the subscription.

Plaintiff Patel was attracted to and wanted to purchase the Odyssey because of the advertised infotainment system and its compatibility with the Apple Car Play app. Plaintiff Patel read reviews of the vehicle online including Edmunds and Cars.com. Plaintiff Patel also reviewed Honda's website and read the marketing material describing the various features on the Odyssey including the new infotainment system and the functions it offered, including its compatibility with Apple Car Play. Plaintiff Patel test drove the Odyssey at the Honda of McKinney dealership prior to purchase during which the salesperson described the various features contained in the 2018 Odyssey, including the state-of-art infotainment system. The Apple Care Play function marketed by Honda for the Odyssey was very important to Plaintiff Patel because he and his wife use iPhones. It was also important to Plaintiff Patel, and an attractive feature touted by Honda, that the Odyssey's infotainment system contained the latest technology. Accordingly, based upon the above described interactions and communications, Plaintiff Patel was exposed to Honda's omissions in the state of Texas and made his purchase decision in Texas.

252. Plaintiff Patel continues to own the 2018 Honda Odyssey. Unknown to Plaintiff Patel at the time he purchased the vehicle, the Odyssey suffered from (and continues to suffer from) a defective infotainment system, which has led to repeated attempts to repair and diminished the value of the Odyssey and caused Plaintiff Patel to overpay for the vehicle. Honda knew about this defect at the time of Plaintiff Patel's purchase but did not disclose it to Plaintiff Patel. Thus, Plaintiff Patel purchased the Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways and was not subject to any known defects.

253. Plaintiff Patel selected and ultimately purchased his Odyssey, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda. Specifically, prior to his purchase of the vehicle, Plaintiff Patel researched the Odyssey and its various features (including

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 254 of 452   PageID 1
Case 2:19-cv-02266-CMC-CJS   Document 50   Filed 11/04/19   Page 74 of 223   Page ID #:301
863

the features of the infotainment system) by reviewing the marketing materials and interacting with the dealership salesperson as described above.  The fact that Honda marketed and claimed that the 2018 Odyssey contained the supposedly advanced infotainment system with the latest technology and was compatible with Apple Car Play was one of the main reasons Plaintiff Patel purchased the Odyssey.  None of the advertisements reviewed or representations received by Plaintiff Patel contained any disclosure relating to any defects in the infotainment system. Had Honda disclosed that the infotainment system in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with the infotainment system or would have paid less for the vehicle.

254.  Plaintiff Patel began having problems with his Odyssey's infotainment system soon after the purchase.  For example, the infotainment system's handsfree phone function does not work properly as approximately 50% of incoming calls are not automatically routed to the system. This is the case for both Plaintiff Patel's iPhone and his wife's iPhone.  Further, when Plaintiff Patel attempts to make outgoing calls, approximately 50% of the time the infotainment system fails.  With regard to the Apple Car Play, the infotainment system routinely freezes when Plaintiff Patel attempts to use the maps and directions function and the music function.  In order to unfreeze the system, Plaintiff Patel must restart the Odyssey.  Since he purchased the Odyssey, the problems Plaintiff Patel has experienced with the vehicle's infotainment system are so frequent and pervasive that he is not able to determine the precise dates he has experienced such problems.  The defects described above constantly create substantial distractions which can result in dangerous driving conditions creating safety hazards

Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 255 of 453   PageID:
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 759 of 223   Page ID #:302
864

such as the inability to use the handsfree phone function.  A picture of the infotainment system failing is shown below:

255.   To date, no Honda of McKinney employee has notified Plaintiff Patel of an update to or fix for his vehicle's infotainment system, nor has Plaintiff Patel received any other notification from Honda about any potential permanent repair or aftermarket



modification that would cure the defects he has experienced.  Because of the poor performance and repeated problems he was experiencing with the Odyssey, Plaintiff Patel called Honda Customer Service to register his complaint and to seek a resolution. Honda Customer Service told Plaintiff Patel to make an appointment with the local Honda dealership.  When Mr. Patel made a service appointment and returned his vehicle to the Honda of McKinney dealership to address the above-described issues, the technician explained that they could not replicate any of the problems.  The technician stated that he did download the most recent software update for the vehicle.  However,

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 256 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 76 of 229 Page ID #303
865

the problems with Plaintiff Patel's Odyssey persist. Plaintiff Patel called the Honda of McKinney dealership in May to again report about and to request assistance with the poor performance of the infotainment system. The dealership has yet to follow up with Plaintiff Patel to schedule a service appointment.

256. Since June, Plaintiff Patel has made additional visits to Honda of McKinney, but has been told that his problems are an "update issue." However, even after installing updates to his vehicle, Plaintiff Patel's problems persist. Furthermore, when Plaintiff Patel spoke to Honda's customer service about the problem, he was told that he must resolve these issues through the dealer from which he purchased his vehicle.

257. As of this date, Plaintiff Patel continues to experience problems with the infotainment system in his Odyssey.

258. Plaintiff Patel has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, overpayment, attempted repairs, and diminished value of his vehicle.

259. Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Patel of the existence of the infotainment system's defects prior to purchasing the vehicle.

**18. Virginia—Ann Morgan**

260. Plaintiff Ann Morgan resides in Washington, DC.

261. Plaintiff Morgan purchased a new 2019 Honda Odyssey on August 9, 2018, from Brown's Arlington Honda, an authorized Honda dealership in Arlington, Virginia. Plaintiff Morgan was interested in purchasing an Odyssey with the infotainment system and conducted most of her research from her home in Washington, D.C. Plaintiff Morgan was exposed to Honda's omissions in that state and made her purchase decision there.

262. Plaintiff Morgan purchased and still owns this Odyssey. Unknown to Plaintiff Morgan at the time of purchase, the Odyssey suffered from a defective

SECOND AMENDED COMPLAINT              - 68 -
010811-11/1205802 V1

1    infotainment system, which has caused her out-of-pocket loss, attempted repairs, and

2    diminished value of the Odyssey.  Plaintiff was also deprived of the benefit of the

3    bargain.  Honda knew about this defect at the time of Plaintiff Morgan's purchase but

4    did not disclose it to Plaintiff Morgan.  Thus, Plaintiff Morgan purchased her Odyssey

5    on the reasonable but mistaken belief that it would be safe and reliable on public

6    roadways.

7        263.   Plaintiff Morgan selected and ultimately purchased her vehicle, in part,

8    because of the features of the infotainment system, as represented through

9    advertisements and representations made by Honda.  Specifically, prior to her purchase

10   of the vehicle, Plaintiff Morgan researched the Honda Odyssey extensively online

11   (including viewing Honda's website), and was attracted to it over alternative vehicles

12   (like the Honda CR-V) because of the vehicle's purported safety, including Apple

13   CarPlay, which allows for dashboard access to GPS, the backup camera, and handsfree

14   calling—features that were particularly important to Plaintiff Morgan who, at the time

15   of purchase, was pregnant with twins and looking for a car that would accommodate

16   and protect her growing family.  None of the advertisements reviewed or representations

17   received by Plaintiff Morgan contained any disclosure relating to any defects in the

18   infotainment system.  Had Honda disclosed that the infotainment system in her vehicle

19   suffered from numerous defects which would prevent the full use of her vehicle and

20   pose safety risks, she would not have purchased her vehicle with the infotainment

21   system, or would have paid less for the vehicle.

22       264.   Plaintiff Morgan first began having problems with her vehicle's

23   infotainment system on or about February 10, 2019, when the system froze while she

24   and her husband were driving on the Capital Beltway.  Plaintiff Morgan pulled off the

25   highway and turned off her vehicle, but the infotainment system's display screen would

26   not deactivate or restart; consequently, the backup camera, on-screen GPS, Bluetooth,

27   climate controls, and radio were disabled as well.

28

SECOND AMENDED COMPLAINT          - 69 -
010811-11/1205802 V1

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 258 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 73 of 228 Page ID #305
867

265.   That same day, Plaintiff Morgan brought her vehicle to Brown's Arlington Honda to have the infotainment system inspected.  Plaintiff Morgan was told to leave her vehicle for service.  When she picked up her vehicle six days later, she was told that the problems with her infotainment system were attributable to a software failure, and that the dealership had performed a "hard reset" on the system.

266.   On or about March 23, 2019, during a drive from Washington, D.C. to New York City, the infotainment system in Plaintiff Morgan's vehicle crashed once again, and would not reboot.  Plaintiff Morgan pulled over and attempted to contact Brown's Arlington Honda in search of a remote fix for the problem; she was told that there was no way for a user to reboot the infotainment system, and instructed to drive her car to a Honda dealership for service.  When Plaintiff Morgan and her husband arrived in New York several hours later, the infotainment system was still frozen, meaning that the auxiliary functions of the car could not be completely turned off, and the infotainment system continued to draw from the car battery even after the car was parked.

267.   On or about March 25, 2019, Plaintiff Morgan contacted the service manager at Browns Arlington Honda to inquire about a fix for her infotainment system. During this call, she was transferred to a technician.  The technician expressed frustration with Honda's response to the problem and explained that this was a known problem; however, the technician told Plaintiff Morgan that, to his knowledge, there was no way to prevent or fix the infotainment system defect.  The technician stated that he believed the infotainment defect was correlated to a defect in the infotainment system's interaction with Apple iPhones while using Apple CarPlay.  Plaintiff Morgan was advised to cease utilizing these features, which include GPS and handsfree calling.

268.   On or about March 25, 2019, Plaintiff Morgan contacted American Honda Motor Co., Inc. and informed them of the defect with her infotainment system.  Plaintiff Morgan was informed that a "case" was opened and that she would be contacted regarding a resolution.  To date, Plaintiff Morgan has not received any notification from

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 259 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 79 of 229 Page ID #:306
868

Honda about any potential repair or aftermarket modification that would cure the defects she has experienced.

269. Plaintiff Morgan has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of her vehicle.

270. Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Morgan of the existence of the infotainment system's defect prior to purchase.

### 19.  Washington—Julie Pereira

271. Plaintiff Julie Pereira resides in Lynnwood, Washington.

272. Plaintiff Pereira purchased a new 2019 Honda Odyssey Elite on August 9, 2018, from Honda of Kirkland, an authorized Honda dealership in Kirkland, Washington.  Plaintiff Pereira was interested in purchasing an Odyssey with the infotainment system and conducted most of her research from her home in Lynnwood, Washington.  Plaintiff Pereira was exposed to Honda's  omissions in that state and made her purchase decision there.

273. Plaintiff Pereira purchased and still owns this Odyssey.  Unknown to Plaintiff Pereira at the time of purchase, the Odyssey suffered from a defective infotainment system, which has caused her out-of-pocket loss, attempted repairs, and diminished value of the Odyssey.  Plaintiff was also deprived of the benefit of the bargain.  Honda knew about this defect at the time of Plaintiff Pereira's purchase but did not disclose it to Plaintiff Pereira.  Thus, Plaintiff Pereira purchased her Odyssey on the reasonable but mistaken belief that it would be safe and reliable on public roadways.

274. Plaintiff Pereira selected and ultimately purchased her vehicle, in part, because of the features of the infotainment system, as represented through advertisements and representations made by Honda.  Specifically, Plaintiff Pereira

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 260 of 453 PageID:
869
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 80 of 229   Page ID #307

1    sought an Odyssey with all of the available features offered by Honda, including the

2    infotainment system, and chose to pay extra for the "Elite" option.  None of the

3    advertisements reviewed or representations received by Plaintiff Pereira contained any

4    disclosure relating to any defects in the infotainment system.  Had Honda disclosed that

5    the infotainment system in her vehicle suffered from numerous defects which would

6    prevent the full use of her vehicle and pose safety risks, she would not have purchased

7    her vehicle with the infotainment system, or would have paid less for the vehicle.

8        275.   Plaintiff Pereira consulted a wide variety of sources before buying her

9    Odyssey, and began doing research related to the purchase in early 2018.  In March

10   2018, for instance, Plaintiff Pereira visited Honda of Kirkland, where a dealership

11   employee reviewed the features of the 2018 Odyssey and, among other things, gave

12   Plaintiff Pereira a Honda-produced booklet on the newly re-designed 2018 model.

13   During this time, Plaintiff Pereira also reviewed Honda's website and Facebook page,

14   and was drawn by Honda's marketing of the redesigned infotainment system—

15   including the CabinWatch and CabinTalk features, as well as the fact that Apple CarPlay

16   was new in the 2018 model.

17       276.   On July 7, 2018, Plaintiff Pereira visited a separate Honda dealership in

18   Burlington, Washington, where she and her husband discussed the 2018 Odyssey with

19   a salesperson and inspected two 2018 Odysseys that were present on site (among other

20   things, Plaintiff Pereira looked at the Monroney labels on these vehicles).  Later in July

21   2018, Plaintiff Pereira returned to Honda of Kirkland once more, and as part of that visit

22   discussed the differences between the 2018 and 2019 Odysseys with a salesman, as well

23   as financing.  On August 3, 2018, Plaintiff Pereira returned to the dealership a third time

24   to purchase the vehicle. 276.    Plaintiff  Pereira's  problems  with  her  vehicle's

25   infotainment system started almost immediately after purchasing her vehicle in August

26   2018, when her phone began having issues connecting to wireless internet through the

27   infotainment system's Apple CarPlay feature.  The other problems she has experienced

28

SECOND AMENDED COMPLAINT              - 72 -
010811-11/1205802 V1

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 261 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS Document 90 Filed 11/04/19 Page 81 of 221 Page ID #:868
870

include, but are not limited to, frequent failure of the CarPlay system's map, text messaging, and calling features; failure of the Bluetooth calling feature; failure of the rear DVD player; and freezing and lockup of the infotainment system as a whole (including all associated controls and functions). Since the date of purchase, the problems Plaintiff Pereira has experienced with her infotainment system are so frequent and pervasive that she is not able to determine the precise dates she has experienced such problems.

277. On August 25, 2018, less than three weeks after purchase, Plaintiff Pereira bought her vehicle to Honda of Kirkland to have the infotainment system inspected because of problems connecting her phone to the Apple CarPlay system. During the visit, dealership employees were unable to reproduce the problem.

278. Plaintiff Pereira returned to Honda of Kirkland on September 11, 2018, after her problems with the CarPlay system continued. Although dealership employees were once again unable to reproduce the problem, they performed a system reset on the infotainment system. In a text message exchange on September 12, a Honda technician suggested that Plaintiff Pereira's problems were attributable to her phone, and recommended she buy a new one. Although Plaintiff Pereira did so, her problems continued.

279. Plaintiff Pereira returned to Honda of Kirkland a third time on September 29, 2018. Initially, dealership employees were again unable to reproduce the problems on site. However, a technician was finally able to do so after Plaintiff Pereira insisted that he drive the vehicle off site. In an attempt to fix the problem, the dealership once again performed a system reset of Plaintiff Pereira's infotainment system.

280. Plaintiff Pereira's problems continued unabated. Plaintiff Pereira became so frustrated by their persistence that she largely stopped using the Apple CarPlay feature.

Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 262 of 453 PageID:
871
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 82 of 223   Page ID #:509

281.   On April 21, 2019, while Plaintiff Pereira was returning home with her family from a trip to Bremerton, Washington, the infotainment system froze, including all associated controls.  At the time the system froze, the air conditioning was on, and Plaintiff Pereira was unable to adjust it or disable it afterwards.

282.   When Plaintiff Pereira and her husband turned their vehicle off in an attempt to fix the problem, the infotainment system's screen remained frozen and inoperable.  The system remained frozen until Plaintiff Pereira returned to the Seattle area.

283.   After this incident, Plaintiff Pereira returned to Honda of Kirkland on April 30, 2019.  Once again, dealership employees were unable to reproduce the problem on site.  However, during the same visit, Plaintiff Pereira was told that hers was a known issue to Honda for which it is developing a fix, but that the release date for that fix is unknown.

284.   On May 8, 2019, the rear DVD player in Plaintiff Pereira's vehicle stopped functioning for two days; since resuming function, the DVD player has, to date, only worked intermittently.

285.   On May 20, 2019, Plaintiff Pereira returned to Honda of Kirkland to have the rear entertainment system and infotainment system inspected.  During this visit, Plaintiff Pereira showed dealership employees videos of the malfunction.  However, they were unable to duplicate the problem, and once again performed a factory reset of the infotainment system.

286.   Most recently, on October 12, 2019, Plaintiff Pereira returned to Honda of Kirkland to have the infotainment system inspected.  Dealership employees once again told her that none of the issues she has experienced could be reproduced by the dealership—despite Plaintiff Pereira showing them videos she had previously taken of the system malfunctioning.

Case 2:20-cv-02947-RMB-KMW    Document 17    Filed 10/23/20    Page 263 of 452 PageID:
Case 2:19-cv-02160-CNC-CJS    Document 50    Filed 11/04/19    Page 83 of 223    Page ID #:590
872

1        287.  Plaintiff Pereira has documented some of these failures in the following

2   photographs:



Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 264 of 453 PageID:
873
Case 2:19-cv-02160-CNC-CJS   Document 50   Filed 11/04/19   Page 84 of 223   Page ID #:591

288.   Each time Plaintiff Pereira brings her vehicle in for these unsuccessful services, it places significant demands on her time, energy, and money: Plaintiff Pereira must find a babysitter for her six children, move her car seats into a rental, and drive to and from the dealership (a lengthy drive, particularly when there is traffic).

289.   To date, Plaintiff Pereira has not received any notification from Honda about any potential repair or aftermarket modification that would cure the defects she has experienced.

290.   Plaintiff Pereira has suffered an ascertainable loss as a result of Honda's omissions associated with the infotainment system, including but not limited to, out-of-pocket loss associated with the infotainment system defect alleged herein and attempted repairs, and diminished value of her vehicle.



Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 265 of 453 PageID 2
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 89 of 223 Page ID #392
874

291.   Neither Honda nor any of its agents, dealers, or other representatives informed Plaintiff Pereira of the existence of the infotainment system's defect prior to purchase.

**B.    Defendant**

292.   Defendant American Honda Motor Co., Inc. is a California corporation with its headquarters in Torrance, Los Angeles County, California.

293.   In this Complaint, when reference is made to any act, deed or conduct of Defendant or Honda, the allegation means that Defendant engaged in the act, deed or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant.

294.   Honda sells cars in part via communications that it authorized its dealers to make about Honda vehicles, including the Defective Vehicles discussed herein.  This includes authorizing Honda dealers to distribute brochures and other marketing and promotional material.   Honda, through its authorized dealers, has and had the opportunity to disclose all material facts relating to the Defective Vehicles.

295.   Authorized Honda dealers are Honda's agents, such that an opportunity to receive information from an authorized Honda dealership is an opportunity to receive information directly from Honda itself.  *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015).  This agency relationship is established by the fact that, among other things: Honda's logo is displayed at authorized dealerships; Honda issues technical bulletins and service instructions to dealerships detailing potential vehicle problems, and also relies on them to push software updates to customers' vehicles; Honda distributes various adverting and promotional material to its dealerships, including brochures, booklets, and pamphlets; and under the terms of its express

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 266 of 453 PageID3
Case 2:19-cv-02160-CNC-CJS Document 90-17 Filed 11/04/19 Page 86 of 229 Page ID #303
875

1  warranty, Honda requires its customers to return to its authorized dealerships to perform

2  warranty repairs.[8]

3      296.   Furthermore, Honda's relationship with its dealerships is governed by a

4  dealership agreement[9] that imposes a number of reciprocal obligations on both parties.

5  Among other things, it requires:

- that Honda offer to dealers "general and specialized product information and
6
  . . . provide field sales personnel to advise and counsel Dealer's sales
7
  organization on sales-related subjects such as merchandising, training, and
8
  sales management," (Dealership Agreement § 1.2.A), as well as "general and
9
  specialized service and parts training courses" (*id.* § 1.2.B);
10

- that Honda make available to dealers: (1) "sample copies of building layout
11
  plans or facility planning recommendations, including sales, service and parts
12
  space and the placement, installation and maintenance of recommended
13
  signs[;]" as well as, "from time to time," (2) "representatives . . . to counsel
14
  and advise Dealer and its personnel in connection with Dealer's planning and
15
  equipping the Dealership Premises" (*id.* § 1.3);
16

- that Honda make available "such sales, service and parts manuals, brochures,
17
  special service tools and equipment and other data for Honda Products as
18
  American Honda deems necessary for Dealership Operations" (*id.* § 1.4);
19

- that Honda "agree to maintain a nationwide system of authorized dealerships
20
  of Honda Products" and that, "[i]n order that those authorized dealers may be
21
  assured of the benefits of comprehensive advertising of Honda Products,"
22

23
      [8] *See* New Vehicle Limited Warranties, *supra* note 4.  For example, page 12 of
24  both the 2018 and 2019 warranties states, in relevant part: "[u]nder normal
    circumstances, Honda will pay for warranty repairs only when they are performed at
25  an authorized Honda repair facility."

26      [9] A copy of Honda's Automobile Dealer Sales and Service Agreement (Dealership
    Agreement), filed with the U.S. Securities and Exchange Commission, is attached as
27  Exhibit A hereto.  A true and correct copy is also available at
    https://www.sec.gov/Archives/edgar/data/1019849/000095012402000556/k66280ex1
28  0-2_3.txt.

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 267 of 453 PageID4
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 879 of 223 Page ID #394
876

Honda agree to "establish and maintain general advertising programs in such manner and amount as it may deem appropriate and will make sales promotion and campaign materials available" to dealers (*id.* § 1.5);

- that dealers "promote and sell, at retail, Honda Products, and . . . promote and render service, whether or not under warranty, for those products within the Dealer's Primary Market Area" (*id.* § 3.1);

- that dealers "agree[] to establish and maintain an adequate and trained sales and customer relations organization," and "agree[] to establish and maintain a complete service and parts organization, including a qualified service manager and a qualified parts manager and a number of competent service and parts personnel adequate to care for the service obligations to be performed by Dealer under the Agreement" (*id.* § 3.3);

- that dealers "agree[] to acknowledge, investigate and resolve satisfactorily all complaints received from owners of Honda Products in a businesslike manner in order to secure and maintain the goodwill of the public, and to "promptly report[]" to Honda "[a]ny complaint received by Dealer which . . . cannot be readily remedied" (*id.* § 3.4);

- that dealers "will follow all reasonable directives, suggestions and policies of American Honda," and that "[a]ll written directives, suggestions and policies of American Honda contained in any of its bulletins or manuals, which are in effect as of the date of the Agreement or are issued thereafter, will be deemed a part of the Agreement" (*id.* § 3.9);

- that dealers "perform any and all warranty, recall, product improvement or product update service in compliance with instructions and directives issued by American Honda, regardless of where the Honda Product involved was purchased," and that "to protect and maintain the goodwill and reputation of Honda Products and the Honda Trademarks," dealers "agree[] that [they] will

- 79 -

not charge any customer for warranty service or any work done in connection with such warranty, recall, product improvement or update or any other service as to which Dealer is reimbursed by American Honda" (*id.* § 3.12);

- that dealers "understand[] and agree[] that the only warranties that will be applicable to Honda Products will be such written warranty or warranties as may be furnished by American Honda." The same provision states: "Except for its express liability under such written warranties, American Honda neither assumes nor authorizes any other person or party to assume for it any other obligation or liability in connection with any Honda Product or component thereof" (*id.* § 4.1);

- that dealers "agree[] that [they] will expressly incorporate any warranty furnished by American Honda with a Honda Automobile as a part of each order form or other contract for the sale of such Honda Automobile by Dealer to any buyer," "agree that [they] will deliver to the buyer of all Honda Products, at the time of delivery of such Honda Products, copies of such applicable warranties as may be furnished by American Honda," and "agree[] to abide by and implement in all other respects American Honda's warranty procedures in effect at the time of Dealer's sale" (*id.* § 4.2);

- that dealers "agree[] to develop and actively utilize programs for the advertisement and promotion of Honda Products and its servicing of such products." The provision further states: "Such programs will include the prominent display and use or demonstration of Honda Automobiles. Dealer further agrees to cooperate with all reasonable promotional programs developed by American Honda" (*id.* § 5.1);

- that dealers "agree[] that [they] will not advertise, promote or trade in Honda Products or the servicing thereof in such a manner as to injure or be detrimental to the goodwill and reputation of American Honda and the Honda

SECOND AMENDED COMPLAINT     - 80 -
010811-11/1205802 V1

Case 2:20-cv-02047-RMB-KMW   Document 17   Filed 10/23/20   Page 269 of 452 PageID:
878
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 89 of 223   Page ID #396

Trademarks." The provision further states: "Dealer further agrees that it will not publish or otherwise disseminate any advertisement or announcement or use any form or media of advertising which is objectionable to American Honda. Dealer agrees to discontinue immediately any advertisement or form of advertising deemed objectionable upon request of American Honda" (*id.* § 5.2);

- that dealers, "[s]ubject to applicable federal, state or local ordinances, regulations and statutes, . . . agree[] to erect and maintain, at the Dealership Location, at Dealer's expense, authorized product and service signs of types required by American Honda, as well as such other authorized signs as are necessary to advertise the Dealership Operations effectively and as are required by American Honda" (*id.* § 5.3);

- that dealers "agree[] that American Honda has the exclusive right to and to control the use of the Honda Trademarks and but for the right and license granted by Paragraph 6.2 hereof to use and display the Honda Trademarks, Dealer would have no right to use the same" (*id.* § 6.1);

- that dealers are "granted the nonexclusive right and license to use and display the Honda Trademarks at the Dealership Premises." The provision further states: "Such use or display is limited to that which is necessary in connection with the sale, offering for sale and servicing of Honda Products at retail at the Dealership Location. Dealer agrees that it will promptly discontinue the use of any of the Honda Trademarks or change the manner in which any of the Honda Trademarks is used when requested to do so by American Honda" (*id.* § 6.2);

- that dealers "agree[] to keep complete and current records regarding the sale and servicing of Honda Products and to prepare for American Honda such reports, based on those records, as American Honda may reasonably request."

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 270 of 453 PageID 7
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 50 of 229 Page ID #397
879

The provision further states: "In order that policies and procedures relating to the applications for reimbursement for warranty and other applicable work and for other credits or reimbursements may be applied uniformly to all authorized dealers, Dealer agrees to prepare, keep current and retain records in support of requests for reimbursement or credit in accordance with policies and procedures designated by American Honda" (*id.* § 7.3);

- that dealers "agree[] to permit, during reasonable business hours, American Honda, or its designee, to examine, audit, reproduce and take copies of all reports, accounts and records pertaining to the sale, servicing and inventorying of Honda Products, including, but not limited to, records in support of claims for reimbursement or credit from American Honda, and with the prior approval of Dealer, which approval will not be unreasonably withheld, to interview Dealer employees with respect thereto" (*id.* § 7.4);

- that the Dealership Agreement is terminated where a dealer fails "to provide adequate representation, promotion, sales or service, including warranty work" (*id.* § 9.4.N); and that, "not later than the effective date of the termination or expiration of the Agreement," dealers "will, at [their] sole expense, discontinue any and all uses of any Honda Trademarks and any words, symbols and marks which are confusingly similar thereto; will remove all signs bearing any Honda Trademark and will destroy all stationery, repair orders, advertising and solicitation materials, and all other printed matter bearing any Honda Trademark or referring directly or indirectly to American Honda or Honda Products in any way which might make it appear to members of the public that Dealer is still an authorized dealer," including, but not limited to, "discontinuing the use of a Honda Trademark as part of Dealer's business and corporate name." The provision continues: "Dealer will also deliver to American Honda, at American Honda's place of business, or to a

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 271 of 453 PageID:
Case 2:19-cv-02160-CMC-CJS Document 50 Filed 11/04/19 Page 51 of 271 Page ID #:398
880

person designated by American Honda, or will destroy the same upon request by American Honda, any and all technical or service literature, advertising and other printed material then in Dealer's possession which relates to Honda Products and which was acquired or obtained by Dealer from American Honda. Dealer will destroy any sign bearing a Honda Trademark which has not been repurchased by American Honda." (*id.* § 10.3).

## IV. FACTUAL ALLEGATIONS

### A. The Honda Infotainment System

297. Honda first introduced the infotainment system found in the Class Vehicles in the 2018 Odyssey, and later to the 2019 Pilot and 2019 Passport. It replaced Honda's proprietary "HondaLink" infotainment system, and its operating system is based on a modified Android operating system developed by Honda.

298. The Vehicles' infotainment system consists of either two or three LCD screens: (1) a primary touch screen located in the center console; (2) a screen located above the steering wheel that functions as a digital speedometer/odometer, and that displays other information as well (e.g., remaining fuel, current song, turn-by-turn directions); and (3) in certain upgraded Odyssey and Pilot models[10], a screen—marketed as the "Rear Entertainment System" (or "RES")—that folds down from the top of the vehicle's cabin and can be used by back seat passengers via a Honda-provided remote control to watch DVDs and interact with various applications.

299. The following photograph depicts the first two screens (which each and every Defective Vehicle has) described above as they appear to a driver:

---

[10] Specifically, for both 2018-2019 Odysseys and 2019 Pilots, the RES is available as an upgrade for the "EX-L" trim, and comes with both the "Touring" and "Elite" trims. The RES is not available as an upgrade for both the "LX" and "EX" trims. The RES is not an available feature in the 2019 Passport.

Case 2:20-cv-02047-RMB-KMW    Document 17    Filed 10/23/20    Page 272 of 453 PageID9
Case 2:19-cv-02160-CNC-CJS    Document 90    Filed 11/04/19    Page 52 of 223    Page ID #599
881



300.   The centerpiece of the Vehicles' infotainment system is an 8-inch touchscreen located in the center stack, depicted in the photograph below:



301.   As can be seen above, the touchscreen interface is akin to a horizontally-oriented tablet. It is organized around a customizable tile-based user interface with tap, swipe, pinch, and zoom functionality, and controls all access to the vehicle's audio, safety (including the CabinWatch rear seat monitor), navigation, communications, entertainment, and climate control features.

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 273 of 453   PageID:
882
Case 2:19-cv-02160-CMC-CJS   Document 50   Filed 11/04/19   Page 59 of 223   Page ID #:800

302.   The second LCD interface is located directly in front of the driver, as depicted in the photograph below:



303.   This interface mimics a traditional instrument panel, and displays additional information as well, including turn-by-turn directions, current song, and the numbers recently dialed by a Bluetooth-paired phone.  It is not a touchscreen; rather, it is operated by buttons on the steering wheel, which can be used to perform some of the same functions that can be performed on the center stack interface, albeit on a more limited basis (e.g., to switch between Honda's user interface and Apple CarPlay/Android Auto, change audio, or toggle between different in-car applications).

304.   The third LCD interface—an optional rear entertainment system—is a 10.2 inch high-resolution screen mounted to the top of the vehicle cabin, between the front driver and passenger seats, as depicted below:

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 274 of 453 PageID:
883
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 54 of 273 Page ID #801



305.   This interface functions as a DVD/Blu-ray media player, and can also be used with a number of built-in entertainment apps.  It is not a touchscreen; rather, it is operated via a Honda-provided remote control.

## B.   Defendant's Failure to Fix or Disclose the Defect

306.   Defendant engineered, manufactured, tested, warranted, advertised, distributed, sold, and leased the 2018-2019 Odyssey, 2019 Pilot, and 2019 Passport vehicles equipped with defective infotainment systems.

307.   It is standard practice for automobile manufacturers to engage in extensive pre-launch testing of its vehicles.  Honda did so for the Defective Vehicles and tested the operation of the infotainment systems prior to selling the Defective Vehicles.  Given the immediacy and frequency of consumer complaints about the infotainment system contained in the Defective Vehicles, it is clear that Honda knew about the defects before the Defective Vehicles were sold.

308.   Because the Vehicles' infotainment systems are responsible for a wide variety of vehicle functions (including navigation, audio, video, handsfree phone, backup cameras, etc.), the defect causes a wide range of problems for the Vehicles.  For

Case 2:20-cv-02947-RMB-KMW   Document 17   Filed 10/23/20   Page 275 of 452 PageID:
884
Case 2:19-cv-02180-CNC-CJS   Document 50   Filed 11/04/19   Page 89 of 273   Page ID: 802

instance, the defect can cause the entire center console to go black or blue while the vehicle is in motion, thereby posing a substantial distraction to the driver.

309.    These serious defects have plagued the Vehicles' infotainment systems since the system's launch.  For example, the database maintained by the National Highway Transportation Safety Administration contains numerous customer complaints about the Vehicles' infotainment systems, some of which are set forth below include:

**Date Complaint Filed:** December 19, 2017
**Date of Incident:** October 14, 2017
**NHTSA ID Number:** 11055584
**Vehicle Identification Number:** 5FNRL6H8XJB****
**Vehicle Type:** 2018 Odyssey

FAILURE OF THE REAR ENTERTAINMENT SYSTEM: THE REAR CAMERA AND ENTERTAINMENT SYSTEM WILL LOST "NETWORK CONNECTIVITY" AND STOP FUNCTIONING…. FAILURE OF THE INFOTAINMENT SYSTEM: THE INFOTAINMENT SYSTEM WILL TURN OFF AND GO INTO A SERIES OF FAILURES, ULTIMATELY TURNING OFF COMPLETELY AND NOT FUNCTIONING. THE INFOTAINMENT SYSTEM WILL ALSO EXPERIENCE POWER ERRORS RESULTING IN ERRORS WITH THE ANTI THEFT SYSTEM. IN ADDITION, THE RADIO/SPEAKERS PERIODICALLY STOP WORKING.

**Date Complaint Filed:** February 13, 2018
**Date of Incident:** August 23, 2017
**NHTSA ID Number:** 11072728
**Vehicle Identification Number:** 5FNRL6H78JB****
**Vehicle Type:** 2018 Odyssey

THE CENTER CONSOLE, WHICH IS THE MONITOR THAT UTILIZES GPS NAVIGATION, REAR VIEW CAMERA DISPLAY, CONTROLS HEAT/AC, VOLUME CONTROL, ETC. HAS CONTINUED TO FAIL SINCE DATE OF PURCHASE (7/15/17). THE MONITOR SHUTS DOWN AT RANDOM TIMES, FOR UNIDENTIFIED REASONS, LEAVING THE DRIVER, DISTRACTED AND ATTEMPTING TO RESOLVE. THE SHUT DOWN CAN OCCUR WHILE IN THE VAN IS MOVING OR STATIONARY. NAVIGATION SHUTS DOWN WHILE THE DRIVER IS IN ROUTE TO A LOCATION CAUSING SIGNIFICANT

Case 2:20-cv-02947-RMB-KMW    Document 17    Filed 10/23/20    Page 276 of 453 PageID 3
Case 2:19-cv-02160-CNC-CJS    Document 50    Filed 11/04/19    Page 56 of 229    Page ID #803
885

DISTRACTION.... Honda WAS MADE AWARE OF THIS PROBLEM IN AUGUST 2017. WE BROUGHT OUR VAN IN TO THE SHOP TWICE AND NO RESOLUTION WAS FOUND. WE FILED A COMPLAINT WITH Honda AMERICA (VOICE MAILS ARE RETAINED AS RECORD). AFTER SEVERAL MONTHS OF NO RESOLUTION, Honda AMERICAN TOLD US OUR CASE WAS BEING CLOSED BECAUSE THE COMPANY CONTINUED TO HAVE NO RESOLUTION. 7 MONTHS AFTER PURCHASE THE CENTER CONSOLE/MONITOR CONTINUES TO RANDOMLY FAIL. SOMETIMES THE MONITOR GOES BLACK, SOME FEATURES WORK WHILE OTHERS STOP (FOR EXAMPLE THE RADIO MAY WORK WHILE THE SCREEN IS BLACK). SOMETIMES THE MONITOR GOES BLUE AND EVERYTHING SHUTS DOWN. PHOTOS AND VIDEOS OF THESE OCCURRENCES WERE SUBMITTED TO Honda VIA EMAIL. THE PROMOTED FEATURES BY Honda AMERICA LEAD THE BUYER TO BELIEVE THERE IS ADDED SAFETY IN THIS VAN. THE OPPOSITE HAS TURNED OUT TO BE TRUE. THESE FAILURES CAUSE SERIOUS SAFETY CONCERNS FOR THE DRIVER AND THE YOUNG FAMILIES UTILIZING THE VAN.

**Date Complaint Filed:** September 5, 2018
**Date of Incident:** September 2, 2018
**NHTSA ID Number:** 11124525
**Vehicle Identification Number:** 5FNRL6H89JB****
**Vehicle Type:** 2018 Odyssey

TOURING-REAR ENTERTAINMENT SYSTEM SHUTS OFF TO BLACK SCREEN AND CABINWATCH LOSES SIGNAL AND GIVES AN ERROR CODE. WHILE DRIVING LONG DISTANCES, THE KIDS CAN ONLY WATCH THE FIRST 30 MINUTES OF THEIR DVD BEFORE THE SYSTEM SEEMS TO OVERHEAT AND COMPLETELY SHUTDOWN. WE HAVE RESORTED TO TURNING IT OFF TO LET IT COOL DOWN (DVD THAT IS REMOVED FROM THE PLAYER COMES OUT SCALDING HOT) BEFORE RETRYING TO LET THEM WATCH AND HAVE IT FAIL A FEW MINUTES LATER. CABINWATCH SEEMS TO ACT UP AT THE SAME TIME THE REAR ENTERTAINMENT SYSTEM FAILS.

**Date Complaint Filed:** October 29, 2018
**Date of Incident:** October 23, 2018
**NHTSA ID Number:** 11143895

**Vehicle Identification Number:** n/a
**Vehicle Type:** 2018 Odyssey

ENTIRE DASH TURNED OFF WHILE DRIVING INCLUDING SPEEDOMETER AND INFORMATION SCREEN-REPLACED RADIOHEAD…. IT'S A BAD REAR ENTERTAINMENT SYSTEM. I BOUGHT MY CAR 1 YEAR AGO AND IT'S OBVIOUSLY FLAWED.

**Date Complaint Filed:** December 25, 2018
**Date of Incident:** October 22, 2018
**NHTSA ID Number:** 11163391
**Vehicle Identification Number:** 5FNRL6H76JB****
**Vehicle Type:** 2018 Odyssey

CRAKLING SOUND ON DASH FROM SIDE TO SIDE, NOISY AND STRONGER BY THE WEEKS. TOOK CA TO THE DEALER WITH 12K MILES; THREE ATTEMPTS WERE MADE. Honda SERVICE REPLACED THE AUDIO SYSTEM, NEXT ATTEMPTS THEY SAID IT WAS MY IPHONE CABLE. NOW, WITH 14K MILES, CAN'T USE RADIO, BLUETOOTH, CARPLAY AND THE ENT SYSTEM FREEZES. ANY CALL I MAKE OR RECEIVE, THE CRACKLIN STARTS AND CALL FREEZES UNTIL GETS DISCONNECTED. DOES NOT MATTER IF THE CAR IS PARKED OR ON THE ROAD. HAVE MORE THAN 10 VIDEOS SHOWING THE PROBLEM. WILL GO NOW TO THE 4TH ATTEMPT TO SEE IF IT CAN BE FIXED.

**Date Complaint Filed:** January 5, 2019
**Date of Incident:** November 15, 2018
**NHTSA ID Number:** 11165340
**Vehicle Identification Number:** n/a
**Vehicle Type:** 2019 Pilot

WHILE DRIVING, BOTH HIGHWAY AND AROUND TOWN, LOUD CRACKLING WOULD OCCUR THROUGH THE SPEAKERS. THEN BOTH THE NAVIGATION SCREEN AND/OR THE SPEEDOMETER SCREEN WOULD GO COMPLETELY BLACK. THE MESSAGE "NETWORK CONNECTION LOST" WOULD SOMETIMES APPEAR. ALL BLUETOOTH CONNECTIVITY AND SPEAKER USAGE WAS LOST. THIS OCCURS ALMOST EVERY DAY WHILE COMMUTING. CAR HAS BEEN BROUGHT TO Honda SERVICE TWICE FOR REPAIRS.

Case 2:20-cv-02947-RMB-KMW Document 17 Filed 10/23/20 Page 278 of 453 PageID5
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 99 of 278 Page ID #805
887

**Date Complaint Filed:** March 20, 2019
**Date of Incident:** March 16, 2019
**NHTSA ID Number:** 11190215
**Vehicle Identification Number:** 5FNYF6H09KB****
**Vehicle Type:** 2019 Pilot

RECURRENT PROBLEM. STARTED WHEN VEHICLE WAS 2 MONTHS OLD. TAKEN CAR TO DEALER SERVICE DEPARTMENT. NO SOLUTION.

WHEN IN MOTION (HIGHWAYS, CITY ROADS) SPEAKERS MAKE A SPARKLING SOUND FOLLOWED BY THE ENTERTAINMENT SCREEN (NAVIGATION, HANDHELD PHONE, REAR VISION...) AND THE ODOMETER SCREEN (SPEED DISPLAY, ALL THE SIGNALS) BECAME DEAD. IT COULD LAST FEW SECONDS AND REBOOT BACK OR UP TO 30 MINUTES. IN A 15 MILE JOURNEY, COULD HAPPEN AROUND 15 TIMES. SO THE DANGEROUS SITUATION IS THAT I AM DRIVING WITH NO IDEA HOW MUCH SPEED I AM GOING, I AM NOT ABLE TO USE MY HANDHELD PHONE (ALSO VERY IMPORTANT TO ME AS A BUSY DOCTOR TRYING TO ANSWER EMERGENCY CALLS), NO NAVIGATION SYSTEM AVAILABLE, THE REAR VISION CAMERA BECOMES USELESS WITH A BLANK SCREEN...

I LEARNT FROM THE INTERNET THAT THIS IS AN ONGOING PROBLEM AND NO SOLUTION HAVE BEEN FOUND.

PROBLEM HAPPENS IN MOTION AND ALSO OR WHEN CAR IS PARKED.

**Date Complaint Filed:** April 7, 2019
**Date of Incident:** March 31, 2019
**NHTSA ID Number:** 11194482
**Vehicle Identification Number:** 5FNYF5H60KB****
**Vehicle Type:** 2019 Pilot

WHEN DRIVING THE CAR, THE INSTRUMENT PANEL (INCLUDING THE SPEEDOMETER) WILL SHUT OFF FOR APPROXIMATELY 2 MINUTES, AND THE REBOOT. THIS RESULT IN THE INABILITY TO TELL EXACTLY HOW FAST THE VEHICLE IS MOVING. THIS WILL

Case 2:20-cv-02047-RMB-KMW Document 17 Filed 10/23/20 Page 279 of 453 PageID:
Case 2:19-cv-02160-CNC-CJS Document 50 Filed 11/04/19 Page 93 of 229 Page ID #806
888

OCCUR UNDER MULTIPLE CONDITIONS WHILE THE CAR IS IN DRIVE, AND IS NOT DEPENDENT ON THE TYPE OF ROAD BEING DRIVEN ON. ADDITIONALLY, THE CENTER CONSOLE INFOTAINMENT SCREEN, WHICH ALSO SERVES AS THE SCREEN FOR THE BACK UP CAMERA WILL SHUT OFF, FOR VARYING AMOUNTS OF TIME, RENDERING THE ABILITY TO SEE/USE THE BACK UP CAMERA USELESS. I HAVE ENCOUNTERED, ON NUMEROUS OCCASIONS, BOTH SYSTEMS SHUTTING OFF AT THE SAME TIME, WHILE THE CAR IS IN DRIVE OR REVERSE, LEAVING ME WITH THE UNABLE TO SAFELY GAUGE HOW I AM OPERATING THE VEHICLE.

**Date Complaint Filed:** April 3, 2019
**Date of Incident:** April 3, 2019
**NHTSA ID Number:** 11193522
**Vehicle Identification Number:** 5FNRL6H73JB****
**Vehicle Type:** 2018 Odyssey

I SHOULD HAVE NEVER GONE BACK TO Honda! MY 2018 Honda ODYSSEY HAS BEEN ANOTHER LEMON! BOUGHT THE CAR AS A CPO ON DECEMBER 21, 2018 WITH JUST OVER 3,000 MILES. SINCE THEN THE CAR HAS BEEN IN THE SHOP 4 TIMES TO FIX THIS INFOTAINMENT SYSTEM. I HAD THE ENTIRE DASHBOARD BLACK OUT ON ME AND COULDN'T SEE MY SPEED, YET THE Honda DEALERSHIP NEAR ME TOLD ME JUST DRIVE IT TO WORK, IT'LL BE OKAY. THEN THE INFOTAINMENT WENT OUT AND NOTHING WORKED FOR WEEKS UNTIL ANOTHER DEALERSHIP WAS NICE ENOUGH TO REPLACE IT. JUST YESTERDAY MY INFOTAINMENT SYSTEM MAKES A VERY LOUD 'BEEP' AND SHUTS DOWN WHILE I'M DRIVING ON A BUSY HIGHWAY! THEN THE DASHBOARD BLACKS OUT AND THE CAR SAFETY FEATURES CAUSE IT TO BREAK! WHEN I SPOKE TO THE DEALERSHIP I AM TOLD WE WILL HAVE TO RECREATE THAT PROBLEM BEFORE ANYTHING IT DONE ARE YOU SERIOUS?! I TAKE MY KIDS AROUND IN THIS MINI VAN. I PUSHED TO GO BACK TO Honda BECAUSE THEY HAVE GOTTEN SO MUCH BETTER, BUT IT TURNS OUT THEY HAVEN'T.

**Date Complaint Filed:** April 30, 2019
**Date of Incident:** April 16, 2019
**NHTSA ID Number:** 11204651

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 91 -

**Vehicle Identification Number:** 5FNYF6H67KB****
**Vehicle Type:** 2019 Pilot

8 DAYS AFTER PURCHASE AND LESS THAN 200 MILES, THE REAR ENTERTAINMENT SCREEN STOPPED WORKING. THE DEALER KEPT THE VEHICLE FOR 7 DAYS AND REPLACED THE RES SCREEN. WHEN THE VEHICLE WAS RETURNED TO US, THE RES SCREEN IMMEDIATELY FAILED TO TURN ON. THIS IS A KNOWN ISSUE RELATED TO THE INFOTAINMENT SYSTEM AND THERE IS AN OPEN CLASS ACTION LAWSUIT. Honda IS AWARE OF THE ISSUE AND HAS NO FIX, YET THEY ARE STILL SELLING CLASS VEHICLES.

**Date Complaint Filed:** April 19, 2019
**Date of Incident:** April 19, 2019
**NHTSA ID Number:** 11202559
**Vehicle Identification Number:** 5FNRL6H9XKB****
**Vehicle Type:** 2019 Odyssey

THERE IS AN ISSUE WITH THE INFOTAINMENT SYSTEM. REAR BACK UP CAMERA DOES NOT WORK. RADIO DOES NOT WORK AND CARPLAY DOES NOT WORK.

**Date Complaint Filed:** May 1, 2019
**Date of Incident:** February 11, 2019
**NHTSA ID Number:** 11205095
**Vehicle Identification Number:** 5FNYF5H41KB****
**Vehicle Type:** 2019 Pilot

 AT ABOUT 300 MILES ENTIRE DISPLAY DOES NOT WORK ON COLD START AND THROUGHOUT THE DAY. SCREEN FLASHES BLUE AND THEN ACTIVATES, HOWEVER DOES NOT REMAIN ON. NO REAR VIEW CAMERA, NAVIGATION, OR OTHER APPS AVAILABLE TO THE DRIVER. SCREEN FLASHES WHILE DRIVING WHICH IS A SAFETY ISSUE AND DISTRACTION. REAR VIEW CAMERA NON-OPERATION IS ALSO A SAFETY ISSUE SINCE UNABLE TO VIEW CHILDREN AS THEY CROSS BEHIND THE VEHICLE."

**Date Complaint Filed:** May 11, 2019
**Date of Incident:** March 29, 2019

**NHTSA ID Number:** 11206993
**Vehicle Identification Number:** 5FNYF6H04KB\*\*\*\*
**Vehicle Type:** 2019 Pilot

TAKATA RECALL CRACKING NOISE THROUGHOUT VEHICLE STARTED A MONTH INTO OWNING THE CAR. SLOWLY THE SYSTEM STARTED TO FAIL PHONE WOULD WORK RADIO WOULDN'T WORK SCREENS WOULD GO OFF AND ON AND FINALLY THE SCREEN WENT BLACK AND NEVER RECOVERED. THEY PUT NEW DRIVER INTERFACE INSTRUMENTAL PANEL AND IT STILL DIDN'T WORK SO Honda CHANGED THE WIRING HARNESSES INFLOWTAINMENT SYSTEM. IT NOW BACK IN THE SERVICE BC STILL NOT WORKING. VEHICLE IN MOTION. DOESN'T MATTER IF IT MOVING GOING FAST OR SLOW.

**Date Complaint Filed:** July 10, 2019
**Date of Incident:** July 9, 2019
**NHTSA ID Number:** 11230644
**Vehicle Identification Number:** 5FNYF8H09KB\*\*\*\*
**Vehicle Type:** 2019 Passport

NOTE. ALL HAS TAKEN PLACE WHILE IN MOTION EXCEPT FOR THE RESTART. STARTED WITH INTERMITTENT SPEAKER CRACKLES. YESTERDAY CRACKLES WITH RADIO ON REOCCURRING CRACKLES FOLLED BY INFOTAINMENT SCREAN NOTING RADIO SIGNAL LOSS FOLLED BY DATA COMMUNICATIONS LOSS. (PARAPHRASING) FOLLWED BY BLANK SCREEN. FOLLOWED BY BLANK INSTRUMENT SCREEN. FOR SOME SECONDS. THEN ALL SCREANS BECAME FUNCTIONAL. TODAY AS RADIO PLAYED THERE WAS A LOSS OF SOUND WITH VISUAL INDICATION RADIO OPERATION WAS CONTINUING AS A BUMP IN THE ROAD WAS NOTED. RADIO REMAINED SILENT TILL LATER AS ENGINE WAS RESTARTED. RADIO THEN SOUNDED THROUGH SPEAKERS.

**Date Complaint Filed:** July 19, 2019
**Date of Incident:** July 13, 2019
**NHTSA ID Number:** 11233479
**Vehicle Identification Number:** 5FNYF7H9XKB\*\*\*\*
**Vehicle Type:** 2019 Passport

MULTIPLE ISSUES WITH THE INFOTAINMENT SYSTEM. THE FIRST ISSUE HAPPENED AROUND 300 MILES, THE APPLE CARPLAY WOULD NOT CONNECT. HAD TO REPEATEDLY DISCONNECT AND RECONNECT APPLE XS MAX. AT TIMES THE SOUND WOULD JUST STOP WORKING. SWITCHING FROM CARPLAY, XM RADIO, AND FM WOULD FIX THE ISSUE.

THE INFOTAINMENT COMPLETELY SHUT DOWN ON JULY 13TH. I TRIED TO "FIX" BY TURNING THE PASSPORT OFF AND ON, GETTING OUT OF THE PASSPORT AND LOCKING THE DOORS, GETTING BACK IN AND STARTING IT. I TRIED THIS ABOUT 10 TIMES AND NOTHING WORKED. I DROVEE STRAIGHT TO THE DEALERSHIP. THEY QUICKLY DISCONNECTED THE BATTER FROM THE PASSPORT AND THIS RESOLVED THE ISSUE.

THE ISSUES HAPPENED BOTH WHILE THE PASSPORT WAS IN DRIVE AND WHILE IN MOTION.

I HAVE ALSO HAD ISSUES WITH THE DRIVER SIDE MIRROR NOT HOLDING MEMORY. THE MIRROR SOMETIMES DOES A FACTORY RESET, SO I AM FINDING MYSELF HAVING TO RESET THE MIRROR EVERY TIME I GO TO DRIVE.

**Date Complaint Filed:** July 30, 2019
**Date of Incident:** June 18, 2019
**NHTSA ID Number:** 11240582
**Vehicle Identification Number:** 5FNYF6H38KB****
**Vehicle Type:** 2019 Pilot

CENTER DISPLAY AND DASHBOARD DISPLAY GO BLANK WHILE DRIVING. IT RESTARTS AFTER SOME TIME. THE CENTER DISPLAY SOMETIMES FLICKERS, SOMETIMES IT MAKES A POPPING NOISE. YOU GET A MESSAGE NETWORK CONNECTION LOST BEFORE THE WHOLE SEQUENCE OF EVENTS START. IT IS A BRAND NEW VEHICLE AND NO ONE IS TAKING OWNERSHIP. THE SCARY THING IS YOU ARE DRIVING ON THE ROAD AND THIS HAPPENS ALL OF A SUDDEN. YOU ARE FORCED TO MOVE OVER TO THE RIGHT LANE AND I HAVE TAKEN IT TO THE DEALER MULTIPLE TIMES. AM HOPING HONDA CAN TAKE OWNERSHIP

AND FIX THE ISSUE. IN ALL INSTANCES, I WAS DRIVING ON THE HIGHWAY AT AROUND 60MPH.

**Date Complaint Filed:** August 7, 2019
**Date of Incident:** August 7, 2019
**NHTSA ID Number:** 11242203
**Vehicle Identification Number:** 5FNYF6H92KB****
**Vehicle Type:** 2019 Pilot

DRIVERS SIDE MIRROR SHAKES WHILE DRIVING. CENTER CONTROL STOPPED WORKING COMPLETELY. LOUD SOUND WILL COME OVER ON THE RADIO AND THEN ALL SYSTEMS STOP WORKING. BACK UP CAMERA DOES NOT WORK, RADIO DOES NOT WORK. VEHICLE IS TURNED OFF BUT THE CENTER CONTROL SCREEN IS FROZEN ON AND WILL NOT TURN OFF. WHEN ON THE BLUETOOTH, RECIPIENT CALLER CANNOT HEAR PERSON INITIATING THE CALL.

**Date Complaint Filed:** August 8, 2019
**Date of Incident:** May 1, 2019
**NHTSA ID Number:** 11242489
**Vehicle Identification Number:** 5FNYF5H30KB****
**Vehicle Type:** 2019 Pilot

THE RADIO IN THIS VEHICLE FREEZES, PRODUCES STATIC FEEDBACK AND ELECTRICAL FEEDBACK WHILE OPERATING THE TOUCHSCREEN. SOUND FROM THE SPEAKERS BECOMES DISTORTED AND LACKING POWER. ELECTRICAL SURGING CAN BE HEARD. THIS OCCURRED WITHIN THE FIRST 1000 MILES SINCE PURCHASED NEW.

REAR HATCH ALIGNMENT WAS ALSO NOT INSTALLED PROPERLY FROM THE FACTORY AND REQUIRED A BODY SHOP TO ATTACH IT CORRECTLY. SEAT FABRIC MATERIAL WAS ALSO DEFECTIVE AND COMING APART.

**Date Complaint Filed:** August 9, 2019
**Date of Incident:** July 31, 2019
**NHTSA ID Number:** 11242740
**Vehicle Identification Number:** 5FNYF8H09KB****
**Vehicle Type:** 2019 Passport

THE INFOTAINMENT INFORMATION DISPLAY BECOMES BLANK INTERMITTENTLY. DATA CONNECTION LOSS RADIO SIGNAL LOSS INTERMITTENTLY WHEN SCREEN IS ACTIVE. SPEED INDICATOR PANEL GOES BLANK INTERMITTENTLY. IT IS CURRENTLY UNKNOWN IF SAFETY FEATURES ARE COMPROMISED AT THIS TIME. HONDA HAS REPLACED SYSTEMS AND THE PROBLEM HAS REOCCURRED. GIVEN THESE PROBLEMS THE VEHICLE IS NOT BEING DRIVEN. THESE EVENTS ARE WHILE VEHICLE IS IN MOTION ON VERY FAT, TO SLIGHTLY BUMPY SURFACES. HARDER JARRING HAS NOT CREATED SIMILAR EVENTS. THIS ISSUE HAS BEEN REPORTED PREVIOUSLY. AND CONTINUES AFTER HONDA RECOMMENDED REPAIR.

**Date Complaint Filed:** August 11, 2019
**Date of Incident:** July 26, 2019
**NHTSA ID Number:** 11243163
**Vehicle Identification Number:** 5FNYF5H93KB****
**Vehicle Type:** 2019 Pilot

HONDA INFOTAINMENT ISSUE: PURCHASED A NEW 2019 PILOT (TOURING) WITH 22 MILES ON IT ON 22 JULY 2019. ON 26 JULY 2019 WHILE DRIVING ON I-10 FROM PHOENIX THE AUDIO QUIT AND THE SCREEN WENT BLANK. ONCE WE STOPPED AND USED REVERSE DISCOVERED THERE WAS NO BACK UP CAMERA AND THE SCREEN WOULD NOT TURN OFF WHEN THE CAR WAS TURNED OFF.TOOK TO DEALER, THEY "FIXED" IT. ON 5 AUG 2019 SAME PROBLEM REOCCURRED. TOOK TO THE DEALER AND THEY FIXED IT AGAIN. FROM 5 AUG TO TODAY (11 AUG) THE SYSTEM HAS OPERATED LIKE IT SHOULD. I DID HAVE THE ABILITY TO SEE WHAT SPEED I WAS GOING AND OTHER GAUGES WORKED. I HAVE READ NUMEROUS REPORTS THAT EVEN THOSE FEATURES WENT BLANK FOR OTHERS.DRIVING FROM TUCSON AZ TO SAN DIEGO, CA TOMORROW AND I AM VERY CONCERNED ABOUT THIS DEFECT HAPPENING WHILE IN THE MIDDLE OF NOWHERE ON I-8! THERE IS NO EXCUSE FOR AN AUTO MANUFACTURER TO NOT LET PEOPLE KNOW WHAT THE STATUS OF A FIX IS AND WHEN TO EXPECT A RESOLUTION TO THE PROBLEM. I HAVE READ NUMEROUS ARTICLES AND EXPERIENCED IT MYSELF, THE DEALERS ACT LIKE THEY HAVE

NOT HEARD OF THIS ISSUE. HOW COULD PEOPLE INVOLVED ON THE CAR BUSINESS NOT KNOW OF MAJOR PROBLEM THAT 1000S OF PEOPLE ARE HAVING, IT IS LIKE THE HONDA CORP PASSED THE WORD TO PLAY DUMB. I TRULY LIKE THE HONDA PILOT, TRADED IN A 2016 EXL FOR THIS NEW CAR. WOULD REALLY LIKE FOR THE CAR TO PREFORM AS ADVERTISED FOR MY (FAMILY) COMFORT AND SAFETY. SAFETY BEING THE MAIN CONCERN HERE.

**Date Complaint Filed:** September 3, 2019
**Date of Incident:** August 30, 2019
**NHTSA ID Number:** 11253049
**Vehicle Identification Number:** 5FNYF6H49KB****
**Vehicle Type:** 2019 Pilot

WHILE DRIVING THE CAR IN MOTION, THE INFOTAINMENT SYSTEM PERIODICALLY AND RANDOMLY WILL 'LOSE CONNECTION' AND BLACKOUT. WHEN THIS HAPPENS THE ENTIRE DASHBOARD BLACKS OUT AND THERE IS NO INFORMATION REGARDING EMERGENCY WARNINGS OR SPEEDOMETER FOR AT LEAST 10 SECONDS, SOMETIMES MORE. I HAVE NO IDEA OF HOW FAST I AM GOING OR IF THERE ARE ANY EMERGENCY WARNINGS. I HAVE TAKEN TO HENNESSY HONDA IN WOODSTOCK, GA FOUR TIMES AND THEY HAVE NOT FIXED THE PROBLEM. THERE IS ALSO RANDOM STATIC ON THE ENTIRE SYSTEM.

**Date Complaint Filed:** September 16, 2019
**Date of Incident:** September 14, 2019
**NHTSA ID Number:** 11255531
**Vehicle Identification Number:** 5FNYF6H92KB****
**Vehicle Type:** 2019 Pilot

THE TRANSMISSION HAS SLIPPED NOW TWICE WHILE DRIVING. ONCE ON THE HIGHWAY AND AGAIN YESTERDAY AFTER TURNING RIGHT ONTO A BUSY NARROW ROAD. THE NAVIGATION SYSTEM AND SCREEN DISPLAY HAS BLACKED OUT AND BECOME NON-FUNCTIONAL WHILE DRIVING AT LEAST 6-7 TIMES (NO RADIO, NAVIGATION, OR ANYTHING FUNCTIONS WHEN THIS OCCURS). THE CAR HAS HAD TO BE TURNED OFF IN ORDER RESET THE SCREEN AND FUNCTION AGAIN. IT IS NOT

POSSIBLE TO TURN OFF THE CAR WHEN DRIVING ON A HIGHWAY OR NARROW COUNTRY ROAD. LASTLY, THE CAR HAS BREAKED UNNECESSARILY ON SEVERAL OCCASIONS DESPITE ADJUSTING THE SETTINGS TO NOT BE OVERLY SENSITIVE. ONCE IT CAME TO A COMPLETE STOP UNNECESSARILY, THANKFULLY NO ONE WAS BEHIND ME. IT HAS STARTED BREAKING UNNECESSARILY WHILE DRIVING ON A HIGHWAY AND ON A COUNTRY ROAD WHEN NO VEHICLES OR ANYTHING WERE AROUND. THESE SITUATIONS HAVE BEEN SCARY AND UNSETTLING.

**Date Complaint Filed:** September 17, 2019
**Date of Incident:** April 16, 2019
**NHTSA ID Number:** 11256170
**Vehicle Identification Number:** 5FNYF5H96KB****
**Vehicle Type:** 2019 Pilot

I PURCHASED MY VEHICLE IN MARCH OF 2019, BY MAY MY DASH/RADIO WENT OUT. FIRST IT STARTED WHEN BLUETOOTH WAS CONNECTED, IT WOULD SOUND LIKE A CRACKING NOISE, LIKE STATIC. THIS IS ALL WHILE VEHICLE IS ON AND IN DRIVING MODE. IT WAS A SCARY SOUND LIKE THAT OF AN ELECTRICAL FIRE WAS GOING TO HAPPEN AT ANY SECOND. ULTIMATELY, BOTH DASH AND RADIO COMPLETELY SHUT OFF AND DIDN'T COME BACK ON. I TOOK IT IN TO THE DEALERSHIP, THEY KEPT MY CAR FOR ALMOST A MONTH AND FINALLY GAVE IT BACK AND STATED THAT THE WIRE HARNESS WAS LOOSE, OR NOT PROPERLY INSTALLED AND THEY HAD RE DONE IT PROPERLY. ALMOST 2 MONTHS LATER THE CRACKING NOISES STARTED AGAIN, AND WOULD SPONTANIOUSLY CUT OFF THE BLUETOOTH. THEN A FEW WEEKS LATER THE DASH WOULD RE START ( SHUT OFF AND THEN BACK ON) BLUETOOTH WOULD NOT CONNECT AND SAME NOISES ALL OVER AGAIN. NOW MY DASH TURNS ON SOMETIMES AND THE RADIO DOES NOT CONNECT AND IS A BLACK SCREEN. IT DOES TURN ON SOMETIMES, BUT THIS IS A NEW CAR AND IT'S VERY ANNOYING. HONDA WAS NOT ABLE TO FIX THE PROBLEM, AND I HAVE HEARD SIMILAR ISSUES FROM OTHER OWNERS OF MY SAME VEHICLE.

**Date Complaint Filed:** September 17, 2019

**Date of Incident:** June 27, 2019
**NHTSA ID Number:** 11256266
**Vehicle Identification Number:** 5FNYF6H08KB****
**Vehicle Type:** 2019 Pilot

THERE ARE SEVERAL ISSUES AND THEY HAVE HAPPENED MANY TIMES - ALL RELATED TO ELECTRICAL SYSTEM, SPEEDOMETER AND INFOTAINMENT DEFECTS. THE INFOTAINMENT AND DASH DISPLAY INCLUDING THE SPEEDOMETER SHUT OFF WHILE DRIVING. THIS INCLUDES THE SPEEDOMETER, ALL SAFETY FEATURES, CRUISE CONTROL SHUTTING OFF WHILE DRIVING. ALSO THE AUDIO WILL COMPLETELY SHUT OFF WHILE DRIVING AND I WILL HAVE NO AUDIO FOR HOURS AT A TIME. ALSO THERE ARE POPS AND CRACKLES OUT OF THE SPEAKERS EVERY TIME I DRIVE THE VEHICLE.

I HAVE DETAILED DOCUMENTATION FOR THESE ISSUES INCLUDING VIDEOS OF THE ISSUES HAPPENING WHILE DRIVING. DEALERSHIP HAS ATTEMPTED TO REPAIR SEVERAL TIMES AND THE ISSUES GET WORSE, NOT BETTER.

**Date Complaint Filed:** September 18, 2019
**Date of Incident:** July 2, 2019
**NHTSA ID Number:** 11256408
**Vehicle Identification Number:** 5FNYF8H08KB****
**Vehicle Type:** 2019 Passport

WHILE DRIVING IN MOTION AND RUNNING OVER SLIGHTLY BUMPY SURFACE I WILL HEAR STATIC IN THE SPEAKERS AFTER HITTING A FEW MORE BUMPS THE AUDIO WILL SHUT OFF. THEN THE INFOTAINMENT SCREEN WITH EITHER SAY "FM RADIO UNAVAILABLE" OR "NETWORK COMMUNICATIONS LOST" FOLLOWING THIS THE INFOTAINMENT SCREEN WILL EITHER REBOOT OR STAY OFF UNTIL THE CAR IS RESTARTED. IN SOME CASES WHEN THE INFOTAINMENT SCREEN WENT OFF THE DRIVER SCREEN THAT DISPLAYS SPEED, RPM AND OTHER SAFETY WARNING MESSAGE SHUTS OFF AND REBOOTS WHILE DRIVING IN MOTION WHICH IS VERY DISTRACTING AND UNSAFE. I HAVE HAD MY 2019 PASSPORT AT THE DEALER FOUR TIMES WHERE THEY HAVE CHECKED CONNECTIONS, REPLACED WIRING HARNESS AND EVEN REPLACED THE DRIVER SCREEN

MODULE. WEEKS AFTER THIS LAST FIX THE SAME ISSUES HAPPENED AGAIN AND NOW BOTH SCREENS ARE BLANK AND WILL NOT COME BACK ON AFTER RESTARTING THE CAR. IT IS HEADING TO THE DEALER FOR YET ANOTHER DIAGNOSTIC. NOTE DURING MOST OF THESE ISSUES I WAS USING CAR PLAY BUT HAVE ALSO EXPERIENCED IT JUST USING FM RADIO. THE PROBLEMS USUALLY DON'T SURFACE TILL AFTER DRIVING ON A BUMPY ROAD.

**Date Complaint Filed:** September 30, 2019
**Date of Incident:** September 28, 2019
**NHTSA ID Number:** 11258912
**Vehicle Identification Number:** 5FNYF6H95KB****
**Vehicle Type:** 2019 Pilot

I PURCHASED THE VEHICLE ON AUGUST 10, 2019. WITHIN 2 WEEKS THE RADIO BEGAN MAKING A POPPING AND CRACKING SOUND THAT SOUNDED LIKE ROCKS HITTING THE WINDSHIELD. THIS SOUND HAPPENS DAILY WHEN I DRIVE THE VEHICLE. ABOUT ONE WEEK AFTER THIS HAPPENED, THE DVD PLAYER WOULD STOP WORKING AND THE SOUND FROM THE RADIO WOULD BEGIN TO COMPLETELY GO OUT. IT WOULD COME BACK ON EVENTUALLY, SOMETIMES AS MUCH AS 30 - 45 MINUTES LATER. AFTER ABOUT TWO WEEKS, THESE PROBLEMS CONTINUED AND THE SCREEN FOR NAVIGATION, ALONG WITH THE SPEEDOMETER SCREEN WOULD COMPLETELY GO BLACK WHILE THE VEHICLE WAS IN MOTION. IT RESTARTS AFTER ABOUT 10 - 20 SECONDS. IN TWO INSTANCES THE REAR BACKUP CAMERA HAS SHUT OFF WHILE I WAS BACKING UP AS WELL. I HAVE REPORTED THE ISSUE TO TWO DEALERSHIPS INCLUDING THE ONE WHERE I MADE THE PURCHASE. I AM SCHEDULED TO TAKE IT IN TO HAVE REPAIRS DONE TOMORROW.

**Date Complaint Filed:** October 2, 2019
**Date of Incident:** June 12, 2019
**NHTSA ID Number:** 11265747
**Vehicle Identification Number:** 5FNYF8H57KB****
**Vehicle Type:** 2019 Passport

TL THE CONTACT OWNS A 2019 HONDA PASSPORT. WHILE DRIVING AT ANY SPEED, THE BLUETOOTH SEIZED AFTER A FEW

MINUTES OF DRIVING. ALSO, THE CLOCK AND RADIO DID NOT AUTOMATICALLY SET TO THE CONTACT'S CURRENT LOCATION. THERE WAS NO WARNING INDICATOR ILLUMINATED. THE SYSTEM RESTARTED AFTER THE VEHICLE WAS TURNED OFF AND RESTARTED. THE VEHICLE WAS TAKEN TO DCH KAY HONDA (732-982-2732, LOCATED AT 200 NJ-36, EATONTOWN, NJ 07724), BUT THE FAILURE COULD NOT BE DUPLICATED. THE FAILURES RECURRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURES AND STATED THAT THERE WAS A COMPUTER UPDATE THAT SHOULD HAVE BEEN PERFORMED. THE CONTACT WAS PROVIDED CASE NUMBER: 09932490 AND WAS REFERRED BACK TO THE SAME DEALER; HOWEVER, THE DEALER STATED THAT THERE WAS NO UPDATE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 2,000.

**Date Complaint Filed:** October 6, 2019
**Date of Incident:** October 2, 2019
**NHTSA ID Number:** 11266621
**Vehicle Identification Number:** 5FNYF6H08KB****
**Vehicle Type:** 2019 Pilot

1ST PROBLEM...VIDEO DISPLAY WORKED ONLY INTERMITTENTLY. 1ST VISIT, WOLFCHASE HONDA UPDATED SOFTWARE, PROBLEM CONTINUED. 2ND VISIT THEY REPLACED VIDEO UNIT.

2ND PROBLEM...SPEAKERS STARTED MAKING CRACKLING NOISE. WENT ON THEIR SITE TO MAKE APPT AND RECEIVED A NOTICE THAT OT A RECALL NOTICE ABOUT ELECTRICAL ISSUE (OR A FLEET CAMPAIGN NOT SURE WHICH). THEY UPDATED SOFTWARE ON THAT 3RD VISIT. SPEAKER PROBLEM WORSENED AFTER THAT VISIT AND SPEEDOMETER DISPLAY AND VIDEO (STEREO SYSTEM, NAVIGATION ETC) WOULD BLANK OUT WHILE DRIVING. SYSTEM WOULD GENERALLY RESET BUT ONLY AFTER 30 SECONDS OF NON VISIBILITY TO MY SPEED, CRUISE CONTROL STATUS ETC.. TOOK IT BACK FOR 4TH VISIT. THEY STATED THEY FOUND AN ISSUE WITH TAILGATE SENSOR. PICKED IT UP ON FRIDAY OCT 4TH AND IT STARTED MAKING THE CRACKLING NOISE IN THE SPEAKERS AGAIN YESTERDAY, OCT 5TH. LAST TIME, IT EVENTUALLY GOT WORSE UNTIL SPEEDOMETER

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 101 -

STOPPED WORKING. PLAN TO MAKE ANOTHER APPT (MY 5TH) THIS WEEK. CRACLKING NOISE OCCURS WHEN STOPPED, WHEN DRIVING, WHEN VEHICLE IS TURNED OFF (AFTER BEING ON). VIDEO AND SPEEDOMETER DISPLAY STOP WORKING WHEN DRIVING.

**Date Complaint Filed:** October 8, 2019
**Date of Incident:** September 9, 2019
**NHTSA ID Number:** 11267053
**Vehicle Identification Number:** 5FNYF6H53KB****
**Vehicle Type:** 2019 Pilot

THE ISSUE IS RELATED TO THE HONDA INFOTAINMENT SYSTEM. AFTER ONLY 2000 MILES THE SYSTEM BEGAN HAVING ISSUES. WHILE THE DRIVER IS DRIVING, THE CENTER DISPLAY AND THE DISPLAY ON THE CONTROL PANEL WILL FREQUENTLY GO BLANK. WHEN THIS HAPPENS THE DRIVER IS UNABLE TO ACTIVATE OR DEACTIVATE SPECIFIC SAFETY CONTROLS INCLUDING LANE KEEP ASSIST, ADAPTIVE CRUISE CONTROL AND AUTOMATIC BRAKING. THE AUTOMATIC BRAKING WARNING IS ALSO LOST WHEN THE DISPLAY GOES OUT. THE DRIVER ALSO LOSES THE SPEEDOMETER. FROM THE CENTER DISPLAY, THE DRIVER IS UNABLE TO USE THE BACKUP CAMERA, THE RADIO, NAVIGATION AND THE ABILITY TO MAKE HANDS FREE PHONE CALLS.

**Date Complaint Filed:** October 16, 2019
**Date of Incident:** October 1, 2019
**NHTSA ID Number:** 11268786
**Vehicle Identification Number:** 5FNYF6H04KB****
**Vehicle Type:** 2019 Pilot

PURCHASED 2019 HONDA PILOT ELITE IN FEBRUARY 2019. NOTICED A POPPING SOUND WHILE DRIVING IT HOME THAT SOUNDED LIKE SAND OR ROCKS SLIGHTLY AMPLIFIED HITTING THE WINDSHIELD INTERMITTENTLY. THIS HAS CONTINUED AND OVER THE NEXT FEW MONTHS IT BECAME APPARENT THE SOUND WAS NOT ACTUALLY FROM THE WINDSHIELD BUT ASSOCIATED WITH THE SPEAKERS/ELECTRICAL SYSTEM. IN AUGUST A LOUD CRACKLING SOUND INTERRUPTING THE

SATELLITE RADIO STARTED HAPPENING INTERMITTENTLY FOLLOWING PERIODS OF THE ORIGINAL POPPING SOUNDS. BY OCTOBER, THAT LOUD POP HAS BEEN FOLLOWED BY A COMPLETE BLACKOUT OF THE SYSTEM SCREEN (BOTH) INCLUDING THE SPEED, ETC. FOLLOWED AFTER 30 SECONDS - A MINUTE BY THE SYSTEM RESTARTED. PRIOR TO THAT THERE WERE SEVERAL CASES OF APPLE CAR PLAY SHUTTING DOWN DURING PHONE CALLS THAT MAY HAVE BEEN ALSO ASSOCIATED WITH THIS PROBLEM WITHOUT A COMPLETE SHUTDOWN. I HAVE 27,000+ MILES AS OF 10/15/19, DRIVE A LOT AND NO DEALER CLOSE BY AND ALSO DEPEND DAILY ON HAVING THE VEHICLE. CONTACTED THE DEALER CAR WAS PURCHASED FROM THIS WEEK AND THEY ADMITTED HAVING A PILOT IN THE SHOP NOW WITH SIMILAR SYMPTOMS THAT THEY HAD NOT BEEN ABLE TO DIAGNOSE OR FIX YET. SUGGESTED I MAKE AN APPOINTMENT AND LEAVE IT WITHOUT THEM KNOW HOW LONG IT MIGHT BE. AGREED I WOULD CALL BACK AND SEE WHAT THEY WERE ABLE TO DO ON THE PILOT THEY ALREADY HAD IN THEIR SHOP. HAVE SINCE THEM FOUND NUMEROUS SIMILAR REPORTS WITH 2019 PILOTS ON THIS SITE AND OTHERS WITH ALL REPORTING HONDA NOT ADMITTING TO A SYSTEMIC PROBLEM AND ALSO NO PERMANENT REPAIRS. PROBLEMS HAVE ALWAYS OCCURRED WHILE DRIVING ON INTERSTATE HIGHWAYS AT FULL SPEED. OTHERS HAVE REPORTED BACKUP CAMERAS GOING OUT BUT I HAVE NOT HAD THE PROBLEM EXCEPT WHEN DRIVING AT FULL SPEED BUT EXPECT THAT BACKUP CAMERA WOULD HAVE ALSO BEEN OUT HAD I BEEN STOPPED AT THE TIME OF THE PROBLEM. I THINK HONDA SENSING SAFETY FEATURES NOT AFFECTED.

**Date Complaint Filed:** October 24, 2019
**Date of Incident:** October 23, 2019
**NHTSA ID Number:** 11270566
**Vehicle Identification Number:** 5FNYF8H90KB****
**Vehicle Type:** 2019 Passport

INFOTAINMENT SYSTEM AND INSTRUMENT PANEL BOTH WENT BLACK TODAY AND STOPPED WORKING FOR NO REASON. CAR HAS ONLY 3000 MILES ON IT. VEHICLE WAS DRIVEN TO WORK THIS MORNING WITH EVERYTHING WORKING. WHEN I STARTED IT TO GO HOME AT END OF DAY NEITHER THE INSTRUMENT

PANEL OR INFOTAINMENT SYSTEM WOULD WORK; BOTH WERE JUST BLACK SCREENS. HAVE SINCE DISCOVERED THERE IS A CLASS ACTION LAWSUIT FILED AGAINST HONDA FOR INFOTAINMENT SYSTEM PROBLEMS AND WANT TO REPORT MY ISSUE. EXTREMELY CONCERNING SITUATION AS CAR UNSAFE TO DRIVE WITHOUT INSTRUMENT PANEL.

310.   Complaints posted on various websites paint a strikingly similar picture:

- "The infotainment on this car really sucks. It has a mind of its own. And, to add insult to injury the whole thing froze rendering the infotainment useless. Went to the dealer to do a hard reset since there was no way in the world that everything else I could have tried worked. The Dealer informed that the infotainment is a known issue yet nothing has been done to fix it. Recently, it simply refused to shut off. This is a brand new car and having problems like these says a lot about the quality of the accessories." (complaint posted on carcomplaints.com dated December 20, 2017).

- I bought 2018 elite model in August 2018. Within two month all entertainment system stopped working. I bought this car because I have kids and I want them to have something like rear entertainment for long trip. But, no luck. Took car to dealer they install some part. Got car back. Use car only on weekend. Now display screen not turning all at all and staying blank. Took car again to dealer they install part (had to leave with them for week because part is not in stock). Got car back again and now back to entertainment problem. Music stop playing automatically in between FM, USB, etc. Even on corner it shows phone is connected through Bluetooth. But when try to play music through phone message keep coming saying no phone connected. Had to send car again to dealer. (complaint posted on Edmunds.com dated January 3, 2019).

- "Biggest regret of our lifetime of new vehicle buying. There are so many bugs and issues, I can't even begin to list them all. CabinWatch was the main feature for choosing Odyssey over Toyota or Chrysler. It continues to glitch and stop working. It affects the DVD entertainment system which makes it hell with children. Honda say they are aware but not concerned about fixing these issues since the vehicle still drives. I can find alot of vehicles that just drive from point A to B, I paid

THOUSANDS more to have extra luxury features!!" (complaint posted on Edmunds.com dated December 4, 2018).

- Got the car in November and problem started about 3 weeks after I got it. The screen does not load properly, it crashes, reboots, freezes, has error messages, sometimes the radio stays dead, sometimes its on. No hands free operation, no GPS. Honda Replaced the unit 1st week of Jan 2019 and 1st of Feb, the problem reappeared. First they thought it was caused by Car play - with the cable being faulty. The new unit - I have not connected carplay and it still occurred. To get it working - i have to exit the car lock and unlock and hopefully the start sequence will work. I think this makes the car unusable, (complaint posted on carcomplaints.com on February 1, 2019).

- "13 months with the same problem. We have taken it to several dealerships and no one can fix it. Honda is "aware" of the problem and says for us to keep waiting until they resolve the issue. We are paying extra money to have features that don't work. We didn't get a rebate since they are high demand, if people only knew...Please make sure you test the entertainment system thoroughly before you leave the dealership. Take the headphones out of the bubble wrap and the take a DVD with you." (complaint posted on Edmunds.com dated December 4, 2018).

- "We acquired the 2018 Odyssey Elite with all the options. We're very unhappy with the upgrade because the entertainment system occasionally stops working. That means the Blue Ray, CabinWatch, everything all of the sudden shuts off. We need to stop the car, turn it off, turn it back on, and hope the system comes back to life. We brought it to the dealership immediately, and we were told this is a known problem, Honda knows about it, and there's no solution. "Check back in 90 days" is the answer we got in writing! Can you believe this?! Please save yourself headaches and buy something else. Of course the sales people at the Honda dealerships will never tell you that. This model is full of other smaller bugs, too many to list here. Looks like a car that was not fully tested before getting to market. (complaint posted on Edmunds.com dated June 4, 2018).

- This car has numerous electronic and software issues that Honda America is unable to fix. Dealers continue to sell these vehicles without

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 105 -

disclosing the problems.… If you buy the Elite, plan on the following; Sirius XM Radio will work occasionally, CabinWatch and park sense cameras will lock up and won't work until the car goes through a hard reset, the cabin doors will not respond to the auto open and close until a hard reset is performed, the DVD system will lock up and won't play until a hard reset is performed, the infotainment system is immature and is still being debugged by Honda Engineers, the voice command system seldom works or responds. The dealer service department will acknowledge that they can't fix the problems. We brought it back 9 times since Jan 2018-April 18 without any fixes made other than reseting which involves disconnecting the battery and waiting 15 minutes for the system to reset.… It is a Lemon Law candidate as well as a class action law suit for fraud." (complaint posted on Edmunds.com dated April 10, 2018).

- "I just bought 2018 odyssey less then 1000miles and my rear entertainment system stop working and went to dealer and find out software problem and honda cannot fix it until they have new update software so I was upset because it's not my fault honda has to replace with new RES but they are not so please before you buy make sure it works and it's not only mine there so many people having same issues....Go to Odyssey forum and you will find details." (complaint posted on Edmunds.com dated September 16, 2017).

- 2018 is redesigned model and maybe it explains why it has so many bugs… A few more issues also happen randomly while driving are: screen goes completely blank or frozen, GPS stops giving a guidance, music doesn't play from USB or creating a horrible noise, Bluetooth connection goes off (consequently phone cannot connect), anti theft system losing a power, speakers producing distorted sound." (complaint posted on Edmunds.com dated August 13, 2018).

- "We purchased the 2018 Honda Odyssey with DVD. The first time we tried it out, the DVD shut off after 10 minutes saying 'network connection lost' and wouldn't turn back on. The sound still worked, the drop-down TV just turned black. After the car had been off for a while, it worked again, for about 10 minutes and then again said, 'network connection lost.' Every single time it overheats after 10 to 30 minutes of play and says "network connection lost." Finally, I brought it to the

dealership. After keeping my car almost all day, they informed me that this was a KNOWN ISSUE that they don't have a fix for. They told me that even when they replace the DVD system it still overheats and does the same thing. They told me they would call me 'whenever they come up with a solution.' Totally unacceptable to keep selling these cars with DVD systems that don't work and no known repair. DEFECTIVE!!" (complaint posted on Edmunds.com dated April 18, 2018).

- "We purchased our 2018 Honda Odyssey Elite in July of 2017 and many of the key features still do not work. Almost every time we are on a road trip and use the Rear Entertainment System, the screen turns black and there is weeping and gnashing of teeth in the back. The CabinWatch camera often freezes or is unable to connect altogether. The hands-free voice commands/calling while connected to ApplyPlay stops working often. I have spent HOURS documenting the errors and trying to speak with HondaCare, but they closed my case until an update was available. There was an update on Wednesday and I have had issues with all three of the aforementioned problems in the past 16 hours. Keeping notes, pictures and videos of all the things wrong with my nice, EXPENSIVE, new van has been a part-time job since I purchased this vehicle." (complaint posted on Edmunds.com dated March 23, 2018).

- "Buy at your own risk, Honda blames everything on Apple, Bluetooth skips, siri does not connect, messages I haven't seen or sent one, screen goes black and does not respond or goes blue with a loud beep while you are driving." (complaint posted on Edmunds.com dated November 29, 2017).

- "This car touts the software and technology but it is a complete rip off for the price. 5k miles in and It hardly ever works and the dealer just sends it back saying non-reproducable. I finally recorded a video to show them the problem and now they blame my Disney original DVD. Are all of my brand new DVDs bad?? Absolute nonsense!" (complaint posted on Edmunds.com dated February 25, 2018).

- "I am normally impressed with Honda's quality. However, I would not recommend buying this car if you have a family. We bought it specifically for family road trips. The Rear Entertainment System failed within a month. This made the 4 hour road trip for the solar eclipse painful!! Took it back to the dealer, they said Honda knows about the

problem, but there is no fix right now. Until this is fixed, do not buy this vehicle if you have young kids." (complaint posted on Edmunds.com dated November 3, 2017).

- "We have had to take our brand new Odyssey into the dealership for repairs 4 times now since October 2018. The dealership and Honda Manufacturing have been working together to resolve the issue but can't seem to find the solution. We are starting to discuss the lemon law and how we can get out of the car. It started at only 800 miles on the car with the radio along with the instrument panel cutting in/out along with a static and popping noise coming from the dashboard. They have replaced several items and performed software updates which seems to resolve the issue temporarily. It works for a week or so and then we are completely inconvenienced of having to schedule a time to drop off the car, remove and transfer car seats to the loaner vehicle, and take time out of our schedule. We went with a brand new vehicle to make sure we had a reliable van for our family. I have always thought of Honda as reliable but not anymore." (complaint posted on Edmunds.com dated January 10, 2019).

I have had my new 2019 Passport for about three weeks. Twice now the infotainment system stopped working. Both times, I was using Apple Play and Waze. A loud beep came on and then nothing. No Apple Play, no radio, ...nothing. The display was on (in fact it wouldn't turn off even when the car was off) and I was not able to use the radio (check tuner message appeared) or an[y] other features. When I would try to check Bluetooth I got a message that said the car was still in motion even though I was parked. I took it to the dealer who took out a fuse and reset the system. That worked for about two days and then it happened again. Any ideas? I have an appointment at the dealership but I am not optimistic. I do not want to have to reset the fuse every time I use Waze. I have read on other forums that using a USB keyboard to Cntl-Alt-Del will also work to reset the system but who wants to keep a keyboard in their car? Is anyone else having this problem? (complaint posted on passportforums.com dated March 20, 2019).

- Just picked my [2019 Passport] up from the dealer. They included a copy of the manufacturer's instructions to technicians. It's a known software issue, and they believe it is related to CarPlay. Once they've fixed the problem a notice will go out to PP owners recommending we come to the dealer for a software update. In the meantime, when it happens you can either disconnect the battery, or pull the "Radio/USB"

fuse. The latter is easier; the fuse box is on the passenger side of the engine compartment. There is a diagram of the fuse box inside the lid (pay attention to the arrow signifying which way is front). It's the 15 amp fuse closest to the driver. I think I'm going to buy a cheap USB keyboard and keep it handy. With my luck this will happen again while I'm wearing a suit and it's 105 outside. (complaint posted on passportforums.com dated May 18, 2019).

- Using my iPhone XS lately in my EX-L, my Infotainment system is becoming unusable. Plugged in via usb or on Bluetooth the pops (or crackles like how wooden logs sound like in a fire pit) that I keep hearing during phone calls or while streaming music is so bad that o don't even use this system anymore until I can bring it into a dealer. My fear is they will simply say they can't recreate it and I'll be on my way...I spoke to Honda and they have no fix for it. (complaint posted on passportforums.com dated June 15, 2019).

- My experience suggests your problems are due to Honda defects, that the service rep repeated to me that "Honda is aware of the problems". I video and audio recorded the problem such that when the Honda dealer knew there is a problem. Infotainment system, wire harness and instrument panel component is being replace this day at the instruction of "Honda" not the dealer. expecting the problem to be resolved. Given the problem menu safety issues are there. Speed undetected at times, Display screen does not provide back up information and who know what other safety devices are connected to these systems. have a great day. BTW California as i read may be suing Honda over Dis[play issues. Display issues go back a couple of years. (complaint posted on passportforums.com dated July 24, 2019)

- "I have been a honda fan for a long time. Owned accord, civic, odysseys in the past. This is my 3rd minivan and luckily I leased it. Mine is Elite model. Since we got this, we have not been able to use DVD player. Some module was replaced by the dealer; started working, then broke again. Very often (97% of the time), i would hear fireworks going off in the speakers which can be very annoying and make it hard to drive the van. Only to fix this is muting the whole volume off. Then display monitor randomly would go dead and stays dead until vehicle is restarted. I was told by the dealer that they are seeing lot of similar issues with 2018/2019 models. Vehicle drives good. Have been to the

SECOND AMENDED COMPLAINT                    - 109 -
010811-11/1205802 V1

dealer 4 times so far. They are clueless; only thing they can tell me is Honda is aware of these problems and are working to fix it. I would stay away from Honda vehicles until they figure out these issues. Hope this helps." (complaint posted on Edmunds.com dated April 2, 2019).

- I learned the hard way that Honda is having a major issue with the "RES", rear entertainment system, of all 2018, 2019 models. There are numerous glitches through out the navigation, Bluetooth, dvd, blue ray and other bells and whistles. Honda is aware of this but does not have a fix for it. If you are lucky to have bought from an honest dealership than they will admit that they sold you the van knowing that it could possibly be back in less than 3 weeks. There are too many issues to list. Do your research or you will be researching yours states lemon law sooner than later. (complaint posted on Edmunds.com dated March 27, 2019).

311. In fact, Consumer Reports has downgraded its rating of the 2018 Honda Odyssey to "No Longer Recommended" due to "much-worse-than-average reliability, with problems including the infotainment display freezing and losing all functionality."

312. A Car and Driver review of the 2018 Honda Odyssey observed, "Our Odyssey continues to be plagued by infotainment glitches, freezes, and outright refusals to turn on (the last most often after using the standard factory remote-start feature), even after a field technician visited the van at our office and replaced the infotainment head unit under warranty at 12,800 miles."

313. Most recently, according to a consumer survey published in the June 2019 issue of Consumer Reports, Honda's infotainment system received an overall score of 56 (out of 100), placing Honda 19th among the 28 automobile manufacturers whose systems were included in the survey.[11]

314. Honda has already publicly acknowledged several manifestations of the defect, and conceded that a fix for it is not yet known.

---

[11] According to Consumer Reports, the survey's overall score is a composite based on the percentage of vehicles for which owners responded that they are very satisfied with the operation of audio, calls, and navigation.

315.  In April 2019, Honda released a Tech Line Summary Article for 2018-2019 Odyssey with Touring or Elite trim.  The article states:

> We're currently investigating an issue that when using CabinWatch and the RES [rear entertainment system] is streaming an application or playing a DVD for **10 minutes** or more, a **Camera System Problem. Image cannot be displayed.** message appears on the Display Audio screen.  At the same time, the overhead screen freezes, but the audio keeps playing.
>
> So far, we know it's software related, so don't replace any components.  When we come up with a fix, we'll release an OTA [over-the-air] software update.

316.  In April and July of 2019, Honda released identical documents—the former captioned a "Tech Line Summary Article" and the latter a "ServiceNews Article"— titled "Radio Stays On with Ignition OFF."  Both identify all trim levels of the 2018-19 Odyssey, 2019 Pilot, and 2019 Passport as affected vehicles, and state:

> Are you having this issue while using Apple CarPlay?
>
> - CarPlay beeps and stops working.
> - If you try to switch to a different audio source, you see the message **XM-Check Tuner or FM-Radio Unavailable.**
> - When you turn the ignition to OFF, the navigation display stays on.
>
> We're aware of this issue and have it under investigation.  So far, we know it's software related, so don't replace any components.  When we come up with a fix, we'll release an OTA software update.
>
> As a temporary measure, just remove and install the radio backup fuse or disconnect and connect the battery.  This will reset the system.

317.  In March and May 2019, Honda released a "ServiceNews Article" that identifies the 2018-19 Odyssey (all trims except LX), 2019 Pilot (all trims except LX), and 2019 Passport (all trims except Sport) as affected vehicles.  The article is titled "Popping or Crackling from the Speakers?  Check the MOST Bus Network," and states:

Are you hearing a popping or crackling from the speakers? This may be due to a connection issue in the MOST bus network, which can be identified by the unique red and green connectors at each component of the infotainment system.

During component inspection or replacement, you can easily damage these connectors if the cable is used for leverage when unplugging them.

To save you time during troubleshooting, check the repair history on the vehicle. Most reported cases happened after a separate previous repair was made to the system. Be sure to inspect the MOST connectors at all components and any connections between the harnesses. If a connector is found to be damaged, like you see here, the entire harness must be replaced. These connectors are **not** repairable.



If you want more info on what the MOST bus network does, look up the Tech2Tech® video, "Lets Talk MOST Bus Network and ECL Diagnostics." And If you want to know how to check for damaged or loose connections, be sure to check out "A Look at MOST Bus Network Connectors."

318. Additionally, as documented above, numerous Honda customers—including various named plaintiffs in this action—have been told by dealership employees since at least mid-2018 that their problems are known to Honda. However, with the exception of the Tech Line Summary Article noted above, Honda has yet to

publicly acknowledge the scope and severity of these problems, or to release any kind of long-promised fix or update to its customers.

319. Honda's New Vehicle Limited Warranty requires it to "repair or replace any part that is defective in material or workmanship under normal use." But as countless consumers have reported, Honda has been unable to repair these defects despite being given numerous opportunities. In violation of this express warranty, and as evidenced by the many complaints and repeat infotainment system failures, Defendant merely replaces a defective part with another defective part.

320. Due to the inherent and permanent nature of the common defect in the Defective Vehicles which cause them to fail, even after repeated replacements, Plaintiffs and the members of the Class have incurred and will continue to incur significant expenses. All Defective Vehicles suffer from the same defect.

321. Additionally, because the infotainment system may fail at any time, thereby startling the driver and putting the passengers' safety at risk, the defect makes these Defective Vehicles unfit for the use for which they were intended in that they cannot be relied upon as a safe and reliable means of transport.

**C.    Defendant's Warranties and Response to the Defect**

322. Defendant issued to all original purchasers and lessees, including Plaintiffs and the other Class members, a written manufacturer's warranty. This New Vehicle Limited Warranty states that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

323. However, Defendant knew, or at least should have known, of the defects at the time of sale or lease of the Defective Vehicles. Plaintiffs and Class members, however, had no such knowledge. The defects were and are latent in nature because they are not obvious or ascertainable upon reasonable examination.

324. Despite having more than adequate opportunity to successfully remedy the defect(s) in the Vehicles, Honda has failed to do so, and in many instances has instead merely replaced defective components with defective components.

325. Honda concealed, and continues to conceal, the fact that the Defective Vehicles contain the defective infotainment systems. Honda also continues to conceal the fact that the replacement components it provides in an attempt to repair the defect are equally defective. In spite of its knowledge of this defect, Honda continues to sell Defective Vehicles that contain the defective infotainment system. Therefore, Plaintiffs did not discover and could not have discovered this defect through reasonable diligence.

326. Plaintiffs and the other class members reasonably relied on Honda's warranties regarding the quality, durability and other material characteristics of their Vehicles, including but not limited to the representation that the Vehicles contained no known defects (defects known to Honda) at the time of sale or lease.

## V.    CLASS ACTION ALLEGATIONS

327. Plaintiffs bring this action on behalf of themselves and all others similarly situated under Fed. R. Civ. P. 23.

328. Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, the classes that Plaintiffs seek to represent shall be defined as follows:

> All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Alabama (the "Alabama Class")

> All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Arizona (the "Arizona Class")

> All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot,

or 2019 Honda Passport vehicle in the State of Colorado (the "Colorado Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Connecticut (the "Connecticut Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Florida (the "Florida Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Georgia (the "Georgia Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Illinois (the "Illinois Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Kansas (the "Kansas Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Kentucky (the "Kentucky Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Maryland (the "Maryland Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot,

or 2019 Honda Passport  vehicle in the State of Massachusetts (the "Massachusetts Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Missouri (the "Missouri Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Ohio (the "Ohio Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Oklahoma (the "Oklahoma Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of South Carolina (the "South Carolina Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Tennessee (the "Tennessee Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Texas (the "Texas Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicle in the State of Virginia (the "Virginia Class")

All persons and entities nationwide that purchased or leased a model year 2018 Honda Odyssey, 2019 Honda Odyssey, 2019 Honda Pilot,

or 2019 Honda Passport vehicle in the State of Washington (the "Washington Class")

(Collectively, the "Class," unless otherwise noted).

329.   Excluded from the Class are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; (3) Class Counsel.

330.   Plaintiffs seek only damages and injunctive relief on behalf of themselves and the Class Members.  Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or the Class Members.

331.   While the exact number of Class Members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Classes is ascertainable based upon the records maintained by Honda and governmental officials.  Upon information and belief, Honda sold and leased over one hundred thousand Defective Vehicles nationwide during the relevant time period, all of which have the defective infotainment systems at issue.  Therefore, the Class Members are so numerous that individual joinder of all Class Members is impracticable under Fed. R. Civ. P. 23(a)(1).

332.   Common questions of law and fact exist as to all Class Members. These common legal and factual questions include:

(a)   whether each Defective Vehicle was sold or leased with defective infotainment systems;

(b)   whether Defendant's express warranty covers the defect;

(c)   whether Defendant breached express warranties made to the Class Members;

(d)   whether Defendant breached implied warranties made to the Class Members;

SECOND AMENDED COMPLAINT                    - 117 -
010811-11/1205802 V1

(e)     whether Defendant replaced defective parts with defective parts;

(f)     whether Defendant knew about the defect and, if so, how long Defendant has known about the defect;

(g)     whether Defendant concealed the defect;

(h)     whether Defendant's conduct violates consumer protection statutes, warranty laws, and other laws asserted herein;

(i)     whether the Class Members have suffered damages as a result of the conduct alleged herein, and if so, the measure of such damages, including diminution of value and deprivation of the benefit of the bargain; and

(j)     whether the Class Members are entitled to injunctive relief.

333.    Plaintiffs' claims are typical of the claims of the Class Members whom they seek to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiffs and each Class Member have a Defective Vehicle with the same defective infotainment system.

334.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members as required by Fed. R. Civ. P. 23(a)(4).  Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class Members.  Further, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive defect class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Therefore, the interests of the Class Members will be fairly and adequately protected.

335.    A class action is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy.  In this regard, the Class Members' interests in individually controlling the prosecution of separate actions is low given the magnitude, burden, and expense of individual prosecutions against large corporations such as Defendant.  Further, neither Plaintiffs nor their counsel are aware

of any on-going litigation concerning this controversy already begun by any of the Class Members. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory results and also increases the delay and expense to all parties and the court system presented by the legal and factual issues of this case. By contrast, the class action procedure here will have no management difficulties. Defendant's records and the records available publicly will easily identify the Class Members. This defect is common to all Defective Vehicles; therefore, the same common documents and testimony will be used to prove Plaintiffs' claims as well as the claims of the Class Members. Finally, proceeding as a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court

336. A class action is appropriate under Fed. R. Civ. P. 23(b)(2) because, as stated above, Honda has acted or refused to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all Class Members.

## VIOLATIONS ALLEGED

**A.     Claims Brought on Behalf of the Nationwide Class**

### COUNT I[12]
### BREACH OF EXPRESS WARRANTY—
### MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301, *ET SEQ.*)

337. Plaintiffs repeat and incorporate the allegations set forth above as if fully alleged herein.

338. The Defective Vehicles are consumer products as defined in 15 U.S.C. § 2301(1)

---

[12] By order dated October 17, 2019, the Court dismissed this count. Plaintiffs include it in their Second Amended Complaint solely to preserve it for appeal.

339.  Plaintiffs and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

340.  Honda is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

341.  Honda provided Plaintiffs and Class Members "written warranties" within the meaning of 15 U.S.C. § 2301(6).

342.  15 U.S.C. § 2310(d)(1)(A) and/or § 2310(d)(3)(C) is satisfied because Plaintiffs properly invoke jurisdiction under the Class Action Fairness Act ("CAFA").

343.  In the course of selling the Defective Vehicles, Defendant expressly warranted in its New Vehicle Limited Warranty that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

344.  Upon information and belief, Defendant's standard warranty language is identical for all Defective Vehicles sold nationwide.

345.  Defendant did not provide at the time of sale, and has not provided since then, vehicles conforming to the express warranties.

346.  Defendant breached and continues to breach express warranties because the defective infotainment systems were present in the Defective Vehicles at the time of sale.

347.  Defendant breached and continues to breach express warranties because Defendant did not (and does not) cover the full expenses associated with repairing and/or replacing the defective infotainment systems in Plaintiffs' and the Class Members' Defective Vehicles.

348.  Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Defendant breached and continues to breach express warranties because it merely replaces the defective components with additional defective components and is unable to successfully repair the defects in Plaintiffs' and the Class Members' Defective

Vehicles, despite having had reasonable opportunities to do so. As such, the express warranties fail their essential purpose.

349. Defendant's refusal to provide an adequate repair or replacement violates 15 U.S.C. § 2304.

350. Despite the fact that the Vehicles' infotainment systems continue to fail despite being "repaired," Defendant continues to replace the defective parts with identical or substantially similar defective parts. Thus, the defect is inherent and permanent in nature.

351. Defendant fraudulently concealed material information from Plaintiffs and the Class regarding the existence and extent of the defects. Defendant also fraudulently concealed the material fact that the replacement components were defective. Therefore, any limitations imposed by Defendant as to the scope of its obligations under the express warranties to repair and replace defective parts and/or any disclaimers in the written warranties prepared by Defendant that purport to preclude recovery by Plaintiffs or the Class Members are unconscionable, both substantively and procedurally, and are unenforceable as a matter of law.

352. Any such limitations or exclusions have been imposed unilaterally by Defendant via adhesive, "take it or leave it" contracts with no ability by Plaintiffs or the Class Members to negotiate the substance or coverage of the warranties, and Plaintiffs and the Class Members did not have any meaningful choices of reasonably available alternative sources of supply of suitable Vehicles free of the above unconscionable conditions.

353. Furthermore, Defendant's express warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the Class Members whole and because Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable time.

354.   Also, as alleged herein, at the time that Defendant warranted and sold the Vehicles, it knew that the Vehicles were inherently defective, and Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Vehicles. Plaintiffs and the Class Members were therefore induced to purchase the Vehicles under false and/or fraudulent pretenses.

355.   Further, the enforcement under these circumstances of any limitations whatsoever on the recovery of incidental and/or consequential damages is barred because any such limitations work to reallocate the risks between the parties in an unconscionable and objectively unreasonable manner, and result in overly harsh or one-sided results that shock the conscience, especially in light of the fact that Defendant simply placed defective components in the Vehicles when those Vehicles are brought in for repairs.

356.   Moreover, many of the damages flowing from the Vehicles cannot be resolved by the limited remedies contained in the express warranty as those incidental and consequential damages have already been suffered due to Defendant's fraudulent conduct as alleged herein and due to their failure to provide such limited remedy within a reasonable time.   Therefore, any limitation on Plaintiffs' and the Class Members' remedies would cause the available remedy to be insufficient to make them whole.

357.   Defendant was previously provided notice of the defects in the Vehicles by numerous customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

358.   Plaintiffs and the Class Members have suffered damages directly and proximately caused by Defendant's breach of the express warranty and are entitled to recover damages including, but not limited to, out of pocket expenses and diminution of value.

**COUNT II[13]**
**BREACH OF IMPLIED WARRANTY—**
**MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301, *ET SEQ.*)**

359. Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein

360. Plaintiffs bring this claim on behalf of the Nationwide Class.

361. The Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301.

362. Plaintiffs and members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301 because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

363. Defendant is a "supplier" of consumer products to consumers and a "warrantor" within the meaning of 15 U.S.C. § 2301.

364. 15 U.S.C. § 2310(d)(1)(A) and/or § 2310(d)(3)(C) is satisfied because Plaintiffs properly invoke jurisdiction under the Class Action Fairness Act ("CAFA").

365. Section 2310(d)(1) of Chapter 15 of the United States Code provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

366. Defendant made written and implied warranties regarding the Vehicles to Plaintiffs and Class Members within the meaning of 15 U.S.C. § 2301. Defendant provided Plaintiffs and other Class Members an implied warranty of merchantability within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

367. Defendant breached the implied warranty of merchantability because the Vehicles were not fit for the ordinary purpose for which such goods are used. As described throughout the Complaint, the Vehicles contain defects which render them

---

[13] By order dated October 17, 2019, the Court dismissed this count. Plaintiffs include it in their Second Amended Complaint solely to preserve it for appeal.

unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

368.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendant notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

369.   Plaintiffs, individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of their Vehicles, in an amount to be proven at trial.

370.   In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class Members in connection with the commencement and prosecution of this action.

371.   Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1) and damages as a result of Defendant's violation of its written and/or implied warranties.

**B.     Claims Brought on Behalf of the Alabama Class**

<div align="center">

**COUNT I**
**VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**(ALA. CODE § 8-19-1 ET SEQ.)**

</div>

372.   Plaintiff Brandi Bishop ("Plaintiff" for purposes of all Alabama Class counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

373.   Plaintiff brings this Count on behalf of the Alabama Class.

374.   The Alabama Deceptive Trade Practices Act declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27)

SECOND AMENDED COMPLAINT                    - 124 -

engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

375. Plaintiff and Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

376. Plaintiff, Class members, and Honda are "persons" within the meaning of Ala. Code § 8-19-3(3).

377. Honda was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

378. Honda's conduct, as set forth above, occurred in the conduct of trade or commerce. In the course of its business, Honda concealed and suppressed material facts concerning the class vehicles. These acts were unconscionable, false, misleading, and/or deceptive within the meaning of Ala. Code § 8-19-5.

379. Plaintiff and the Class were injured as a result of Honda's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and have suffered damages as a result.

380. Honda's conduct proximately caused the injuries to Plaintiffs and the Class.

381. Pursuant to Alabama Code § 8-19-10, Plaintiff seeks monetary relief against Honda measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff.

382. Plaintiff also seeks an order enjoining Honda's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code § 8-19-1 *et seq.*

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (ALA. CODE § 7-2-313)

383. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

SECOND AMENDED COMPLAINT                     - 125 -
010811-11/1205802 V1

384.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

385.   In the course of selling its vehicles, Honda expressly warranted in writing that the Class Vehicles were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain.

386.   In its Limited Warranty, Honda expressly warranted that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

387.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

388.   Honda breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replaced, the Class Vehicles' materials and workmanship defects.

389.   Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

390.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

391.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the

other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

392.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

393.  Finally, due to Honda's breach of warranties as set forth herein, Plaintiff and the Class assert as an additional and/or alternative remedy, as set forth in Ala. Code § 7-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the Class of the purchase price of all vehicles currently owned.

394.  Honda was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and the Class.

395.  As a direct and proximate result of Honda's breach of express warranties, Plaintiff and the Class have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(ALA. CODE § 7-2-314)**

396.  Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

397.  Honda is and was at all relevant times a merchant with respect to motor vehicles.

398.  A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to Ala. Code § 7-2-314.

399.   These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiff and Class Members would not have purchased the Vehicles had they known of the defects.

400.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

401.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

402.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Alabama Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

C.   **Claims Brought on Behalf of the Arizona Class**

**COUNT I**
**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT**
**(ARIZ. REV. STAT. § 44-1521 ET SEQ.)**

403.   Plaintiffs Brigid Hirth, Michael Hirth, and Mark Ankrom ("Plaintiffs" for purposes of all Arizona Class counts) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

404.   Plaintiffs bring this claim on behalf of the Arizona Class.

405.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact

been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A). Honda concealed and failed to disclose the infotainment system defect. Honda had an ongoing duty to Plaintiff and the Arizona Class to refrain from unfair and deceptive practices under the Arizona CFA in the course of its business.

406. Honda is a "person" within the meaning of the Arizona CFA, Ariz. Rev. Stat. § 44-1521(6). Each class vehicle at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

407. Honda's conduct, as set forth above, occurred in the conduct of trade or commerce. In the course of its business, Honda concealed and suppressed material facts concerning the class vehicles.

408. The facts concealed and omitted by Honda from Plaintiffs and the other Arizona Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the class vehicles or pay a lower price. Had Plaintiffs and the other Arizona Class members known of the true facts at the time they purchased or leased their Vehicles, they would not have purchased or leased those Vehicles, or would have paid substantially less for the Vehicles than they did.

409. Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against Honda in an amount to be determined at trial. Plaintiffs also seeks punitive damages because Honda engaged in aggravated and outrageous conduct with an evil mind.

410. Plaintiffs also seeks an order enjoining Honda's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

<div align="center">

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(ARIZ. REV. STAT. § 47-2313)**

</div>

411. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

412.   Plaintiffs bring this Count on behalf of the Arizona Class.

413.   Honda is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2104(A).

414.   In its Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

415.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Arizona Class members purchased or leased their Vehicles equipped with an infotainment system from Honda.

416.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Vehicles' materials and workmanship defects.

417.   Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Arizona Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

418.   Accordingly, recovery by Plaintiffs and the other Arizona Class members is not limited to the limited warranty of repair or replacement of parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Arizona Class members, seek all remedies as allowed by law.

419.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Vehicles it knew that the Vehicles did not conform to Honda's Limited Warranty and were defective.  Honda wrongfully and fraudulently concealed material facts regarding its Vehicles.  Plaintiffs and the other Arizona Class members were

therefore induced to purchase or lease the Vehicles under false and/or fraudulent pretenses.

420. Moreover, many of the injuries flowing from the Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Arizona Class members' remedies would be insufficient to make Plaintiffs and the other Arizona Class members whole.

421. Finally, due to Honda's breach of warranties as set forth herein, Plaintiffs and the other Arizona Class members assert as an additional and/or alternative remedy, as set forth in Ariz. Rev. Stat. § 47-2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Arizona Class members of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Ariz. Rev. Stat. §§ 47-2711 and 47-2608.

422. Honda was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

423. As a direct and proximate result of Honda's breach of express warranties, Plaintiffs and the Arizona Class members have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (ARIZ. REV. STAT. § 47-2314)

424. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

425. Plaintiffs bring this Count on behalf of the Arizona Class.

426.   Honda is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014.

427.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Ariz. Rev. Stat. § 47-2314.  These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.  Specifically, the Class Vehicles contain infotainment system defects that render the Vehicles unsafe and prevent users from enjoying many of the Vehicles' features that Class members paid for.

428.   Honda was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

429.   As a direct and proximate result of Honda's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**D.    Claims Brought on Behalf of the Connecticut Class**

<div align="center">

**COUNT I**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**(CONN. GEN. STAT. § 42-110A ET SEQ.)**

</div>

430.   Plaintiff Anthony Rossomando ("Plaintiff," for purposes of all Connecticut Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

431.   This claim is brought by Plaintiff on behalf of the Connecticut Class.

432.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

433.   Honda is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

434.   Honda's challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

435.   Honda had an ongoing duty to Plaintiff and the Connecticut Class to refrain from unfair and deceptive practices under the Connecticut UTPA in the course of its business.

436.   Plaintiff and the Connecticut Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments and/or failure to disclose material information.

437.   Plaintiff and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

438.   Honda acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

## COUNT II
## BREACH OF EXPRESS WARRANTY
## (CONN. GEN. STAT. ANN. § 42A-2-313)

439.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

440.   Plaintiff brings this Count on behalf of the Connecticut Class.

441.   Honda is and was at all relevant times a merchant with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

442.   Honda breached its express warranty to repair and to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.  Therefore, Defendant has violated Conn. Gen. Stat. Ann. § 42a-2-313.

443.   Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

444.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

445.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

446.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

447.   Finally, due to Honda's breach of warranties as set forth herein, Plaintiff and the Class assert as an additional and/or alternative remedy, as set forth in Conn. Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the Class of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Conn. Gen. Stat. Ann. §§ 42a-2-711and 42a-2-608.

448. Honda was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiff and the Class.

449. As a direct and proximate result of Honda's breach of express warranties, Plaintiff and the Class have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CONN. GEN. STAT. ANN. § 42A-2-314)

450. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

451. Plaintiff brings this Count on behalf of the Connecticut Class.

452. Honda was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

453. A warranty that the class vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

454. These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Class Vehicles contain infotainment system defects that render the Vehicles unsafe and prevent users from enjoying many of the Vehicles' features that Class members paid for.

455. Honda was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and the Class.

456. As a direct and proximate result of Honda's breach of the warranties of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

### E.    Claims Brought on Behalf of the Colorado Class

<div align="center">

**COUNT I**
**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(COLO. REV. STAT. §§ 6-1-101, *ET SEQ.*)**

</div>

457.    Plaintiffs Heidi and Peter Phan ("Plaintiffs," for purposes of all Colorado Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

458.    Plaintiffs bring this claim on behalf of the Colorado Class.

459.    Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods."  Colo. Rev. Stat. § 6-1-105(1)(b), (e).

460.    Honda is a "person" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

461.    In the course of Honda's business, it failed to disclose, and actively concealed, the dangerous risk of infotainment system failure in Class Vehicles as described above.  Accordingly, Honda engaged in a deceptive trade practice.

462.    Honda's actions as set forth above occurred in the conduct of trade or commerce.

463.    Honda's conduct proximately caused injuries to Plaintiffs and the other Class members.

464.    Plaintiffs and the other Class members were injured as a result of Honda's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Honda's omissions.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(BASED ON COLORADO LAW)**

465.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

466.   Plaintiffs bring this claim on behalf of the Colorado Class.

467.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

468.  In its Limited Warranty, Honda expressly warranted that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

469.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

470.   Honda breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replaced, the Class Vehicles' materials and workmanship defects.

471.   Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

472.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

473.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's

Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

474. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

475. Due to Honda's breach of warranties as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in Colo. Rev. Stat. § 4-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under Colo. Rev. Stat. §§ 4-2-711 and 4-2-608.

476. Plaintiffs have attempted to have their Vehicles repaired under the warranty. And Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

477. As a direct and proximate result of Honda's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED WARRANTY**
**(BASED ON COLORADO LAW)**

478.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

479.   Plaintiffs bring this claim on behalf of the Colorado Class.

480.   Honda is a merchant with respect to motor vehicles.

481.   Under COL. REV. STAT. § 4-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from Honda.

482.   These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

483.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

484.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

485.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Colorado Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## F.    Claims Brought on Behalf of the Florida Class

### COUNT I
### VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (FLA. STAT. § 501.201, ET SEQ.)

486.    Plaintiffs Larry Simkin and Laura Mohr ("Plaintiffs" for purposes of all Florida Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

487.    Plaintiffs bring this claim on behalf of the Florida Class.

488.    Plaintiffs and the other Florida Class members are 'consumers', as defined by § 501.203(7) of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

489.    Honda engaged in "trade or commerce", as defined by § 501.203(8) of the FDUTPA.

490.    The sale of the Vehicles to Plaintiffs and other Florida Class members was a "consumer transaction", as defined by § 1345.01 of the FDUTPA.

491.    Section 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce…" Fla. Stat. § 501.204(1). Honda participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

492.    By not disclosing the defective nature of the infotainment system Honda has willfully and knowingly engaged in unfair and deceptive acts in the conduct of trade and commerce within the State of Florida.

493.    In purchasing or leasing the Vehicles, Plaintiffs and the other Florida Class members were deceived by Honda's failure to disclose that the infotainment system in the Vehicles was defective.

494.    Plaintiffs and the other Florida Class members reasonably relied upon Honda's f omissions. They had no way of knowing that Honda's representations were false, misleading, and incomplete. As alleged herein, Honda willfully and knowingly

SECOND AMENDED COMPLAINT                    - 140 -
010811-11/1205802 V1

engaged in a pattern of deception and public silence in the face of a known defect with its infotainment system. Plaintiffs and the other Florida Class members did not, and could not, unravel Honda's deception on their own.

495.   Honda's actions as set forth above occurred in the conduct of trade or commerce.

496.   Honda's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

497.   Honda willfully and knowingly omitted material facts regarding the Vehicles with intent to mislead Plaintiffs and the other Florida Class members.

498.   Honda knew or should have known that its conduct violated the FDUTPA.

499.   Honda owed Plaintiffs and the other Florida Class members a duty to disclose the truth about its faulty infotainment system because the defect created a safety hazard and Honda:

    i.   Possessed exclusive knowledge of the defect in the infotainment system;

    ii.   Intentionally concealed the foregoing from Plaintiffs and the other Florida Class members; and/or

    iii.   Made incomplete representations in advertisements and on its website, failing to warn the public or to publicly admit that the infotainment system was defective.

500.   Honda had a duty to disclose that the infotainment system in the Vehicles was fundamentally flawed as described herein, because the defect created a safety hazard and Plaintiffs and the other Florida Class members relied on Honda's material omissions regarding the technology, benefits, efficiency, convenience, performance, and safety features of the infotainment system.

501.   Honda's conduct proximately caused injuries to Plaintiffs and the other Florida Class members who purchased or leased the Vehicles and suffered harm as alleged herein.

502.   Plaintiffs and the other Florida Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiffs and the other Florida Class members incurred costs, including overpaying for their Vehicles that have suffered a diminution in value.

503.   Honda's violations cause continuing injuries to Plaintiffs and the other Florida Class members. Honda's unlawful acts and practices complained of herein affect the public interest.

504.   Plaintiffs and the other Florida Class members seek damages and treble damages for Honda's knowing violations.

505.   Plaintiffs and the other Florida Class members also seek court costs and attorneys' fees.

## COUNT II
## FRAUDULENT CONCEALMENT
## (BASED ON FLORIDA LAW)

506.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

507.   Plaintiffs bring this claim on behalf of the Florida Class.

508.   Honda intentionally concealed that the infotainment system is defective.

509.   Honda further misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Vehicles it was selling had no significant defects, that the infotainment system was a safety feature, reliable, and would perform and operate properly.

510.   Honda knew about the defect in the infotainment system when these representations were made.

SECOND AMENDED COMPLAINT                    - 142 -
010811-11/1205802 V1

511.   The Vehicles purchased by Plaintiffs and the other Florida Class members contained a defective infotainment system.

512.   Honda had a duty to disclose that the infotainment system contained a fundamental defect as alleged herein, because the defect created a safety hazard and Plaintiffs and the other Florida Class members relied on Honda's material representations.

513.   As alleged herein, at all relevant times, Honda has held out the Vehicles to be free from defects such as the defect related to the infotainment system. Honda touted and continues to tout the many benefits and advantages of the infotainment system, but nonetheless failed to disclose important facts related to the defect. This made Honda's other disclosures about the infotainment system deceptive.

514.   The truth about the defective infotainment system was known only to Honda; Plaintiffs and the other Florida Class members did not know of these facts and Honda actively concealed these facts from Plaintiffs and the other Florida Class members.

515.   Plaintiffs and the other Florida Class members reasonably relied upon Honda's deception. They had no way of knowing that Honda's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Florida Class members did not, and could not, unravel Honda's deception on their own. Rather, Honda intended to deceive Plaintiffs and the other Florida Class members by concealing the true facts about the Vehicles' infotainment systems.

516.   Honda's false representations and omissions were material to consumers because they concerned qualities of the Vehicles that played a significant role in the value of the Vehicles.

517.   Honda had a duty to disclose the infotainment system defect and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to Honda, because Honda had exclusive knowledge as to such facts, and

1    because Honda knew these facts were not known to or reasonably discoverable by

2    Plaintiff or Class members.

3        518.    Honda also had a duty to disclose because it made general affirmative

4    representations about the technological and safety innovations included with its

5    Vehicles, without telling consumers that one of the features had a fundamental defect

6    that would affect the safety, quality and performance of the Vehicles.

7        519.    Honda's disclosures were misleading, deceptive, and incomplete because

8    they failed to inform consumers of the additional facts regarding the defect in the

9    infotainment system as set forth herein. These omitted and concealed facts were material

10   because they directly impact the value of the Vehicles purchased by Plaintiffs and the

11   other Florida Class members.

12       520.    Honda has still not made full and adequate disclosures, and continues to

13   defraud Plaintiffs and the other Florida Class members by concealing material

14   information regarding the defect in the infotainment system.

15       521.    Plaintiffs and the other Florida Class members were unaware of the omitted

16   material facts referenced herein, and they would not have acted as they did if they had

17   known of the concealed and/or suppressed facts, in that they would not have purchased

18   or paid as much for cars with faulty technology, and/or would have taken other

19   affirmative steps in light of the information concealed from them. Plaintiffs' and the

20   other Florida Class members' actions were justified. Honda was in exclusive control of

21   the material facts, and such facts were not generally known to the public, Plaintiffs, or

22   Class members.

23       522.    Because of the concealment and/or suppression of facts, Plaintiffs and the

24   other Florida Class members sustained damage because they own(ed) Vehicles that are

25   diminished in value as a result of Honda's concealment of the true quality of those

26   Vehicles' infotainment systems. Had Plaintiffs and the other Florida Class members

27   been aware of the defect in the infotainment systems installed in the Vehicles, and the

28

SECOND AMENDED COMPLAINT              - 144 -
010811-11/1205802 V1

Company's disregard for the truth, Plaintiffs and the other Florida Class members who purchased or leased a Vehicle would have paid less for it or would not have purchased or leased it at all.

523.  The value of Plaintiffs' and the other Florida Class members' Vehicles has diminished as a result of Honda's fraudulent concealment of the defective infotainment system of the Vehicles, which has made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

524. Accordingly, Honda is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial.

525.  Honda's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and the other Florida Class members' rights and the representations that Honda made to them, in order to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF EXPRESS WARRANTY
### (FLA. STAT. § 672.313)

526.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

527.  Plaintiffs bring this claim on behalf of the Florida Class.

528.  Plaintiffs were at all relevant times "buyers", as defined by § 672.103 of the Florida Uniform Commercial Code.

529.  Honda was at all relevant times a "merchant", as defined by § 672.104 of the Florida Uniform Commercial Code.

530.  The Vehicles are and were at all relevant times "goods," as defined by § 672.105 of the Florida Uniform Commercial Code.

531.   Honda marketed the Vehicles as safe and reliable luxury vehicles. Such representations formed the basis of the bargain in Plaintiffs' and the other Florida Class members' decisions to purchase the Vehicles.

532.   In connection with the purchase or lease of each of the Vehicles, Honda provided warranty coverage for the Vehicles for four years or 50,000 miles, which obliges Honda to repair or replace any part that is defective under normal use.

533.   Honda's warranty formed a basis of the bargain that was reached when Plaintiff and other Florida Class members purchased their Vehicles.

534.   Plaintiffs and the other Florida Class members owned Vehicles with defective infotainment systems within the warranty period but had no knowledge of the existence of the defect, which was known and concealed by Honda.

535.   Despite the existence of the warranty, Honda failed to inform Plaintiffs and the other Florida Class members that the Vehicles contained the defective infotainment systems during the warranty periods.

536.   Honda breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

537.   Honda knew about the defect in the infotainment systems, allowing Honda to cure their breach of its warranty if it chose.

538.   However, Honda concealed the defect and has failed to repair or replace the infotainment systems despite the defect's existence at the time of sale or lease of the Vehicles.

539.   Any attempt by Honda to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Honda's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Florida Class members. Among other things, Plaintiffs and the other

Florida Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and other Florida Class members, and Honda knew that the infotainment systems were defective at the time of sale.

540. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and other Florida Class members whole because the replacement part used by Honda contains the same defect. Affording Honda a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

541. Accordingly, Honda is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial.

<div align="center">

**COUNT IV**
**BREACH OF IMPLIED WARRANTY**
**(FLA. STAT. § 672.314)**

</div>

542. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

543. Plaintiffs bring this claim on behalf of the Florida Class.

544. Plaintiffs were at all relevant times a "buyer" as defined by § 672.103 of the Florida Uniform Commercial Code.

545. Honda was at all relevant times a "merchant" as defined by § 672.104 of the Florida Uniform Commercial Code.

546. The Vehicles are and were at all relevant times "goods", as defined by § 672.105 of the Florida Uniform Commercial Code.

547. Honda marketed the Vehicles as safe and reliable luxury vehicles. Such representations formed the basis of the bargain in Plaintiffs' and the other Florida Class members' decisions to purchase the Vehicles.

548.   Plaintiffs and the other Florida Class members purchased or leased the Vehicles from Honda, through Honda's authorized agents for retail sales, through private sellers, or were otherwise expected to be the eventual purchasers of the Vehicles when bought from a third party. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Vehicles.

549.   Honda knew or had reason to know of the specific use for which the Vehicles were purchased or leased.

550.   Honda impliedly warranted that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

551.   Because of the defect in the infotainment system, the Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

552.   Honda knew about the defect in the infotainment systems, allowing Honda to cure their breach of its warranty if it chose.

553.   Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the other Florida Class members. Among other things, Plaintiffs and the other Florida Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and other Florida Class members, and Honda knew of the defect at the time of sale.

554.   Plaintiffs and the other Florida Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a

reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

555.   Accordingly, Honda is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial.

## COUNT V
## UNJUST ENRICHMENT
## (BASED ON FLORIDA LAW)

556.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

557.   Plaintiffs bring this claim on behalf of the Florida Class.

558.   Honda has benefitted and been enriched by the conduct alleged herein. Honda has generated substantial revenue from the unlawful conduct described herein. Honda has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Florida Class members.

559.   Honda has voluntarily accepted and retained this benefit.

560.   The circumstances, as described herein, are such that it would be inequitable for Honda to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Florida Class members.

561.   Plaintiffs and the other Florida Class members are entitled to the amount of Honda's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## G.    Claims Brought on Behalf of the Georgia Class

## COUNT I
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
## (GA. CODE ANN. § 10-1-390 ET SEQ.)

562.   Plaintiff Harmeet Gill ("Plaintiff," for purposes of all Georgia Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

563. Plaintiff brings this claim on behalf of the Georgia Class.

564. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 101-393(b), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

565. Plaintiff and Class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

566. Defendant engaged in "trade or commerce" within the meaning of Ga. Code Ann. § 10-1-393(b).

567. Honda violated the Georgia FBPA by concealing and failing to disclose the infotainment defect. Honda had an ongoing duty to Plaintiff and the Georgia Class to refrain from unfair and deceptive practices under the Georgia FBPA in the course of its business.

568. Plaintiff and the Georgia Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments and/or failure to disclose material information.

569. Plaintiff and Class members are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a). On June 10, 2019, Plaintiffs provided Honda with a written demand for relief pursuant to Ga. Code Ann. § 10-1-399(b).

570. Plaintiff also seeks an order enjoining Defendant unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA Code Ann. § 10-1-399.

## COUNT II
## BREACH OF EXPRESS WARRANTY

571.   Plaintiff Harmeet Gill ("Plaintiff," for purposes of all Georgia Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

572.   Plaintiff brings this claim on behalf of the Georgia Class.

573.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

574.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

575.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

576.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

577.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

578.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

579.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

580.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

581.   Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

582.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

583.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212)

584.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

585.   Plaintiff brings this claim on behalf of the Georgia Class.

586.   Honda was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

587.   The Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

588.   A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

589.   These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

590.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

591.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

592.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Georgia Class members have been damaged

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 153 -

in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## H.    Claims Brought on Behalf of the Illinois Class

### COUNT I
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)

593.    Plaintiff Yazeed Issa ("Plaintiff," for purposes of all Illinois Class Counts) incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

594.    Plaintiff brings this claim on behalf of the Illinois Class.

595.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 ILCS 505/2.

596.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

597.    Plaintiff and Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

598.    Honda violated the Illinois CFA by concealing and failing to disclose the infotainment system defects.  Honda had an ongoing duty to Plaintiff and the Illinois Class to refrain from unfair and deceptive practices under the Illinois CFA in the course of its business.

599.    Plaintiff and the Illinois Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments  and/or failure to disclose material information.

600.   Pursuant to 815 ILCS 505/10a(a), Plaintiff seek monetary relief against Defendant in the amount of actual damages as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

601.   Plaintiff also seeks an order enjoining Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS 505/1 ET SEQ.

## COUNT II
## BREACH OF EXPRESS WARRANTY[14]

602.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

603.   Plaintiff brings this claim on behalf of the Illinois Class.

604.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

605.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

606.   Honda's warranty formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defective infotainment system from Honda.

607.   Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of its warranty, Honda failed to inform Plaintiff and Class members that the Class Vehicles were defective and failed to fix the defective infotainment system.

---

[14] By order dated October 17, 2019, the Court dismissed Plaintiff Issa's express warranty claim because he had yet to offer Honda an opportunity to repair or replace the defect, with leave to amend.  *See* DE 49 at p. 16.  As discussed above, Plaintiff Yazeed Issa now alleges that he has presented Honda with such an opportunity.

608.   Affording Honda a reasonable opportunity to cure its breach of written warranty would be unnecessary and futile here.

609.   Also, as alleged in more detail herein, at the time Honda warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to Honda's warranty and were inherently defective.  Honda wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

610.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints filed against it, including the instant Complaint, within a reasonable amount of time after the defect was discovered.

611.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (810 ILL. COMP. STAT. §§ 5/2-314 AND 5/2A-212)[15]

612.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

613.   Plaintiff brings this claim on behalf of the Illinois Class.

614.   Honda was at all relevant times a "merchant" with respect to motor vehicles under 810 ILL. COMP. STAT. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

---

[15] By order dated October 17, 2019, the Court dismissed Plaintiff Issa's implied warranty claim because he had yet to offer Honda an opportunity to repair or replace the defect, with leave to amend.  *See* DE 49 at p. 21-22.  As discussed above, Plaintiff Yazeed Issa now alleges that he has presented Honda with such an opportunity.

615. The Vehicles are and were at all relevant times ""goods" within the meaning of 810 ILL. COMP. STAT. §§ 5/2-105(1) and 5/2A-103(1)(h).

616. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

617. These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

618. Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

619. Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

620. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Illinois Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

**I.     Claims Brought on Behalf of the Kansas Class**

<div align="center">

**COUNT I**
**VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT**
**(KAN. STAT. ANN. § 50-623 *ET SEQ.*)**

</div>

621. Plaintiff Ashley Pfeifer for all Kansas state law claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

622. Plaintiff brings this claim on behalf of the Kansas Class.

SECOND AMENDED COMPLAINT                - 157 -
010811-11/1205802 V1

623.   The Kansas Consumer Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a). Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions," "whether or not any consumer has in fact been misled." Kan. Stat. Ann. § 50-626.

624.   Plaintiff and Class members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased the vehicles at issue.

625.   Each sale of the Class Vehicles to Plaintiff and Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

626.   Honda violated the Kansas CPA by concealing and failing to disclose the infotainment defects.  Honda had an ongoing duty to Plaintiff and the Kansas Class to refrain from unfair and deceptive practices under the Kansas CPA in the course of its business.

627.   Plaintiff and the Kansas Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments and/or failure to disclose material information.

628.   Pursuant to Kan. Stat. Ann. § 50-634, Plaintiff and Class members seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

629.   Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623 ET SEQ.

## COUNT II
## BREACH OF EXPRESS WARRANTY[16]

630.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

631.   Plaintiff brings this claim on behalf of the Kansas Class.

632.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

633.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

634.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

635.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

636.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

637.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials

---

[16] By order dated October 17, 2019, the Court dismissed Plaintiff Pfeifer's express warranty claim because she did not adequately plead that she had yet to offer Honda an opportunity to repair or replace the defect, with leave to amend.  *See* DE 49 at p. 16.  As discussed above, Plaintiff Pfeifer now alleges that she has presented Honda with such an opportunity.

or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

638.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

639.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

640.   Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

641.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

642.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

<div align="center">

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(KAN. STAT. §§ 84-2-314 AND 84-2A-212)**

</div>

643.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

644.   Plaintiff brings this claim on behalf of the Kansas Class.

645.   Honda was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

646.   The Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

647.   A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

648.   These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

649.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

650.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

651.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Kansas Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## J.   Claims Brought on Behalf of the Kentucky Class

### COUNT I
### VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
### (KY. REV. STAT. § 367.110, *ET SEQ.*)

652.   Plaintiff William Lampton ("Plaintiff," for purposes of all Kentucky Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

653.   Plaintiff brings this claim on behalf of the Kentucky Class.

654.   Honda and Plaintiff are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

655.   Honda engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

656.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." Ky. Rev. Stat. § 367.170(1).  Honda participated in misleading, false, or deceptive acts that violated the Kentucky CPA.  By systematically concealing the defects in the Class Vehicles, Honda engaged in deceptive business practices prohibited by the Kentucky CPA.  These defects would be material to a reasonable consumer.

657.   Honda's actions, as set forth above, occurred in the conduct of trade or commerce.

658.   In the course of its business, Honda systematically concealed the defects in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Honda also engaged in unlawful trade practices by

employing deception, deceptive acts or practices, fraud or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

659.   Honda knew that the infotainment systems in the Class Vehicles were defectively manufactured, would fail without warning, and were not suitable for their intended use.  Honda was previously provided notice of the defects in the Vehicles by numerous customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.  Honda nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

660.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Honda engaged in unfair and deceptive business practices in violation of the Kentucky CPA.

661.   In the course of Honda's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiff's vehicle.

662.   Honda's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of their vehicles.

663.   Honda intentionally and knowingly omitted material facts regarding the Class Vehicles with the intent to mislead Plaintiff.

664.   Honda knew or should have known that its conduct violated the Kentucky CPA.

665.   As alleged above, Honda made material statements about the safety and reliability of the Class Vehicles and the Honda brand that were either false or misleading.

666.   Honda owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Honda:

a.      Possessed exclusive knowledge about the defects in the Class Vehicles;

SECOND AMENDED COMPLAINT                    - 163 -
010811-11/1205802 V1

b.     Intentionally concealed the foregoing from Plaintiff; and/or

c.     Made incomplete representations about the safety and reliability of the Class Vehicles.

667.   Because Honda fraudulently concealed the defects in Honda vehicles, Class Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiff had to spend his time and money to bring his Class Vehicles in for repair.  Had Honda Class Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Class Vehicles or would have paid less for them.

668.   Honda Class Vehicle owners were also harmed by Honda's unfair and deceptive trade practices since their vehicles were worth less as the result of Honda's concealment of, and failure to remedy, the defects.  This diminished value is directly attributed to Honda's dishonesty and omissions with respect to the quality and safety of the Class Vehicles.

669.   Honda's concealment of the defects in Plaintiff's vehicle was material to Plaintiff.

670.   Plaintiff suffered ascertainable loss caused by Honda's omissions and its concealment of and failure to disclose the defects in his vehicle.

671.   Honda's violations present a continuing risk to Plaintiff as well as to the general public.  In particular and as alleged herein, Honda's has yet to attempt to fix, much less acknowledge, the defects in Class Vehicles' infotainment systems.  Honda's unlawful acts and practices complained of herein affect the public interest.

672.   As a direct and proximate result of Honda's violations of the Kentucky CPA, Plaintiff has suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of Honda's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

SECOND AMENDED COMPLAINT                              - 164 -
010811-11/1205802 V1

673.   Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining Honda's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

## COUNT II
## BREACH OF EXPRESS WARRANTY

674.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

675.   Plaintiff brings this claim on behalf of the Kentucky Class.

676.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

677.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

678.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

679.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

680.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

681.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials

or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

682.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

683.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

684.   Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

685.  Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

686.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**K.   Claims Brought on Behalf of the Maryland Class**

**COUNT I**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(MD. CODE COM. LAW § 13-101, ET SEQ.)**

687.   Plaintiff Jacob Szajowitz ("Plaintiff," for purposes of all Maryland Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

688.   This claim is brought on behalf of the Maryland Class.

689.   Honda and Plaintiff are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

690.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good. Md. Com. Law Code § 13-303.   Honda participated in misleading, false, or deceptive acts that violated the Maryland CPA.   By systematically concealing the defects in the Class Vehicles, Honda engaged in deceptive business practices prohibited by the Maryland CPA.   These defects would be material to a reasonable consumer.

691.   Honda's actions, as set forth above, occurred in the conduct of trade or commerce.

692.   In the course of its business, Honda concealed the defects in Plaintiff's vehicle as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   Honda also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

SECOND AMENDED COMPLAINT                    - 167 -
010811-11/1205802 V1

693.    Honda knew that the infotainment systems in the Class Vehicles were defectively manufactured, would fail without warning, and were not suitable for their intended use.  Honda was previously provided notice of the defects in the Vehicles by numerous customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.  Honda nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

694.    By failing to disclose and by actively concealing the defects in Plaintiff's vehicle, which it marketed as safe, reliable, and of high quality, Honda engaged in unfair and deceptive business practices in violation of the Maryland CPA.

695.    In the course of Honda's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiff's vehicle.

696.    Honda's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

697.    Honda intentionally and knowingly omitted material facts regarding the Class Vehicles with the intent to mislead Plaintiffs.

698.    Honda knew or should have known that its conduct violated the Maryland CPA.

699.    As alleged above, Honda made material statements about the safety and reliability of the Class Vehicles and the Honda brand that were either false or misleading.

700.    Honda owed Plaintiff a duty to disclose the true safety and reliability of the Class Vehicles because Honda:

a.    Possessed exclusive knowledge about the defects in the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiff; and/or

c.    Made incomplete representations about the safety and reliability of the Class Vehicles.

SECOND AMENDED COMPLAINT                          - 168 -
010811-11/1205802 V1

701.   Because Honda fraudulently concealed the defects in the Class Vehicles, Honda Class Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.   Further, Plaintiff had to spend his time and money to bring his Class Vehicle in for repair.   Had Honda Class Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Class Vehicles or would have paid less for them.

702.   Honda Class Vehicle owners were also harmed by Honda's unfair and deceptive trade practices since their vehicles were worth less as the result of Honda's concealment of, and failure to remedy, the defects.   This diminished value is directly attributed to Honda's dishonesty and omissions with respect to the quality and safety of the Class Vehicles.

703.   Honda's concealment of the defects in Plaintiff's vehicles was material to Plaintiff.

704.   Plaintiff suffered ascertainable loss caused by Honda's omissions and its concealment of and failure to disclose the defects in his vehicle.

705.   As a direct and proximate result of Honda's violations of the Maryland CPA, Plaintiff has suffered injury-in-fact and/or actual damage as alleged above.   As a direct result of Honda's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

706.   Pursuant to Md. Code Com. Law § 13-408, Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT II
## BREACH OF EXPRESS WARRANTY

707.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

708.   This claim is brought on behalf of the Maryland Class.

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 169 -

709.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

710.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

711.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

712.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

713.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

714.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

715.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

SECOND AMENDED COMPLAINT                           - 170 -
010811-11/1205802 V1

716.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

717.   Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

718.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

719.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Maryland Class members have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (MD. CODE COM. LAW § 2-314)

720.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

721.   This claim is brought on behalf of the Maryland Class.

722.   Honda was a merchant with respect to motor vehicles within the meaning of MD. COM.  LAW § 2-104(1).

723.    Under MD. COM. LAW § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff purchased or leased their Class Vehicles from Honda.

724.    These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' infotainment systems rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

725.    Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

726.    As a direct and proximate result of Honda's breach of the warranties of merchantability, Plaintiff and the other Maryland Class members have been damaged in an amount to be proven at trial.

**L.    Claims Brought on Behalf of the Massachusetts Class**

### COUNT I
### VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECT ACT
### (MASS. GEN. LAWS CH. 93A)

727.    Plaintiff Michaela Hetzler ("Plaintiff," for purposes of all Massachusetts Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

728.    Plaintiff brings this claim on behalf of the Massachusetts Class.

729.    The conduct of Honda as set forth herein constitutes unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, including but not limited to Honda's manufacture, and sale of Class Vehicles with the defective infotainment system, which Honda failed to adequately investigate, disclose, and remedy, and its omissions regarding the safety, reliability, and functionality of its Class Vehicles, which omissions possessed the tendency to deceive.

730.   Honda engages in the conduct of trade or commerce and the misconduct alleged herein occurred in trade or commerce.

731.   Therefore, Plaintiff seeks monetary and equitable relief under the Massachusetts Consumer Protection Act as a result of Honda's unfair and deceptive acts and practices.   On June 10, 2019, and pursuant to Mass. Gen. Laws Ch. 93A, § 9(3), Plaintiffs sent notice and demand to Honda of its violations of the Massachusetts Consumer Protection Act.

### COUNT II
### BREACH OF EXPRESS WARRANTY
### (MASS. GEN. LAWS CH. 106, § 2-313)

732.   Plaintiff Michaela Hetzler ("Plaintiff," for purposes of all Massachusetts Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

733.   Plaintiff brings this claim on behalf of the Massachusetts Class.

734.   Honda is and was at all relevant times a "merchant" with respect to motor vehicles.

735.   In its Limited Warranty, Honda expressly warranted that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

736.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

737.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

738.   Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make

Plaintiff and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

739. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or replacement of parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

740. Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

741. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

742. Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Mass. Gen. Laws Ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under Mass. Gen. Laws Ch. 106, §§ 2-711 and 2-608.

743. Plaintiffs have attempted to have their Vehicles repaired under the warranty. Honda was also provided notice of these issues by numerous complaints

against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

744.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Massachusetts Class members have been damaged in an amount to be determined at trial.

<div align="center">

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(MASS. GEN. LAWS CH. 106, § 2-314)**

</div>

745.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

746.   Plaintiff brings this claim on behalf of the Massachusetts Class.

747.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

748.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

749.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' infotainment systems rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

750.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

751.   As a direct and proximate result of Honda's breach of the warranties of merchantability, Plaintiff and the other Massachusetts Class members have been damaged in an amount to be proven at trial.

## M.     Claims Brought on Behalf of the Missouri Class

### COUNT I
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010 *ET SEQ.*)

752.    Plaintiff Michelle Beckwith ("Plaintiff," for purposes of all Missouri Class Counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

753.    This claim is brought by Plaintiff on behalf of the Missouri Class.

754.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

755.    Defendant, Plaintiff, and Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

756.    Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. REV. STAT. § 407.010(7).

757.    Honda violated the Missouri MPA by concealing and failing to disclose the infotainment system defects.  Honda had an ongoing duty to Plaintiff and the Missouri Class to refrain from unfair and deceptive practices under the Missouri MPA in the course of its business.

758.    Plaintiff and the Missouri Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments, and/or failure to disclose material information.

759.    Defendant is liable to Plaintiff and Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

SECOND AMENDED COMPLAINT                          - 176 -
010811-11/1205802 V1

## COUNT II
## BREACH OF EXPRESS WARRANTY

760.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

761.   Plaintiff brings this claim on behalf of the Missouri Class.

762.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

763.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

764.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

765.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

766.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

767.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

768.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's

Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

769. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

770. Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

771. Plaintiffs have attempted to have their Vehicles repaired under the warranty. Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

772. As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Missouri Class members have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MO. REV. STAT. § 400.2-314)

773.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

774.   Plaintiff brings this Count on behalf of the Missouri Class.

775.   Honda was at all relevant times a "merchant" as defined by Mo. Rev. Stat. § 400.2-104 and a "seller" of motor vehicles under § 400.2-103(1)(d).

776.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

777.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

778.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

779.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

780.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

781.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Missouri Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## N.    Claims Brought on Behalf of the Ohio Class

### COUNT I
### VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE §§ 1345.01, *ET SEQ.*)

782.    Plaintiffs Leslie and Tom Conti ("Plaintiffs," for purposes of all Ohio Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

783.    Plaintiffs bring this claim on behalf of the Ohio Class.

784.    Plaintiffs and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA"). Honda is a "supplier" as defined by the OCSPA.  Plaintiffs' and the other Ohio Class members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the OCSPA.

785.    By failing to disclose and actively concealing the defects in the infotainment systems in the Class Vehicles, Honda engaged in deceptive business practices prohibited by the OCSPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

786.    Honda knew that the infotainment systems in the Class Vehicles were defectively manufactured, would fail without warning, and were not suitable for their intended use.  Honda nevertheless failed to warn Plaintiffs about these defects despite having a duty to do so.

787.    Honda owed Plaintiffs a duty to disclose the defective nature of the infotainment systems in the Class Vehicles, because Honda:

i)      Possessed exclusive knowledge of the defects rendering the Class Vehicles more unreliable than similar vehicles;

ii)     Intentionally concealed the defects associated with infotainment system; and/or

iii)   Made incomplete representations about the characteristics and performance of the infotainment system generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

788.   Honda's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs, about the true performance and characteristics of Honda's infotainment system.

789.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Honda in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Honda Motor Co.* (OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Oho App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g.   *Mark J. CrawHonda, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.   *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i.   *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.   *Khouri v. Don Lewis* (OPIF #100001995);

k.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524);

m.   *Brown v. Spears* (OPIF #10000403);

n.   *State ex rel. Brown v. Bud Fletcher Used Cars, Inc.* (OPIF #10000228) (Ohio Ct. C.P. Apr. 27, 1982);

o.   *State ex rel. Celebrezze v. Metro Toyota, Inc.* (OPIF #10001194); and

p.   *Shellhorn v. Kohler Chrysler-Plymouth, Inc.*, PIF Number:10001309.

790.   As a result of its violations of the OCSPA detailed above, Honda caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have owned or leased, a Class Vehicle that is defective.  Defects associated with the infotainment system have caused the value of Class Vehicles to decrease.

791.   Plaintiffs and the Class sustained damages as a result of Honda's unlawful acts and are, therefore, entitled to damages and other relief as provided under the OCSPA.

792.   Plaintiff also seeks court costs and attorneys' fees as a result of Honda's violation of the OCSPA as provided in Ohio Rev. Code § 1345.09.

### COUNT II
### BREACH OF EXPRESS WARRANTY
### (OHIO REV. CODE § 1302.26)

793.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

794.   Plaintiffs bring this claim on behalf of the Ohio Class.

795.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

SECOND AMENDED COMPLAINT                      - 182 -
010811-11/1205802 V1

796.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

797.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

798.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

799.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

800.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

801.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

802.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and

consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

803.    Due to Honda's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in Ohio Rev. Code § 1302.66, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under Ohio Rev. Code §§ 1302.66 and 1302.85.

804.    Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

805.    As a direct and proximate result of Honda's breach of express warranty, Plaintiffs and the other Ohio Class members have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED WARRANTY IN TORT**
**(BASED ON OHIO LAW)**

806.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

807.    Plaintiffs bring this claim on behalf of the Ohio Class.

808.    The Class Vehicles contained a defect, namely, an infotainment system that routinely fails, completely or partially, resulting in loss of crucial safety, communications, and entertainment functions, as detailed herein more fully.

809. The manufacturing, and/or assembly defect existed at the time these Class Vehicles containing the infotainment system left the hands of Honda.

810. Based upon the dangerous product defect and its certainty to occur, Honda failed to meet the expectations of a reasonable consumer. The Class Vehicles failed their ordinary, intended use because the infotainment system does not function (when it functions at all) as a reasonable consumer would expect. Moreover, it presents a serious danger to Plaintiffs and the other Class members that cannot be eliminated without significant cost.

811. The defect in the infotainment systems in these Class Vehicles was the direct and proximate cause of economic damages to Plaintiff, as well as damages.

**O.    Claims Brought on Behalf of the Oklahoma Class**

<div align="center">

**COUNT I**
**VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT**
**(OKLA. STAT. TIT. 15 § 751, *ET SEQ.*)**

</div>

812. Plaintiffs Ross and Stephanie Conley ("Plaintiffs," for purposes of all Oklahoma Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

813. Plaintiffs bring this claim on behalf of the Oklahoma Class.

814. Plaintiffs are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

815. Honda is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15 § 15-751(1).

816. The sale or lease of the Class Vehicles to Plaintiffs was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and Honda's actions as set forth herein occurred in the conduct of trade or commerce.

817. The Oklahoma CPA declares unlawful, inter alia, the following acts or practices when committed in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics…, uses, [or]

benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice."  See OKLA. STAT. TIT. 15, § 753.  By failing to disclose and by systematically concealing the defects in the Class Vehicles, Honda engaged in deceptive business practices prohibited by the Oklahoma CPA.  These defects would be material to a reasonable consumer.

818.   In the course of its business, Honda concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Honda also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

819.   Honda knew that the infotainment systems in the Class Vehicles were defectively manufactured, would fail without warning, and were not suitable for their intended use.  Honda was previously provided notice of the defects in the Vehicles by numerous customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.  Honda nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

820.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicle, which it marketed as safe, reliable, and of high quality, Honda engaged in unfair and deceptive business practices in violation of the Oklahoma CPA.

821.   In the course of Honda's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

822.   Honda's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

823.   Honda intentionally and knowingly omitted material facts regarding the Class Vehicles with the intent to mislead Plaintiffs.

824.   Honda knew or should have known that its conduct violated the Oklahoma CPA.

825.   As alleged above, Honda made material statements about the safety and reliability of the Class Vehicles and the Honda brand that were either false or misleading.

826.   Honda owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles, because Honda:

    a.    Possessed exclusive knowledge about the defects in the Class Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Class Vehicles.

827.   Because Honda fraudulently concealed the defects in Honda vehicles, Honda Class Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.  Further, Plaintiffs had to spend their time and money to bring their Class Vehicles in for repair.  Had Honda Class Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Class Vehicles or would have paid less for them.

828.   Honda Class Vehicle owners were also harmed by Honda's unfair and deceptive trade practices since their vehicles were worth less as the result of Honda's concealment of, and failure to remedy, the defects.  This diminished value is directly

attributed to Honda's dishonesty and omissions with respect to the quality and safety of the Class Vehicles.

829.    Honda's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

830.    Plaintiffs suffered ascertainable loss caused by Honda's omissions and its concealment of and failure to disclose the defects in their vehicles.

831.    As a direct and proximate result of Honda's violations of the Oklahoma CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of Honda's misconduct, Plaintiffs incurred damages in at least the form of lost time required to repair their vehicle.

832.    Plaintiffs seek punitive damages against Honda because Honda's conduct was egregious and unconscionable.  Honda's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.

833.    Because Honda's unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1. Plaintiffs further seeks an order enjoining Honda's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT II
## BREACH OF EXPRESS WARRANTY

834.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

835.    Plaintiffs bring this claim on behalf of the Oklahoma Class.

836.    Honda is and was at all relevant times a merchant with respect to motor vehicles.

837.    In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under

SECOND AMENDED COMPLAINT                 - 188 -

normal use" and that "all repairs/replacements made under this warranty are free of charge."

838.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

839.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

840.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

841.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

842.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

843.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

844. Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

845. Plaintiffs have attempted to have their Vehicles repaired under the warranty. Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

846. As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Oklahoma Class members have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(12A OKLA. STAT. ANN. § 2-314)**

847. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

848. Plaintiffs bring this claim on behalf of the Oklahoma Class.

849. Honda was a merchant with respect to motor vehicles.

850. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicle from Honda.

851. These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.

Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

852.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

853.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

854.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Oklahoma Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## P.   Claims Brought on Behalf of the South Carolina Class

### COUNT I
### VIOLATION OF THE SOUTH CAROLINA
### UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 *ET SEQ.*)

855.   Plaintiff Emily Darr ("Plaintiff," for purposes of all South Carolina Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

856.   This claim is brought by Plaintiff on behalf of the South Carolina Class.

857.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).

858.   Defendant is a "person" under S.C. Code Ann. § 39-5-10.

859.   Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiff and Class members seek monetary relief to recover their economic losses. Because Defendant's actions were willful and knowing, Plaintiff's damages should be trebled.

860.   Honda violated the South Carolina UTPA by concealing and failing to disclose the infotainment system defects.  Honda had an ongoing duty to Plaintiff and the South Carolina Class to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of its business.

861.   Plaintiff and the South Carolina Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments, omissions, and/or failure to disclose material information.

862.   Plaintiff also seeks punitive damages against Defendant because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff to cruel and unjust hardship as a result. Honda's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

863.   Plaintiff further seeks an order enjoining Defendant's unfair or deceptive acts or practices.

## COUNT II
## BREACH OF EXPRESS WARRANTY

864.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

865.   Plaintiff brings this claim on behalf of the South Carolina Class.

866.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

867.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

868. Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

869. Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda. Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

870. Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

871. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

872. Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

873. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class

members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

874. Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

875. Plaintiffs have attempted to have their Vehicles repaired under the warranty. Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

876. As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other South Carolina Class members have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.C. CODE §§ 36-2-314 AND 36-2A-212)**

877. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

878. Plaintiff brings this claim on behalf of the South Carolina Class.

879. Honda was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and a "seller" of motor vehicles under § 36-2-103(1)(d).

880. The Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

881.   A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

882.   These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

883.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

884.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

885.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other South Carolina Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

**Q.   Claims Brought on Behalf of the Tennessee Class**

**COUNT I**
**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT OF 1977**
**(TENN. CODE ANN. § 47-18-101, *ET SEQ.*)**

886.   Plaintiff Pamela Turberville ("Plaintiff," for purposes of all Tennessee Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

887.   This claim is brought by Plaintiff on behalf of the Tennessee Class.

888.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

889.   Plaintiff and the Tennessee Class are "natural persons" and "consumers" within the meaning of Tenn. Code § 4-18-104.

890.   Defendant is engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Tenn. Code § 47-18-103(9).

891.   Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

892.   By concealing and failing to disclose the infotainment system defects, Honda violated the Tennessee CPA.  Honda had an ongoing duty to Plaintiff and the Tennessee Class to refrain from unfair and deceptive practices under the Tennessee CPA in the course of its business.

893.   Plaintiff and the Tennessee Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments, omissions, and/or failure to disclose material information.

894.   Pursuant to Tenn. Code §§ 47-18-109 and 47-18-109(a)(3), Plaintiff and the Tennessee Class members seek an order enjoining Defendant's unfair, unlawful, or deceptive practices, declaratory relief, punitive damages, attorneys' fees, and any other just and proper remedy under the Tennessee CPA.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(BASED ON TENNESSEE LAW)[17]**

895.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

---

[17] By order dated October 17, 2019, the Court dismissed Plaintiff Turberville's express warranty claim because she had yet to offer Honda an opportunity to repair or replace the defect, with leave to amend.  *See* DE 49 at p. 16.  As discussed above, Plaintiff Turberville now alleges that she has presented Honda with such an opportunity.

896.   Plaintiff brings this claim on behalf of the Tennessee Class.

897.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

898.   In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

899.   Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

900.   Honda breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Honda.  Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

901.   Furthermore, the limited warranty of repair and/or replacement of defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

902.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or replacements to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

903.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the

other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

904.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

905.   Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed.

906.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

907.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Tennessee Class members have been damaged in an amount to be determined at trial.

**R.    Claims Brought on Behalf of the Texas Class**

<div align="center">

**COUNT I**
**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT**
**(TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)**

</div>

908.   Plaintiff Smuti Patel ("Plaintiff," for purposes of all Texas Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

909. Plaintiff brings this Count on behalf of the Texas Class.

910. Plaintiff and Honda are each "persons" as defined by Tex. Bus. & Com. Code § 17.45(3). The Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1). Plaintiff and the other Texas Class members are "consumers" as defined in Tex. Bus. & Com. Code § 17.45(4). Honda has at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

911. The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41, et seq.

912. By failing to disclose and actively concealing the defects in the infotainment systems in the Class Vehicles, Honda engaged in deceptive business practices prohibited by the DTPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

913. Honda knew that the infotainment systems in the Class Vehicles were defectively manufactured, would fail without warning, and were not suitable for their intended use. Honda nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

914. Honda owed Plaintiff a duty to disclose the defective nature of the infotainment systems in the Class Vehicles, because Honda:

i) Possessed exclusive knowledge of the defects rendering the Class Vehicles more unreliable than similar vehicles;

ii) Intentionally concealed the defects associated with the infotainment systems; and/or

iii) Made incomplete representations about the characteristics and performance of the infotainment system generally, while purposefully

1                    withholding material facts from Plaintiff that contradicted these

2                    representations.

3      915.   Honda's unfair or deceptive acts or practices were likely to and did in fact

4 deceive reasonable consumers, including Plaintiff, about the true performance and

5 characteristics of the Class Vehicles' infotainment systems.

6      916.   Honda's intentional concealment of and failure to disclose the defective

7 nature of the Class Vehicles to Plaintiff and the other Class members constitutes an

8 "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5)

9 because, to the detriment of Plaintiff and the other Class members, that conduct took

10 advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.

11 That "unconscionable action or course of action" was a producing cause of the economic

12 damages sustained by Plaintiff and the other Class members.

13      917.   Honda is also liable under Tex. Bus. & Com. Code § 17.50(a) because

14 Honda's breach of the implied warranty of merchantability set forth herein was a

15 producing cause of economic damages sustained by Plaintiff and the other Class

16 members.

17      918.   As a result of its violations of the DTPA detailed above, Honda caused

18 actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff.  Plaintiff

19 currently owns or leases, or within the class period has owned or leased, a Class Vehicle

20 that is defective.  Defects associated with the Class Vehicles' infotainment systems have

21 caused the value of Class Vehicles to decrease.

22      919.   All procedural prerequisites, including notice, have been met.  The giving

23 of notice to Honda is rendered impracticable pursuant to Tex. Bus. & Com. Code

24 § 17.505(b) and unnecessary because Honda has notice of the claims against it through

25 the numerous complaints filed against it.  On October 29, 2019, pursuant to Tex. Bus.

26 & Com. Code § 17.505(a), Plaintiff, individually and on behalf of the other Class

27 members, sent  Honda a written notice that advised Honda in reasonable detail of

28

Plaintiff Patel and the Class' specific complaint and the amount of economic damages and expenses, including attorneys' fees, reasonably incurred to date in asserting the claim against Honda. On November 4, 2019, pursuant to Tex. Bus. & Com. Code § 17.501, Plaintiff, individually and on behalf of the other Class members, sent the Texas Consumer Protection Division a copy of this Complaint.

920. Plaintiff and the Class sustained damages as a result of the Honda's unlawful acts and are, therefore, entitled to damages and other relief as provided under the DTPA.

921. Plaintiff and the other Texas Class members should be awarded three times the amount of their economic damages because Honda intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

## COUNT II
## BREACH OF EXPRESS WARRANTY
## (TEX. BUS. & COM. CODE § 2.313)

922. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

923. Plaintiff brings this Count on behalf of the Texas Class.

924. Honda is and was at all relevant times a merchant with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104.

925. In its Limited Warranty, Honda expressly warranted that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

926. Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

927. Honda breached the express warranty to repair and replace to correct defects in materials and workmanship of any part supplied by Honda. Honda has not

repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

928. In addition to this Limited Warranty, Honda otherwise expressly warranted several attributes, characteristics, and qualities of the infotainment system.

929. These warranties are only a sampling of the numerous warranties that Honda made relating to safety, reliability, and operation. Generally, these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of the infotainment system. These warranties were made, inter alia, in advertisements, on Honda's website, and in uniform statements provided by Honda to be made by salespeople, or made publicly by Honda executives or by other authorized Honda representatives. These affirmations and promises were part of the basis of the bargain between the parties.

930. These additional warranties were also breached because the Class Vehicles were not fully operational, safe, or reliable, nor did they comply with the warranties expressly made to purchasers or lessees. Honda did not provide at the time of sale, and has not provided since then, Class Vehicles conforming to these express warranties.

931. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

932. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

933. Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranties and were inherently defective, and Honda wrongfully and fraudulently omitted and/or

concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

934. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

935. Due to Honda's breach of warranties as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Tex. Bus. & Com. Code § 2.711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Tex. Bus. & Com. Code §§ 2.711 and 2.608.

936. Plaintiffs have attempted to have their Vehicles repaired under the warranty. Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

937. As a direct and proximate result of Honda's breach of express warranties, Plaintiff and the other Texas Class members have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED WARRANTY**
**(BASED ON TEXAS LAW)**

938.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

939.   Plaintiff brings this Count on behalf of the Texas Class.

940.   Honda is and was at all relevant times a merchant with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104.

941.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Tex. Bus. & Com. Code § 2.314. These vehicles and the infotainment systems in the Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.   Specifically, the Class Vehicles are inherently defective in that there are defects in the infotainment system which prevent users from enjoying many features of the Class Vehicles they purchased and/or leased and that they paid for; and the infotainment system was not adequately tested.

942.   Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

943.   As a direct and proximate result of Honda's breach of the warranties of merchantability, Plaintiff and the Texas Class have been damaged in an amount to be proven at trial.

1  **S.  Claims Brought on Behalf of the Virginia Class**

2  **COUNT I**
**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
3  **(VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)**

4  944.  Plaintiff Ann Morgan ("Plaintiff," for purposes of all Virginia Class

5  Counts) incorporates by reference all preceding allegations as though fully set forth

6  herein.

7  945.  Plaintiff brings this Count on behalf of the Virginia Class.

8  946.  The Virginia Consumer Protection prohibits "(14) using any . . . deception,

9  fraud, false pretense, false promise, or misrepresentation in connection with a consumer

10  transaction[.]"  Va. Code Ann. § 59.1-200(A).

11  947.  Honda is a "person" as defined by Va. Code Ann. § 59.1-198.  The

12  transactions between Plaintiff and the other Class members on one hand and Honda on

13  the other, leading to the purchase or lease of the Class Vehicles by Plaintiff and the other

14  Class members, are "consumer transactions" as defined by Va. Code Ann. § 59.1-198,

15  because the Class Vehicles were purchased or leased primarily for personal, family or

16  household purposes.

17  948.  In the course of Honda's business, it willfully failed to disclose and actively

18  concealed the dangerous risk of infotainment system failure in Class Vehicles as

19  described above.  Accordingly, Honda engaged in acts and practices violating Va. Code

20  Ann. § 59.1-200(A), including engaging in conduct likely to deceive.

21  949.  Honda's actions as set forth above occurred in the conduct of trade or

22  commerce.

23  950.  Honda's conduct proximately caused injuries to Plaintiff and the other

24  Class members.

25  951.  Plaintiff and the other Class members were injured as a result of Honda's

26  conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles

27  and did not receive the benefit of their bargain, and their Class Vehicles have suffered

28

a diminution in value. These injuries are the direct and natural consequence of Honda's omissions.

952. Honda actively and willfully concealed and/or suppressed the material facts regarding the defective and unreasonably dangerous nature of the infotainment system and the Class Vehicles, in whole or in part, with the intent to deceive and mislead Plaintiff and the other Class members and to induce Plaintiff and the other Class members to purchase or lease Class Vehicles at a higher price, which did not match the Class Vehicles' true value. Plaintiff and the other Virginia Class members therefore seek treble damages.

<div align="center">

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(VA. CODE ANN. § 8.2-313)**

</div>

953. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

954. Plaintiff brings this Count on behalf of the Virginia Class.

955. Honda is and was at all relevant times a merchant with respect to motor vehicles.

956. In its New Vehicle Limited Warranty, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

957. Honda's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with an infotainment system from Honda.

958. Honda breached the express warranty to repair or replacement to correct defects in materials and workmanship of any part supplied by Honda. Honda has not repaired or replaced, and has been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

959.   Furthermore, the limited warranty of repair and/or replacement to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Honda has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

960.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or replacement of parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

961.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, and Honda wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

962.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

963.   Due to Honda's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Va. Code Ann. § 8.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under Va. Code Ann. §§ 8.2-711 and 8.2-608.

964.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.   Honda was also provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

965.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the other Virginia Class members have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (VA. CODE ANN. § 8.2-314)

966.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

967.   Plaintiff brings this Count on behalf of the Virginia Class.

968.   Honda is and was at all relevant times a merchant with respect to motor vehicles.

969.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

970.   These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiffs and Class Members would not have purchased the Vehicles had they known of the defects.

971.   Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

972.    Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

973.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Virginia Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## T.    Claims Brought on Behalf of the Washington Class

### COUNT I
### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)

974.    Plaintiff Julie Pereira ("Plaintiff," for purposes of all Washington Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

975.    Plaintiff brings this Count on behalf of the Washington Class.

976.    The conduct of Honda as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Honda's manufacture and sale of vehicles with infotainment system defect(s), which Honda failed to adequately investigate, disclose and remedy.  Further, Honda knew about these defects prior to the sale of the Class Vehicles but did not disclose the existence of these defects to Plaintiff and the Washington Class members and concealed those defects.   Honda also omitted information regarding the safety and reliability of the Class Vehicles.

977.    Honda's actions as set forth above occurred in the conduct of trade or commerce.

978.    Honda's actions constituted a generalized course of deception that impacts the public interest because Plaintiff and the Washington Class members were injured in exactly the same way as millions of others purchasing and/or leasing Honda vehicles and that the failure to follow the practices pertaining to motor vehicle warranties in

Wash. Rev. Code § 19.18 is recognized by statute as matters vitally affecting the public interest.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Honda's business and has the potential for repetition.

979.   Honda's actions as set forth above induced Plaintiff and the Washington Class members to purchase their Class Vehicles from Honda and/or pay a higher price for their Class Vehicles than they otherwise would have.

980.   Plaintiff and the Washington Class members were injured as a result of Honda's conduct.  Due to Honda's deceptive or unfair conduct, Plaintiff and the Washington Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Their vehicles have also suffered a diminution in value.

981.   Honda's conduct proximately caused the injuries to Plaintiff and the Washington Class members.

982.   Honda is liable to Plaintiff and the Washington Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

983.   Pursuant to Wash. Rev. Code § 19.86.095, Plaintiff will serve the Washington Attorney General with a copy of this complaint as Plaintiff and the Washington Class members seek injunctive relief.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (REV. CODE WASH. § 62A.2-313)

984.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

985.   Plaintiff brings this Count on behalf of the Washington Class.

986.   As an express warrantor and manufacturer and merchant, Honda had certain obligations under Wash. Rev. Code § 62A.2-313 to conform the Class Vehicles to the express warranties.

987.   When Plaintiff and the Washington Class members purchased or leased their Class Vehicles, Honda expressly warranted in writing that the Class Vehicles were

SECOND AMENDED COMPLAINT
010811-11/1205802 V1

- 210 -

covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth above, Honda expressly warranted that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

988.   The defects at issue in this litigation were present at the time of sale and lease to Plaintiffs and members of the Washington Class.

989.   Honda breached the Limited Warranty to repair or replace defects in materials and workmanship of any part supplied by Honda as Honda has been unable to repair or replace the Class Vehicles' materials and workmanship defects.

990.   Furthermore, the Limited Warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the Washington Class members whole and because Honda has failed and/or refused to adequately provide the promised remedies within a reasonable time.

991.   Also, as alleged in more detail herein, at the time that Honda warranted and sold the Class Vehicles, and while knowing that the Class Vehicles did not conform to Honda's Limited Warranty and were inherently defective, Honda wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiff and the Washington Class members were therefore induced to purchase the Class Vehicles under false and/or fraudulent pretenses.

992.   Plaintiffs have attempted to have their Vehicles repaired under the warranty.  Honda and its agent dealers have failed and refused to conform the Class Vehicles to the express warranties.

993.   Moreover, many of the damages flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as those incidental and consequential damages have already been suffered due to the Honda's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such

limited remedy within a reasonable time, and any limitation on Plaintiff's and the Washington Class members' remedies would be insufficient to make Plaintiff and the Washington Class whole.

994.   Honda received timely notice regarding the problems at issue in this litigation. Honda was also provided notice of these issues almost immediately after launching the first Class Vehicles through the receipt of numerous complaints regarding those vehicles' infotainment systems. Honda has received, on information and belief, numerous complaints and other notices from consumers advising them of the defects at issue in this litigation.

995.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Honda or by operation of law in light of Honda's unconscionable conduct.

996.   Plaintiff has had sufficient dealings with either Honda or its agents (dealerships) to establish privity of contract. Privity is not required in this case because Plaintiff and the Washington Class members are intended third-party beneficiaries of contracts between Honda and its dealers; specifically, they are the intended beneficiaries of Honda's express warranties and these warranties were advertised to Plaintiff and the Washington Class members as the ultimate consumers.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

997.   As a direct and proximate result of Honda's breach of express warranty, Plaintiff and the Washington Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT III
## BREACH OF IMPLIED WARRANTY

998.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

SECOND AMENDED COMPLAINT                              - 212 -
010811-11/1205802 V1

999.   Plaintiff brings this Count on behalf of the Washington Class.

1000.    Honda is and was at all relevant times a merchant with respect to the Class Vehicles.

1001. A warranty that the Class Vehicles were in merchantable condition is implied by law pursuant to Wash. Rev. Code § 62A.2-614.

1002. These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that the defects in the Vehicles' infotainment systems render them unsafe, inconvenient, and imperfect such that Plaintiff and Class Members would not have purchased the Vehicles had they known of the defects.

1003. Honda knew about the infotainment system defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

1004. Honda was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

1005. Washington Plaintiff has had sufficient dealings with either Honda or its agents (dealerships) to establish privity of contract. Privity is not required in this case because Plaintiffs and the Washington Class members are intended third-party beneficiaries of contracts between Honda and its dealers; specifically, they are the intended beneficiaries of Honda's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

1006. As a direct and proximate result of Honda's breach of the warranties of merchantability, Plaintiff and the Washington Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class Members, respectfully request judgment against Defendant as follows:

    (A)    certifying the proposed State Law Classes;

    (B)    appointing Plaintiffs and their counsel to represent the Class;

    (C)    ordering injunctive relief, restitution, disgorgement, and/or other appropriate relief;

    (D)    awarding compensatory, punitive, exemplary, and other recoverable damages;

    (E)    awarding reasonable attorney's fees and expenses;

    (F)    awarding pre-judgment and post-judgment interest;

    (G)    awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

SECOND AMENDED COMPLAINT

010811-11/1205802 V1

- 214 -

Case: 2:19-cv-08947-BMB-KMW   Document 57   Filed 10/23/20   Page 403 of 453   Page ID:
#:730
Case: 2:19-cv-02760-CBC-GJS   Document 57   Filed 11/04/19   Page 223 of 223   Page ID
#:730

Dated: November 4, 2019            Respectfully submitted,

                                   HAGENS BERMAN SOBOL SHAPIRO LLP

                                   By */s/ Christopher R. Pitoun*
                                       Christopher R. Pitoun (SBN 290235)
                                   301 North Lake Avenue, Suite 920
                                   Pasadena, California 91101
                                   Telephone: (213) 330-7150
                                   Facsimile: (213) 330-7152
                                   *christopherp@hbsslaw.com*

                                   Steve W. Berman (*pro hac vice*)
                                   Sean R. Matt (*pro hac vice*)
                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                   1301 Second Avenue, Suite 2000
                                   Seattle, Washington 98101
                                   Telephone: (206) 623-7292
                                   Facsimile: (206) 623-0594
                                   *steve@hbsslaw.com*
                                   *sean@hbsslaw.com*

                                   Jeffrey S. Goldenberg (*pro hac vice* to be filed)
                                   Todd Naylor (*pro hac vice* to be filed)
                                   GOLDENBERG SCHNEIDER, LPA
                                   One West Fourth Street, 18th Floor
                                   Cincinnati, Ohio 45202
                                   Tel: (513) 345-8291
                                   Fax: (513) 345-8294
                                   *jgoldenberg@gs-legal.com*
                                   *tnaylor@gs-legal.com*

                                   John C. Weisensell (*pro hac vice* to be filed)
                                   NIEKAMP, WEISENSELL, MUTERSBAUGH &
                                   MASTRANTONIO LLP
                                   23 South Main Street, Third Floor
                                   Akron, OH 44308
                                   Tel: (330) 434-1000
                                   Fax: (330) 434-1001
                                   *jack@nwm-law.com*

                                   *Counsel for Plaintiffs and Class*

# EXHIBIT E

Case 1:20-cv-08947-RMB-KMW   Document 17   Filed 10/23/20   Page 405 of 453 PageID:
1014
Case 1:19-cv-02160-CJC-GJS   Document 47   Filed 10/17/19   Page 1 of 45   Page ID #:982

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LESLEY CONTI, et al., on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>                    Defendant. | Case No.: CV 19-02160-CJC(GJSx)<br><br><br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT [Dkt. 37] |

## I.  INTRODUCTION

Plaintiffs bring this putative class action against Defendant American Honda

Motor Co., Inc. ("Honda"), alleging a variety of claims related to purported defects in the

"infotainment" systems of their Honda Odyssey or Honda Pilot vehicles.  Before the

Court is Honda's motion to dismiss Plaintiffs' First Amended Complaint ("FAC") for

Case 1:20-cv-08947-RMB-KMW   Document 17   Filed 10/23/20   Page 406 of 453 PageID:
Case 2:19-cv-02160-RMC-SMS   Document 49-17   Filed 10/19/23   Page 2 of 246   Page ID #948:
1015

failure to state a claim and for lack of subject matter jurisdiction.  (Dkt. 37 [hereinafter "Mot."].)  For the following reasons, the motion is **GRANTED IN PART and DENIED IN PART**.[1]

## II.  BACKGROUND

Defendant Honda is a California corporation with headquarters in Torrance, California that manufactures and sells vehicles.  (Dkt. 32 [First Amended Complaint, hereinafter "FAC"] ¶ 202.)   Plaintiffs are individuals who purchased or leased a 2018 Honda Odyssey, 2019 Honda Odyssey, or a 2019 Honda Pilot (the "vehicles").  (FAC ¶ 1.)  Honda allegedly manufactured, tested, warranted, advertised, distributed, sold, and leased these vehicles.  (*Id.* ¶ 6.)  Plaintiffs made their purchases in fifteen different states: Colorado, Georgia, Illinois, Kansas, Kentucky, Maryland, Massachusetts, Missouri, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and Washington.  (*See generally id.*)  There are no named plaintiffs from California and no California subclass. Plaintiffs allege that they purchased their vehicles from authorized Honda dealerships, but do not allege whether these entities are owned or operated by Honda.  (*See, e.g.*, *id.* ¶ 15.)  Instead, the FAC alleges that "Honda sells cars in part via communications that it authorized its dealers to make about Honda vehicles."  (*Id.* ¶ 204.)  All of the vehicles were purchased with a written manufacturer's warranty from Honda.  (*Id.* ¶ 227.)  This "New Vehicle Limited Warranty" allegedly provides that "Honda will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."  (*Id.*)

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for October 21, at 1:30 p.m. is hereby vacated and off calendar.

This case is about alleged defects in the vehicles' infotainment systems.  (*Id.* ¶¶ 2–5.)  The infotainment systems consist of multiple LCD screens and at least one touch screen.  (*Id.*)  It controls the vehicles' safety, navigation, communications, entertainment, and climate control features.  (*Id.*)  Specifically, the infotainment systems allow drivers to control the vehicles' GPS, radio, backup camera, and—in some models—a "CabinWatch" feature that allows front seat occupants to monitor rear passenger seats. (*Id.* ¶ 5).  Plaintiffs generally allege that the infotainment system in the vehicles frequently freeze and crash.  (*Id.* ¶ 7.)  Because the infotainment system controls so many features, these malfunctions cause "a wide range of problems."  (*Id.* ¶ 216.)  Honda allegedly knew about the defects before the vehicles were sold.  (*Id.* ¶ 215.)  Plaintiffs allege that Honda fraudulently concealed and/or misrepresented these defects and have failed to address them as required by their written warranties.  (*Id.* ¶¶ 8–10, 227–231.)

The FAC generally alleges some version of the following facts for each named Plaintiff.[2]  Before purchasing one of the vehicles from an authorized Honda dealership, Plaintiff reviewed its features on various websites and with a salesperson at the dealership.  (*See, e.g.*, *id.* ¶ 15.)  Plaintiff purchased the vehicle in part because of its infotainment system, as represented by Honda in advertisements and other communications.  (*See, e.g.*, *id.* ¶ 18.)  Soon after purchase, the infotainment system became dysfunctional, and Plaintiff's efforts to have it repaired under the warranty have been unsuccessful.  (*See, e.g.*, *id.* ¶¶ 18–23.)

Based on these allegations, Plaintiffs bring forty-seven causes of action on behalf of a nationwide class and fifteen state-specific subclasses, representing the fifteen states where plaintiffs purchased their vehicles.  (*See generally id.*)  The nationwide class asserts a claim for breach of express warranty and a claim for breach of implied warranty

---

[2] Given the number of named plaintiffs and the length of the FAC, the Court does not attempt to summarize allegations specific to each named plaintiff.

under the Magnuson Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*  (*Id.*
¶¶ 242–276.)  Each state subclass brings three claims for (1) breach of express warranty,
(2) breach of implied warranty, and (3) violations of a state consumer protection statute.
(*See id.* ¶¶ 298–768.)

Specifically, the state subclasses bring claims under the Colorado Consumer
Protection Act (Colo. Rev. Stat. §§ 6-1-101, *et seq.*), the Georgia Fair Business Practices
Act (Ga. Code Ann. §§ 10-1-390, *et seq.*), the Illinois Consumer Fraud and Deceptive
Business Practices Act (815 Ill. Comp. Stat. §§ 505/1, *et seq.*, 720 Ill. Comp. Stat.
§ 295/1a), the Kansas Consumer Protection Act (Kan. Stat. Ann. §§ 50-623, *et seq.*), the
Kentucky Consumer Protection Act (Ky. Rev. Stat. §§ 367.110, *et seq.*), the Maryland
Consumer Protection Act (Md. Code Com. Law §§ 13-101, *et seq.*), the Massachusetts
Consumer Protect Act (Mass Gen. Laws Ch. 93A), the Missouri Merchandising Practices
Act (Mo. Rev. Stat. §§ 407.010, *et seq.*), the Ohio Consumer Sales Practices Act (Ohio
Rev. Code §§ 1345.01, *et seq.*), the Oklahoma Consumer Protection Act (Okla. Stat. Tit.
15 §§ 751, *et seq.*), the South Carolina Unfair Trade Practices Act (S.C. Code Ann.
§§ 39-5-10, *et seq.*), the Tennessee Consumer Protection Act (Tenn. Code Ann. §§ 47-18-
101, *et seq.*), the Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code §§ 17.41,
*et seq.*), the Virginia Consumer Protection Act (Va. Code Ann. §§ 59.1-196, *et seq.*), and
the Washington Consumer Protection Act (Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*).
(*See id.*)

## III.  LEGAL STANDARD

### A.    Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins.
Co. of Am.*, 511 U.S. 375, 377 (1994).  As such, federal courts are presumed to lack

jurisdiction in a particular case "unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir.1989). In deciding a Federal Rule of Civil Procedure 12(b)(1) motion challenging subject matter jurisdiction, the burden of proof in is on the party asserting jurisdiction, and the court will presume a lack of jurisdiction until the pleader proves otherwise. *See Kokkonen*, 511 U.S. at 377.

A jurisdictional challenge under Federal Rule of Civil Procedure 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *see also Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (noting that a Rule 12(b)(1) motion "may either attack the allegations of the complaint or . . . attack[] the existence of subject matter jurisdiction in fact"). With a facial attack on the allegations of the complaint, a court must assume the truth of the complaint's non-conclusory allegations. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

## B.     Failure to State a Claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). The district court may also consider additional facts in

materials that the district court may take judicial notice, *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled in part on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotes omitted)). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

In federal court, a plaintiff alleging fraud and misrepresentation must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1145 (9th Cir. 2009); *UMG Recordings, Inc. v. Glob. Eagle Entm't*, 117 F. Supp. 3d 1092, 1106 (C.D. Cal. 2015). Under Rule 9(b), the plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). When an artificial entity is the alleged perpetrator of the fraud, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *UMG Recordings*, 117 F. Supp. 3d at 1107.

## IV.  DISCUSSION

### A.      Magnuson-Moss Warranty Act Claims

The MMWA authorizes consumers to bring claims for breach of an express or implied warranty in federal district court.  15 U.S.C. § 2310(d).  It imposes special pleading requirements for MMWA class action claims.  Specifically, it provides that "[n]o claim shall be cognizable in a suit brought [in federal court] . . . if the action is brought as a class action, and the number of named plaintiffs is less than one hundred." *Id.* § 2310(d)(3).  Honda argues that because there are fewer than one-hundred named Plaintiffs in this putative class action, the Court lacks subject matter jurisdiction over the nationwide class's MMWA claims.

Plaintiffs respond that the Court has subject matter jurisdiction over all their claims, including the MMWA claims, pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2).  (FAC ¶ 12.)  CAFA provides that federal district courts have original jurisdiction over any civil action in which the the amount in controversy exceeds $5,000,000 and there is minimal diversity between the parties.  28 U.S.C. § 1332(d)(2).  Plaintiffs argue that they need not meet MMWA's class-action pleading requirements if they can establish subject matter jurisdiction under CAFA.[3]  A number of federal courts agree that CAFA creates a basis for federal subject matter jurisdiction in MMWA actions even if the hundred-named-plaintiffs requirement is not met.  *See, e.g.*, *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 954 (C.D. Cal. 2012) (listing cases).  Because the MMWA predates CAFA, these courts found that "CAFA effectively supercedes the MMWA's more stringent jurisdictional requirements." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013) (listing cases).

---

[3] Honda does not challenge the Court's subject matter jurisdiction over Plaintiff's state law claims and concedes that they have established minimal diversity and the amount in controversy required by CAFA.

The Ninth Circuit has not squarely addressed this question.  In *Birdsong v. Apple, Inc.*, a MMWA class action where the pleading requirements may not have been met, the court explained in a footnote, "[t]he parties do not dispute that the district court had subject matter jurisdiction over the class action. We agree."  590 F.3d 955, 957 n.1 (9th Cir. 2009).  After *Birdsong*, courts in the Ninth Circuit—including this Court—generally followed suit.  *See, e.g.*, *Keegan*, 838 F. Supp. 2d at 954–55.  However, in at least three recent decisions, this Court changed course and found that "MMWA's requirement to name one hundred plaintiffs must be met independently of CAFA's jurisdictional standard."  *Floyd v. Am. Honda Motor Co.*, 2018 WL 6118582, at *3 (C.D. Cal. June 13, 2018) (Wilson, J.); *MacDougall v. Am. Honda Motor Co.*, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) (Guilford, J.); *Cadena v. Am. Honda Motor Co.*, 2019 WL 3059931, at *11 (C.D. Cal. May 29, 2019) (Fitzgerald, J.).  A one decision explains, "CAFA—a basis for federal courts to exercise jurisdiction over state law disputes between diverse parties—doesn't fill in the gaps for missing substantive requirements of a federal law."  *MacDougall*, 2017 WL 8236359, at *4.  The Court agrees and finds that Plaintiffs must satisfy MMWA's class-action pleading requirements.  Accordingly, Honda's motion to dismiss Plaintiffs' MMWA claims is **GRANTED**.

## B.    Consumer Protection Claims

Plaintiffs bring causes of action under fifteen state consumer protection statutes, all alleging that Honda failed to disclose, actively concealed, and/or knowingly misrepresented defects in its infotainment systems.  Because these claims sound in fraud, Plaintiffs must satisfy Rule 9(b)'s heightened standard.  *See Vess*, 317 F.3d at 1097.

//

//

//

### 1. Fraudulent Misrepresentations

At various points, the FAC alleges that Honda made fraudulent misrepresentations about the infotainment systems. (*See, e.g.*, FAC ¶ 450 ["Honda intentionally and knowingly misrepresented material facts."].) Defendant argues, and the Court agrees, that Plaintiffs fail to allege the "who, what, when, where, and how" of these misrepresentations as required by Rule 9(b). *See UMG Recordings*, 117 F. Supp. 3d at 1107. Plaintiffs apparently concede and explain that they "rely *only* on omission-based theories in pleading their claims under various state consumer protection laws." (Dkt. 47 [Plaintiffs' Opposition to Honda's Mot., hereinafter "Opp."] at 7 n.5 (emphasis added).) This concession does not align with the FAC, which alleges that Honda violated Georgia, Kentucky, Maryland, and Massachusetts consumer protection statutes in part by "employing misrepresentations." (*See* FAC ¶ 311 (Georgia), ¶ 400 (Kentucky), ¶¶ 445, ¶ 450 (Maryland), ¶ 482 (Massachusetts).) Accordingly, Honda's motion to dismiss Plaintiffs' consumer protection claims is **GRANTED** to the extent such claims allege fraudulent misrepresentations.

### 2. Fraudulent Omission & Failure to Disclose

Plaintiffs remaining consumer protection claims allege that Honda unlawfully failed to disclose and/or concealed defects prior to Plaintiffs' purchases. The Court addresses each of Honda's challenges to these claims in turn.[4]

//

//

---

[4] The Court does not address Honda's argument that class claims are barred by Colorado, Georgia, Kansas, South Carolina, and Tennessee's consumer protection statutes. (*See* Mot. at 37–38.) This issue is premature in a motion to dismiss for failure to state a claim and can be properly addressed at the class certification stage. *See Falk v. Nissan N. Am., Inc.*, 2018 WL 2234303, at *7 (N.D. Cal. May 16, 2018).

### i.  Knowledge of Defect

Honda first argues that Plaintiffs' fraudulent omission claims must be dismissed because the FAC does not sufficiently allege Honda's pre-sale knowledge of the defect. (Mot. at 31–32.)  Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  However, the Ninth Circuit generally requires that a plaintiff allege *how* defendant obtained knowledge of a specific defect prior to plaintiff's purchase.  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012).[5]  "General or conclusory allegations are not enough, but the 'amassed weight' of consumer complaints may be sufficient along with other indications that the defendant had knowledge of the defect."  *Barrera v. Samsung Elecs. Am., Inc.*, 2019 WL 1950295, at *4 (C.D. Cal. Feb. 27, 2019) (quoting *id.* at 1146–48).

Plaintiffs need not prove their case on the pleadings.  Instead, they must allege details showing that it is *plausible* that Honda had knowledge of the defect.  *See id.* Plaintiffs have carried this burden.  First, the FAC alleges that Honda learned about the defect through industry-standard pre-launch testing of the vehicles.  (FAC ¶¶ 8, 215). The FAC also quotes a "Tech Line Summary Article" allegedly released by Honda acknowledging that the infotainment system in at least one vehicle model freezes under certain conditions.  (*Id.* ¶ 222.)  Plaintiffs also allege that employees at Honda dealerships made statements suggesting Honda was aware of these defects as early as March 2018. (*See id.* ¶¶ 32–34, 62–65, 100, 119, 181, 196, 223).  Finally, Plaintiffs allege that soon after the 2018 vehicles were released, customers submitted numerous consumer complaints through the National Highway Transportation Safety Administration and third-party websites.  (*See id.* ¶¶ 217–221.)  Taking these allegations together, the Court

---

[5] The parties apparently agree that Ninth Circuit decisions assessing California's consumer protection statutes can be applied to the fifteen other consumer protection statutes at issue here.  (*See* Mot. at 32; Opp. at 8.)  The Court accepts this premise solely for this motion.

finds Plaintiffs have plausibly alleged that Honda had knowledge of the defect before Plaintiffs purchased their vehicles. *See Barrera*, 2019 WL 1950295, at *4.

### ii. Specificity and Causation

Honda next argues that the FAC does not allege sufficiently specific details about the nature, context, and content of the omissions. Fraudulent omission claims must satisfy the particularity requirements of Rule 9(b), *Kearns*, 567 F.3d at 1127, and a plaintiff must still set out the "who, what, when, where, and how" of the alleged omission, *see Vess*, 317 F.3d at 1106. However, because the relevant misconduct is a *failure* to act, these allegations "can succeed without the same level of specificity required by a normal fraud claim." *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007) (explaining that a plaintiff alleging omission-based fraud will "not be able to specify the time, place, and specific content of an omission as would a plaintiff in a false representation claim"). Plaintiffs urge the Court to follow the reasoning set out in *MacDonald v. Ford Motor Co.*, where plaintiffs alleged omission-based fraud in Ford's communications about vehicles with allegedly defective coolant pumps. 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014). In *MacDonald*, the court found

> Plaintiffs adequately allege the "who what when and how," given the inherent limitations of an omission claim. In short, the "who" is Ford, the "what" is its knowledge of a defect, the "when" is prior to the sale of Class Vehicles, and the "where" is the various channels of information through which Ford sold Class Vehicles.

*Id.*

As an initial matter, Plaintiffs omission-based fraud claims improperly rely on the alleged actions and inactions of dealerships. (*See, e.g.*, FAC ¶ 27.) The FAC alleges generally that "Honda sells cars in part via communications that it authorized its dealers to make about Honda vehicles," including "authorizing Honda dealers to distribute

-11-

brochures and other marketing and promotional material." (*Id.* ¶ 204.) It provides no other allegations about the relationship between authorized dealerships and Honda. Without more, the Court cannot attribute the dealerships' communications to Honda. *See Azimi v. Ford Motor Co.*, 977 F. Supp. 847, 851 (N.D. Ill. 1996); *cf. Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) (considering evidence showing that Ford communicates through its dealerships in summary judgment motion).

The Georgia, Illinois, Kansas, Kentucky, Missouri, Ohio, Oklahoma, South Carolina, Tennessee, Virginia, and Washington Plaintiffs' omission-based fraud claims fail to satisfy the standard set out in *MacDonald*. *See* 37 F. Supp. 3d at 1096. Specifically, these claims fail to allege sufficient details about where or how Honda committed the alleged fraud. As explained above, Plaintiffs have not properly alleged that Honda is responsible for the dealerships' communications. Moreover, these Plaintiffs do not identify any other specific "channels of information" that Honda used to sell them cars. *Cf. MacDonald*, 37 F. Supp. 3d at 1091 ("Plaintiffs also reviewed their vehicles' Monroney window stickers or Ford's website prior to purchasing their vehicles."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1171 (C.D. Cal. 2010) ("[R]epresentations were allegedly made in magazine advertisements, press kits, and brochures."). Instead, they allege simply that they "conducted . . . research from [their] home" and were "exposed to Honda's misrepresentations and/or omissions" in their respective home states. (FAC ¶¶ 25 (Georgia), 57 (Kentucky), 92 (Missouri), 105 (Ohio), 130 (Oklahoma), 144 (South Carolina), 156 (Tennessee), 175 (Virginia), 186 (Washington).) The Illinois and Kansas Plaintiffs also allege that they reviewed dealership websites and "videos specific to the 2018 Odyssey," but do not allege that Honda controlled these channels. (*Id.* ¶¶ 39, 48.)

While Plaintiffs are not required "to specify how Honda should or could have revealed that the class vehicles' infotainment systems were defective," (Opp. at 17–18),

they must allege "how" or "where" the omission occurred to satisfy Rule 9(b).  *See MacDonald*, 37 F. Supp. 3d at 1096.  It is not sufficient to allege that generally that they were exposed to "advertisements and representations made by Honda."  (*See, e.g.*, FAC ¶ 59.)  The Georgia, Illinois, Kansas, Kentucky, Missouri, Ohio, Oklahoma, South Carolina, Tennessee, Virginia, and Washington Plaintiffs have not properly alleged any pre-sale line of communication or relationship with Honda.  Accordingly, Honda's Motion to Dismiss these Plaintiffs' consumer protection claims is **GRANTED**.

The Colorado, Maryland, Massachusetts, and Texas Plaintiffs all allege at least one direct line of communication with Honda: they alleged reviewed information on Honda's website before purchasing their vehicles.  (FAC ¶¶ 15, 71, 81, 166.)  These allegations provide sufficient detail about how and where the alleged omission occurred.  *See MacDonald*, 37 F. Supp. 3d at 1096.  Plaintiffs have also properly alleged causation and reliance by asserting that "had the omitted information been disclosed, [they] would have been aware of it and behaved differently."  *Daniel*, 806 F.3d at 1225

### iii.    Pre-Suit Notice

Honda argues that Georgia, Ohio, and Texas Plaintiffs fail to state a claim under their respective consumer protection statutes because they have not properly pled that they provided pre-suit notice to Honda.[6]  *See* Ga. Code Ann. § 10-1-399(b);; O.R.C. § 1345.09(B); Tex. Bus. & Com. Code § 17.505.  Georgia Plaintiff Harmeet Gill concedes that he has not satisfied Georgia's pre-suit notice requirement and asks that his claim be dismissed without prejudice.  (Opp. at 24.)  Honda's motion is therefore **GRANTED** as to Georgia Plaintiff's consumer protection claim.

---

[6] Honda withdraws its initial argument that the Massachusetts Plaintiff's consumer protection claim must be dismissed for lack of notice.  (Dkt. 48 [Honda's Reply to Opp., hereinafter "Reply"] at 9.)

The Texas Deceptive Trade Practices Act ("Texas DTPA") requires that a plaintiff give defendant notice sixty days before filing suit.  Tex. Bus. & Com. Code § 17.505. The notice must inform defendant "in reasonable detail of the consumer's specific complaint and the amount of economic damages, damages for mental anguish, and expenses, including attorneys' fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant."  *Id.*  Plaintiffs contend that they belatedly satisfied this requirement with a letter sent to Honda on June 10, 2019.  (*See* Dkt. 38-2 [Declaration of Livia Kiser in Support of Honda's Mot.] Ex. A [hereinafter "June Notice Letter"].)  While the letter identifies the nature of Plaintiffs' claims and alleges violations of the Texas DTPA, it does not include any details about the amount of economic damages incurred by Plaintiffs.  Abatement is the proper remedy for failure to give proper notice under the DTPA.  *Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 194 (5th Cir. 1996).  Accordingly, Honda's Motion to Dismiss the Texas Plaintiff's Texas DTPA claim for lack of pre-suit notice is **GRANTED**.  It is **ORDERED** Plaintiffs' claims under the Texas DTPA will remain in abatement until sixty days after Plaintiffs provides Honda with proper pre-suit notice as required by statute, including information about the amount of damages incurred.

A plaintiff may only bring a class action under the Ohio Consumer Sales Protection Act ("OCSPA"), "if the defendant was sufficiently on notice that its conduct was deceptive or unconscionable under the statute at the time it committed the alleged acts."  *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012) (citing Ohio. Rev. Code § 1345.09(B)).  The parties dispute whether Ohio case law and the Ohio Attorney General's regulations put Honda on notice.  Although dismissal of an OCSPA claim is proper if this requirement is not satisfied, *id.* at 869, the Court declines to conduct such an inquiry here.  Such a determination may be proper at a class certification, and, regardless, the Court has already dismissed Ohio Plaintiff's OCSPA claim under Rule 9(b).

Honda's motion is **DENIED** as to Plaintiff's remaining claims under the Colorado

Consumer Protection Act, Maryland Consumer Protection Act, and Massachusetts

Consumer Protect Act

## C.     Breach of Express Warranty Claims

### 1.     Defective in Material or Workmanship

Plaintiffs' express warranty claims arise from Honda's New Vehicle Limited

Warranty.  (FAC ¶ 248).  Honda does not dispute the existence of a binding warranty but

argues that Plaintiffs have not properly alleged that the warranty was breached.  The

warranty only required Honda to repair or replace a part that was "defective in material or

workmanship."  (*Id.*)  According to Honda, the FAC clearly alleges a "design defect" that

does not fall under the terms of this warranty.  *See e.g.*, *Gertz v. Toyota*, 2011 WL

3681647 (C.D. Cal. Aug. 22, 2011) (dismissing express warranty claim because

complaint clearly alleged design defect).  The Court disagrees.  Throughout the FAC,

Plaintiffs allege that the infotainment systems are defective in manufacture, assembly,

material, and/or workmanship.  (*See, e.g.*, FAC ¶¶ 403, 423, 562.)[7]  In support of this

claim, Plaintiffs offer specific allegations about the symptoms of the defect.  (*See, e.g.*,

*id.* ¶ 169.)  Such allegations are sufficient to survive a motion to dismiss.  Plaintiffs are

"not required to plead the mechanical details of an alleged defect in order to state a

claim."  *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1237 n.60 (C.D.

Cal. 2011).  Moreover, the allegation that all vehicles share a common defect is not

necessarily inconsistent with a defect in material and workmanship.  *See Cabebe v.*

---

[7] There is only one reference to defects in the vehicles' design in Plaintiffs' 150-page pleading.  (FAC ¶ 351.)  The Court does not find this dispositive given the extensive allegations of other types of defects.

-15-

*Nissan of N.A., Inc.*, 2018 WL 5617732, at *11 (N.D. Cal. Oct. 26, 2018). At this stage, the precise nature of the alleged defects is an unresolved question of fact. (*See id.*)

### 2. Opportunity to Repair

Honda next argues that all of Plaintiffs' express warranty claims—except those brought by the Georgia and Oklahoma Plaintiffs—should be dismissed because Plaintiffs do not allege that they offered Honda an opportunity to repair or replace defective components. (Mot. at 39–40.) Plaintiffs Pfeifer (Kansas) and Turberville (Tennessee) voluntarily withdraw their breach of express warranties claims on these grounds. (Opp. at 34 n.30.) Accordingly, Honda's motion is **GRANTED** as to Kansas and Tennessee Plaintiffs' express warranty claim. The remaining Plaintiffs (Colorado, Illinois, Kentucky, Maryland, Massachusetts, Missouri, Ohio, South Carolina, Texas, and Virginia) maintain that they properly allege an opportunity to repair.

The Court finds that Illinois Plaintiff Abdalhfeth Issa has not stated a claim for breach of express warranty. Issa alleges that his vehicle's infotainment system freezes and crashes while running navigation apps. (FAC ¶ 42.) As alleged, however, Issa never asked Honda to address this issue, but merely "contacted Honda to complain about a problem with a software update to his Pilot's infotainment system." (*Id.* ¶ 43.) Such communication would not have been sufficient to give Honda an opportunity to repair the alleged defect. Accordingly, Honda's motion is **GRANTED** as to Illinois Plaintiff's express warranty claim.

The Court finds that the remaining Plaintiffs properly allege an opportunity to repair. According to the FAC, each of these Plaintiffs brought their vehicle to the dealership at least once and specifically asked technicians at the dealership to address problems with their infotainment system. (*Id.* ¶ 20 (Colorado), ¶ 43 (Illinois), ¶¶ 62–64

(Kentucky), ¶ 76 (Maryland), ¶ 86 (Massachusetts), ¶¶ 97–99 (Missouri), ¶¶ 111–115 (Ohio), ¶¶ 149–152 (South Carolina), ¶ 170 (Texas), ¶¶ 179–182 (Virginia).)  These Plaintiffs have sufficiently pled that Honda had an opportunity to make repairs or replacements.

### 3.    Notice of Express Warranty Claims

Honda next argues that the Colorado, Georgia, Missouri, and Texas Plaintiffs fail to allege that Honda had pre-suit notice of their express warranty claims as required by their respective state's laws.[8]  Under the Uniform Commercial Code ("UCC"), a buyer of goods "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  *See* U.C.C. § 2-607.  Courts in these four states have applied this UCC provision to require that a plaintiff provide pre-suit notice before asserting a claim of breach of express warranty.  (*See* Mot. at 41 (citing state law requirements).  Under the UCC, Georgia law, and Texas law, the seller need only provide notice that "the transaction is still troublesome and must be watched."  U.C.C. § 2-607, cmt. 4; *see Martinelli Ginetto Spa v. Sample Dyeing Serv., Inc.*, 2010 WL 11505451, at *12 (N.D. Ga. Jan. 12, 2010); Tex. Bus. & Com. Code Ann. § 2.714 (West).  Under Colorado and Missouri law, a plaintiff need only provide this type of notice to the immediate seller, not a remote manufacturer.  *See Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 741 (Colo. 1991); *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 369 (Mo. 1993).  The UCC generally does not impose any specific content requirements for pre-suit notice.  *See* U.C.C. § 2-607, cmt. 4.

The Court finds that these four Plaintiffs' express warranty claims survive this challenge.  The Georgia and Texas Plaintiffs allege that they contacted Honda directly

---

[8] Because the Court has already dismissed Illinois and Kansas Plaintiffs' express warranty claims, it need not address Honda's argument that these Plaintiffs failed to provide notice.

and explained the defects in their infotainment systems.  (FAC ¶ 32 (Georgia), ¶ 170 (Texas).)  They also allegedly told Honda that Honda and the dealerships' previous attempts to address the defects were ineffective.  (*Id.*)  The Colorado and Missouri Plaintiffs allege that they asked their respective dealerships to address the alleged defects multiple times.  (*Id.* ¶ 20 (Colorado), ¶¶ 97–99 (Missouri).)  These Plaintiffs allegedly told the dealerships that their attempts to address the defects were ineffective.  (*Id.*)  At this early stage of the proceedings, these alleged communications suffice as allegations of direct notice.  *See In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 799 (N.D. Ill. 2016).  If this case proceeds, Plaintiffs will have the burden of proving that they provided notice as required by state law.  Honda's motion is therefore **DENIED** as to Plaintiffs' remaining express warranty claims.

### D.     Breach of Implied Warranty Claims

#### 1.     Merchantability

All fifteen subclasses of Plaintiffs assert state law causes of action for breach of the implied warranty of merchantability.  Under the UCC, "[u]nless excluded or modified . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is merchant with respect to goods of that kind."  U.C.C. § 2-314(1).  The implied warranty of merchantability generally requires that products be "fit for the ordinary purposes for which such goods are used."  *Id.* § 2-314(2)(c).  Honda acknowledges that the fifteen states may impose different standards of merchantability but asserts that "no Plaintiff alleges facts sufficient to meet even the most lenient standard under any of their respective home states."  (Mot. at 42.)  The parties agree that "where a car can provide safe, reliable transportation, it is generally considered merchantable."

(Mot. at 43 (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297–98 (4th Cir. 1989)); Opp. at 39–40 (same).)[9]

     Accepting well-pleaded allegations as true, the Court finds that Plaintiffs' implied warranty claims survive this challenge.  Some of the alleged problems with the infotainment system are relatively harmless.  (*See, e.g.*, FAC ¶ 51 (dysfunctional DVD players).)  Others, however, could pose safety and reliability issues.  Plaintiffs allege loud and startling "cracking" or "knocking" noises, (*see id.* ¶ 60), dysfunctional backup cameras, (*see id.* ¶¶ 19, 51), and disabled GPS and radio systems, (*see id.* ¶¶ 134, 148).  Honda asserts that "Plaintiffs from Kentucky, Ohio, Oklahoma, South Carolina, Virginia, and Washington do not allege any safety or drivability issue whatsoever with their vehicles."  (Mot. at 43.)  The Court disagrees.  Each of these Plaintiffs allege that the infotainment system freezes and crashes and that this defect effectively disables features like the radio, GPS, and back-up camera.  (*See* FAC ¶¶ 60–61 (Kentucky), ¶ 122 (Ohio), ¶ 134 (Oklahoma), ¶ 148 (South Carolina), ¶ 178 (Viriginia), ¶ 189 (Washington).)  Based on these allegations, the Court finds that the risks posed by the alleged defects cannot be discredited in a Rule 12(b)(6) motion.  *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 981 (N.D. Cal. 2014).

### 2.    Privity

     Honda next argues that Illinois, Kentucky, Tennessee, and Washington Plaintiffs' implied warranty claims fail due to those states' vertical privity requirements.[10]  Under

---

[9] Honda cites various courts' interpretations of various states' implied warranty statutes without specifying which decisions can be properly applied to Plaintiffs' claims.  (*See* Mot. at 42–43.)  Despite its promise to show that Plaintiffs fail to meet the "most lenient standard," Honda also appears to cite the most *exacting* interpretations of unmerchantability.  (*See id.* ("[A] vehicle is unmerchantable only if it is not 'capable of being driven . . .'") (quoting *Soto v. CarMax Auto Superstores, Inc.*, 271 Ga. App. 813, 815 (2005)).  The Court applies the "safe, reliable transportation" interpretation of merchantability quoted by both parties for the purposes of this motion only.  *See Carlson*, 883 F.2d at 297.

Tennessee law, "a plaintiff may not maintain a claim for purely economic losses absent contractual privity with the party charged with responsibility for those losses." *Messer Greisheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 463 (Tenn. Ct. App. 2003). However, privity is not required in a cause of action "action for personal injury or property damage brought on account of negligence, strict liability or breach of warranty." Tenn. Code Ann. § 29-34-104. Tennessee Plaintiff Pamela Turberville does not allege personal injury or property damage. (*See* FAC ¶¶ 155–164.) She describes her injury as "an ascertainable loss . . . including but not limited to, out-of-pocket losses, overpayment, attempted repairs, and diminished value of [her] vehicle." (*Id.* ¶ 163.) Because it is based on these economic losses, Turberville's implied warranty claim must be dismissed unless she identifies an applicable exception. *See Smith v. Nissan N. Am., Inc.*, 2018 WL 4691612, at *4 (W.D. Tenn. Sept. 27, 2018). In opposition to Honda's motion, Turberville does not identify any such exception under Tennessee law. (*See* Opp. at 43–44.) Accordingly, Honda's motion is **GRANTED** as to Tennessee Plaintiff's implied warranty claim. The Kentucky Plaintiff (William Lampton) concedes that he has not satisfied Kentucky's vertical privity requirement and voluntarily withdraws his breach of implied warranty claim. (Opp. at 41 n.38.) Honda's motion is therefore **GRANTED** as to Kentucky Plaintiff's implied warranty claim.

Honda's arguments under Illinois and Washington law fail. Illinois recognizes a "direct relationship" exception to the vertical privity requirement. *See Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 86 Ill. App. 3d 980, 992 (1980); *see also In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942, 957 (N.D. Ohio 2009), *as amended* (Nov. 4, 2009). Washington similarly recognizes an "intended beneficiary" exception that examines whether "the manufacturer was sufficiently

---

[10] Honda withdraws its initial argument that Virginia Plaintiff's implied warranty claim must also be dismissed for lack of privity. (Reply at 15 n.10.) Under Virginia law, lack of vertical privity may bar certain types of damages but is not required for an implied warranty claim. *See* Va. Code § 8.2-318.

involved in the transaction (including post-sale) with the remote purchaser to warrant enforcement." *Brenner v. Vizio, Inc.*, 2018 WL 4566054, at *3 (W.D. Wash. Sept. 24, 2018) (*quoting Babb v. Regal Marine Indus., Inc.*, 2015 WL 786857, at *3 (Wn. App. Feb. 24, 2015)). The FAC alleges that Honda dealt directly with Plaintiffs pre- and post-sale by warranting their vehicles against certain defects and maintaining a customer service line that helped Plaintiffs resolve issues with their vehicles. (*See* FAC ¶¶ 6, 32, 170, 227.) Under both Illinois and Washington law, Plaintiffs therefore plausibly allege a cognizable relationship with Honda to support an implied warranty claim.

### 3. Notice of Implied Warranty Claims

Finally, Honda argues that Illinois, Maryland, Missouri, Ohio, South Carolina, Texas, and Virginia Plaintiff's implied warranty claims must be dismissed for lack of pre-suit notice. As discussed above, in a breach of warranty action the UCC requires only that a plaintiff put defendant on notice that "the transaction is still troublesome and must be watched." U.C.C. § 2-607, cmt. 4.[11] Plaintiffs contend—and Honda does not dispute—that Maryland law allows a purchaser to provide notice of her warranty claim against a remote manufacturer by providing notice to the immediate seller. (*See* Opp. at 45 [citing *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011)].)[12]

The Court finds that the Illinois Plaintiff has not properly alleged pre-suit notice of his implied warranty claim. As explained above, the Illinois Plaintiff does not allege that he informed Honda about the nature or extent of the defects. (*See* FAC ¶ 34 [alleging

---

[11] Honda's Motion does not explain whether and how the relevant notice requirements in these seven states vary from the UCC standard. For this Motion only, the Court assumes that the UCC standard is substantively identical to the relevant standard in these states, except as specifically identified.
[12] The case cited by Plaintiffs sets out a slightly different proposition: a plaintiff that *fails* to provide notice to an immediate seller also *fails* to provide notice to a remote manufacturer. *See Doll*, 814 F. Supp. 2d at 542. Because Honda does not challenge Plaintiffs' interpretation of Maryland law, the Court applies this rule for the purpose of this motion only.

only that he "contacted Honda to complain about a problem with a software update to his Pilot's infotainment system"].)  Just as this communication would not have given Honda an opportunity to make repairs, it also would not provide notice of an implied warranty claim.  *See Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 495-96 (1996).  Accordingly, Honda's motion is **GRANTED** as to Illinois Plaintiff's implied warranty claim.

The Court finds that the remaining Plaintiffs properly allege notice.  The Missouri, Ohio, South Carolina, Texas, and Virginia Plaintiffs all allege that they directly contacted Honda—or that their dealership contacted Honda—to discuss the specific and substantial defects with their vehicles.  (FAC ¶¶ 97–100, 111–128, 149–152, 170, 179–182).)  The Maryland Plaintiff allegedly brought his vehicle to the dealership and asked dealership employees to address defects with his infotainment system.  (*Id.* ¶ 76.)  Again, at this early stage of the proceedings, these alleged communications suffice as allegations of direct notice.  *See In re Rust-Oleum*, 155 F. Supp. 3d at 799 (N.D. Ill. 2016).  If this case proceeds, Plaintiffs will have the burden of proving that they provided notice as required by state law.  Honda's motion is **DENIED** as to Plaintiffs' remaining implied warranty claims.

//
//
//
//
//
//
//
//
//
//

## V. CONCLUSION

For the foregoing reasons, Honda's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**, as summarized below. Plaintiffs' claims under the Texas DTPA will remain in **ABATEMENT** until sixty days after Plaintiffs provides Honda with proper pre-suit notice as required by statute. Plaintiffs' consumer protection claims are **DISMISSED IN PART** to the extent such claims allege fraudulent misrepresentations. Because Plaintiffs may be able to cure deficiencies in the FAC, all dismissed claims are dismissed with **LEAVE TO AMEND**. *See Doe v. United States*, 58 F.3d at 497. Plaintiffs must file any amended complaint by **NOVEMBER 4, 2019**. In addition to the "clean" version of the second amended complaint, such a filing shall also include a "redlined" version clearly indicating all changes.

| Proposed Class | Cause of Action | Disposition |
|---|---|---|
| Nationwide | MMWA Express Warranty | **Granted** |
| | MMWA Implied Warranty | **Granted** |
| Colorado | Colorado Consumer Protection Act | Denied |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Georgia | Georgia Fair Business Practices Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Illinois | Illinois Consumer Fraud and Deceptive Business Practices Act | **Granted** |
| | Express Warranty | **Granted** |
| | Implied Warranty | **Granted** |
| Kansas | Kansas Consumer Protection Act | **Granted** |
| | Express Warranty | **Granted** |
| | Implied Warranty | Denied |
| Kentucky | Kentucky Consumer Protection Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | **Granted** |
| Maryland | Maryland Consumer Protection Act | Denied |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |

| Massachusetts | Massachusetts Consumer Protect Act | Denied |
|---|---|---|
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Missouri | Missouri Merchandising Practices Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Ohio | Ohio Consumer Sales Practices Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Oklahoma | Oklahoma Consumer Protection Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| South Carolina | South Carolina Unfair Trade Practices Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Tennessee | Tennessee Consumer Protection Act | **Granted** |
| | Express Warranty | **Granted** |
| | Implied Warranty | **Granted** |
| Texas | Texas Deceptive Trade Practices Act | **Granted (Abatement)** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Virginia | Virginia Consumer Protection Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |
| Washington | Washington Consumer Protection Act | **Granted** |
| | Express Warranty | Denied |
| | Implied Warranty | Denied |

DATED:     October 17, 2019

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

# Exhibit F

The Warranty Process Flow Within the
Automotive Industry:
An Investigation of
Automotive Warranty Processes and Issues

Prepared for the

Program on Automotive Practices

Sponsored by

Microsoft Corporation



August 2005

The statements, findings, and conclusions herein are those of the authors and do not
necessarily reflect the views of the project sponsor.

# Acknowledgements

The CAR-Microsoft Program on Automotive Industry Practices is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders.  The Automotive Industry Program, funded by Microsoft, will investigate two topics per year, with results publicly disseminated.   The first topic of investigation for 2005, presented in this report, is the flow of warranty data within the automotive industry.

The Center for Automotive Research would like to thank Microsoft Corporation for its support and proactive interest in topics of critical importance to all automotive industry stakeholders.  We believe the CAR-Microsoft Program on Automotive Industry Practices is representative of Microsoft's desire to further public discussion on important automotive issues.

We would like to thank those in the automotive industry who took time to guide our work.  CAR greatly appreciates the willingness of those interviewed to share their insights and ideas.  Without their support such a project would not be possible.  These individuals showed a strong passion for creating better warranty processes both within their companies, and throughout the industry.  We hope this report reflects, in some way, the commitment these industry participants have toward their work.

Finally, this report is the result of several people contributing in many ways. The authors of this report would like to thank Karen Esper, who contributed by formatting and managing the document.  Jillian Lindsay Gauthier assisted in the interview process and document review.

Brett C. Smith
Assistant Director, Manufacturing, Engineering and Technology

Raymond T. Miller
Research Assistant

The Center for Automotive Research
1000 Victors Way, Suite 200
Ann Arbor, MI 48108
Telephone:  (734) 662-1287
Fax:  (734) 662-5736
www.cargroup.org

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ............................................................................I

Introduction ........................................................................................1

The Path from Repair Bay to the Supplier ..................................2

From the Dealer to the Vehicle manufacturer ..........................3

The Pathway Within the Vehicle manufacturers ......................5

Data Overload......................................................................................10

Strategic Warranty Considerations ...............................................13

Conclusions .........................................................................................16

# Executive Summary

The Center for Automotive Research (CAR) has undertaken the CAR-Microsoft Program on Automotive Industry Practices. The program is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders. The Automotive Industry Program will investigate two topics per year, with results publicly disseminated. [The first topic of investigation is warranty process flow in the automotive industry.] Importantly, this topic is not intended to gather confidential data such as warranty cost estimates. Instead, this report will describe the flow of warranty data gathering, including processing and application activities, and where possible, highlight selected practices and critical future operating issues.

As with many CAR projects, the identity of companies interviewed will not be made available—nor will information be presented in a way that may directly identify any participating companies. CAR researchers interviewed representatives from three automakers, four suppliers, and one dealership as part of this project. Given the relative small number of interviews, this report is not intended to be a complete description of the topic. Instead it is hoped that by selecting companies that have been identified as thought leaders in a specific topic, these reports will be then be viewed as contributing to the greater understanding of the issues and challenges.

Given the high volume of manufacture, the complexity of the product, and the often harsh operating environment in which the automobile is used, it is inevitable that there will be component failures. While there are certainly lessons to be learned from these failures, such incidents can in some ways be viewed as normal operating noise from non-assignable causes. However, the manufacturers and suppliers must be able to differentiate the expected component failure rate—the 'noise'—from those incidents that may be an indication of a systemic failure of the component. This report will focus on how the industry is addressing those warranty issues that appear to be serial in nature, and would thus present significant potential cost exposure.

Guided by the responses of those interviewed, CAR has identified two areas of the warranty process of focus for this report, and four issues that are likely to be critical challenges for the industry in the coming years. The first area of focus is the flow of data from the dealership to the manufacturer, and then from the manufacturer to the supplier. The second area of focus is the challenges brought about by the large volume of warranty data that is available.

Lastly, CAR will address four issues that were described by interviewees as pending warranty challenges within the industry: (1) the challenge of increased warranty issues surrounding greater application of on-vehicle electronics; (2) the lack of skilled mechanics; (3) the action of vehicle manufacturers moving toward warranty cost-sharing as a method to increase revenue; and finally (4) the difficulty presented when applying current warranty strategies in developing markets.

The flow of warranty data, in its most simple form, is a reporting and transfer of information regarding an in-service product failure. A failure is reported by the service representative (the dealer) to the vehicle manufacturer, and then, if deemed necessary by the vehicle manufacturer, to the component supplier. In reality, this seemingly simple path is exceptionally complex, and at times even serendipitous. The warranty data

process is highly quantitative and qualitative, sometimes scientific, and often creative. The process as identified by the participants includes:

1. Part identification/defect analysis and codification.
2. Reporting of warranty claim to the vehicle manufacturer—claim processing.
3. Investigation of claim by vehicle manufacturer warranty analysis center—claim review.
4. Notification of incident—or more accurately, increase in reported incidents—to component supplier.
5. Incident remediation (i.e. manufacturing, engineering, materials etc.) as required.
6. And, possible further action taken to assure the correction is implemented throughout the product line, including future components.

This report describes the communication formats, and touch-points for the six data flow processes.

As noted, on the surface the warranty process would appear to be rather straight forward.  However, the variance with which the data is collected, communicated and analyzed creates opportunity for complexity nearly unimaginable by an outsider. Warranty data coding of failures varies from dealer to dealer—even from technician to technician—within a vehicle manufacturer dealer network, as well as between the vehicle manufacturer dealer networks.  Nearly all interviewed suggested that if they were to take the same part to five different dealers, the failure would likely be identified and coded differently by each dealer.  In their view, this was not an indictment of the repair shops ability to analyze the problem.  Instead it was a reflection of the extent of the challenge.  Often times the reason for a part failure is obvious, but just as often, the root cause of a failure is not readily apparent.  The dealer repair shop must make a rapid decision regarding the failed part.  Included in the decision process is allowable repair time, workload of staff, the experience of the technician, and even the history of reimbursement by the vehicle manufacturer.

From this rather inauspicious start, the data is then sent to the vehicle manufacturer where, although it is usually centrally housed, it often follows several separate paths. While each manufacturer has developed its own internal process for warranty data, the flow generally starts with a review of the dealership claim.  In most aspects, this step serves as a method to monitor dealer repair work and focus on the process of repairing the vehicle.  Although the claim process has become electronic in recent years, there is still a considerable amount of staff effort required to analyze and follow-up via telephone for clarification.  While this review process is intended to monitor the dealership repair work, it is also considered a line of first defense in identifying potential warranty problems.

Once the warranty data is in an acceptable form, the vehicle manufacturer enters it into a database.   From this point, each manufacturer has developed very established and confidential internal systems, often using both internally developed and third party software.  The warranty data is controlled by either a quality or warranty function, but can be accessed by product engineering, manufacturing, materials, legal, finance, and other functions within the company.

Selected data is then made available to the suppliers.  The type of data transferred from vehicle manufacturer to supplier differs greatly among the vehicle manufacturers.  One respondent described three general types of data they receive: incident-based data (limited to claims and count); rate-based data (based on production/sales); and warranty data with month of production/months in service (MOP/MIS) data included.  Obviously the ability to tie a defect to a date of manufacture, months in service, or some similar measure is of great value when assessing the problem and developing a response.  It was widely agreed that to have an effective warranty process, the 'born on date' for a component is critical.  The traceability of subsystems may become a competitive advantage for manufacturers and suppliers.

While the warranty data is vital to identifying systemic failures, an analysis of the component is often required to establish root cause of the failure.  Due largely to logistics and transportation, it is also a costly proposition.  Thus it is important to better understand the fate of the failed component.  Often the component is disposed of at the dealership, thus ending any opportunity to establish root cause of the failure.  Manufacturers also may randomly select dealers to send a limited number of components for inspection, allowing a sample for study.  These are then sent to the supplier for review.  Finally, if the supplier has an indication there may be issues related to a component, the supplier may request the vehicle manufacturer obtain a small number of components for analysis from the dealers.  Importantly, the vehicle manufacturers differ greatly in how they deliver the parts.  Some send them through a vehicle manufacturer parts center, while others have a more formal warranty processing location, and still others send the parts directly to the supplier.  The inherent conflict of the warranty system is that it was originally developed to monitor and pay claims, not necessarily to capture the data.

The vehicle manufacturers (and some of the suppliers) interviewed indicated that one of the most pressing challenges of warranty investigation is the vast amounts of data processed, and the wide range of groups within the company that have use for the data.  During the creation and implementation of the TREAD (Transportation Recall Enhancement, Accountability and Documentation) act, much was made of the enormous amount of data already collected by the industry.  Based on numerous published reports, CAR estimates the automotive industry handles well over 100 million warranty claims per year.  Each claim includes numerous fields, and often several lines of text.  Realistically, the industry handles billions of warranty data fields annually.

Not only are companies challenged to develop methods of effectively capturing and storing warranty data, but they also must have the ability to access the information in a timely—and perhaps most importantly—cost effective way.   As noted, each manufacturer has developed such information technology systems, but there continues to be concern that these systems are not yet fully capable of delivering consistent data to the suppliers. One supplier suggested they don't need more data, instead they need increased responsiveness (of the manufacturers to data requests); while another suggested that there was not consistent data available.  A strong theme from all discussions was that a successful warranty program relied on a strong relationship between the interested parties.

Several companies were either currently investigating or had recently investigated text data mining as a method of increasing their ability to better analyze warranty data.  From a vehicle manufacturer's viewpoint, text data mining presents opportunity to further

investigate and understand the vast text reports received from dealer repair shops.  The ability to accurately analyze text entered by technicians may offer insight into, and potential early warning of, likely in-service product failures. One supplier indicated that it had spent several months investigating text data mining, but concluded that the cost of off-the-shelf systems could not be justified by the expected savings.

During the interviews, respondents identified several issues that will likely challenge the automotive industry in the near future.  While CAR does not attempt to offer solutions to these issues, each of them is worthy of discussion and provides fertile ground for further research. Those areas are:

1. Warranty cost sharing
2. The lack of skilled mechanics
3. Electronics as a warranty burden
4. Adapting warranty systems to developing markets

This report presents a description of the flow of warranty data within the automotive industry, and highlights pending challenges faced by dealers, vehicle manufacturers and suppliers.  CAR's investigation has highlighted several areas that offer opportunity for improvement.  It is apparent that the industry continues to struggle with the warranty data flow, particularly in the areas of data management and process interfaces.   In conclusion, CAR believes the warranty process will continue to be an area of great challenge, interest and opportunity for the industry.

## Introduction

The Center for Automotive Research (CAR) has undertaken the CAR-Microsoft Program on Automotive Industry Practices.  This program is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders.  The Automotive Industry Program will investigate two topics per year; the results will be publicly disseminated.   Warranty in the automotive industry is the first topic for consideration.  It is important to note that it is not the study's purpose to gather confidential data, such as warranty cost estimates.  Instead, this report will describe the flow of warranty data gathering and, where possible, highlight selected practices and critical future operating challenges.  The identity of companies interviewed will not be made available—nor will information be presented in a way that could directly identify any participating company.

As a part of this project, CAR researchers interviewed representatives from three vehicle manufacturers (VM), four automotive suppliers, and one automobile dealer.  By design, this program's studies are not intended to be a complete description of the topic.  Instead it is hoped that by focusing on companies identified as leaders in a specific topic, these reports will then be viewed as contributing to the greater understanding of the issues and challenges.

Given the high volume of manufacture, the complexity of the product, and the often harsh environment in which the automobile operates, it is inevitable that there will be component failures.  While there are certainly lessons to be learned from these failures, such incidents can in some ways be viewed as normal operating noise.  However, the vehicle manufacturers and suppliers must be able to differentiate the expected component failure rate—the 'noise'—from those incidents that may indicate a systemic failure of the component.  This report will focus on how the industry is addressing those warranty issues that appear to be systemic in nature, and would thus present significant potential cost exposure.

Theoretically, vehicle manufacturers can address warranty costs via two approaches.  First, they can proactively attempt, through engineering, to reduce expected warranty costs toward zero.  While this approach will likely lead to robustly engineered products, and concomitantly higher usage of engineering resources, it also often requires a willingness to accept a higher initial price for a component.  Alternatively, the manufacturers can attempt to monitor the warranty data and react to in–service incidents.  This approach is closely associated with those companies that have a strong cost-focused purchasing bias in their sourcing decision process.  Realistically, each vehicle manufacturer uses a combination of the strategies, with some companies biased more toward the proactive engineering approach, while others tend to place more emphasis on reacting to reported data.

The automotive industry tends to focus on warranty in terms of direct costs— manufacturing, logistics and labor for replacement.  Granted, these are significant costs; however, it is also important to understand other 'soft' costs associated with warranty.  While any in-service product failure is likely to dissatisfy a customer to some extent, the quick, accurate repair of a warranty issue is likely to lessen the customer's overall dissatisfaction.  Any discussion of warranty processes should not overlook the

importance of developing warranty strategies that deliver the greatest customer satisfaction—or more appropriately—least dissatisfaction in the most cost effective manner.

## The Path from Repair Bay to the Supplier

The flow of warranty data, in its most simple form, is a reporting and transferring of information regarding an in-service product failure. A failure is reported by the service representative (the dealer) to the vehicle manufacturer, and then, if deemed necessary by the vehicle manufacturer, to the component supplier[1]. In reality, this seemingly simple path is exceptionally complex, and at times even serendipitous. The warranty data process is highly quantitative and qualitative, sometimes scientific, and often creative.

The process, as identified by the participants, includes:

1. Part identification/defect analysis and codification. This may be the most critical element of the process, and yet it is certainly the most variable. The process of capturing the customer's description of an in-service product failure, diagnosing the problem and correcting it remains a difficult and unscientific process.

2. Reporting of warranty claims to the vehicle manufacturer. The movement of data from the dealer repair shop to the vehicle manufacturer has become electronic in recent years, which has allowed for a much faster reporting system.

3. Investigation of claim by vehicle manufacturer warranty analysis center. Even though warranty claim filing has become increasingly electronic, it still requires effort to verify and clarify the data. Each manufacturer has a group review the data and enter it into some form of warranty database. This database is then accessed by product engineering, product development, manufacturing engineering, and the manufacturing plant, among others.

4. Notification of incident—or more frequently, increase in reported incidents—to component supplier. The type and amount of data transferred to supplier differs among the vehicle manufacturers.

5. Incident remediation (i.e. manufacturing, engineering, materials etc.) as required. If the in-service product failure is found to be caused by a supplier component, the supplier will then use the available data and parts to identify the problem, and determine actions to elicit a remedy.

---

[1] CAR acknowledges the failure of a product may enter through other sources (e.g. police reports, fleet reports, insurance claims and customer service calls). For this study, the focus is on the warranty process though the most common entry-point, from the dealer's repair shop.

6. Proactive suppliers and the vehicle manufacturers will take action to assure the correction is implemented throughout the product line, including incorporating the knowledge into future component development.

## From the Dealer to the Vehicle Manufacturer

On the surface the warranty process appears to be rather straightforward. However, the variance with which the data is collected, communicated, and analyzed results in complexity nearly unimaginable by someone unfamiliar with the process. Warranty data reporting varies from dealer to dealer within vehicle manufacturer dealer networks, and even mechanic to mechanic within dealerships. Vehicle manufacturers also differ in the reporting methods they require of their dealers. Such a varied starting point for warranty data creates potential for great difficulty downstream.

Nearly all study participants suggested that if they were to take the same part to five different dealers, the failure would likely be identified and coded differently by each dealer. In their views, this was not an indictment of the repair shops' ability to analyze the problem. Instead, it was a reflection of the extent of the challenge. Often times, the reason for a part failure is obvious, but just as often, the root cause of a failure is not readily apparent. The dealer repair shop must make a rapid decision regarding the failed part. Included in the decision process is allowable repair time, workload of staff, the experience of the technician or mechanic, and even the history of reimbursement by the vehicle manufacturer.

Because the point of entry for an in-service product failure is so critical, it is valuable to investigate this stage of the process more closely (Diagram 1). The first step in the process is to record the customer's complaint. Again, while this is a seemingly simple task, there is great opportunity for miscommunication as the customer tries to explain the problem to the service manager. Importantly, this input—often a short written documentation of the issue—can be a vital part of the warranty tracking process. Key words or phrases entered at this point can potentially offer insights as vehicle manufacturers and suppliers undertake root cause analysis weeks, months or even years later. An investigation of the warranty process in the automotive industry quickly highlights the fact that the dealer repair shop service manager is, in many ways, the cornerstone of a successful process. Once the shop manager identifies a likely cause of the problem, the vehicle is assigned to the appropriate mechanic.[2]

Each vehicle manufacturer continues to develop strategies that remove the responsibility from the repair shop floor. One vehicle manufacturer respondent suggested the biggest improvement of the information received from the repair shop to the vehicle manufacturer would be the implementation of a new, more structured warranty reporting software; however, the respondent also suggested that the replacement cost was currently prohibitive. While it is important to develop systems that make the identification of an in-service failure more efficient and effective, it is also important to realize that the ability of the mechanic or technician will be a key part of any diagnosis strategy for the

---

[2] Repair shops may use a technician to identify the problem, then, in turn assign a mechanic who will do the actual repair work.

foreseeable future.  As such, it behooves the industry to work to develop a skilled technical base at the dealership level.

**Diagram 1: In-Service Problem Identification**



The mechanic, using visual inspection, technical manuals, service bulletins, and technical support from the vehicle manufacturer, must then begin the process of identifying the part that has failed.  Upon determining the failure, the mechanic must then match it to a warranty repair code.  The coding process illustrates two important variables.  First, there are often ulterior motives for the mechanic to select a code for the in-service failure.  For example, some codes may tend to offer more repair time, or may be less likely to be questioned by the manufacturer[3].  Second, the true cause of the failure may not be completely understood, thus the mechanic may make an educated guess as to why the failure occurred, and code it accordingly.  Given the time constraints, working environment and differing experience level among mechanics, it is understandable that the mechanics often aren't able to fully identify the product failure. However, once the repair is performed, a warranty claim is then sent to the manufacturers.

Most respondents expressed concern that there is potential for dealers to consider the repair shop as a profit center by affecting *unnecessary* repair work.  Although there was no data presented to support this concern, those that mentioned the problem indicated that if new vehicle sales were down, some dealers were more likely to push warranty

---

[3] CAR does not wish to suggest that these are necessarily fraudulent acts, instead they may be honest attempts by the mechanic to better capture the time needed to complete an adequate repair, and better satisfy the customer, while remaining within the standards set forth.

claims to fill the profit 'valleys.'  While such actions have wide ranging implications, of interest to this report is the potential for a decrease in the accuracy of the reported warranty data.  A warranty claim that is not accurate—whether intentionally or unintentionally entered as such—will have consequences throughout the entire warranty process.

Finally, it is at the dealer repair shop where warranty data and the part are separated.  Most parts are scrapped, while others are shipped to the manufacturer—or directly to the supplier for review.  In order to understand and analyze the warranty process more completely, it is important to note the data and the component take markedly different paths.


## The Pathway Within the Vehicle Manufacturer

From this rather inauspicious start, the data is then sent to the vehicle manufacturer where it often follows several separate paths, although it is usually centrally housed.  While each manufacturer has developed its own internal process for warranty data, the flow generally starts with a review of the dealership claim.  Such a review is intended to monitor the work done at the dealership.  In most aspects, this step serves as a method to monitor dealer repair work and focus on the process of repairing the vehicle.  Special attention is given at this step to assuring the warranty claim meets the standards set by the manufacturer.  Commonly, the review includes an evaluation of the claim to assure completeness and correctness, an analysis of the type of repair, the time taken to make the repair (especially if different from the standard), the frequency of repair at that dealership vis-à-vis other dealerships and other such concerns.  Although the entry of the claim process has become electronic in recent years (most are now on-line, and completed overnight), there is still a considerable amount of staff effort required to analyze and follow-up via telephone for clarification.  While this review process is intended to monitor the dealership repair work, it is also considered a line of first defense in identifying potential warranty problems as trends become evident.

The reduction in time for the claim filing process has important implications for root cause analysis.  Critical to understanding any in-service part failure is the interaction with the mechanic.  The ability for the vehicle manufacturer—or even the supplier—to contact the mechanic within a few days of when the repair is affected increases the chance the mechanic will be able to more clearly remember the repair in question, and thus more accurately describe the problem identified, and the process of repair.

Once the warranty data is in an acceptable form, the vehicle manufacture enters it into a database.   From this point, each manufacturer has developed comprehensive and confidential internal systems, often using both internally developed and third party software.  The warranty data is controlled by either a quality or warranty function, but is available to be accessed by product engineering (product and manufacturing), manufacturing (assembly plant), legal and other functions within the company.  Diagram 2 illustrates the complex flow of warranty data within the vehicle manufacturer.  It is important to note warranty data is only one form of information used to identify in-service product issues.  Other forms (technical call centers, insurance claims, police reports, etc.) are often captured by other internal functions, and are likely to be stored in entirely different data warehouses.

Warranty data is accessed by many different functions within a vehicle manufacturer. The manufacturers interviewed indicated that because the warranty data was accessed by so many functions internally, some uncertainty exists among the different functions as to who else in the organization might be accessing the same data and what their needs might be.  There was also uncertainty expressed as to how the data might be of value to others in the company.  It is a valuable area of further study to more closely examine the pathways within the vehicle manufacturers.  However, two caveats are offered.  First, the flow of data, or more appropriately the description of users, within these large companies is complex.  Second, each manufacturer views the warranty process as a competitive advantage, and is not necessarily interested in discussing detailed descriptions of the process.

**Diagram 2: Flow of Data within the Vehicle Manufacturer (VM)**



The type and amount of data that flows to suppliers from a vehicle manufacturer differs greatly among vehicle manufacturers.  Generally, the supplier must query the vehicle manufacturer database (increasingly via web-based applications) to access warranty information.  One respondent described three general types of data his company receives (Diagram 3): incident-based data (limited to claims and count); rate-based data (based on production/sales); and data that included months in service, and month of production.  While the suppliers interviewed had developed strong internal warranty tracking processes, the respondents made it clear the quality of data passed along by

the vehicle manufacturers affected the speed and accuracy of any early warning system. The ability to tie a defect to a date of manufacture, months in service, or other similar measures is of great value when assessing the problem and developing a response. Certainly there has been much discussion surrounding the traceability of parts in the manufacturing process. However, the traceability of some key components in service presents an opportunity for those wishing to gain a competitive advantage in the automotive warranty business. Vehicle manufacturers that develop effective reporting systems—a means of getting concise, accurate warranty data to their suppliers in a timely fashion—will take a large step toward developing a proactive early warning system.

**Diagram 3: The Reporting of Data from Vehicle Manufacturer to Supplier**

Because of the variance in the warranty reporting processes among vehicle manufacturers, each supplier interviewed had set up its warranty efforts by customer. Such redundancy was difficult for the suppliers to justify financially. Although several people interviewed indicated it would be valuable for the vehicle manufacturers to work to make their systems more common, there was little hope that it would occur. It is worth noting the Automotive Industry Acton Group (AIAG) has begun to investigate warranty process flow, with the intention of developing a set of industry best practices for use as a guideline. As such, this guideline could potentially serve to offer a first step toward industry standardization within some elements of the automotive warranty reporting system.

While the warranty data is important for identifying systemic failures, an analysis of the component is often required to establish the root cause of the failure. It is a costly proposition, due largely to logistics and transportation. Thus, it is important to better understand the fate of the failed component. Diagram 4 shows the possible outcomes for an in-service failure under warranty. The vast majority of components are disposed of at the dealership, thus eliminating any opportunity to establish the root cause of the

failure.[4]  Manufacturers may randomly select dealers and require that the dealers send a limited number of components for inspection, creating a sample for study.  Depending on the vehicle manufacturer, these components are then sent either to their component assessment center, or directly to the supplier for review.

**Diagram 4: The Returning of Parts from Vehicle Manufacturer Repair Shop to Supplier**



If the supplier has an indication there may be issues related to a component, the supplier may request the vehicle manufacturer obtain a small number of components for analysis from the dealers.  As was illustrated during the course of the interviews for this project, the automotive warranty process is often driven by relationships.  Each of the suppliers interviewed had established relationships that enabled them to side-step the bureaucratic red tape, and resolve issues rapidly.  This was especially evident in the area of component procurement.  Such relationships are difficult to represent in a flow chart, but are vital to successfully solving warranty issues.  One final method of parts dispersal, according to one supplier: one vehicle manufacturer sends the supplier a 'box of parts' with no information nor explanation of failure.

Each supplier interviewed had developed similar, albeit slightly different processes, for analyzing the warranty data.  Diagram 5 shows the general flow of warranty data and parts as described by a smaller supplier.  The data (and component) is directed from the vehicle manufacturer to the supplier's manufacturing plant, where it is received by the plant's quality department.  After review of the data, a cross-functional team is assembled to begin the process of identifying the problem.  It is important to note that the smaller supplier felt warranty issues were in essence a 'plant issue,' thus they used

---

[4] Vehicle manufacturers have often struggled with quality on newly launched vehicles, and therefore have become much more aggressive in addressing launch quality.  Several companies have leveraged the existing warranty system to assure that launch products have a 100 percent part return program.  By capturing all parts that fail during the launch phase and using the warranty infrastructure to analyze the data, companies hope to quickly respond to potential product issues.

the manufacturing plant as the central processing point for the in-service product failures.

**Diagram 5: Stylized Flow of Warranty Data and Parts—Tier 2 (Small Supplier)**



CAR researchers also had discussions with a larger supplier who admitted that ownership of the problem—and thus solution—was often found at the manufacturing plant.  However, this supplier had a more comprehensive program than the others (Diagram 6).  This maybe due, in part, to a progressive warranty strategy as well as availability of greater resources.  According to this supplier, the warranty data was received from the vehicle manufacturer by a central quality contact for this supplier. This supplier requested a structured monthly data report from its customer. The data was then reviewed by the customer-focused quality team.  Any issues were discussed at a cross-functional meeting. The warranty data was tracked using structured problem solving strategies. If it was determined that more information was needed, they would make a special request to the vehicle manufacturer for more specific data or components.  The supplier also worked with the vehicle manufacturers' assembly facility, engineers and others as needed.

The supplier requested that generic parts (i.e. those components that were used for several different vehicle lines and customers) be sent to a central location.  This was done because these products tended to be manufactured using similar processes in multiple plants.   Components that were product specific (i.e. those components that were unique to a vehicle) were passed on to their specific manufacturing plant.

**Diagram 6: Stylized Flow of Warranty Data and Parts—Tier 1 (Large Supplier)**

The availability of resources was an important determinant of the supplier's warranty process. The larger companies are more likely to have dedicated quality departments, focusing on ongoing warranty tracking. Conversely, smaller companies are more likely to have a small quality staff, with much of the product failure analysis done by an ad hoc cross-functional team at the manufacturing facility. In such cases, the tracking of warranty information is then done by a small staff at the product engineering center.

Several respondents interviewed used basic spreadsheet software found on most computers to handle all data. A few respondents indicated they needed more complex information technologies to be used for specific and more technical actions—or as one respondent suggested the "backroom work." However, most of the respondents interviewed strongly indicated their current spreadsheet software was more than adequate for many of their manipulation and data management needs. The challenge was making the "back room" operations available in a format conducive to corporate wide use through common user-friendly interfaces.

## Data Overload

The manufacturers (and some of the suppliers) interviewed indicated one of the most pressing challenges of warranty investigation is the vast amount of data processed. Further, they indicated the wide range of groups within the company that have use for

the data adds even greater complexity. During the creation and implementation of the TREAD (Transportation Recall Enhancement, Accountability and Documentation) Act (2000), much was made of the enormous amount of data already collected by the industry. Based on numerous published estimates, and discussions with industry sources, CAR researchers estimate the automotive industry handles well over 100 million warranty claims per year. Each claim includes numerous fields, and often several lines of text. Realistically, the industry handles billions of warranty data fields annually. The challenge for vehicle manufacturers is not to get enough data, but instead to better understand which of the data is important.

While the TREAD act is not of central concern to this report, it is important to briefly address some key points of the regulation. Probably the most visible element of TREAD is the development of an early warning database to help identify critical safety defects. Like many aspects of the warranty/defect discussion, this database (containing information on 24 vehicle systems) presents a challenge far greater than merely reporting those key systems. Although the act requires vehicle manufacturers to report quarterly on 24 different systems, in reality each of those systems is made up of numerous components, which are manufactured by a wide range of suppliers. Interestingly, the interviewees had varying levels of familiarity with TREAD. The vehicle manufacturers have proactively approached the act by developing internal systems. Each manufacturer has developed a TREAD response system that it believes offers a significant advantage over its competitors. However, the vehicle manufacturer representatives were not willing to discuss the specifics of those programs. This highlights an interesting challenge with regard to investigating warranty processes. Each manufacturer believes warranty to present opportunity for strong competitive advantage. Thus, there is little willingness to share strategies, and even less understanding of the opportunities presented by collaborative efforts. The suppliers interviewed seemed to better grasp the opportunity—and even need—to develop collaborative solutions. This is likely due to the fact the suppliers have to deal with numerous warranty systems. The suppliers may be better able to identify which vehicle manufacturer systems truly provide a competitive advantage.

Although the usefulness of the TREAD act was initially questioned by many within the automotive industry, several respondents did credit the act for leading manufacturers to be more proactive in establishing early warning reporting systems. It has encouraged—even required—the companies to re-examine their existing systems, to better understand the data, and to assess how the warranty process might be improved.

Diagram 7 shows the various inputs that comprise a vehicle manufacturer warranty data warehouse. It is important to note although the diagram suggests a single data storage warehouse, there are often numerous data warehouses within each manufacturer. While this report has focused on the dealer warranty repair shop as the entry point, it is valuable to briefly consider the other input sources. National Highway Transportation Safety Administration (NHTSA) reports, police reports and insurance claims are usually presented in some form of coded response and unstructured text. Customer feedback (via call centers and other forums) is often the first line of notification for a developing problem. Critical data can also be gathered from mechanic councils and tracking repair part sales. There is also valuable information available from monitoring both internal and supplier engineering documents. Many of these inputs present rich information. However, they are often in the form of unstructured text.

11

**Diagram 7: In-Service Product Failure Reporting Channels**



Not only are companies challenged to develop methods of effectively capturing and storing warranty data, but they also have the ability to access the information in a timely—and perhaps most importantly—cost-effective way.  As noted, each manufacturer has developed numerous internal information technology storage and retrieval systems.  These legacy systems are occasionally redundant, and often narrowly focused. One individual stated that data overload was an important challenge. According to this respondent, it was critical for each function within a vehicle manufacturer to learn what data were the best indicators for their needs.  They should then use that type of data as the guidepost.  The other types of data should then be used to confirm trends identified by the lead data.

A supplier indicated that it doesn't need more data. Instead, it needed increased responsiveness from the manufacturers to data requests. Another supplier also

suggested that consistent data was not available. All discussions asserted a successful warranty program relied on a strong relationship between the interested parties, in part to make up for the lack of robust data (and component retrieval) processes.

Both manufacturers and suppliers highlighted the richness and importance of warranty claim text. Each of the respondents described the complexity and repetitiveness of reviewing the unstructured text. Each of the suppliers was either currently investigating, or had recently considered unstructured text data mining as a method of increasing their ability to better analyze warranty data. From a vehicle manufacturer perspective, text data mining presents an opportunity to further investigate and understand the vast text reports received from dealer repair shops. The text entries may offer insight into, and potentially an early warning of, in-service product failures. Such analysis also adds depth to the often vague or inconclusive repair codes entered at the repair shop.

One supplier indicated that his company had spent several months investigating text mining, but concluded that the cost of off-the-shelf systems could not be justified by the expected savings. The respondent believed the vast coding differences and terminology between vehicle manufacturers presented complexity issues that made text mining strategies difficult (and cost prohibitive) at the supplier level. This respondent believed the standard reports were sufficient in tracking potential problems. However, another supplier had worked with a software provider to develop a text mining application that effectively searched data text from several manufacturers. This supplier believed that its ability to mine text was a significant advantage. Further, they indicated several other suppliers had contacted him to inquire about their application of the software.

## Strategic Warranty Considerations

During the interviews, respondents identified several issues that will likely challenge the automotive industry in the near future. This section will address those concerns. While solutions to these issues are not presented here, each of the issues is worth discussing and provides fertile ground for further research.

A. Warranty Cost Recovery

The issue of most concern to supplier respondents was that of vehicle manufacturers moving toward a cost recovery warranty strategy as a revenue stream. As an increasing amount of the vehicle is built by suppliers, it is logical to believe components produced by suppliers are a major portion of the total warranty cost. One vehicle manufacturer estimated that 80 to 85 percent of all recalls were traceable to supplier components. Therefore, according to the vehicle manufacturers, it is logical that the suppliers take a larger portion of the financial responsibility for the failures. The vehicle manufacturer representatives indicated it was a logical step to pursue some form of cost sharing. They also expected it would happen.

Currently, it is common practice for the component supplier to be responsible for the manufacturing cost of the failed part covered under warranty plus some portion of the logistics and labor cost. However, the vehicle manufacturer must cover the remaining costs, including transportation, part replacement labor, and

information processing.  Warranty cost recovery has shifted an increased portion of those non-manufacturing costs to the supplier.

Suppliers felt that if the vehicle manufacturers continue to pursue cost recovery, it will have a negative impact on product quality.  It was suggested that suppliers will be forced to put increased resources into defending against accusations, and less time resolving issues, resulting in more cost for all.  Another aspect is the lack of ability to build some cost for warranty into the piece price of the component. Suppliers suggested that the car companies 'bake-in' warranty cost into the price of a vehicle.  (Assuming they are able to get the 'price.')  Suppliers have no leverage/leeway to include a 'warranty cost' into the price of the component.  A part is sold at production cost, with no allowance for future warranty costs.  Thus, if the suppliers are increasingly charged for total warranty costs, the respondents believe it could have serious implications.

Importantly, the suppliers interviewed indicated they had made recommendations—even warnings—to vehicle manufacturers regarding product decisions.  According to these suppliers, the warnings usually went unheeded and occasionally predicted warranty actions accurately during production.  There was great concern among the suppliers that with warranty cost recovery, the suppliers would likely be paying for future product failures that could have been prevented with better upfront engineering.

Suppliers (and the dealership manager) also expressed concern regarding vehicle manufacturers including a strong purchasing bias in their component sourcing decision process.  One supplier recounted an example where it had clearly demonstrated that its component, although a few pennies more expensive than that of its competitor's, had a significantly lower expected warranty cost—and a thus a lower overall cost.  According to the supplier, the vehicle manufacturer, driven by its purchasing bias, chose the component with the lower upfront cost.  According to this supplier, within several months of launch the cheaper component was already causing significant warranty expense and likely customer dissatisfaction.   Suppliers indicated such a strategy creates a very difficult operating environment.

Suppliers also expressed concern regarding initial analysis of the component at the dealership, and the integration of that component into the vehicle.  Because of the vagaries of component identification, defect analysis and codification processes (at the dealership repair shop) suppliers suggested there is opportunity, even likelihood, that their part may be improperly identified as at fault.  Further, if the in-service failure is the fault of their part, they may be held liable for the costs of disassembling the vehicle to conduct a repair.  Such cost (as measured in mechanic labor hours) could be substantial, and is driven, not by the component, but instead by vehicle design decisions made by the vehicle manufacturer.

B.  Lack of Skilled Mechanics

As described in this report, the first step in the warranty process is the identification of the in-service product failure by the mechanic at the dealer repair shop.  If a problem is not properly identified, or it takes several attempts to

correctly pinpoint the problem, the process is less efficient. The service manager interviewed indicated his concern regarding the availability of highly competent mechanics. According to the service manager, a strong understanding of how a vehicle works is essential to quickly and accurately assessing in-service product failures. Based on his experience, he believes there are too few mechanics who truly understand the automobile. He left little doubt that a good mechanic can be one of the most effective early warning points in the process.

While mechanics are critical to the warranty process, they can also be viewed as the touch point for the customer. An accurate, fair and fast assessment of a warranty issue by the mechanic can greatly enhance customer satisfaction. Thus, a first step for vehicle manufacturers looking to more effectively address warranty costs while increasing customer satisfaction is to address the shortage of highly trained mechanics with a strong diagnostic skill.

C. Electronics as a Warranty Burden

Numerous articles in the popular press have illustrated the growing dissatisfaction (as measured in quality ratings) among consumers—and concern among vehicle manufacturers—regarding the reliability of in-vehicle electronics. Warranty repair for electrical systems has always presented unique challenges. Traditionally a wire that was 'pinched' during installation in the vehicle could cause a short in the electrical system. This type of electrical open circuit has been a part of the failure identification challenge since the alternator became a standard option on the vehicle. However, it is no longer as simple as finding a bare wire or a poorly performing electrical motor. Now many of the product failures are caused by software or other electronic glitches. The non-technical term for such challenges offered by one respondent was 'chasing electronic gremlins.'

These electronic gremlins present significant challenges for the repair shop attempting to properly identify and correct the problem. A dealer repair shop manager interviewed for this project estimated that 90 percent of the electronic problems reported by consumers were intermittent, and were not able to be validated by the dealership on the first attempt. Since the warranty process cannot start without a validated problem, they will return the vehicle to the consumer and expect it back within a short period. After two failed attempts to verify using vehicle manufacturer guidelines, the manager then advises the mechanic to attempt to identify the problem by using a process of elimination. Often times such a strategy proves to be very time-consuming and difficult to code into warranty claim forms. However, the manager felt it was his responsibility to his customers to go beyond what the system allowed, and do anything in his power to resolve their problems. Once the electronic gremlin was identified, the dealership was able to correct about 90 percent of the problems. The area of in-service electronic product failure resolution—and prevention of such incidences—presents a strong opportunity for further investigation.

D. The International Challenge

The final area of concern addressed in this report is the international challenge—or more accurately the *two* international challenges. The first challenge is that of

vehicle manufacturers operating different warranty strategies and processes in the United States, Japan and Europe. Suppliers indicated some manufacturers have different warranty processes and targets for each of these regions. The elimination of such differences could bring significant efficiency gains. The second challenge is that of bringing the current warranty methodology to developing markets.

The warranty process is, in many ways, driven by the dealer repair service shops. As noted earlier, the dealer repair service is the point of entry for any in-service product failure. The United States, Japanese and European dealer systems are characterized by strong technical expertise, significant experience, and ample resources. As such, they have demonstrated an ability to analyze and identify in-service product failures. They also benefit from strong logistical networks within the borders of their country of operation. Although the dealerships in these different regions are similar in some ways, they have developed within the constraints of the local customs, laws and consumer requirements. Suppliers indicated their customers had different systems in place in the each of the developed markets. From their point of view, there is significant opportunity to standardize international warranty operations.

As manufacturers move into developing markets, they often ask their suppliers to apply their warranty data control systems to operations in these new markets. This request presents challenges on many levels. It was strongly suggested that operations in markets with relatively undeveloped dealer networks—and no local suppliers—cannot meet the same warranty standards as those in more experienced markets. It is important for vehicle manufacturers to work with suppliers and dealers in these developing markets to leverage the systems already in place elsewhere, but also to be prepared for lapses in the system.

## Conclusions

This study, the first in the CAR-Microsoft Program on Automotive Industry Practices, is intended to identify the flow of warranty data through the automotive value chain. As such, CAR researchers have captured the drivers and pertinent issues regarding this important automotive data process flow. However, to view the path warranty data travels as merely a data flow process would be a mistake. As this project progressed, it became apparent that although the flow of warranty data was increasingly becoming more formalized, successful actions were still often behavioral and relationship driven. From the dealership through to the supplier, each of the interviewees had examples of how they went beyond the process 'structure' to obtain a better result.

It is valuable to present a few examples of this creative behavior for illustrative purposes. One supplier, with a critical new engine component, developed an early warning system by enlisting the help of local dealerships. This supplier contacted several local dealers and asked them to inform the supplier if the dealer were to perform repairs on engines that used this particular technology. The supplier had an engineer assigned to the dealerships to observe the repair, and analyze specifics of the failure. While such an action is not statistically reliable, it gives the supplier immediate feedback on early problem detection.

Another supplier spoke of how his personal relationship with his vehicle manufacturer warranty contact allowed him to 'go around' the process to get a more immediate response to questions and concerns.  If this supplier needed better access to a part, or wanted further data, he would contact the vehicle manufacturer representative.  And certainly, the service manager interviewed had developed numerous action plans that better enabled him to reach a satisfactory—and equitable—resolution for the vehicle owner.  CAR researchers believe any analysis of the warranty process must consider these behavioral characteristics as an important and effective part of the system.

Similarly, there were individuals within the vehicle manufacturers that had clearly driven a process or project to resolve challenges.  These individuals had to use creativity to overcome the challenge of the legacy systems, scope, and cost to develop solutions that achieved the desired results while still staying within the bounds of their corporate culture.

These relationships, while successful, are indicative of the complexity of an effective warranty process.  As vehicle manufacturers and IT providers attempt to formalize the warranty process, it is likely that behavioral aspects will continue to be a vital part of rapid warranty resolution.